## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x
                                                        :
In re:                                                  :   Chapter 11
                                                        :
REICHHOLD HOLDINGS US, INC., et al.,                    :   Case No. 14-_____ (_____)
                                                        :
        Debtors.[1]                                     :   Joint Administration Requested
                                                        :
------------------------------------------------------- x

### DECLARATION OF ROGER L. WILLIS, CHIEF FINANCIAL OFFICER AND TREASURER OF REICHHOLD, INC. IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Roger L. Willis, being duly sworn, depose and say:

1.      I am the Chief Financial Officer and Treasurer of Reichhold, Inc., one of the debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors"). I have been employed by the Debtors and served as Chief Financial Officer and Treasurer of Reichhold, Inc. since 2005. In such capacity, I have become, and am, generally familiar with the Debtors' day-to-day operations, financial conditions, business affairs, and books and records. I submit this declaration (this "Declaration") on the Debtors' behalf in conjunction with their petitions for relief under Chapter 11 and in support of the various motions and applications for orders filed with the Court contemporaneously herewith (collectively, the "First Day Pleadings").

2.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; my review of the Debtors' books and records, relevant documents and

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Reichhold Holdings US, Inc. (5768), Reichhold, Inc. (4826), Canadyne Corporation (7999), and Canadyne-Georgia Corporation (7170). The street address for the Debtors is 1035 Swabia Ct., Durham, NC 27703.

other information prepared or collected by the Debtors' employees; my discussions with other members of the Debtors' management team; or my opinion based upon experience, expertise and knowledge of the Debtors' operations and financial condition.  In making my statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing or collecting any such documentation and other information.

3.      I am over the age of 18 and am competent to testify.

4.      If I were called to testify as a witness in this matter, I could and would testify competently as to the veracity of the facts set forth herein.

5.      The Declaration is divided into two parts.  Part I of this Declaration provides background information about the Debtors, their business operations, and the circumstances surrounding the commencement of these Chapter 11 cases.  Part II sets forth the relevant facts in support of each of the Debtors' First Day Pleadings.

## PART 1

## <u>GENERAL BACKGROUND</u>

A.      <u>Chapter 11 Filings</u>

6.      On September 30, 2014 (the "Petition Date"), each of the Debtors filed in this Court a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") commencing cases (these " Chapter 11 Cases") thereunder.[2]  The Debtors continue to operate their businesses and manage their properties and will act as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

---

[2]   Except as otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the relevant First Day Pleadings.

B.     The Debtors' Corporate Structure

7.     The Debtors include the following four entities:  (a) Reichhold Holdings US, Inc. ("Holdings"), a Delaware corporation; (b) Reichhold, Inc., a Delaware corporation, which is wholly owned by Holdings; (c) Canadyne Corporation ("Canadyne"), a Delaware corporation, which is wholly owned by Reichhold, Inc.; and (d) Canadyne-Georgia Corporation ("CGC"), a Georgia corporation, which is wholly owned by Canadyne.  Reichhold, Inc. is the only entity among the four Debtors that has active operations.  Holdings is strictly a holding company. Canadyne and CGC are inactive entities.

8.     The Debtors are part of the privately-held international "Reichhold" family of companies (the "Reichhold Companies") owned, directly or indirectly, by non-Debtor Reichhold Industries, Inc. ("Reichhold Industries").  The Reichhold Companies include operations in North America, Europe, Latin America, South America, the Middle East and Asia.  The Debtors conduct the Reichhold Companies' United States operations.

9.     Holdings is a wholly owned subsidiary of Reichhold Corporate Holdings II B.V., a Dutch entity, which is in turn a wholly owned subsidiary of Reichhold Industries.  Reichhold Industries is wholly owned by Kestrel I Acquisition Corp. ("Kestrel"), a Delaware corporation. Kestrel is privately held.  None of the foregoing entities are debtors in these cases.  The corporate structure of the Debtors, excluding non-debtor affiliates, is presented in Table 1.  A more complete corporate structure chart, including non-U.S. operations of the Debtors' affiliates is set forth on Exhibit A attached hereto.

3

## Table 1



52719/0001-10276649v13

C.    Senior Management Team

10.    The Reichhold Companies' management team includes: (i) John S. Gaither, Chairman, President and Chief Executive Officer; (ii) Mitzi A. Van Leeuwen, Senior Vice President, Corporate Services; and (iii) myself. These three individuals serve as directors and/or officers of non-Debtors Reichhold Industries and Kestrel and of Debtors Holdings and Reichhold, Inc. Mr. Gaither, Ms. Van Leeuwen and myself are also the indirect majority owners of the Debtors, in that we are the majority owners, holding 56.61% of the common stock, of Kestrel and, pursuant to a stockholders' agreement among Kestrel's shareholders, we control 100% of the voting stock, of non-debtor Kestrel, which wholly owns Reichhold Industries.

D.    History

11.    The Reichhold Companies have been a leading provider of synthetic materials and innovative technologies for over 85 years. In 1924, at the age of 23, Henry Reichhold immigrated to the United States from Germany and found employment in the paint department of the Ford Motor Company. In 1925, Mr. Reichhold customized synthetic resins in a friend's garage that radically decreased paint drying times from days to hours while imparting better color and greater durability. Based on this technology, Henry Reichhold founded the predecessor to Debtor Reichhold, Inc., a company by the name of Beck, Koller & Company, which was originally incorporated in 1930, and then renamed Reichhold Chemicals, Inc. in 1938. Reichhold Chemicals, Inc. went public on the New York Stock Exchange in 1955; and in 1981 it was named to the "Fortune 500". Reichhold Chemicals, Inc. became Reichhold, Inc. through a name change in 1998.

12.    In 1987, Reichhold Chemicals, Inc. was acquired by Dainippon Ink & Chemicals, Inc. ("DIC"), one of the world's largest chemical companies. After its acquisition by DIC, the company entered a new growth phase. In 1989, Reichhold Chemicals, Inc. acquired the

5

unsaturated polyesters business of Koppers Inc. to obtain the leading market share of the U.S. composites industry. Also in 1989, Reichhold Chemicals, Inc. acquired the coatings resins business of Spencer Kellogg, adding a number of new and innovative products to its coatings portfolio. The growing Reichhold Companies strengthened their position in Latin America through the acquisition of a former Brazilian licensee that was the leader in Brazil for both coatings and composites resins. In 1997, the Reichhold Companies acquired the European composites business of Jotun Polymers, giving it a leadership position in the European composites market. Following a strategy to expand into rapidly growing regions, a Reichhold Companies' subsidiary signed a sourcing agreement for composites resins with Spolchemie, a company based in the Czech Republic.

13.    In April 2004, the current President and Chief Executive Officer of the Reichhold Companies, John Gaither, was asked to return to the company to lead a turnaround in performance and profitability. In late 2004, DIC decided to realign its global business strategy and began exploring the possible sale of the Reichhold Companies to its management. In September 2005, the existing senior management team led a management buyout from DIC, whereby the existing senior management team acquired much of the Reichhold Companies' existing business from DIC.

14.    After the management buyout, the Reichhold Companies continued their expansion into emerging global markets. In February 2006, the Reichhold Companies entered the resins market in Turkey by creating a new subsidiary for marketing and signing a resin sourcing agreement with a Turkish manufacturer. The Reichhold Companies, through their local subsidiaries, completed the construction of a plant in India in 2009 and the construction of a state of the art facility in China in 2011.

52719/0001-10276649v13

E.    Business Operations

15.    The Reichhold Companies are leading global suppliers of intermediate products for the composites and coatings industry with operations in North America, South America, Europe, the Middle East and Asia.  They serve a diversified range of end markets and segments through two main business segments – composites and coatings.  The Reichhold Companies have 19 manufacturing sites in 13 countries and currently serve more than 2,000 customers in over 85 countries through their world-wide network of production facilities.  The Reichhold Companies own significant technology and know-how which is shared among the Reichhold Companies for use in their worldwide operations.  As of June 30, 2014, the Reichhold Companies had consolidated assets of $538 million and consolidated liabilities of $631 million.  In 2013, the Reichhold Companies generated $1,084 million in net revenues.  The Reichhold Companies have generated $750 million in net revenues as of year-to-date August 2014.

