## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

In re:                                                          :      Chapter 11
                                                                :
REICHHOLD HOLDINGS US, INC., et al.,                            :      Case No. 14-_____ (____)
                                                                :
          Debtors.[1]                                           :      Joint Administration Requested

------------------------------------------------------------- x

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363 AND 364; (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors") hereby move (the "Motion") for entry of an interim order (the "Interim Order"),[2] in

substantially the form attached hereto as Exhibit A, and a final order (the "Final Order")

(i) authorizing the Debtors to obtain postpetition financing pursuant to sections 105, 362, 363,

364, and 507 of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001-5 of

the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for

the District of Delaware (the "Local Rules"); (ii) granting liens and super-priority claims; and

(iii) scheduling a final hearing pursuant to Rule 4001 of the Federal Rules of Bankruptcy

Procedure (as amended, the "Bankruptcy Rules").  In support of this Motion, the Debtors rely

upon and incorporate by reference the Declaration of Roger L. Willis, Chief Financial Officer

and Treasurer of Reichhold, Inc., in Support of Chapter 11 Petitions and First Day Pleadings,

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Reichhold Holdings US, Inc. (5768), Reichhold, Inc. (4826), Canadyne Corporation (7999), and Canadyne-Georgia Corporation (7170).  The street address for the Debtors is 1035 Swabia Ct., Durham, NC 27703.

[2]     Unless indicated otherwise, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Interim Order.  In the event there is any conflict between the descriptions of the Interim Order and/or the DIP Loan Documents set forth in this Motion and the Interim Order or the DIP Loan Documents, the Interim Order and the DIP Loan Documents shall govern.

filed with the Court concurrently herewith (the "Willis Declaration") and the Declaration of

Robert A. Del Genio in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing

Debtors to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and

364; (II) Granting Liens and Super-Priority Claims; and (III) Scheduling a Final Hearing

Pursuant to Bankruptcy Rule 4001, filed under separate cover and fully incorporated herein (the

"Del Genio Declaration"). In further support of the Motion, the Debtors, by and through their

undersigned counsel, respectfully represent:

## PRELIMINARY STATEMENT AND OVERVIEW OF DIP STRUCTURE

1.      Faced with significant liquidity constraints, the Debtors recognized that to achieve

their Chapter 11 objectives -- including, most notably, the effectuation of the sale of all or certain

of the Debtors' assets pursuant to Bankruptcy Code section 363 (a "363 Sale") -- it would be

necessary to obtain postpetition financing. Unfortunately, however, the Debtors also recognized

that the nature of their prepetition capital structure (and other issues discussed below) made

procuring such financing extremely challenging. Most notable of these challenges was the fact

that there was insufficient collateral value among the Debtor entities to enable the Debtors to

attract traditional lenders willing to provide the funding the Debtors needed.[3]

2.      Despite these challenges, in the weeks prior to the Petition Date (defined below),

the Debtors, with the assistance of their financial and other advisors, engaged in lengthy

discussions with representatives of various potential sources of postpetition financing. As

reflected in the Del Genio Declaration, those discussions took place with the representatives of

several different types of financing sources, including (a) existing creditors of the Debtors and

---

[3]      The Debtors are obligors under a prepetition secured credit facility, discussed below, which is secured by
substantially all of the Debtors' assets. The Debtors, therefore, require liquidity sufficient both to repay that
facility in full and to provide the Debtors with the incremental funding necessary to fund the Debtors' chapter
11 cases. The value of the Debtors' assets alone proved insufficient to support a loan of that size.

2

certain of their non-Debtor affiliates, (b) traditional lenders (i.e., banks), and (c) non-traditional

lenders (i.e., distressed funds that routinely lend in the distressed-debt space).

3.      As also reflected in the Del Genio Declaration, the Debtors undertook a rigorous

marketing process and exploration of strategic alternatives, in which the Debtors received formal

proposals from several of these potential financing sources.  In evaluating the strengths and

weaknesses of these proposals, the Debtors' primary objective was to find a financing source that

would (a) provide sufficient liquidity to allow the Debtors the necessary runway to operate their

businesses while utilizing the Chapter 11 process to effectuate a 363 Sale, (b) avoid the costs and

risks (including possible delay) associated with potential litigation surrounding the selection of

any particular financing option, and (c) provide competitive terms to the Debtors for such

financing.

4.      Ultimately, with the foregoing objectives in mind, the Debtors determined that the

best financing option was presented (as a component of a larger, comprehensive transaction

discussed below), collectively, by funds managed by Third Avenue Management ("Third

Avenue"), JP Morgan ("JPM") and Black Diamond ("Black Diamond" and together with Third

Avenue and JPM, but solely in their capacity as the source of postpetition financing, the "Senior

DIP Lenders"), the largest holders of the 9% / 11% Senior Secured Notes due 2017 in the

aggregate principal amount of $255 million (the "Senior Secured Notes" and all of the holders of

such Notes referred to, collectively, as the "Senior Secured Noteholders") issued by the Debtors'

non-debtor parent Reichhold Industries, Inc. ("Reichhold Industries").  Significantly, the Senior

DIP Lenders' proposal represents the most reasonable and viable option for obtaining the

additional liquidity necessary to sustain the Debtors' operations in Chapter 11 for the benefit of

their estates and creditors.

5.    As set forth below, to secure its obligations under the Senior Secured Notes, Reichhold Industries pledged 65% of the voting shares (and 100% of the non-voting shares) it holds in its wholly-owned, direct, non-Debtor subsidiary, Reichhold Holdings Luxembourg, S.a.r.l. ("RHL").  RHL is the ultimate holding company of all of the non-Debtor affiliates that operate outside of North America (these non-North American entities and operations, including Reichhold Industries, are hereafter referred to collectively as "ROW").[4]  Given the fact that the non-voting shares that have been pledged carry with them a significant portion of the economic value of RHL, the Debtors (and the non-Debtor affiliates) believe that the Senior Secured Noteholders are the primary, and almost sole, economic beneficiaries of ROW's value.

6.    Discussions with the Senior DIP Lenders accelerated and ultimately culminated with a comprehensive, multi-staged transaction (the "Proposed Transaction") a key component of which is a financing structure pursuant to which the Senior DIP Lenders agreed to provide secured financing in the aggregate net principal amount of $130,000,000 (after original issue discount) both directly to the Debtors and to one of the non-Debtor ROW affiliates (which affiliate would, under the terms of the Proposed Transaction, in turn, loan a portion of such funds to the Debtors).  The structure's ultimate funding goal was to provide the Debtors with access to new liquidity, after the repayment of (i) approximately $73 million owed to the Debtors' pre-petition secured lender, Oaktree Capital Management L.P. ("Oaktree") and (ii) approximately $28.9 million owed to the ROW affiliates' secured lender GA Capital LLC.

7.    The DIP Loan is essential to the continued operation of the Debtors' businesses and the Debtors' efforts to consummate a value-maximizing restructuring transaction.  Absent

---

[4]    All of the non-Debtor affiliates, including Reichhold Industries, Inc. that are part of the business that operates outside of North America have historically been referred to by the Debtors' management team, collectively, as "Rest of World" or by the acronym "ROW."

52719/0001-10997527v5

access to the DIP Loan, the Debtors will likely not have adequate cash on hand to satisfy their

debt obligations and maintain uninterrupted operations, resulting in immediate liquidation,

severe employee dislocation and crippling losses for vendors and customers.