16.    The Debtors are the premier supplier of unsaturated polyester resins ("UPR") used to fabricate composites and advanced composite products.  The composites business markets four broad product groups: UPR, vinyl ester resin, gelcoats and bonding paste.  These products are used in such applications as marine manufacturing, tub and shower components, energy windmill blades, solid surface applications, large diameter water pipe manufacturing, automotive manufacturing and advanced composites/prepregs.  The Debtors (and a Canadian non-debtor affiliate) produced 219 million pounds of composites in 2013 and held a 17% market share.  In 2013, the composites segment generated $772 million of revenue, 71% percent of the companies' total revenue.  Consolidated UPR represents 62% of the Reichhold Companies' total revenue.

7

17.     The Debtors' coatings business manufactures a comprehensive range of products. A pioneer in the coatings industry since 1927, the Debtors' expertise is in waterborne chemistries such as acrylics, alkyds, epoxies, polyesters, polyurethanes and powder coatings and printing resins. The Debtors' more than 3,000 products are typically sold to a broad base of customers primarily for industrial purposes, used in thousands of applications such as consumer goods, architectural products, industrial maintenance, printing, marine applications, automotive coatings and construction. The Debtors (and a Canadian non-debtor affiliate) produced 203 million pounds of coatings in 2013 and held a 30% market share in alkyds. In 2013, the Debtors' coatings segment generated $312 million and was responsible for 29% of the Reichhold Companies' total revenue.

18.     The Debtors conduct their business from the world headquarters of the Reichhold Companies located in Durham, North Carolina, in office space leased by Debtor Reichhold, Inc. That office space also houses the Debtors' North American technology center and laboratory. In addition, the Debtors have operations in owned manufacturing facilities located in Azusa, California (composites); Houston, Texas (composites and coatings); Jacksonville, Florida (composites); Morris, Illinois (composites and coatings); Pensacola, Florida (coatings and composites); and Valley Park, Missouri (coatings).

19.     As of the Petition Date, the Debtors employ approximately 379 employees in their business operations. Of those employees, approximately 47% (176) are hourly employees and approximately 53% (203) are salaried employees. Approximately 23% (89) of the Debtors' hourly employees are covered by collective bargaining agreements. The Debtors' workforce of employees is augmented by services received from approximately ten (10) independent

8

contractors who devote all or the substantial portion of their working time to providing services to the Debtors.

**THE DEBTORS' PRE-PETITION DEBT STRUCTURE**

20.     The Debtors are borrowers, guarantors and/or obligors under various credit agreements, notes and financial arrangements.  As of the Petition Date, the Debtors' secured and unsecured debt obligations totaled approximately $287.3 million (exclusive of the guarantee obligations under the Senior Secured Notes described below).

I.     Secured Debt

21.     As of the Petition Date, the Debtors had aggregate outstanding secured debt totaling approximately $64.3 million (exclusive of the Senior Secured Notes) in connection with various loans, notes and equipment financings, as described in more detail below.

(a)     Senior Credit Facility With Oaktree

22.     Debtor Reichhold, Inc. and non-debtor affiliate Reichhold Industries Limited ("RIL"), an Ontario, Canada corporation were borrowers (the "Borrowers") under a Credit Agreement dated October 7, 2005, as subsequently amended, (the "Credit Agreement") among various lenders thereunder (the "Prior Lenders") and Bank of America, N.A. ("BofA") as administrative agent and a Prior Lender and Wells Fargo Bank, National Association ("Wells Fargo") as Documentation Agent and a Prior Lender.  Pursuant to the Credit Agreement, the Prior Lenders made available to the Borrowers a maximum amount of $85 million on a revolving basis (the "Revolving Loan").

23.     In the early months of 2014, it became apparent that availability under the Revolving Loan was becoming insufficient to supply the Borrowers with the liquidity necessary to continue financing their operations.  As a result, the Borrowers entered into discussions with

9

OCM Reichhold Holdings, Ltd., an affiliate of Oaktree Capital Management, L.P. ("Oaktree"),

to provide a new credit facility. On or about May 20, 2014, BofA and Wells Fargo in their

respective capacities as Prior Lenders under the Credit Agreement assigned the Credit

Agreement and all rights and interests thereunder to Oaktree, as the new sole lender under that

agreement (the "Assignment"). BofA, however, agreed to continue as administrative agent.

24.    In connection with the Assignment, the Borrowers and BofA entered into a

Fifteenth Amendment to Credit Agreement dated May 20, 2014 (the "Amendment"). Pursuant

to the Amendment, the Revolving Loan was replaced with term loans and a delayed draw term

loan in the aggregate amount of $70 million as follows (collectively, the "Term Loans"): (a) a

term loan in the aggregate principal amount of $8,345,353.79 to RIL, the proceeds of which were

used to repay RIL's outstanding balance on the Revolving Loan; (b) a term loan in the aggregate

principal amount of $29,265,221.07 to Debtor Reichhold, Inc., the proceeds of which were used

to repay Reichhold, Inc.'s outstanding balance on the Revolving Loan; (c) a delayed draw term

loan commitment to Debtor Reichhold, Inc. in the original principal amount of $5,000,000; and

(d) additional term loans to Debtor Reichhold, Inc. in the aggregate principal amount of

$27,389,425.14, of which $13,743,950.76 was used to cash collateralize outstanding letters of

credit. The Term Loans are scheduled to mature on October 31, 2014.

25.    The Borrowers' obligations under the Credit Agreement, as amended by the

Amendment, are secured by a security interest in substantially all of the Borrowers' assets other

than the equity interests held by Holdings. Additionally, in consideration for the Term Loans

and subject to the terms set forth in the Amendment, non-Debtor Reichhold Industries, the parent

of the Borrowers, agreed not to sell any of its assets, including equity in its subsidiaries.

52719/0001-10276649v13

26.     As of the Petition Date, the amount outstanding to Oaktree under the Credit

Agreement is approximately $73 million, of which $64.3 million was owed by Debtor Reichhold,

Inc. and $8.7 million was owed by non-Debtor RIL.

(b)     Senior Secured Notes

27.     On May 8, 2012, non-debtor Reichhold Industries issued $206,578,066 of

9%/11% Senior Secured Notes (the "Senior Secured Notes") due 2017 pursuant to an indenture

(the "Senior Secured Indenture") under which Wells Fargo serves as trustee and collateral agent.[3]

Reichhold Industries' obligations under the Senior Secured Notes and Senior Secured Indenture

are guaranteed by Holdings and Reichhold, Inc. (together with Reichhold Industries, the

"Issuers"). The Senior Secured Notes are secured by a pledge of, among other things, Reichhold

Corporate Holdings II B.V.'s interest in Holdings and Holdings' interest in Reichhold, Inc.[4] To

secure its obligations under the Senior Secured Notes, Reichhold Industries also pledged 65% of

the voting shares (and 100% of the non-voting shares) its holds in its wholly-owned direct, non-

Debtor subsidiary, Reichhold Holdings Luxembourg, S.a.r.l. ("RHL"). Because RHL is the

ultimate holding company of all of the non-Debtor affiliates that operate outside of North

America, and given the fact that the non-voting shares that have been pledged carry with them a

significant portion of the economic value of RHL, the Debtors believe the holders of the Senior

Secured Notes are the primary beneficiary of the Reichhold Companies' non-U.S. operations.

---

[3]    Third Avenue Management ("Third Avenue"), JP Morgan ("JPM") and Black Diamond are the largest holders of
the Senior Secured Notes.