8.      As described below, obtaining the DIP Loan on the terms proposed is well within

the sound discretion of the Debtors as it will allow the Debtors to stabilize their operations and

preserve and maximize the value of their estates for the benefit of all parties in interest.

Significantly, the DIP Loan is provides for a comprehensive transaction that allows the

Reichhold Companies' to emerge with continuing business operations, a delevered balance sheet

and significantly enhanced financial condition, across the Debtors' worldwide operations.

Additionally, the DIP Loan provides for a stalking horse bid for the Reichhold Companies' U.S.

operations (as further discussed below) thereby ensuring a clear path towards emergence while

providing the liquidity needed to run a marketing process and encourage overbidding to increase

value for the Debtors' estates.  Moreover, the DIP Loan solves the Reichhold Companies'

liquidity needs while providing a stalking horse bid and allowing for a complete sale process for

the U.S. operations.  As a result of the foregoing, the DIP Loan allows the Reichhold Companies

to continue operations post-emergence with a delevered balance sheet and on stronger financial

footing.  Furthermore, the DIP Loan is being provided by parties who are the Reichhold

Companies' largest economic constituents, including the three largest holders of the Senior

Secured Notes and the potential for additional bondholders to participate.  This provides the

added benefit that the DIP Loan eliminates the risk of significant litigation with the bondholders

during the Chapter 11 cases.

9.      This triangular or 3-pronged financing structure and the larger Proposed

Transaction to which it is central was necessitated by the fact that (a) there is, as noted above,

insufficient collateral value, at normal advance rates, among the Debtor entities to support

financing in an amount necessary to both pay off the Debtors' existing prepetition secured loan

and provide the additional liquidity the Debtors need to effectuate the 363 Sale process, and (b)

the ROW affiliates (which had historically provided unsecured credit to the Debtors to support

the Debtors' operations) could not provide direct collateral support for a secured loan to the

Debtors because of certain adverse tax consequences that the Debtors would experience.

Accordingly, the Debtors and the Senior DIP Lenders developed the triangular financing

structure to provide a way in which (x) the ROW entities could provide collateral support for the

infusion of new secured loans and (y) from the perspective of the Senior DIP Lenders, they

would effectively have collateral support for the funds flowing to the Debtors, but with a much

more limited tax consequence for the Debtors.  The financing structure is illustrated on the chart

annexed as Exhibit B.

      10.     As illustrated in Exhibit B, the agreed financing structure, will allow funds to

flow to the Debtors from two separate sources:  The first funding source is a direct loan[5] in the

amount up to $53.19 million on an interim and final basis (the "Senior DIP Loan") from the

Senior DIP Lenders to Debtor Reichhold, Inc., guaranteed by the other Debtors.[6]  The second

funding source ultimately derives from a secured loan of $85.1 million made by the Senior DIP

Lenders to Reichhold Holdings International B.V. ("Reichhold BV") a holding company for all

of the ROW entities, guaranteed by many of the ROW entities (the "ROW Loan").  The proceeds

from the ROW Loan will be used to repay certain secured indebtedness at Reichhold BV and to

---

[5]    Due to the internal requirements of certain of the Third-Party DIP Lenders, the loans in each case take the form of secured notes rather than a credit agreement.  The difference in structure, however, has no impact upon the Debtors.

[6]    It is ultimately intended that this Third-Party DIP Loan be refinanced by a more traditional DIP lender.  However, the Debtors' need for liquidity did not allow for sufficient time to obtain such financing prior to the Petition Date.

fund the Junior DIP Loan (as defined below).  Reichhold BV (in its capacity as a postpetition

lender, the "Junior DIP Lender") will then make an intercompany loan in the same amount as the

Senior DIP Loan of $53.19 million (the "Junior DIP Loan" and, together with the Senior DIP

Loan, the "DIP Loans") to Debtor Reichhold, Inc. which will be evidenced by an intercompany

note between the Junior DIP Lender and Debtor Reichhold, Inc. (the "Junior DIP Note").  A

copy of the Junior DIP Note is attached substantially in the form as <u>Exhibit C</u>.  The Debtors

believe that the credit support from ROW to the Debtors is necessary to maximize the overall

value of the Debtors' assets.  Both DIP Loans will be secured by liens upon substantially all of

the Debtors' assets.  The liens under the Senior DIP Loan are, however, first priority liens on

such assets which are senior in priority to the liens under the Junior DIP Loan.  Among other

conditions precedent to initial funding under the DIP Loans, reciprocal license agreements for

the use of intellectual property shall have been executed and delivered as set forth and pursuant

to the terms of the ROW Note Purchase Agreement (as defined below).  The Debtors intend to

use the proceeds of the DIP Loans to (a) pay off all outstanding obligations under the Debtors'

existing Oaktree prepetition secured facility in the principal amount of approximately $73

million, (b) support the ongoing operations of the Debtors' business during these Chapter 11

cases, and (c) enable the Debtors to fund the 363 Sale process.

   11.    As noted above, the furnishing of the funds underlying the DIP Loans is only the

first step in the overall Proposed Transaction.  The second step is the commitment by Reichhold

Industries to negotiate documents for (a) a consensual foreclosure by Wells Fargo, National

Association as indenture trustee (the "Indenture Trustee" on behalf of and for the benefit of the

Industries Noteholders) of the ROW equity collateral pledged under the Senior Secured

Indenture (defined below) (i.e., the substantial majority of the stock that Reichhold Industries

7

holds in RHL) and (b) an asset purchase agreement (the "APA") under which Reichhold BV or another of the ROW entities as successor to the Junior DIP Lender would become the stalking horse to purchase substantially all of the Debtors' material assets in the 363 Sale process, initially by credit- bidding the Intercompany DIP Loan in full. The DIP Loans reflect milestones to allow this second step of the Proposed Transaction to be completed quickly and to thereby preserve value of the Debtors' estates and the non-Debtor affiliates. The understanding among the various parties in interest is that the parties will commence the documentation and prosecution of this second step of the Proposed Transaction immediately upon interim approval of the DIP Loans.

12.     Based upon the foregoing, and as more fully discussed below, the Debtors respectfully submit that the proposed postpetition financing structure should be approved as it provides the Debtors with ample liquidity to address their Chapter 11 objectives and further represents the best available postpetition financing option known to the Debtors and is in the best interests of the Debtors, their estates and stakeholders.

<strong><u>JURISDICTION</u></strong>

13.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code Sections 105, 362, 363, 364 and 507. Such relief is also warranted under Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rule 4001-5.

<strong><u>BACKGROUND</u></strong>

**A.      <u>General Background</u>**

14.     On  the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in this Court commencing cases for relief under Chapter 11 of the Bankruptcy Code (the "Chapter

8

11 Cases"). The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the Willis Declaration, filed on the Petition Date and fully incorporated herein by reference.

15.    The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have yet been appointed.

**B.    Company History and Corporate Structure**

16.    The Debtors are part of the privately-held international "Reichhold" family of companies (the "Reichhold Companies") owned, directly or indirectly, by Reichhold Industries. The Reichhold Companies are leading global suppliers of intermediate products for the composites and coatings industry. The Reichhold Companies include operations in North America, Europe, Latin America, South America, the Middle East and Asia. The Debtors conduct the Reichhold Companies' United States operations.