[4]    Reichhold, Inc. is a guarantor of the Senior Secured Notes. Reichhold, Inc., however, did not pledge any assets
to secure that guarantee.

11

28.     The Senior Secured Notes were issued following an exchange offer whereby the Senior Secured Notes were exchanged for the Senior Unsecured Notes.[5]  The Senior Secured Notes accrue cash interest at 9% and payment-in-kind interest ("PIK Interest") at 11%, with payments due annually on November 1 and May 1.  Under the Senior Secured Indenture, the Issuers are permitted to add interest payments to the principal amount outstanding at the PIK Interest rate through May 1, 2014.

29.     As of the Petition Date, principal in the amount of approximately $255 million was outstanding under the Senior Secured Notes.

(c)     Equipment Financing

30.     The Debtors are also party to several equipment leases and purchase agreements for equipment that they financed.  The total secured obligations related to that equipment is only $3,000.

II.     Unsecured Debt

31.     As set forth in more detail below, as of the Petition Date, the Debtors had aggregate outstanding unsecured debt of approximately $223 million arising in connection with accounts payable and other liabilities.

(a)     Intercompany Debt with Non-Debtor Affiliates

32.     Reichhold, Inc. has received inter-company transfers in the form of loans evidenced by notes from its foreign affiliates in order to address the Debtors' liquidity shortfall (discussed below).  Those inter-company loans are recorded by intercompany notes that are

---

[5]     On August 15, 2006, Reichhold Industries issued $195 million of 9% Senior Notes (the "Senior Unsecured Notes") due in August of 2014 pursuant to a first amended indenture.  As a result of an exchange offer undertaken by Reichhold Industries in May of 2012, approximately 99% of the holders of the Senior Unsecured Notes were replaced with the Senior Secured Notes.  Holders of approximately 1% of the Senior Unsecured Notes did not agree to exchange their Senior Unsecured Notes for the Senior Secured Notes.  As of the Petition Date, however, there are no amounts due and owing to the holders of the Senior Unsecured Notes.

12

issued monthly and payable the next month.  As of the Petition Date, Reichhold, Inc. had

borrowed approximately $103.7 million from foreign affiliates through inter-company loans.  Of

this amount, $93.9 million was owed to an affiliate in the Netherlands and $9.8 million was

owed to RIL.

> (b)    Other Obligations

33.    As of the Petition Date, the Debtors also estimate that there is approximately $119

million in general unsecured claims against the Debtors.[6]  Of this amount, approximately $68

million relates to unfunded pension and other postretirement obligations.

## FACTORS LEADING TO BANKRUPTCY PETITIONS

34.    Although no one factor has caused the Debtors to seek relief under Chapter 11 of

the Bankruptcy Code, numerous factors have contributed to the Debtors' decision to file their

bankruptcy petitions.

A.    Declining Revenue, Operating Losses the Tightening of Trade Terms with Key Vendors
and Shortage of Cash

35.    The Debtors' revenues have been impacted by changes in the US economy,

particularly the decline in housing levels in 2005 and 2006 and the financial crisis of 2008.  This

decline is in line with industry trends, with US UPR production having fallen 34% from its peak

of 1.9 billion pounds in 2005 to 1.2 billion pounds in 2012.  This drop in production has left the

industry operating at an estimated 60% of capacity in North America.  More recently, the

Debtors' revenues declined precipitously from approximately $536 million in 2012 to $470

million for 2013; a decline of approximately $66 million.  The majority of the decline in the

Debtors' revenues occurred in the coatings business.  Coatings revenues primarily declined due

---

[6]    In addition, as of the Petition Date, the Debtors had approximately $31 million in liabilities for estimated
environmental and legal obligations and had posted financial assurance letters of credit in the amount of $4
million.

to the destruction of the Newark coatings plant caused by "Superstorm" Sandy and the loss of a significant tolling contract that ended in July, 2013. As of August 31, 2014, the Debtors generated year-to-date net sales of approximately $320,997,000. For the twelve-month period ending August 31, 2014, the Debtors generated net sales of $458,928,000.

36.    In recent years, the Debtors generated large net losses and experienced negative cash flows. In addition to the Debtors' significant debt service levels, the Debtors spent substantial amounts to fund pension and other postretirement obligations and to pay for environmental remediation matters. During 2012 and 2013, respectively, the Debtors contributed $12.7 million and $10.0 million to their pension and other postretirement benefit plans. The Debtors spent $8.6 million in 2013 for environmental matters. The Debtors have also incurred significant costs for legal and financial advisors to assist with their financial restructuring efforts.

37.    Since 2010, the Debtors' significant cash needs have been satisfied primarily from intercompany loans received from their foreign affiliates. During 2011, the cash generated by the Debtors' foreign affiliates was reduced due to their investment in a plant in China and economic conditions in Europe and the Middle East. The use of PIK interest after the 2012 bond exchange (described above) reduced the cash requirements for the Reichhold Companies and improved operating results, supporting additional intercompany loans from the Debtors' foreign affiliates. This trend, however, did not continue into 2013, both with the negative impact of the US coatings operations and significant decline in the profitability of the Debtors' foreign affiliates, especially Brazil. In December of 2013, in order to provide additional funding for the Debtors and additional liquidity for the foreign affiliates, certain of the Debtors' European, Asian and South American affiliates (the "GAC Credit Parties") and GA Capital LLC entered into a

new credit facility (the "GAC Facility"). The Reichhold Companies' affiliates in the United States (including the Debtors), Canada, India, China and Turkey ("Non-GAC Credit Parties") are not participants in the GAC Facility. The GAC Facility allowed up to $18 million, plus a portion of excess cash flow generated by the GAC Credit Parties to be calculated semi-annually, of intercompany loans or investments made by the GAC Credit Parties to any Non-GAC Credit Parties. Of the initial $18 million allowance for intercompany loans and investments, $11 million has been loaned to the Debtors and $6.1 million has been loaned to or invested in other Non-GAC Credit Parties as of the Petition Date. On September 26, 2014, the allowance for such intercompany loans and investments was increased by $5.8 million due to the semi-annual excess cash flow calculation. As of the Petition Date, the unused allowance for intercompany loans or investments by the GAC Credit Parties was $6.7 million.

38.     On April 17, 2014, the credit rating agency Standard and Poor's ("S&P") downgraded Reichhold Industries' credit rating from B- to CCC, and thereafter issued a further downgrade on July 28, 2014 to CCC-. The credit downgrades have had a significant impact on the Debtors' liquidity as they lost a total of approximately $10 million of liquidity since April 17, 2014 due to reduced credit limits and the tightening of trade terms from many of their vendors.

39.     By September 2014, the Debtors were fully drawn under the Oaktree facility and facing severe liquidity problems.

C.     Unsustainable Legacy Liabilities

40.     The Debtors are heirs to an 85+ year history of involvement in the specialty chemicals industry and carry with them exceedingly burdensome liabilities related to that legacy. As of June 30, 2014, the Debtors' unfunded pension and retirement liability exceeded $71 million, and reserves on account of environmental liabilities were approximately $32 million.

15

These obligations persist, notwithstanding the fact that the Debtors' revenues have declined precipitously while their profits have evaporated and cash has become scarce.

D.      Efforts to Address Financial Constraints

41.      In response to the financial challenges discussed above, the Reichhold Companies' management team initiated a number of actions to improve the performance of the company.

42.      During the period from 2011 to 2013, the Debtors restructured their operations by replacing US business unit management, restructuring contracts to allow quicker pass-through of increased raw material costs to customers, reducing headcount, reducing facilities expenses and utilities and relocating the world headquarters offices and laboratories to a smaller facility. These changes have saved the Debtors approximately $14 million annually.