17.    The Debtors include the following four entities:  (a) Reichhold Holdings US, Inc. ("Holdings"), a Delaware corporation; (c) Reichhold, Inc., a Delaware corporation, which is wholly owned by Holdings; (d) Canadyne Corporation ("Canadyne"), a Delaware corporation, which is wholly owned by Reichhold, Inc.; and (e) Canadyne-Georgia Corporation ("CGC"), a Georgia corporation, which is wholly owned by Canadyne. Reichhold, Inc. is the only entity among the four Debtors that has active operations. Holdings is strictly a holding company. Canadyne and CGC are inactive entities.

18.    Holdings is a wholly owned subsidiary of Reichhold Corporate Holdings II B.V., a Dutch entity, which is in turn a wholly owned subsidiary of Reichhold Industries. Reichhold

52719/0001-10997527v5

Industries is wholly owned by Kestrel I Acquisition Corp. ("Kestrel"), a Delaware corporation. Kestrel is privately held.

**C.    Overview of the Debtors' Pre-Petition Capital Structure**

19.    The Debtors are borrowers, guarantors and/or obligors under various credit agreements, notes and financial arrangements.  As of the Petition Date, the Debtors' secured and unsecured debt obligations totaled approximately $287.3 million (exclusive of the guarantee obligations under the Senior Secured Notes described below).

### (i)    Secured Debt

20.    As of the Petition Date, the Debtors had aggregate outstanding secured debt totaling approximately $64.3 million (exclusive of the Senior Secured Notes) in connection with various loans, notes and equipment financings, as described in more detail below.

a.    Senior Credit Facility With Oaktree

21.    Debtor Reichhold, Inc. and non-debtor affiliate Reichhold Industries Limited ("RIL"), an Ontario, Canada corporation were borrowers (the "Borrowers") under a Credit Agreement dated October 7, 2005, as subsequently amended, (the "Credit Agreement") among various lenders thereunder (the "Prior Lenders") and Bank of America, N.A. ("BofA") as administrative agent and a Prior Lender and Wells Fargo Bank, National Association ("Wells Fargo") as Documentation Agent and a Prior Lender.  Pursuant to the Credit Agreement, the Prior Lenders made available to the Borrowers a maximum amount of $85 million on a revolving basis (the "Revolving Loan").

22.    In the early months of 2014, it became apparent that availability under the Revolving Loan was becoming insufficient to supply the Borrowers with the liquidity necessary to continue financing their operations.  As a result, the Borrowers entered into discussions with

10

OCM Reichhold Holdings, Ltd., an affiliate of Oaktree, to provide a new credit facility.  On or about May 20, 2014, BofA and Wells Fargo in their respective capacities as Prior Lenders under the Credit Agreement assigned the Credit Agreement and all rights and interests thereunder to Oaktree, as the new sole lender under that agreement (the "Assignment").  BofA, however, agreed to continue as administrative agent.

23.     In connection with the Assignment, the Borrowers and BofA entered into a Fifteenth Amendment to Credit Agreement dated May 20, 2014 (the "Amendment").  Pursuant to the Amendment, the Revolving Loan was replaced with term loans and a delayed draw term loan in the aggregate amount of $70 million as follows (collectively, the "Term Loans"): (a) a term loan in the aggregate principal amount of $8,345,353.79 to RIL, the proceeds of which were used to repay RIL's outstanding balance on the Revolving Loan; (b) a term loan in the aggregate principal amount of $29,265,221.07 to Debtor Reichhold, Inc., the proceeds of which were used to repay Reichhold, Inc.'s outstanding balance on the Revolving Loan; (c) a delayed draw term loan commitment to Debtor Reichhold, Inc. in the original principal amount of $5,000,000; and (d) additional term loans to Debtor Reichhold, Inc. in the aggregate principal amount of $27,389,425.14, of which approximately $14 million was used to cash collateralize outstanding letters of credit.  The Term Loans are scheduled to mature on October 31, 2014.  As of the Petition Date, the amount outstanding to Oaktree under the Credit Agreement is approximately $73 million, of which $64.3 million was owed by Debtor Reichhold, Inc. and $8.7 million was owed by non-Debtor RIL (though the total amount is the joint and several obligation of one of the Debtors).

24.     The Borrowers' obligations under the Credit Agreement, as amended by the Amendment, are secured by a security interest in substantially all of the Borrowers' assets other

52719/0001-10997527v5

than the equity interests held by Holdings.  Additionally, in consideration for the Term Loans and subject to the terms set forth in the Amendment, non-Debtor Reichhold Industries, the parent of the Borrowers, agreed not to sell any of its assets, including equity in its subsidiaries.

           b.     <u>Senior Secured Notes</u>

25.    On May 8, 2012, non-debtor Reichhold Industries issued $206,578,066 of 9%/11% Senior Secured Notes (the "Senior Secured Notes") due 2017 pursuant to an indenture (the "Senior Secured Indenture") under which Wells Fargo serves as trustee and collateral agent. Reichhold Industries' obligations under the Senior Secured Notes and Senior Secured Indenture are guaranteed by Holdings and Reichhold, Inc. (together with Reichhold Industries, the "Issuers").  The Senior Secured Notes are secured by a pledge of, among other things, Reichhold Corporate Holdings II B.V.'s interest in Holdings and Holdings' interest in Reichhold, Inc.[7]

26.    The Senior Secured Notes were issued following an exchange offer whereby the Senior Secured Notes were exchanged for the Senior Unsecured Notes.  The Senior Secured Notes accrue cash interest at 9% and payment-in-kind interest ("PIK Interest") at 11%, with payments due annually on November 1 and May 1.  Under the Senior Secured Indenture, the Issuers are permitted to add interest payments to the principal amount outstanding at the PIK Interest rate through May 1, 2014.

27.    As of the Petition Date, principal in the amount of approximately $255 million was outstanding under the Senior Secured Notes.

---

[7]    Reichhold, Inc. is a guarantor of the Senior Secured Notes.  Reichhold, Inc., however, did not pledge any assets to secure that guarantee.

c.    Equipment Financing

28.    The Debtors are also party to several equipment leases and purchase agreements for equipment that they financed.  The total secured obligations related to that equipment is only approximately $3,000.

(ii)    **Unsecured Debt**

29.    As set forth in more detail below, as of the Petition Date, the Debtors had aggregate outstanding unsecured debt of approximately $223 million arising in connection with unsecured notes, accounts payable, accrued liabilities and other liabilities.

a.    Intercompany Debt with Non-Debtor Affiliates

30.    Reichhold, Inc. has received inter-company transfers in the form of loans evidenced by notes from its foreign affiliates to address the Debtors' liquidity shortfall (discussed below).  Those inter-company loans are recorded by intercompany notes that are issued monthly and payable the next month.  As of the Petition Date, Reichhold, Inc. had borrowed approximately $103.7 million from foreign affiliates through inter-company loans.  Of this amount, $93.9 million was owed to an affiliate in the Netherlands and $9.8 million was owed to RIL.

b.    Other Obligations

31.    As of the Petition Date, the Debtors also estimate that there is approximately $119 million in general unsecured claims against the Debtors[8].  Of this amount, approximately $68 million relates to unfunded pension and other postretirement obligations.

---

[8]    In addition, as of the Petition Date, the Debtors also had approximately $31 million in liabilities for estimated environmental and legal obligations and had posted financial assurance letters of credit in the amount of $4 million.