43.      In October of 2012 the Debtors' Newark, New Jersey plant suffered devastating damage caused by "Superstorm" Sandy. After shifting production to other plants, the Debtors concluded that they had sufficient capacity at other locations to fulfill customer orders previously filled through the Newark plant. As a result, in January of 2013, the Debtors announced that they would close the Newark facility permanently. That closure reduced the Debtors' annual manufacturing cost by approximately $3 million. However, these savings were partially offset by increased freight costs and losses in revenues due to delays in transitioning products to the other plants.

44.      In addition to the steps taken to improve the Debtors' performance, the Reichhold Companies' management took steps to improve the performance of the non-Debtor affiliates. For example, in late 2011, the company exited a tolling facility in the Czech Republic, resulting in annual savings of approximately $8 million beginning in 2012. The Reichhold Companies

16

also implemented headcount reductions in Europe and Brazil during 2012 and 2013 which resulted in annual savings of approximately $7 million. In December 2013, many of the Debtors' foreign affiliates secured the GAC Facility to provide additional liquidity for the foreign affiliates and to provide funding to the Debtors. All of these actions improved the liquidity of the Debtors' foreign affiliates, enabling them to loan more cash to the Debtors. The Debtors' foreign affiliate in the Netherlands made additional loans to the Debtors of $25.3 million in 2012 and $5.6 million in 2013.

45.    Notably, the Company's efforts during the period from 2011 to 2013 to address its financial challenges, were not limited to addressing operational changes, but also included efforts to address perceived problems with its balance sheet. More specifically, as set forth above, in March of 2012, Reichhold Industries commenced an exchange offer seeking to exchange the Senior Unsecured Notes for the Senior Secured Notes. Under the Senior Secured Indenture and Senior Secured Notes, the Debtors had the option, through May 1, 2014, to pay interest on the Senior Secured Notes either in cash (at 9%) or by increasing the principal amount of Senior Secured Notes outstanding by the amount of unpaid interest (at 11%). This so-called PIK interest feature improved the Debtors' cash position.

46.    When Reichhold Industries commenced the exchange offer it believed, on the basis of all evidence available, that there was likely to be a significant rebound in its business and markets with an attendant increase in the profitability of the North American business. Unfortunately, these efforts proved insufficient to overcome the financial obstacles facing the Debtors. Indeed, in point of fact, the business remained depressed and, in certain respects, market conditions further deteriorated.

E.    Exploration of Strategic Alternatives

47.    After completing the exchange offer in May 2012, the Reichhold Companies

devoted significant time and resources to exploring strategic alternatives to maximize value for

the benefit of all stakeholders.  Those alternatives included, but were not limited to, a potential

sale of the entire company and a transaction with one of the industry players that would

consolidate the composite industry.  At that time, a strategic transaction was not available due, in

part, to the Debtors' significant legacy liabilities.  The Reichhold Companies, therefore,

determined that a more structured transaction was necessary.  Given the Reichhold Companies'

diminishing financial profile, they determined that finding an equity partner was critical.  The

management of the Reichhold Companies expended significant time meeting with potential

equity partners.  An equity deal, however, did not materialize.

48.    Upon securing the Oaktree Term Loans which provided the Debtors with

additional liquidity, the Reichhold Companies again focused their efforts to secure a transaction

with a leading, global industry player.  Their financial position, however, continued to decline.

Despite their best efforts, the Reichhold Companies were unable to secure a combination

transaction with another industry player.

49.    During this period of time, the non-Debtor foreign affiliates supported the U.S.

operations (i.e., the Debtors) with continued intercompany loans (as discussed above).  But,

ultimately, the non-Debtor foreign affiliates determined that they could not continue to afford to

support both their own operations and those of the U.S. operations.

50.    As of the Petition Date, the Debtors did not have sufficient liquidity to operate

their businesses and could not fund the administration of these Chapter 11 Cases without the

need for debtor-in-possession financing.  Toward that end, before the Petition Date, the Debtors

18

retained CDG Group to, among other things, critically examine the Debtors' business operations and funding requirements. In or about April 2014, given the Debtors' operating losses and reduced liquidity, the Debtors and their advisors contacted 4 potential lenders and received one financing proposal from prospective lenders in anticipation of a potential Chapter 11 filing. As set forth above, in May 2014, however, the Debtors secured the Oaktree Term Loans, alleviating the need for a DIP loan at that time.

51.    Subsequently, however, due to further liquidity constraints and limited available cash, the Debtors and their advisors renewed their efforts to secure a DIP loan. They contacted and solicited DIP financing proposals from seven prospective lenders including their existing lenders and bondholders, traditional lenders and non-traditional lenders. The Debtors and their advisors explored two types of financing structures with the prospective lenders – funding for the Reichhold Companies' United States operations only and a global financing solution for the Reichhold Companies' United States and rest of world businesses. The Debtors ultimately received four proposals for DIP financing. None of the prospective lenders were willing to provide a DIP facility secured only by the Debtors' collateral. Instead, all four of the proposals required security from the Reichhold Companies' rest of world businesses to fund the cash needs of the Debtors.

52.    After careful review and extensive negotiation of the DIP financing proposals, the Debtors' Board of Directors determined in its business judgment that the proposal from Third Avenue, JP Morgan and Black Diamond represented the best option for the Debtors and their businesses (the "DIP Loan"). As described below, the DIP Loan provides for a comprehensive transaction that allows the Reichhold Companies' to emerge with continuing business operations, a delevered balance sheet and significantly enhanced financial condition, across the Debtors'

19

worldwide operations. Additionally, the DIP Loan provides for a stalking horse bid for the Reichhold Companies' U.S. operations (as further discussed below) thereby ensuring a clear path towards emergence while providing the liquidity needed to run a marketing process and encourage overbidding to increase value for the Debtors' estates.

53. The DIP Loan makes the original principal amount of $106,380,000 available to the Debtors and to one of their non-debtor affiliates, which affiliate, will, in turn, loan a portion of such funds to the Debtors to be used to satisfy the Oaktree Term Loans and provide the Debtors with sufficient liquidity to pursue a sale of their assets pursuant to section 363 of the Bankruptcy Code. The DIP Loan solves the Reichhold Companies' liquidity needs while providing a stalking horse bid and allowing for a complete sale process for the U.S. operations. Additionally, the DIP Loan provides for incremental liquidity to the Reichhold Companies' rest of world businesses, which will allow the Reichhold Companies' to stabilize global operations. As a result of the foregoing, the DIP Loan allows the Reichhold Companies to continue operations post-emergence with a delevered balance sheet and on stronger financial footing. Furthermore, the DIP Loan is being provided by parties who are the Reichhold Companies' largest economic constituents, including the three largest holders of the Senior Secured Notes and the potential for additional bondholders to participate. This provides the added benefit that the DIP Loan eliminates the risk of significant litigation with the bondholders during the Chapter 11 Cases as well as provides funding for an orderly wind down of the Debtors' estates.

54. The DIP Loan is one element of a larger transaction under which the Debtors and their non-debtor, non-U.S. affiliates intend to sell their businesses and assets. The Debtors intend, promptly following the commencement of these Chapter 11 Cases, to negotiate stalking horse documents with the holders of the Senior Secured Notes with respect to a sale transaction

that has two elements: (i) a consensual foreclosure by the holders of the Senior Secured Notes on their security interests in the common and preferred stock in RHL and (ii) a purchase of certain assets of Reichhold Industries by Reichhold Holdings International B.V. through a credit bid (subject, of course, to appropriate approvals of this Court pursuant to section 363 of the Bankruptcy Code with the opportunity of other parties to bid for those assets).