**D.    Efforts to Obtain Post-Petition Financing**

32.    As of the Petition Date, the Debtors did not have sufficient liquidity to operate their businesses and cannot fund the administration of these Chapter 11 Cases without debtor-in-possession financing.  Toward that end, before the Petition Date, the Debtors retained CDG Group to, among other things, critically examine the Debtors' business operations and funding requirements.  In or about April 2014, given the Debtors' operating losses and financial stress, the Debtors and their advisors contacted 4 potential lenders and received one  financing proposal from prospective lenders in anticipation of a potential Chapter 11 filing.  As set forth above, in May 2014, however, the Debtors secured the Oaktree Term Loans, alleviating the need for a DIP loan at that time.

33.    In August 2014, the Debtors met with the holders of the Senior Secured Notes to address the state of the Debtors' business operations and need for additional financing while they explored strategic alternatives.  At that time, given the Debtors' liquidity constraints and limited available cash, the Debtors and their advisors renewed their efforts to secure a DIP loan.  They contacted and solicited DIP financing proposals from seven prospective lenders including their existing lenders and bondholders, traditional lenders and non-traditional lenders.  The Debtors and their advisors explored two types of financing structures with the prospective lenders – funding for the Debtors' United States operations only and a global financing solution for the Debtors' United States and ROW businesses.  The Debtors ultimately received four proposals for DIP financing.  None of the prospective lenders were willing to provide a DIP facility secured only by the Debtors' collateral.  Instead, all four of the proposals required security from the ROW entities to fund the cash needs of the Debtors.

14

34.     As set forth in the Del Genio Declaration, after careful review and extensive

negotiation of the DIP financing proposals, the Debtors' Board of Directors determined in its

business judgment that the Proposed Transaction represented the best option for the Debtors and

their businesses and is in the best interest of the Debtors, their estates and their stakeholders.

**E.     Additional Specifics Regarding the Senior DIP Loan**

35.     The funding for the Senior DIP Loan will be obtained through the issuance by

Debtor Reichhold Inc. of those certain Senior Secured Promissory Notes in the amount of

$53,190,000 in favor of the Senior DIP Lenders (the "Senior DIP Note"). The Senior DIP Note

is governed by the Note Purchase and Guaranty Agreement. A copy of the Senior DIP Note

Purchase and Guaranty Agreement is attached substantially in the form of Exhibit D. The

Oaktree Term Loans had been secured by first priority liens on substantially all of the assets of

the Debtors and the DIP financing will repay the Oaktree Term Loans. The Senior DIP Note will

be secured by first priority liens on all of the same assets as those which secured the Oaktree

Term Loans and such liens will, as noted above, be senior to the liens and on the same collateral

that secure the Junior DIP Loan. The Senior DIP Note will not be guaranteed by any of the non-

Debtor affiliates

**F.     Additional Specifics Regarding the Junior DIP Loan**

36.     The funding for the Junior DIP Loan will be obtained, in part, through the

issuance of those certain Senior Secured Promissory Notes in the aggregate principal amount of

$85.1 million issued to the Senior DIP Lenders by Reichhold BV (the "ROW Note"). A copy of

the ROW Note Purchase and Guaranty Agreement is attached substantially in the form as Exhibit

E. The ROW Note is subject to the terms and conditions set forth in a Note Purchase

Agreement. A portion of the proceeds generated through the issuance of the ROW Note will be

used to pay off all amounts outstanding under a facility with GA Capital LLC (approximately $28.9 million) (the "GAC Facility"). After satisfying the amounts outstanding under the GAC Facility, Reichhold BV will use the remaining amounts borrowed under the ROW Note, plus additional cash on hand to provide the Junior DIP Loan to the Debtors in the aggregate amount up to $53.19 million on an interim and final basis.

## RELIEF REQUESTED

37.     The Senior DIP Lenders and the Junior DIP Lender (collectively, for themselves and such other lenders as may become party to the DIP Facilities from time to time, the "DIP Lenders") have agreed to provide Reichhold, Inc. (for the benefit of all of the Debtors) with post-petition financing (the "DIP Facilities") in the aggregate principal amount of $106.4 million pursuant to (a) the terms and conditions of the Senior DIP Note and Junior DIP Note (collectively, the "DIP Notes" as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of the Interim Order and, if applicable, any Final Order, the "DIP Documents") and (b) an agreed upon budget (the "Approved Budget").[9] Although the DIP Loans are not structured pursuant to a credit agreement, Cantor Fitzgerald Securities will effectively act as security agent and central paying agent with respect to the Senior DIP Note (in such capacity, the "Senior DIP Agent") and the Junior DIP Note (in such capacity, the "Junior DIP Agent" which together with the Senior DIP Agent, are the "DIP Agents").

38.     By this Motion and pursuant to Bankruptcy Code Sections 105, 362, 363, 364 and 507, and Bankruptcy Rules 2002, 4001, 6004 and 9014, the Debtors hereby seek entry of two orders (together, the "DIP Orders")—an Interim Order in the form annexed hereto as Exhibit A

---

[9]     A copy of the Approved Budget is attached to the Interim Order as Exhibit A.

16

and, following notice of the Motion and the Interim Order and a hearing (the "Final Hearing") on

the relief requested, a Final Order[10] approving such relief on a final basis—which in each case,

among other things:

(a)    authorizes the Debtors to obtain loans under the DIP Facilities up to the aggregate principal amount of $93,620,000 (the "Interim Amount") on an interim basis and $106,380,000 on a final basis, from the DIP Agents and the DIP Lenders;

(b)    approves the terms of, and authorizes the Debtors to execute and perform under, the DIP Documents and to perform such other and further acts as may be required in connection with the DIP Documents;

(c)    authorizes the Debtors to grant first priority superpriority claims to the Senior DIP Lenders and first priority liens (only as to the holders of Senior Secured Notes' pre-petition claims) in favor of the Senior DIP Agent (for the benefit of the Senior DIP Lenders) on all prepetition and postpetition property of the Debtors' estates and all proceeds thereof (but excluding a lien on Avoidance Actions (as defined in the Interim Order) and, prior to entry of the Final Order, any Avoidance Proceeds (as defined in the Interim Order)), subject to the Carve-Out (as defined below) and the terms of the DIP Orders;

(d)    authorizes the Debtors to grant second priority superpriority claims to the Junior DIP Lender and second priority liens in favor of the Junior DIP Agent (for the benefit of the Junior DIP Lender) on all prepetition and postpetition property of the Debtors' estates and all proceeds thereof (but excluding a lien on Avoidance Actions and, prior to entry of the Final Order, any Avoidance Proceeds), subject to the Carve-Out and the terms of the DIP Orders;

(e)    subject to and only effective upon the entry of a Final Order, approves the waiver by the Debtors of any right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise; and

(f)    waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of the DIP Orders.

---

[10]    A copy of the proposed Final Order shall be filed under separate cover prior to the Final Hearing and shall be in form and substance substantially similar to the Interim Order.