F.    Use of Chapter 11 Process

55.    Given the Debtors' severe liquidity constraints, these Chapter 11 Cases were commenced to maximize value for the benefit of all stakeholders. The Debtors believe that the comprehensive transaction that underlies the commencement of these Chapter 11 Cases (including, perhaps most notably, the access to necessary debtor-in-possession financing and the willingness of the holders of the Senior Secured Notes to serve as a stalking horse bidder and establish a floor price for the U.S. operations that will hopefully lead to a robust auction with participation by other bidders) is a transaction that will benefit all stakeholders. The Debtors, thus, believe these Chapter 11 filings and the pursuit of a sale process involving substantially all of the Debtors' assets under section 363 is in the best interest of the Debtors' creditors and other stakeholders. If, as contemplated, the holders of the Senior Secured Notes move forward with a foreclosure on their security interests in the common and preferred stock in RHL, and they are the winning bidder in the 363 sale, the Reichhold Companies would be kept together, which the Debtors believe will maximize recoveries for all creditors as well as saving the jobs of many employees.

52719/0001-10276649v13

## PART II

## FACTS IN SUPPORT OF FIRST DAY PLEADINGS

56.     To enable the Debtors to operate effectively and to transition seamlessly into Chapter 11, the Debtors have filed the First Day Pleadings, requesting various types of immediate relief.  I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought is critical to stabilizing the Debtors' business operations, preserving value and facilitating an effective transition into Chapter 11.  Moreover, absent the immediate ability to make certain essential payments as sought in the First Day Pleadings, I believe the Debtors' estates would suffer immediate and irreparable harm.

**A.     Motion of Debtors for Order Under Fed. R. Bankr. P. 1015 and Del. Bankr. L.R. 1015-1 Authorizing Joint Administration of Chapter 11 Cases**

57.     By the Joint Administration Motion, the Debtors seek entry of an order authorizing the joint administration of the Debtors' Chapter 11 Cases for procedural purposes under the number assigned to Holdings.  The Debtors in these proceedings include Holdings and three of its subsidiaries and affiliates.  Holdings is the direct, sole owner of Reichhold, Inc.; Reichhold, Inc., in turn, is the direct, sole owner of Canadyne; and Canadyne, in turn, is the direct, sole owner of CGC.

58.     In addition, the Debtors request (i) that an entry, as set forth in the Joint Administration Motion, be made on the docket of each of the Debtors' cases (except that of Holdings), to reflect the joint administration of the Chapter 11 Cases and (ii) the Court direct that any creditor filing a proof of claim against any of the Debtors or their respective estates clearly assert its claim against the particular Debtor obligated on such claim, and not against the jointly administered Debtors.

22

59.     I am advised by counsel that jointly administering these cases will save time and money and avoid duplicative and potentially confusing filings by permitting counsel for parties in interest to (a) use a single caption on the numerous documents that will be served and filed herein and (b) file the papers in one case rather than in multiple cases.

60.     Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.     Application of Debtors for Order Appointing Logan & Company, Inc. as Claims and Noticing Agent Under 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and Del. Bankr. L.R. 2002-1(f)**

61.     By the Claims and Noticing Agent Application, the Debtors request entry of an order appointing Logan & Company, Inc. ("Logan") as claims and noticing agent in these Chapter 11 Cases. I am advised by counsel that such appointment is required by the rules of this Court. Moreover, I believe that such relief is prudent in light of the fact that there will be in excess of 10,000 entities to be noticed. In view of the number of anticipated claimants and other notice parties and the complexity of the Debtors' business, the Debtors submit, and I agree, that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors.

62.     I am advised that the Debtors' selection of Logan to act as the claims and noticing agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, in that the Debtors have obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, the Debtors submit, and I agree, based on all engagement proposals obtained and reviewed, that Logan's rates are competitive and reasonable given Logan's quality of services and expertise.

63.     As more fully detailed in the Claims and Noticing Agent Application, I understand that Logan will engage in certain services, including, but not limited to, maintenance, processing and docketing proofs of claim filed in the Chapter 11 Cases.  Logan will also work with the office of the Clerk of the United States Bankruptcy Court for the District of Delaware (the "Clerk") to ensure that their methodology conforms with all of the Court's procedures, the Local Bankruptcy Rules and the provisions of an order entered by this Court.  Moreover, I am informed that the Claims and Noticing Agent Application pertains only to the work performed by Logan under the Clerk's delegation of duties permitted by 28 U.S.C. § 156(c) and Local Bankruptcy Rule 2002-1(f).

64.     I am advised that Logan has acted as the claims and noticing agent in numerous cases of comparable size, including several cases that were commenced in the United States Bankruptcy Court for this District, and that Logan, therefore, is well qualified to provide the Debtors with experienced noticing, claims, and balloting services in connection with these cases. Given the need for the services described above and Logan's expertise in providing such services, I believe that retaining Logan will expedite service of notices, streamline the claims administration and balloting processes, and permit the Debtors to focus on their chapter 11 efforts.

65.     Accordingly, on behalf of the Debtors, I respectfully submit that the Claims and Noticing Agent Application should be approved.

C.    **Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105(a), 345, 363 and 364, Fed. R. Bankr. P. 6003 and 6004 and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Authorizing Continuation of Intercompany Transactions, (IV) Granting Superpriority Status to Postpetition Intercompany Claims between Debtors and Administrative Expense Status to Postpetition Intercompany Claims between Debtors and Non-Debtor Affiliates and (V) Waiving the Requirements of 11 U.S.C. § 345(b)**

66.    By the Cash Management Motion, the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of the Debtors' existing bank accounts, checks and business forms; (b) granting the Debtors a waiver of certain bank account and related requirements of the United States Trustee to the extent that such requirements are inconsistent with (i) the Debtors' existing practices under the cash management system or (ii) any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Cases; (c) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices notwithstanding the provisions of Bankruptcy Code section 345(b), and waiving the requirements of Bankruptcy Code section 345(b); (d) authorizing, but not directing, the Debtors to continue certain ordinary course intercompany transactions; and (e) according superpriority status to postpetition intercompany claims between Debtors subject and subordinate to other valid liens in existence as of the Petition Date or ranted pursuant to the DIP order and administrative expense status to postpetition intercompany claims between Debtors and non-Debtor affiliates.

i.    The Debtors' Cash Management System and Bank Accounts

67.    In the ordinary course of their businesses, the Debtors maintain a cash management system (the "Cash Management System") which includes collection, operating, payable and other accounts.  The Cash Management System is integral to the operation and

25

administration of the Debtors' businesses.  In this regard, the Cash Management System allows

the Debtors to efficiently (a) identify the Debtors' cash requirements, (b) transfer cash as needed

to respond to cash requirements, and (c) track all intercompany transfers.  The Debtors believe

that the Cash Management System is similar to those utilized by many other companies of

comparable size and complexity to collect, transfer and disburse funds in a cost-effective and

efficient manner.  A summary of the Cash Management System is annexed to the Cash

Management Motion as <u>Attachment 1</u> and a schedule of the Bank Accounts is attached as

<u>Attachment 2</u> to the Cash Management Motion.

68.    The Cash Management System is managed by the financial personnel in the

Debtors' Finance department at their headquarters in Durham, North Carolina.  The Finance

department's control over the administration of the various Bank Accounts to effect the

collection, disbursement and movement of cash facilitates accurate cash forecasting and

reporting and enables the Debtors to monitor the collection and disbursement of funds.

ii.    <u>Maintenance of Existing Checks and Business Forms</u>

69.    I have been advised by counsel that Local Rule 2015-2(a) requires that once a

debtor's existing checks have been used, it shall, when reordering checks, require the designation

"Debtor-in-Possession" and corresponding bankruptcy number on all such checks.  Although the

Debtors believe that their accounting software platform will allow them to quickly comply with

this Local Rule, there may be a short time lag in their ability to do so immediately following the

Petition Date.  Accordingly, out of an abundance of caution, the Debtors seek authorization to

continue using all checks substantially in the form existing immediately prior to the Petition Date,

without reference to the Debtors' status as debtors in possession; <u>provided</u>, <u>however</u>, that once

the Debtors are able to practically do so, the Debtors will generate new checks to be utilized

during the pendency of the Chapter 11 Cases, which checks will include a legend referring to the

Debtors as "Debtors in Possession."  To the extent necessary, the Debtors also seek authority to use all correspondence and other business forms (including, without limitation, letterhead, purchase orders, and invoices) without reference to the Debtors' status as debtors in possession.