52719/0001-10997527v5

## TERMS AND CONDITIONS OF THE DIP FACILITY

### A.    Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2[11]

39.    The following sets forth the Sections of the DIP Documents and paragraphs of the Interim Order that are required to be identified in accordance with Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i):

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| N/A | Borrower Under Senior DIP Note | Reichhold, Inc. | Senior Note: Preamble; Interim Order: Introductory paragraph |
| N/A | Borrower Under Junior DIP Note | Reichhold, Inc. | Junior Note: Preamble; Interim Order: Introductory paragraph |
| N/A | DIP Agent and DIP Lender Under DIP Notes | Agent: Cantor Fitzgerald Securities Lenders: Third Avenue, JPM, Black Diamond and possibly other holders of the Senior Secured Notes. | DIP Notes: Preamble; Interim Order: Preamble |
| N/A | Use of proceeds Under Notes | The proceeds shall be used for (a) working capital and other general corporate purposes, (b) permitted payment of costs of administration of the Chapter 11 Cases, (c) payment of such prepetition expenses as have been or are consented to by each DIP Agent, in its reasonable discretion, and are approved by the Court; (d) repayment in full of the Prepetition Oaktree Term Loan Indebtedness; and (e) providing liquidity to the Debtors to effectuate the Transactions as defined in the DIP Documents | Interim Order at ¶ 3(d) |

---

[11] The description of the terms of the DIP Facilities in the Motion are intended only to be a summary. In the event of any inconsistency between the descriptions set forth herein and the terms of the DIP Documents or the DIP Orders, the DIP Orders shall govern. The Final Order will be in a form substantially similar to the Interim Order. All capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them in the DIP Documents or Interim Order. Local Rule 4001-2 requires the Debtors to highlight certain provisions in the Motion. Sections that must be highlighted for the Court under either Bankruptcy Rule 4001(c) or Local Rule 4001-2 are in bold and references to the DIP Documents and Interim DIP Order are provided.

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| N/A | Amount of Senior DIP Loan and Junior DIP Loan | The Senior DIP Loan consists of a term loan in aggregate principal amount of $53,190,000. Upon the entry of the Interim Order, the Reichhold, Inc. will be permitted to borrow collectively under the Senior DIP Loan $53,190,000, subject to the terms and conditions contained in the Interim Order and the Approved Budget.  Upon entry of the Final Order, Reichhold, Inc. will be permitted to borrow up to the full amount of the DIP Facility, subject to the terms and conditions contained in the Final Order and the Approved Budget. The Junior DIP Loan consists of a term loan in aggregate principal amount of $53,190,000. Upon the entry of the Interim Order, Reichhold, Inc. will be permitted to borrow collectively under the Senior DIP Loan and Junior DIP Loan up to $40,430,000, subject to the terms and conditions contained in the Interim Order and the Approved Budget.  Upon entry of the Final Order, Reichhold, Inc. will be permitted to borrow up to the full amount of the DIP Facility, subject to the terms and conditions contained in the Final Order and the Approved Budget. | Senior Note: § 1(A)(i); Junior Note: § Preamble; Interim Order: Introductory paragraph I |
| N/A | Interest rate for Senior DIP Loan and Junior DIP Loan | The DIP Loans shall bear interest at the rate of 12% per annum or at the PIK Rate of 14%. During the occurrence and continuance of an Event of Default, the Senior DIP Loan shall bear interest at 2% per annum in excess of the otherwise applicable rate. | Senior Note: § 1(B)(i); Junior Note: § 2 |
| N/A | Term/ Maturity date | The DIP Loans mature and must be paid in full on February 27, 2015 | Senior Note: § 4(A); Junior Note: § 1 |
| Local Rule 4001-2(a)(ii) | Events of Default | In addition to the Events of Default set forth in the DIP Documents, the following shall constitute Events of Default :  (i) any modification or extension of the Interim Order without the prior written consent of the DIP Agents, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agents, (ii) an order converting or dismissing the Chapter 11 Cases and such order shall not have been reversed or vacated within | Senior Note: § 58; Junior Note: § 7; Interim Order: ¶ 17(b) |

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | ten (10) days; (iii) an order appointing a chapter 11 trustee in the Chapter 11 Cases and such order shall not have been reversed or vacated within ten (10) days, (iv) an order appointing an examiner with enlarged powers in the Chapter 11 Cases and such order shall not have been reversed or vacated within ten (10) days, (v) an order providing for a change of venue with respect to the Chapter 11 Cases and such order shall not have been reversed or vacated within ten (10) days; (vi) an order approving a plan of reorganization or the sale of all or substantially all of the Collateral (except to the extent permitted under the DIP Documents) shall have been entered which does not provide for the repayment in full in cash of the DIP Obligations (other than any contingent obligations not yet due and payable) upon the consummation thereof. | |
| N/A | Fees | 6% Original Issue Discount.  The DIP Facilities also contemplate the payment of reasonable fees and expenses of the professionals of the DIP Agents and the DIP Lenders as well as administrative agency fees and reimbursement of out-of-pocket expenses. | Senior Note: § 3(A)(7); Interim Order ¶ 5. |
| Bankruptcy Rule 4001 (c)(i)(B)(i) Local Rule 4001-2(a)(i)(G) | Liens/security for DIP Agents and DIP Lenders | 1.  Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior (but subject to the priorities set forth in the DIP Documents) security interest in and lien upon all pre- and postpetition tangible and intangible property of the Debtors and the Debtors' estates, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or to valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code) (collectively, "Unencumbered Property"), including without limitation, all inventory, accounts receivable, general intangibles, chattel paper, contracts, owned real estate, real and | Interim Order: ¶ 7 |

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | personal property leaseholds, property, plants, fixtures and machinery and equipment, vehicles, vessels, deposit accounts, cash and cash collateral of the Debtors (whether maintained with the applicable DIP Agent or otherwise) and any investment of such cash and cash collateral, letter of credit rights, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property and stock of subsidiaries of the Debtors. Unencumbered Property shall exclude (x) the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but, subject only to and effective upon entry of the Final Order, shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise and (y) any property which any DIP Agent discovers a lien on prior to entry of the Final Order (the "Excluded Property"). <br><br> 2.  Liens Junior to Certain Other Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest (subject to the priorities set forth in the DIP Documents) in and lien upon all pre- and postpetition tangible and intangible property of the Debtors and the Debtors' estates (other than the Excluded Property), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, or to any valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Agents are junior to such valid, perfected and unavoidable | |

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | liens. | |
| | | 3.  Liens Senior to Certain Other Liens.  The DIP Liens are not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) unless otherwise provided for in the DIP Documents, any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors.  Priority of DIP Liens.  The DIP Liens granted under the Junior DIP Facility are immediately junior in priority and subject to the DIP Liens granted to the Senior DIP Lenders. | |
| Local Rule 4001-2(a)(i)(F) | Carve-out Disparate treatment of professionals | As more fully set forth in the DIP Orders, the liens on and security interests in the DIP Collateral and the superiority administrative expenses claims shall be subordinate to the "Carve Out."  For purposes hereof, the "Carve Out" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) and 31 U.S.C. § 3717; (ii) all reasonable fees and expenses incurred by a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iii) to the extent allowed at any time, but subject in all respects to the Budget and the terms of the Interim Order, all accrued and unpaid fees, disbursements, costs and expenses ("Professional Fees") (other than any monthly fee, restructuring fee, sale fee or other success fee of any investment bankers or financial advisors of the Debtors), incurred by professionals or professional firms  whose retention has been approved by the Court during the Chapter 11 Cases pursuant to sections 327 | Interim Order: ¶ 6(b) |