70.    In addition, I believe that changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates.  Further, such changes would be disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.

     iii.    <u>Waiver of Certain Requirements of the United States Trustee</u>

71.    As set forth in the Cash Management Motion, the Debtors submit that (x) they are able to work with their current banks to ensure that this goal of separation between the prepetition and postpetition period is observed and (y) enforcing certain of these UST Requirements would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.

72.    To begin, closing all of the Debtors' existing Bank Accounts will, among other things, create confusion with respect to the large number of customers who currently remit payments to the Debtors via wire transfer.  The distraction and inconvenience that the Debtors' employees would experience from contacting customers and requesting changes to these long-standing practices will not only waste valuable time and resources of the Debtors at the early stages of these cases, but has the potential to create customer dissatisfaction at the very time that the Debtors are attempting to do everything in their power to protect valuable customer relationships.

     iv.    <u>Continuation of Deposit Practices</u>

73.    The Debtors deposit funds and manage their cash in accordance with the Cash Management System.  Except as set forth in the Cash Management Motion, the Bank Accounts

are in financially stable institutions that are insured by the FDIC (up to an applicable limit per Debtor per institution). In addition, the Debtors do not have any excess cash to invest. The Debtors request a waiver of the requirements of section 345(b), to the extent applicable.

74.     I have been advised of the restrictions imposed by section 345(b) of the Bankruptcy Code. The Debtors are large, sophisticated entities with a complex Cash Management System that relies on multiple banks and Bank Accounts on a daily basis. All of the Bank Accounts the Debtors seek to continue to use are federally insured, but the balances on the collateral accounts, on any given day may exceed the federally insured limit, such accounts are fully collateralized. Requiring the posting of a bond to the extent that the balances of these accounts exceed FDIC insurance limits at a given time would be especially disruptive, unnecessary and wasteful.

        v.     Continuation of Intercompany Transactions

75.     In connection with the daily operation of the Debtors' businesses, as funds are moved within the Cash Management System at any given time, there may be intercompany claims owing by one Debtor to another Debtor, or claims owing between one Debtor to a non-Debtor affiliate. In addition, as a crucial part of their daily ordinary course operations, the Debtors transfer funds to and receive funds from certain Debtor and non-Debtor affiliates with respect to, among other things as set forth below, (a) the intercompany allocation of essential goods and services and (b) trade balances that arise as a result of sales between Debtor and non-Debtor affiliates (all such intercompany transfers, the "Intercompany Transactions"). The principal Intercompany Transactions are described in the Cash Management Motion.

76.     The Debtors routinely engaged in Intercompany Transactions prior to the Petition Date. Therefore, they submit that the Intercompany Transactions are within the ordinary course

28

of their business.  Nevertheless, out of an abundance of caution, the Debtors seek Court approval

of the relief requested in the Cash Management Motion in the event that this Court finds that the

Intercompany Transactions are outside the ordinary course of business.  I believe that the

Debtors' business judgment to continue the Intercompany Transactions is sound because, among

other reasons discussed in the Cash Management Motion, the Intercompany Transactions reduce

the  administrative costs of certain of the Debtors and facilitate the satisfaction of the Debtors'

obligations and are integral to the Debtors' daily operations.  Thus, on behalf of the Debtors, I

believe that continuation of the Intercompany Transactions is in the best interests of the Debtors'

estates and their creditors.

77.    Accordingly, on behalf of the Debtors, I submit that Cash Management Motion

should be approved.

**D.    Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Payment of Certain Prepetition Employee Obligations, Including Compensation, Benefits, Expense Reimbursements and Related Obligations, (II) Confirming Right to Continue Employee Programs on Postpetition Basis, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, (IV) Authorizing Payment of Prepetition Claims Owing to Administrators of, or Third Party Providers Under, Employee Programs, (V) Authorizing Payment of Independent Contractor Obligations, and (VI) Directing Banks to Honor Prepetition Checks and Fund Transfers For Authorized Payments**

78.    By the Wage Motion, the Debtors seek entry of an order, (i) authorizing the

Debtors to pay certain prepetition amounts owing to or for the benefit of their current and former

employees (the "Employees") and retirees for compensation, benefits and reimbursable expenses;

(ii) confirming the Debtors' right to continue postpetition, in the ordinary course of business,

certain Employee-related plans, programs and policies in effect immediately prior to the filing of

these cases; (iii) authorizing the Debtors to pay any and all local, state and federal withholding

and payroll-related or similar taxes relating to prepetition periods; (iv) confirming the Debtors'

52719/0001-10276649v13

right to continue to deduct and to transmit deductions from payroll checks as authorized by
Employees or required under any Employee-related plan, program or policy or as required by
law; (v) authorizing the Debtors to pay any prepetition claims owing to the administrators of, or
third party providers under, their Employee-related plans, programs and policies as necessary to
ensure the delivery of compensation, benefits and expense reimbursements to their Employees;
(vi) authorizing the Debtors to continue to pay prepetition amounts owing to or for the benefit of
independent contractors (the "Independent Contractors") and temporary Employees in the
ordinary course of business and utilize such individuals in the ordinary course of business; and
(vii) authorizing and directing all banks to receive, process, honor and pay all of the Debtors'
prepetition checks and fund transfers on account of any obligations authorized to be paid
pursuant hereto.

79.    I am advised by counsel that sections 507(a)(4) and 507(a)(5) of the Bankruptcy
Code  require that certain claims for prepetition wages, salaries, commissions, vacation, sick
leave, independent contractor sales commissions, and employee benefit contributions be
accorded priority in payment in an amount not to exceed $12,475.00 for each individual.
Because of the number of Employees and Independent Contractors working for the Debtors, and
because some amounts are unknown pending submission of claims, the Debtors do not know the
exact amount due each Employee and Independent Contractor for the prepetition period.
However, the Debtors  believe that the vast majority of their Employees and Independent
Contractors are owed amounts under the $12,475.00 cap of Bankruptcy sections 507(a)(4) and
507(a)(5), to the extent such caps are applicable.  Accordingly, granting the relief requested will
not adversely affect the Debtors' other unsecured creditors.  To the extent that Employees and
Independent Contractors are owed aggregate amounts in excess of these caps, or certain of the

Independent Contractors payments are not subject to priority treatment, the Debtors submit that payment of such obligations in such higher amounts or otherwise non-priority amounts is nonetheless justified in these cases. The Debtors' Employees and Independent Contractors are extremely important in maintaining the current value of the Debtors' estates.

80.    I have also been advised that it is critical that the Debtors be permitted to continue their workers' compensation programs and to pay outstanding prepetition claims, taxes, charges, assessments, premiums, and third party administrator fees in the ordinary course of business because alternative arrangements for workers' compensation coverage would most certainly be more costly, and the failure to provide coverage may, in some states, subject the Debtors and/or their officers to severe penalties.

81.    The Debtors' ability to preserve their businesses and conduct a successful chapter 11 process is dependent on the continued enthusiasm, service and expertise of their Employees and Independent Contractors. Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the morale and, thus, the performance of their Employees and Independent Contractors may be adversely affected.

82.    If the Debtors fail to pay the prepetition employee-related obligations in the ordinary course, their Employees and Independent Contractors will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. Such a result would have a highly negative impact on workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates. In addition, the Debtors have determined that continuation of the Employee Programs is vital to preserving and rebuilding Employee morale during the

52719/0001-10276649v13

pendency of these Chapter 11 Cases and to reducing the level of Employee attrition that might otherwise occur.

83.    In sum, the Employees' and Independent Contractors' skills and their knowledge and understanding of the Debtors' infrastructure and operations are essential to the continued operation of the Debtors' business. Without the continued services of the Employees and Independent Contractors, a successful outcome of these Chapter 11 Cases will not be possible.