22

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | and 1103 of the Bankruptcy Code (collectively, "Professional Persons"), retained by the Debtors and the Committee, if any, at any time before or on the first business day following delivery by any DIP Agent of a Carve Out Trigger Notice, to the extent such Professional Fees are allowed by the Bankruptcy Court whether prior to or after delivery of a Carve Out Trigger Notice; and (iv) after the first business day following delivery by any DIP Agent of the Carve Out Trigger Notice, to the extent allowed by the Bankruptcy Court whether prior to or after delivery of a Carve Out Trigger Notice, all unpaid fees, disbursements, costs and expenses incurred by Professional Persons, in an aggregate amount not to exceed $1,000,000 with no more than $250,000 of that amount allocable to professionals retained by a Committee ] (the amount set forth in this clause (iv) being the "Carve-Out Cap"); *provided, however*, that no party may use the Collateral, the DIP Facilities, the Carve-Out or the Carve-Out Cap or any portion or proceeds of the foregoing in connection with (1) objecting to or contesting the validity or enforceability of the Interim Order or Final Order or any obligations outstanding under the DIP Documents or the Prepetition Documents;  (2) asserting or prosecuting any claims or defenses or causes of action against the DIP Agents, the DIP Lenders or their respective agents, affiliates, representatives, attorneys or advisors or preventing, hindering or otherwise delaying the DIP Agents' or the DIP Lenders' assertion, enforcement or realization on the Collateral or Superpriority Claims once an Event of Default has occurred and is continuing in accordance with the DIP Documents and this Interim Order; (3) seeking to modify any of the rights granted under the Interim Order or Final Order to the DIP Agents, any DIP Lender, any Prepetition Agent or any Prepetition Secured Party, or for any act which has the effect of materially or adversely modifying or compromising the rights | |

52719/0001-10997527v5

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | and remedies of any DIP Agent or any DIP Lender as set forth in any DIP Documents or any Prepetition Agent or any Prepetition Secured Party as set forth in the applicable Prepetition Documents; (4) making any payment in settlement or satisfaction of any prepetition or administrative expense claim, unless in compliance with the DIP Documents and, with respect to the payment of any prepetition claim or non-ordinary course administrative expense claim, separately approved by the Court pursuant to a filing in form and substance acceptable to the applicable DIP Agent; (5) objecting to, contesting, delaying, preventing or interfering with in any way the exercise of rights and remedies by the DIP Agents and the DIP Lenders with respect to the applicable Collateral once an Event of Default has occurred; (6) except as expressly provided by the DIP Documents, making any payment or distribution to any affiliate, equity holder, or insider of the Debtors outside of the ordinary course of business; (7) using or seeking to use any insurance proceeds related to the Collateral except as permitted by the DIP Documents or otherwise with the consent of the applicable DIP Agent and, to the extent provided in the applicable DIP Documents, the DIP Lenders; or (8) a request, without the prior consent of the applicable DIP Agent, and, to the extent provided in the applicable DIP Documents, the DIP Lenders, for authorization to obtain debtor in possession financing pursuant to section 364(c) or (d) of the Bankruptcy Code that does not indefeasibly discharge in full in cash the DIP Obligations immediately upon the closing of such financing. | |
| Bankruptcy Rule 4001 (c)(i)(B)(iv) | Waiver or modification of the automatic stay | The automatic stay is modified to the extent necessary to permit the DIP Agents and the DIP Lenders to exercise all rights and remedies provided for in the DIP Documents and Interim Order, including to take any or all of the | Interim Order ¶¶ 11 and 16(b) |

24

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | following actions, without further order of or application or motion to this Court, immediately upon the occurrence of an Event of Default (as defined in the DIP Documents) (subject to the Interim DIP Order and Carve-Out Cap) upon seven days' prior written notice (which seven days' notice period (the "Notice Period") shall run concurrently with any notice provided under the DIP Documents) to the Debtors and the Creditors' Committee, if any, of any DIP Agent's intent to exercise such rights and remedies: (i) immediately terminate the Debtors' use of any cash collateral; (ii) freeze monies or balances in the Debtors' accounts and sweep all funds contained therein and apply the same to pay the DIP Obligations; (iii) declare all DIP Obligations to be immediately due and payable; (iv) immediately set-off any and all amounts in accounts maintained by the Debtors with any DIP Agent or any DIP Lender or on their behalf against the DIP Obligations, or otherwise enforce any and all rights against the Collateral in the possession of the DIP Agents or any of the DIP Lenders or being held on their behalf, including, without limitation, disposition of the Collateral solely for application towards the DIP Obligations; and (v) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Documents or applicable law to effect the repayment of the DIP Obligations; *provided that* the Debtors do not have the right to contest the enforcement of the remedies set forth in the Interim Order and the DIP Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth herein or in the applicable DIP Documents. The automatic stay provisions of section 362(a) of the Bankruptcy Code are modified to the extent necessary to permit the DIP Agents to take all actions to perfect the DIP Liens. | |
| Bankruptcy | Waiver or | The Interim Order is sufficient and conclusive | Interim Order |

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| Rule 4001 (c)(i)(B)(vii) | modification of applicability of non-bankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | evidence of the validity, enforceability, perfection and priority of the DIP Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. | ¶ 7 |
| Bankruptcy Rule 4001(c)(i) (B)(x) Local Rule 4001-2(a)(i)(C) | 506(c) Waiver | Subject to and effective only upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Agents and the DIP Lenders, as the case may be with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the DIP Agents or the DIP Lenders. | Interim Order ¶ 13 |
| Bankruptcy Rules 4001(c)(1) (B)(iii) and (viii) Local Rules 4001-2(a)(i)(B) | Releases and Waiver | 1.  Waiver of ability to challenge validity, enforceability, priority or amount of prepetition claim.  The Debtors stipulate in the Interim Order that the Prepetition Debt constitutes the legal, valid and binding obligations of the applicable borrowers and guarantors, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Debt is subject to avoidance, recharacterization, recovery or subordination | Interim Order ¶ 3(c) and (f) |

26

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | pursuant to the Bankruptcy Code or applicable nonbankruptcy law. <br> 2. <u>Release, waiver and limitation on claims and causes of action</u>. Subject to the reservation of rights in the Interim Order, each applicable obligor with respect to the Prepetition Debt is deemed to have forever waived, discharged and released each of the Prepetition Secured Parties and their respective affiliates and each of the respective members, managers, equity holders, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives thereof (all of the foregoing, solely in their respective capacities as such, collectively, the "Prepetition Secured Party Releasees") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses, setoff, recoupment or other offset rights against any and all of the Prepetition Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the applicable Prepetition Obligations, the Prepetition Liens, Prepetition Collateral or the debtor-creditor relationship between any of the applicable Prepetition Agents or the Prepetition Secured Parties, on the one hand, and the Debtor and each such obligor, on the other hand, from the beginning of time through the date hereof, including, without limitation, (i) any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law and (ii) any right or basis to challenge or object to the amount, validity or enforceability of the applicable Prepetition Obligations or any payments made on account of the applicable Prepetition Obligations, or the validity, enforceability, priority or non-avoidability of the applicable Prepetition Liens | |

| Bankruptcy Code / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | securing the applicable Prepetition Obligations. | |
| Local Rule 4001-2(a)(ii) | Sale Milestones | The following are the sale milestones: (i) Debtors to have obtained entry of an interim DIP Order by October 2, 2014; (ii) Debtors to have completed marketing materials with respect to the 363 Sale by October 13, 2014, (iii) Debtors to have executed the Stalking Horse Agreement by October 27, 2014; (iv) Debtors to have filed (a) a motion seeking approval of the Bid Procedures Order with respect to the 363 Sale and (b) a notice of selection of the proposal set forth in the Stalking Horse Agreement as the stalking horse bid in the 363 Sale by October 27, 2014; (v) US Debtors to have obtained entry of a final DIP Order by October 30, 2014; (vi) Debtors to have obtained entry of the Bidding Procedures Order by November 19, 2014; (vii) December 17, 2014 as the deadline by which all bids must be actually received by the Debtors in connection with the 363 Sale, in the form and manner specified in the Bidding Procedures Order; (viii) Debtors to conduct an auction with respect to the 363 Sale by December 19, 2014; (ix) Debtors to have obtained entry of an order approving the 363 Sale winner by December 22, 2014; and (x) Debtors to have closed the 363 Sale by January 30, 2015 | |