84.    Accordingly, the Debtors submit, and I agree, that the Wage Motion should be approved.

**E.    Motion of Debtors for Order Under 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Companies From Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment**

85.    By the Utility Motion, the Debtors entry of interim and final orders approving procedures that would provide adequate assurance of payment to their utility service providers (the "Utility Companies") under Bankruptcy Code section 366, while allowing the Debtors to avoid the threat of imminent termination of electricity, recycling, water, natural gas, oil, waste removal, telephone, telecommunications, and similar utility products and services (collectively, the "Utility Services") from those Utility Companies.

86.    Specifically, the Debtors request entry of interim and final orders (a) approving the Debtors' deposit of $417,360 (which is approximately 50% of the estimated monthly cost of the Utility Services, based on historical averages over the prior twelve (12) months) (the "Adequate Assurance Deposit") into a newly-created segregated, interest-bearing account, as adequate assurance of postpetition payment to the Utility Companies pursuant to Bankruptcy Code section 366(b), (b) approving the additional adequate assurance procedures described in the Utility Motion as the method for resolving disputes regarding adequate assurance of payment to

32

Utility Companies and (c) prohibiting the Utility Companies from altering, refusing or discontinuing services to the Debtors except as may be permitted by the proposed procedures.

87.     By making the Adequate Assurance Deposit and establishing related procedures, the Debtors seek to provide adequate assurance and to implement an orderly process to determine any challenges to the adequacy of that adequate assurance.  Without approval of the Utility Motion, the Debtors could be forced to address numerous requests by Utility Companies in an unorganized manner at a critical period in their chapter 11 efforts.  Thus, the relief requested in Utility Motion is necessary for a smooth transition by the Debtors into Chapter 11.

88.     The Utility Services are crucial to the continued operations of the Debtors.  If the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and the Debtors could be forced to cease operations.

89.     Accordingly, on behalf of the Debtors, I respectfully submit that the Utility Motion should be approved.

**F.     Motion of Debtors for Interim and Final Orders Under 11 U.S.C. §§ 105(a), 363(b), 506(a), 507(a)(8) and 541 and Fed. R. Bankr. P. 6003 and 6004 Authorizing Payment of Prepetition Taxes and Fees**

90.     By the Taxes Motion, the Debtors seek entry of an order authorizing them to pay, in their discretion, any prepetition tax and fee obligations including, without limitation, sales and use taxes; income or gross receipts taxes; franchise taxes; net worth taxes; real and personal property taxes; rental taxes; business licenses, qualification to do business, registration, commercial activity or other business and occupation taxes or fees; any other types of taxes, fees, or charges; and any penalty, interest, or similar charges (collectively, the "Taxes and Fees") owing to certain governmental entities including federal, state and local (the "Taxing Authorities") that will become due during the pendency of the Debtors' Chapter 11 Cases.

91.    The Debtors seek the relief requested in the event and to the extent that: (a) the various taxes, regulatory fees, and related obligations that accrued prior to the Petition Date: (i) were not paid prepetition, (ii) were not processed prepetition or (iii) were paid in an amount that was less than is actually owed, including amounts subsequently determined upon any audit or otherwise to be owed for periods prior to the Petition Date; (b) any payments made prepetition were rejected, lost or otherwise not received in full by any taxing authority, or (c) any taxes and related obligations accrued or incurred prepetition that will become due during the pendency of these cases in the ordinary course of business.  On an interim basis, the Debtors only seek authorization to pay certain prepetition taxes that are currently due or will become due within 30 days of the Petition Date (the "Upcoming Taxes"), in an aggregate amount not to exceed $60,000. The Debtors estimate that during the pendency of these cases the amount of such prepetition taxes will not exceed $510,000.

92.    The continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful chapter 11 process.  If such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether (a) the obligations are priority, secured, or unsecured in nature, (b) they are proratable or fully prepetition or postpetition and (c) penalties, interest, attorneys' fees and costs can continue to accrue on a postpetition basis, and, if so, whether such penalties, interest, attorneys' fees and costs are priority, secured, or unsecured in nature.

93.    Nonpayment or delayed payment of Taxes and Fees may also subject the Debtors to efforts by certain Taxing Authorities, whether or not permissible under the Bankruptcy Code,

to revoke the Debtors' licenses and other privileges either on a postpetition or post confirmation basis.  Moreover, certain of the Taxes and Fees may be considered to be trust funds that are not included in property of the Debtors' estates and/or taxes as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment.  In such events, collection efforts by the Taxing Authorities would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

94.      Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**G.     Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363, 1107 and 1108 and Fed. R. Bankr. P. 6003 and 6004 Authorizing Debtors to Pay Prepetition Insurance Obligations and Maintain Postpetition Insurance Coverage**

95.      By the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors (a) to pay all prepetition premiums, taxes, charges, fees and other obligations, including broker's fees and insurance premium financing payments (the "Insurance Obligations"), owed under or with respect to their existing insurance policies (collectively, the "Insurance Policies") in an aggregate amount not to exceed $956,000 and (b) to maintain necessary insurance coverage by honoring their postpetition obligations under the Insurance Policies and Premium Financing Agreement (as defined below) and obtaining renewal coverage or new insurance arrangements as and when required.

96.      In connection with the operation of their businesses and management of their properties, each of the Debtors is covered under the Insurance Policies (as set forth on <u>Exhibit A</u> to the Insurance Motion), which have been obtained through several third-party insurance carriers (collectively, the "Insurance Carriers").

97.     Maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation of the Debtors' businesses.  To the extent that the Insurance Obligations may be attributed to prepetition insurance coverage, the Debtors believe that payment of such obligations is necessary to ensure continued coverage under the Insurance Policies, and to maintain good relationships with the Insurance Carriers.  The Debtors' maintenance of their relationships with the Insurance Carriers is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods.

98.     Insofar as the employment of Marsh USA Inc. ("Marsh"), the Debtors' insurance agent/broker, is necessary for the ordinary course maintenance of the Insurance Policies in the most efficient, cost-effective manner, the Debtors believe that they should be authorized to continue to pay, as they come due, not only the brokerage fees owed to Marsh but also any other of the Insurance Obligations that are remitted to Marsh and thereafter submitted by Marsh to certain of the Insurance Carriers.

99.     Failure to perform their obligations under the Premium Financing Agreement (as defined in the Insurance Motion) could mean that the coverage under the Insurance Policies could be voided.  Disruption of the Debtors' insurance coverage would expose the Debtors to serious potential risks, including:  (i) incurring direct liability for the payment of claims that otherwise would have been paid by the insurance providers under the insurance policies; (ii) incurring material costs and other losses that otherwise would have been reimbursed by the insurance providers under the insurance policies; (iii) losing their good-standing certifications to conduct business in states that require the Debtors to maintain certain levels of insurance coverage; (iv) the inability to obtain similar types of insurance coverage; and (v) incurring higher

36

costs for re-establishing lapsed policies or obtaining new insurance coverage. Any or all of these consequences could be seriously harmful to the Debtors' businesses, as they would expose the Debtors to higher costs and an increased risk of loss. To avoid these potential consequences, the Debtors believe, and I agree, relief requested in the Insurance Motion should be granted.

**H.     Motion of the Debtors for an Order Authorizing the Debtors to Continue Pre-petition Customer Programs and Practices in the Ordinary Course of Business**

100.    By this Motion, the Debtors request the entry of an order granting the Debtors authority to (i) perform their prepetition obligations related to the Customer Programs (as defined in the Customer Program Motion), up to and including $900,000 (the "Customer Programs Cap") and (ii) continue, renew, replace, modify and/or terminate any of the Customer Programs, as the Debtors determine advisable, in the ordinary course of business and without further application to this Court.