## B.    Approved Budget

40.    Attached as Exhibit A to the Interim Order is the Approved Budget, a thirteen-week cash flow budget that is in form and substance satisfactory to the DIP Lenders and the DIP Agents (and may be amended or restated with the prior written consent of the DIP Lenders and the DIP Agents), which reflects, on a line-item basis for such thirteen-week period, the Debtors' projected cash receipts and disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Chapter 11 Cases, capital expenditures and fees and expenses of the DIP Agents and the DIP Lenders (including counsel, financial advisors and other

28

professionals therefor)), and unrestricted cash on hand.  Pursuant to the Interim Order, the

Debtors must ensure, among other things, that at no time (a) a negative variance by 15% or more

from the designated "Operating Receipts" line in the Budget, tested on a cumulative weekly

basis over a rolling four-week period and commencing with the week that the Petition Date

occurs; or (b) a negative variance by 15% or more from the designated "Operating

Disbursements" line in the Budget, tested on a cumulative weekly basis over a rolling four-week

period and commencing with the week that the Petition Date occurs.

### BASIS FOR RELIEF

**A.**     **The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to
Sections 364(c) and 364(d)(1) of the Bankruptcy Code**

41.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a

hearing, that the Debtors seeking postpetition financing on a secured basis cannot "obtain

unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative

expense."  See 11 U.S.C. § 364(c).  In addition, section 364(d)(1) of the Bankruptcy Code, which

governs the incurrence of postpetition debt secured by "priming" liens, provides that the Court,

after notice and a hearing, may:

> authorize the obtaining of credit or the incurring of debt secured by
> a senior or equal lien on property of the estate that is subject to a
> lien only if --
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of
> the lien on the property of the estate on which such senior or equal
> lien is proposed to be granted.

11 U.S.C. § 364(d)(l).

42.     In evaluating proposed postpetition financing under section 364(c) of the

Bankruptcy Code, the Debtors have the burden of proving that:

(1)    They are unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A);

(2)    The credit transaction is necessary to preserve the assets of the estate; and

(3)    The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Los Angeles Dodgers, LLC, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011); see also In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); In re Aqua Assocs., 132 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).

43.    The Court "may not approve any credit transaction under subsection (c) [of section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b)." In re Los Angeles Dodgers, LLC, 457 B.R. at 313 (citing In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990)). To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. See Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). The statute imposes no duty to seek credit from "every possible lender before concluding that such credit is unavailable." See In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (citing In re Snowshoe Co., 789 at 1088).

44.    For the reasons discussed below, the Debtors submit that they have satisfied the standards required to access postpetition financing on a secured superpriority basis under section 364(c) of the Bankruptcy Code.

(i)    **The Debtors Were Unable to Obtain Financing on More Favorable Terms**

45.    The Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under sections 364(a) or (b) of the Bankruptcy Code.  The Debtors face liquidity restraints and were forced to file these Chapter 11 Cases to preserve the value of their assets.  Prior to negotiating the DIP Facilities, the Debtors considered other sources of postpetition financing to determine whether they could obtain debtor in possession financing on better terms.  Based on current capital markets conditions, after consultation with their financial advisors, the Debtors determined that postpetition financing on an unsecured basis would be unobtainable.  Without postpetition financing, the Debtors would not be able to ensure that they would be able to continue operations without interruption and fund the 363 Sale process.  The failure to continue to operate and fund such process would significantly impair the value of the Debtors' assets and the Debtors' ability to maximize value through the proposed 363 Sale or any other restructuring.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facilities are fair, reasonable and adequate, all as more fully set forth below.

(ii)    **The DIP Facilities Are Necessary to Preserve the Assets of the Debtors' Estates**

46.    As debtors-in-possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets.  See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004).  In the weeks preceding the Petition Date, the Debtors were faced with two important problems that had to be solved.  The first problem was that the Debtors lacked liquidity to be able to continue to operate and needed to quickly obtain financing.  The second problem was that the Debtors needed to secure a stalking horse bidder willing to agree to purchase the Debtors' assets (or at least some material portion thereof) to increase the likelihood of a successful auction that would maximize the value of the Debtors' estate for the benefit of

31

their stakeholders.  Within a very short timeframe, the Senior DIP Lenders provided solutions to

both problems.  The Senior DIP Lenders were willing to provide the funding necessary to fund

both DIP Loans, which funding was necessary for the Debtors to operate their business through

an auction and the closing of the 363 Sale.  Additionally, Senior DIP Lenders agreed to negotiate

documents for the APA under which Reichhold BV or another of the ROW entities as successor

to the Junior DIP Loan would become the stalking horse to purchase substantially all of the

Debtors' material assets in the 363 Sale process, initially by credit- bidding the Junior DIP Loan

in full.

47.     The Debtors determined, after consultation with their financial advisors, that there

was no party other than the Senior DIP Lenders who could offer what the Senior DIP Lenders

could offer in the timeframe available:  a debtor-in-possession financing and a material stalking

horse bid.  Thus, in addition to evidence to be introduced at the Interim Hearing if necessary, the

Debtors submit that the requirements of Bankruptcy Code section 364(c) that alternative credit

on more favorable terms was unavailable to the Debtors is satisfied

### (iii)    The Terms of the Postpetition Financing Arrangement Are Fair, Reasonable, and Appropriate Given the Circumstances

48.     In considering whether the terms of postpetition financing are fair and reasonable,

courts consider the terms in light of the relative circumstances of both the debtor and the

potential lender.  In re Farmland Indus., Inc., 294 B.R. at 886; see also Unsecured Creditors'

Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65

B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire

funds).

49.     The DIP Facilities were negotiated in good faith and at arm's-length between the

Debtors and the DIP Lenders resulting in an agreement designed to permit the Debtors to

maximize the value of their assets through an orderly sale process. Accordingly, and as set forth

in more detail herein, the terms and conditions of the DIP Facilities are fair and reasonable.

(iv)    **Entry Into the DIP Facility Reflects the Debtors' Sound Business Judgment**

50.    A debtor's decision to enter into a postpetition lending facility under section 364

of the Bankruptcy Code is governed by the business judgment standard. See, e.g., Trans World

Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr.