101.    In connection with the Debtors' presence as a leading global manufacturer and supplier of composites and coatings resins, their composites and coatings segments serve more than 130 and 170 customers worldwide, respectively. The Debtors' Customer Programs include Earned Volume Rebates, Early Payment Discounts, Extended Payment Terms, Product Warranties, Product Recalls and Distributor Commissions (each as defined and discussed in more detail in the Customer Program Motion and, collectively, the "Customer Programs"). The goals of the Customer Programs are to meet competitive pressures, ensure customer satisfaction and generate goodwill for the Debtors, thereby retaining current customers, attracting new ones and ultimately enhancing the Debtors' revenue and profitability.

102.    The success and viability of the Debtors' businesses are dependent upon the development and maintenance of customer loyalty. The commencement of the Chapter 11 Cases will no doubt create apprehension on the part of customers or potential customers regarding their

37

willingness to continue or to commence doing business with the Debtors. The Debtors believe

that without the requested relief, the stability of the Debtors' businesses may be undermined, and

otherwise loyal customers may explore other alternatives. To preserve the value of the Debtors'

businesses, the Debtors must be permitted, in their sole discretion, to continue honoring or

paying all Customer Programs without interruption or modification.

103.     The Debtors believe in their business judgment that continuing the Customer

Programs in the ordinary course of business during these Chapter 11 Cases is essential to

maximizing the value of their estates for the benefit of all stakeholders. Accordingly, on behalf

of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

**I.      Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 364(b), 1107(a) and 1108 and Fed. R. Bankr. P. 6003 and 6004 Authorizing Payment of Certain Prepetition Shipping, Warehousing and Related Claims**

104.     By this Motion, the Debtors seek authority to pay, in their discretion, the

prepetition shipping, warehousing and related claims, relating to both domestic and international

freight (the "Distribution Claims"), up to and including $3.8 million that are owed, either directly

or indirectly, to (i) the Shippers, (ii) the Warehousemen, (iii) the Freight Brokers and (iv) the

Container Suppliers (each as defined and discussed in more detail in the Shippers Motion and,

collectively, the "Distribution Vendors"), to the extent the Debtors determine, in the exercise of

their business judgment, that such payments are necessary or appropriate to (a) secure the

delivery, distribution and sale of the Debtors' products to customers throughout the United States

and abroad, (b) ensure the delivery of goods and raw materials to the Debtors' facilities or

(c) satisfy the liens, if any, in respect of amounts owed to such parties.

105.     The Debtors seek to pay the Distribution Claims for several reasons. First, many

of the Distribution Vendors likely will assert possessory other liens on the goods currently in

their possession if such claims are not paid. The assertion of possessory or other liens will delay

delivery of goods to both the Debtors' plants and to their customers, thereby severely, if not irreparably damaging the Debtors' businesses. In addition, many Distribution Vendors may refuse to perform additional services for the Debtors. In such event, the Debtors will incur significant additional expenses (such as premium shipping, distribution and storage costs) to replace these parties, which amounts likely will exceed the amount of unpaid prepetition Distribution Claims that the Debtors request permission to pay hereunder. More importantly, locating entities to replace the Distribution Vendors will be difficult, if not impossible.

106.    The Debtors believe in their business judgment that the failure to pay the Distribution Claims could have a material adverse impact on their day-to-day operations. Accordingly, on behalf of the Debtors, I respectfully submit that the Shippers Motion should be approved.

**J.    Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 364, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Prepetition Claims of Certain Critical Vendors and Service Providers**

107.    By this Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors to pay the agreed amount of the Critical Vendor Claims (as defined in the Critical Vendor Motion), up to and including $2.2 million, of certain critical suppliers of goods and services, with whom the Debtors continue to do business and whose goods and services are essential to the Debtors' operations (the "Critical Vendors").

108.    The Debtors' ongoing businesses are dependent upon their ability to fulfill orders and provide shipment of products to their customers which, in turn, is dependent upon access to the goods and services that are essential to the production of the Debtors' products. The Debtors believe that many of their vendors and service providers will continue to do business with them after commencement of these cases because doing so simply makes good business sense. In some cases, however, the Debtors anticipate that certain Critical Vendors will: (a) refuse to

39

deliver goods and services without payment of their prepetition claims; or (b) refuse to deliver goods and services on reasonable price or credit terms absent payment of prepetition claims, thereby effectively refusing to do business with the Debtors. The Debtors believe that payment of the Critical Vendor Claims is vital to the Debtors' ability to deliver their products and, thus, to their effort to preserve and maximize value for all stakeholders.

109.    To ensure that the Debtors identify as Critical Vendors only those vendors and service providers that are actually critical to the Debtors' businesses, and who will refuse to, or who will demand pricing or trade terms that constitute an effective refusal to, provide goods or services if not paid, certain of the Debtors' employees and professionals who are responsible for maintaining, and have intimate knowledge of, the Debtors' vendor and service provider relationships, have conducted, and will continue to conduct, an extensive analysis and review of the Debtors' immediate needs for goods and services. Toward that end, the Debtors have determined that they will not pay as Critical Vendors those parties that are obligated to perform under executory contracts with the Debtors.

110.    Moreover, the Debtors propose to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying goods or services to the Debtors on trade terms that are the same or better than the trade terms that existed immediately prior to the Petition Date or, if more favorable, within the first quarter of 2014 (the "Customary Trade Terms"). The Debtors also reserve the right to negotiate new trade terms (the "Minimum Credit Terms") with any Critical Vendor as a condition to payment of any Critical Vendor Claim, in the Debtors' discretion. To ensure that the Critical Vendors deal with the Debtors on either Customary Trade Terms or Minimum Credit Terms, the Debtors propose that a

Trade Agreement (as defined in the Critical Vendor Motion) be sent to the Critical Vendors for execution.

111.    I believe that maintaining the goods and services provided by the Critical Vendors on Customary Trade Terms or Minimum Credit Terms and in accordance with a Trade Agreement or otherwise is vital to the Debtors' continuing business operations and the success of these Chapter 11 Cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendor Motion should be approved.

**K.    Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (II) Granting Liens and Super-Priority Claims; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001**

112.    As set forth in the Declaration of Robert A. Del Genio In Support of Debtors' Motion For Approval of Debtor-in-Possession Financing (the "Del Genio Declaration") filed concurrently with the DIP Financing Motion, the Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facilities to operate their businesses and run an orderly sale process under section 363 of the Bankruptcy Code.  The nature of the Debtors' prepetition capital structure made procuring financing challenging.  Most notable of these challenges was the fact that there was insufficient collateral value owned by the Debtors to enable them to attract traditional lenders willing to provide the liquidity the Debtors needed.  Without access to the DIP Facilities, the Debtors and their estates would suffer immediate and irreparable harm because they could not effectuate a sale of their assets or continue to operate.

113.    As further set forth in the Del Genio Declaration, the Debtors were unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  After careful review and extensive negotiation of several DIP financing proposals, the Debtors' Board of Directors determined in its business judgment that the

41

proposal from the DIP Lenders represented the best option for the Debtors and their businesses. The Debtors have negotiated the DIP Facilities in good faith and at arm's-length with the DIP Lenders.

114.    Unless this Court authorizes the debtor-in-possession financing, the Debtors will be unable to fund their day-to-day operating expenses and the administration of these cases. Absent sufficient funds to support the Debtors' operations, the value of the Debtors' assets and operations will quickly erode and their ability to consummate an orderly sale of their assets under section 363 of the Bankruptcy Code and maximize value will be significantly jeopardized, to the detriment of the Debtors' estates and all stakeholders.

52719/0001-10276649v13

## CONCLUSION

Accordingly, for the reasons stated herein and in each of the First Day Pleadings, the

Debtors request that the relief sought in the First Day Pleadings be approved.

I swear under penalty of perjury that the foregoing is true and correct.


Dated:  September 30, 2014

REICHHOLD HOLDINGS US, INC., *et al.*
Debtors and Debtors in Possession


Roger L. Willis
Chief Financial Officer and Treasurer
Reichhold, Inc.