D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and

prudent business judgment"); In re Ames Dep't Stores, Inc., 115 B.R. at 38 (financing decisions

under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

51.    Bankruptcy courts routinely accept a debtor's business judgment on many

business decisions, including the decision to borrow money. See, e.g., In re AMR Corp.,

485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013) ("[i]n determining whether to approve a debtor's

request under Section 364, a Court must examine whether the relief requested is an appropriate

exercise of the debtor's business judgment); In re DB Capital Holdings, LLC, 454 B.R. 804,

822-23 (Bankr. D. Colo 2011) (must demonstrate, among other things, that the proposed

financing is an exercise of sound and reasonable business judgment); In re Yellowstone

Mountain Club, LLC, No. 08–61570–11, 2008 WL 5875547, at **7-8 (Bankr. D. Mont. Dec. 17,

2008) (same). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors'

business decisions] would slow the administration of the debtor's estate and increase its cost,

interfere with the Bankruptcy Code's provision for private control of administration of the estate,

and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital

Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

52.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  See In re Curlew Valley Assocs., 14 B.R. 506, 514, n. 11(a) (Bankr. D. Utah 1981).  Generally, a court will not second-guess a debtor in possession's business decisions as long as, as a whole, the decisions are within the debtor's sound business judgment.  See In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990); cf. In re Ames Dep't Stores, Inc., 115 B.R. at 37–38 (courts, in passing upon arrangements for postpetition financing under section 364(b)–(d), consider, *inter alia,* whether the terms would tilt the conduct of the bankruptcy case in a manner inconsistent with Chapter 11, or merely reflect a debtor's business judgment).

53.     As described above, the Debtors have exercised sound business judgment in determining the appropriateness of the DIP Facilities and submit they have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Facilities.  The Debtors believe that the DIP Facilities contain terms that are the best available under the circumstances.  The funds provided by the DIP Facilities are essential to enable the Debtors to avoid irreparable harm to the Debtors' assets and business and enable the Debtors to market their assets in an orderly manner pursuant to section 363 of the Bankruptcy Code.

**B.     The Section 506(c) Waiver Should be Approved**

54.     The Court should approve the Debtors' waiver of any right to surcharge under section 506(c).  Such waivers and provisions are standard and customary under financings between sophisticated parties.  As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtors-In-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by

34

waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)." In re Molten Metal Technology, Inc., 244 B.R. 515, 527 (Bankr. D. Mass. 2000), vacated and remanded on other grounds, 2001 WL 36381917 (1st Cir. BAP March 11, 2001); see also In re Nutri/System of Florida Assocs., 178 B.R. 645, 650 (E.D. Pa. 1985) (noting that the debtor had waiver section 506(c) rights in obtaining debtor-in-possession financing).

55.    The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from both the postpetition financing and the Carve Out.  In particular, the Debtors have waived the uncertainty of surcharge rights in exchange for immediate and necessary liquidity from the DIP Lenders and the valuable and predictable rights granted to the Debtors' estate professionals under the Carve Out.  See In re Lunan Family Restaurant Ltd. P'ship, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure]").  For these reasons, the section 506(c) waiver is appropriate.

**C.    Modification of the Automatic Stay Is Warranted**

56.    The proposed Interim DIP Order provides certain circumstances under which the automatic stay could be vacated without further order of the Court.  The Debtors submit that such stay modification is in the best interests of the Debtors and their estates and is the best attainable under the circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Facilities and the proposed DIP Orders.

35

**D.    Interim Approval of Borrowings Should Be Granted**

57.    It is essential that the Debtors immediately stabilize their operations and cash

flow, which will maximize the potential for a successful sale of their assets.  Accordingly, the

Debtors are seeking interim approval to access the full amount of the DIP Facilities to meet their

working capital needs, including making payments to employees, pending a final hearing.

58.    Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to

obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to
> obtain credit no earlier than 14 days after service of the motion.  If
> the motion so requests, the court may conduct a hearing before
> such 14-day period expires, but the court may authorize the
> obtaining of credit only to the extent necessary to avoid immediate
> and irreparable harm to the estate pending a final hearing.

59.    In examining requests for interim relief under this rule, courts apply the same

business judgment standard applicable to other business decisions.  See, e.g., Ames Dep't Stores,

115 B.R. at 36;  In re Simasko Production Co., 47 B.R. 444, 449 (D. Colo. 1985).  Under this

standard, the Debtors' requests for entry of the DIP Orders, in the time periods and for the

financing amounts requested herein, is appropriate.  Moreover, courts in this jurisdiction have

granted similar relief in other chapter 11 cases.  See, e.g., In re Brookstone Holdings Corp., et al.,

Case No. 14-10752 (BLS), Docket No. 85 (Bankr. D. Del. April 4, 2014) (authorizing debtor to

borrow $91.25 million on an interim basis of the total $96.25 million DIP facility); In re Ablest

Inc., et al., Case No. 14-10717 (KJC), Docket No. 47 (Bankr. D. Del. April 2, 2014) (authorizing

the debtor, on an interim basis, to borrow up to an aggregate principal amount not to exceed $20

million of the total $50 million DIP facility); In re The Dolan Company, et al., Case No. 14-

10614 (BLS), Docket No. 97 (Bankr. D. Del. March 26, 2014) (authorizing each debtor, on an

interim basis, to borrow up to an aggregate principal amount not to exceed $4.5 million of the

36

total $10 million DIP facility); <u>In re Exide Technologies</u>, Case No. 13-11482 (KJC), Docket No. 79 (Bankr. D. Del. June 11, 2013) (allowing immediate access to $395 million under the DIP facilities).

60.    The Debtors believe that, under the circumstances, the terms and conditions set forth herein are fair and reasonable for the interim approval of the DIP Facilities.

**E.    <u>Request for Final Hearing</u>**

61.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event earlier than seven (7) days following the organizational meeting of the creditors' committee contemplated by section 1102 of the Bankruptcy Code and consistent with Local Rule 4001-2(c), and fix the time and date prior to the final hearing for parties to file objections to the Motion.

**F.    <u>Waiver of Bankruptcy Rule 6004(a) and 6004(h)</u>**

62.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**G.    <u>No Prior Request</u>**

63.    No prior motion for the relief requested herein has been made to this or any other court.

## <u>NOTICE</u>

64.    Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' pre-petition lenders; (c) counsel for the administrative agents for the Debtors' proposed postpetition lenders; (d) the United States Securities and Exchange Commission; (e) the Internal Revenue Service; (f) the Office of the United States Attorney for the District of Delaware; (g) the parties included on the Debtors'

37

consolidated list of forty (40) largest unsecured creditors; and (h) all other known parties asserting a lien against the Debtors' assets. The Debtors will serve copies of the Motion and any order entered in respect of the Motion as required by Local Rule 9013-1(m). The Debtors submit that, under the circumstances, no other or further notice is required.

52719/0001-10997527v5

WHEREFORE, the Debtors respectfully request that this Court (i) enter the Interim

Order, substantially in the form attached hereto as Exhibit A; (ii) after the Final Hearing, enter

the Final Order substantially in the form that shall be filed with the Court; and (iii) grant such

other and further relief as this Court deems appropriate.

Dated:  September 30, 2014
           Wilmington, Delaware

                                 COLE, SCHOTZ, MEISEL,
                                 FORMAN & LEONARD, P.A.

                                 By:_____
                                 Norman L. Pernick (I.D. No. 2290)
                                 David R. Hurst (I.D. No. 3743)
                                 Marion M. Quirk (I.D. No. 4136)
                                 Therese A. Scheuer (I.D. No. 5699)
                                 500 Delaware Avenue, Suite 1410
                                 Wilmington, DE 19801
                                 Telephone: (302) 652-3131
                                 Facsimile: (302) 652-3117

                                 - and -

                                 Stuart Komrower
                                 Felice R. Yudkin
                                 25 Main Street
                                 Hackensack, NJ 07602-0800
                                 Telephone: (201) 489-3000
                                 Facsimile: (201) 489-1536

                                 *Proposed Counsel for Debtors and Debtors in*
                                 *Possession*