Exhibit A
Proposed Interim Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x

In re:

REICHHOLD HOLDINGS US, INC., et al.,

       Debtors.[1]

-------------------------------------------------------- x

:   Chapter 11

:

:   Case No. 14-_____ (_____)

:

:   Joint Administration Requested

:

:

:

## INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363 AND 364; (II) GRANTING LIENS AND SUPERPRIOROTY CLAIMS; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

Upon the motion (the "Motion"), dated September __, 2014 (the "Petition Date"), of Reichhold Holdings US, Inc. ("Reichhold") and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Cases"), pursuant to sections 105, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and Del. Bankr. L.R. 4001-2, seeking, among other things:

    (I)    authorization for Reichhold (the "Borrower") to obtain postpetition financing up to an aggregate principal amount of $106,380,000 (the "DIP Facilities"), consisting of (a) up to $53,190,000 of postpetition financing (the "Senior DIP Facility") through issuance by Borrower of senior secured promissory notes to Senior DIP Lenders

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Reichhold Holdings US, Inc. (5768), Reichhold, Inc. (4826), Canadyne Corporation (7999), and Canadyne-Georgia Corporation (7170). The street address for the Debtors is 1035 Swabia Ct., Durham, NC 27703.

(as defined below) on the terms and conditions set forth in this Order, the Note Purchase and Guaranty Agreement (substantially in the form attached to the Motion as <u>Exhibit A,</u> and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "<u>Senior DIP Note Agreement</u> and together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "<u>Senior DIP Documents</u>"), among the Borrower, the guarantors party thereto, Cantor Fitzgerald Securities, acting as the administrative and collateral agent (in such capacities, the "<u>Senior DIP Agent</u>"), and the noteholders party thereto from time to time (together with the Senior DIP Agent, in such capacity, the "<u>Senior DIP Lenders</u>"); and (b) up to $53,190,000 in principal amount of postpetition financing (the "<u>Junior DIP Facility</u>") through issuance by the Borrower of a second lien secured promissory note to its non-Debtor foreign affiliate, Reichhold Holdings International B.V. ("<u>Reichhold BV</u>" or "<u>Junior DIP Lender</u>" and together with the Senior DIP Lenders, the "<u>DIP Lenders</u>") on the terms set forth in this Order and the Intercompany DIP Loan Agreement (substantially in the form attached to the Motion as <u>Exhibit B,</u> and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "<u>Intercompany DIP Loan Agreement</u>"), among the Borrower, the guarantors party thereto, the Junior DIP Lender, and Cantor Fitzgerald Securities, acting as the administrative and collateral agent (in such capacities, the "<u>Junior DIP Agent</u>" and together with the Senior DIP Agent, the "<u>DIP Agents</u>") (the

2

Intercompany DIP Loan Agreement together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "Junior DIP Documents" and together with the Senior DIP Documents, the "DIP Documents");

(II)    authorization for the Debtors to execute and deliver the DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(III)    authorization for the Senior DIP Agent and the Junior DIP Agent, as applicable, to terminate the applicable DIP Documents upon the occurrence and continuance of an Event of Default (as defined therein);

(IV)    subject to the terms of the Intercompany DIP Loan Agreement and this Order, authorization to grant first priority superpriority claims to the Senior DIP Lenders and first priority liens in favor of the Senior DIP Agent (for the benefit of the Senior DIP Lenders) on all prepetition and postpetition property of the Debtors' estates and all proceeds thereof (but excluding a lien on Avoidance Actions (as defined below) and, prior to entry of the Final Order (as defined below), any Avoidance Proceeds (as defined below)), subject to the Carve-Out (as defined below) and the terms of this Order;

(V)    subject to the terms of the Intercompany DIP Loan Agreement and this Order, authorization to grant second priority superpriority claims to the Junior DIP Lender and second priority priming liens in favor of the Junior DIP Agent (for the benefit of the Junior DIP Lender) on all prepetition and postpetition property of the Debtors'

3

estates and all proceeds thereof (but excluding a lien on Avoidance Actions (as defined below) and, prior to entry of the Final Order (as defined below), any Avoidance Proceeds (as defined below)), subject to the Carve-Out (as defined below) and the terms of this Order;

(VI)    subject to and only effective upon the entry of a Final Order granting such relief, the waiver by the Debtors of any right to surcharge against the Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(VII)    pursuant to Bankruptcy Rule 4001(c)(2), requesting an Interim Hearing on the Motion be held before this Court to consider entry of the proposed interim order (the "Interim Order" or "Order") annexed to the Motion on an interim basis (a) authorizing the Debtors, on an interim basis, to borrow under the Senior DIP Facility in an aggregate principal amount of $53,190,000; (b) authorizing the Debtors, on an interim basis, to borrow under the Junior DIP Facility in an aggregate principal amount of $40,430,000; and (c) granting other relief described therein; and

(VIII)    the scheduling of a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") approving the Motion and approving the Debtors' notice with respect thereto.

The Interim Hearing having been held by this Court on October ___, 2014, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and upon the record made by the Debtors at the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

4

1.      <u>Jurisdiction</u>.  This Court has core jurisdiction over these Cases, this Motion, and the parties and property affected hereby under 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      <u>Notice</u>.  The notice given by the Debtors of the Motion and the Interim Hearing was, in the Debtors' belief, the best available under the circumstances and included service upon (a) the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' prepetition lenders; (c) counsel to the Debtors' postpetition lenders; (d) the United States Securities and Exchange Commission; (e) the Internal Revenue Service; (f) the Office of the United States Attorney for the District of Delaware; (g) the parties included on the Debtors' consolidated list of forty (40) largest unsecured creditors; and (h) all other known parties asserting a lien against the Debtors' assets.  Such notice constitutes due and sufficient notice under the circumstances and complies with Bankruptcy Rules 4001(b) and (c) and local rules.  No further notice of the relief sought at the Interim Hearing is necessary or required.

3.      <u>Debtors' Stipulations</u>.  Without prejudice to the rights of any other party-in-interest (but subject to the limitations thereon contained in paragraph 19 below) the Debtors admit, stipulate and agree that:

(a)      <u>The Prepetition Secured Notes</u>.

(i)      Pursuant to that certain indenture, dated as of May 8, 2012 (as heretofore supplemented from time to time, the "<u>Indenture</u>") by and among the Debtors' indirect parent, Reichhold Industries, Inc. ("<u>Reichhold Industries</u>"), as issuer, the guarantors listed therein, including Debtors Reichhold Holdings US, Inc. and Reichhold, Inc. (together with Reichhold Industries, the "<u>Prepetition Secured Notes Obligors</u>") and Wells Fargo Bank, National Association, as trustee and collateral agent (in such capacities, the "<u>Prepetition Secured Notes</u>

5

Agent" and together with the holders of securities issued under the Indenture, the "Prepetition Secured Notes Parties"), Reichhold Industries issued approximately $207,000,000 in in aggregate principal amount of secured notes due 2017 (the "Prepetition Secured Notes").

(ii)    As of the Petition Date, the outstanding aggregate principal amount of Prepetition Secured Notes issued under the Indenture was approximately $255,395,165 (together with all other outstanding Obligations, as defined in the Indenture, including interest, fees and expenses, the "Prepetition Secured Notes Indebtedness").

(iii)    To secure the Prepetition Secured Notes Indebtedness, the Prepetition Secured Notes Obligors and the Prepetition Secured Notes Agent entered into that certain pledge and security agreement, dated as of May 8, 2012 (the "Prepetition Secured Notes Security Agreement" and together with the Indenture and all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "Prepetition Secured Notes Documents"), pursuant to which the Prepetition Secured Notes Obligors granted to the Prepetition Secured Notes Agent, for the benefit of itself and the other Prepetition Secured Notes Parties, valid, binding, perfected, first lien liens and security interests in, among other things (a) 100% of the stock of Reichhold and Reichhold, Inc. (the "Prepetition Debtor Secured Notes Collateral"), and (b) 65% of the voting ordinary shares and 100% of the convertible preferred equity certificates, Series A of Reichhold Holdings Luxembourg S.a.r.l., the Debtors' Luxembourg subsidiary.

(b)    The Prepetition Oaktree Credit Agreement.

(i)       Reichhold, Inc. and Reichhold Industries Limited, as

borrowers (the "Prepetition Oaktree Borrowers"), the lenders party thereto (the "Prepetition

Oaktree Term Loan Lenders" and together with the Prepetition Secured Notes Parties, the

"Prepetition Secured Creditors"), and Bank of America, N.A., as administrative agent (in such

capacity, the "Prepetition Oaktree Term Loan U.S. Agent") and Bank of America, N.A. (acting

through its Canada branch), as Canadian agent (in such capacity, and collectively with the

Prepetition Oaktree Term Loan U.S. Agent, the "Prepetition Oaktree Term Loan Agent" and

together with the Prepetition Secured Notes Agent, the "Prepetition Agents" and together with

the Prepetition Secured Creditors and the Issuing Bank (defined below), the "Prepetition Secured

Parties"), are parties to that certain Credit Agreement dated as of October 7, 2005 (as amended,

supplemented or otherwise modified from time to time, the "Prepetition Oaktree Term Loan

Credit Agreement" and together with all agreements, documents, certificates and instruments

delivered or executed from time to time in connection therewith, as amended, restated, amended

and restated, supplemented, or otherwise modified from time to time in accordance with the

terms thereof, collectively, the "Prepetition Oaktree Term Loan Documents" and together with

the Prepetition Secured Notes Documents, the "Prepetition Documents"), pursuant to which the

Prepetition Oaktree Term Loan Lenders made term loans available to the Prepetition Oaktree

Borrowers (the "Prepetition Oaktree Term Loans") and Bank of America, N.A., as issuing bank

(in such capacity, the "Issuing Bank") issued letters of credit (the "Prepetition Letters of Credit")

on the application of the Debtors.  The Prepetition Oaktree Term Loan Lenders, the Prepetition

Oaktree Term Loan Agent and the Issuing Bank are collectively referred to herein as the

"Prepetition Oaktree Term Loan Secured Creditors".

7

(ii)    As of the Petition Date, the outstanding aggregate principal amount of Prepetition Oaktree Term Loans was $73,017,116.72 and the issued and outstanding amount of Prepetition Letters of Credit was $13,743,950.76 (together with all other outstanding Obligations, as defined in the Prepetition Oaktree Term Loan Credit Agreement, including interest, fees and expenses, the "Prepetition Oaktree Term Loan Indebtedness" and, together with the Prepetition Secured Notes Indebtedness, the "Prepetition Debt" and the respective obligations thereunder, the "Prepetition Obligations").

(iii)    To secure the Prepetition Oaktree Term Loan Indebtedness, the Prepetition Oaktree Borrowers entered into various security agreements and other collateral documents, pursuant to which the Prepetition Oaktree Borrowers granted to the Prepetition Oaktree Term Loan Agent, for the benefit of itself and the other Prepetition Oaktree Term Loan Lenders, valid, binding, perfected, first lien liens and security interests (the "Prepetition Oaktree Term Loan Liens") in substantially all of their assets, including, among other things: (a) accounts receivable, inventory, deposit accounts, chattel paper and instruments, intangibles, intellectual property, books and records, insurance, liens, intercompany loans, cash and cash equivalents and proceeds, real property, improvements and fixtures, machinery and equipment, equity interests in subsidiaries and rights under any insurance covering or condemnation proceeds in respect of the foregoing), and (b) a grant in certain scheduled patents and patent applications and all proceeds of such patents and patent applications, and (iii) a grant in certain scheduled trademarks, trademark registrations, trade names and trademark applications (collectively, the "Prepetition Oaktree Term Loan Collateral" and together with the Prepetition Debtor Secured Notes Collateral, the "Prepetition Collateral").

(c)    The Prepetition Liens are valid, binding, enforceable, non-avoidable and perfected liens and the Prepetition Debt constitutes the legal, valid, binding, enforceable and non-avoidable obligations of the applicable borrowers and guarantors, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Debt is subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, disgorgement, recharacterization, surcharge, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law.

(d)    The Debtors' borrowings from the DIP Lenders under the DIP Facilities and this Order will be used in a manner consistent with the terms and conditions of the applicable DIP Documents and only in express accordance with and to the extent set forth in the Budget (as defined below), solely for (a) working capital and other general corporate purposes, (b) permitted payment of costs of administration of these Cases, (c) payment of such prepetition expenses as have been or hereafter are consented to by each DIP Agent, in its reasonable discretion, and are approved by the Court; (d) repayment in full of the Prepetition Oaktree Term Loan Indebtedness upon entry of this Order; and (e) providing liquidity to the Debtors to effectuate the Transactions as defined in the DIP Documents;

(e)    (i) the proceeds from the DIP Loans shall not be loaned or advanced to, or invested in (in each case, directly or indirectly), any entity that is not a subsidiary of the Debtors, (ii) the proceeds from the DIP Facilities loaned or advanced to, or invested in, any subsidiary of a Debtor shall be evidenced by an intercompany note, in form and substance reasonably satisfactory to the DIP Agents, for the full amount of the proceeds so loaned, advanced or invested, (iii) such intercompany note shall be pledged to the DIP Agents subject

9

to the terms of the Intercreditor DIP Loan Agreement, for the benefit of the applicable DIP Lenders, to secure the applicable DIP Obligations (as defined herein), and (iv) all intercompany liens of the Debtors, if any, will be contractually subordinated to the liens securing the DIP Facilities on terms satisfactory to the DIP Agents; and

(f)     subject to the reservation of rights set forth in paragraph 19 below, each applicable obligor with respect to the Prepetition Debt shall be deemed to have forever waived, discharged and released each of the Prepetition Secured Parties and each of their respective predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives thereof (all of the foregoing, solely in their respective capacities as such, collectively, the "Prepetition Secured Party Releasees") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses, setoff, recoupment or other offset rights against any and all of the Prepetition Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the applicable Prepetition Obligations, the Prepetition Liens, Prepetition Collateral or the debtor-creditor relationship between any of the applicable Prepetition Agents or the Prepetition Secured Parties, on the one hand, and the Debtor and each such obligor, on the other hand, from the beginning of time through the date hereof, including, without limitation, (i) any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law and (ii) any right or basis to challenge or object to the amount, validity or enforceability of the applicable Prepetition Obligations or any payments

10

made on account of the applicable Prepetition Obligations, or the validity, enforceability,

priority or non-avoidability of the applicable Prepetition Liens securing the applicable

Prepetition Obligations.

    4.    <u>Findings Regarding the Financing and Use of Cash Collateral.</u>

    (a)    Good cause has been shown for the entry of this Interim Order.

    (b)    The Debtors have an immediate and critical need to obtain the DIP

Facilities to continue the operation of their businesses.  Without such funds, the Debtors will

not be able to meet their payroll obligations or to pay operating and other expenses during this

critical period.  The ability of the Debtors to finance their operations through the incurrence of

new indebtedness is vital to the preservation and maintenance of the going concern value of the

Debtors' estates and necessary to avoid immediate and irreparable harm to the estates.

    (c)    The Debtors are unable to obtain sufficient financing on more favorable

terms from sources other than the DIP Lenders under the DIP Documents and are unable to

obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as

an administrative expense.  The Debtors are also unable to obtain secured credit allowable

solely under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code.

    (d)    The DIP Agents and the DIP Lenders are willing to provide the DIP

Facilities, and the Prepetition Secured Notes Agent, on behalf of itself and the applicable

Prepetition Secured Parties are willing to advance the DIP Facilities, subject to the terms and

conditions set forth in the DIP Documents and the provisions of this Order, as applicable, and

provided that the DIP Liens, the Superpriority Claims and other protections granted by this

Order and the DIP Documents will not be affected by any subsequent reversal or modification

of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which

is applicable to the DIP Facilities approved by this Order.  The DIP Agents and the DIP Lenders have acted in good faith in agreeing to provide the DIP Facilities approved by this Order and to be further evidenced by the DIP Documents and their reliance on the assurances referred to above is in good faith.

(e)    Among other things, entry of this Order will minimize disruption of the Debtors' businesses and operations by enabling them to meet payroll and other critical expenses, including vendor and professional fees.  The DIP Facilities as set forth herein are vital to avoid immediate and irreparable loss or harm to the Debtors' estates, which will otherwise occur if immediate access to the DIP Facilities is not obtained.  Consummation of the DIP Facilities pursuant to the terms of this Order therefore is in the best interests of the Debtors' estates.

(f)    The DIP Documents and the DIP Facilities contemplated thereunder, each as authorized hereunder, have been negotiated in good faith and at arm's length among the Debtors, the DIP Agents and the DIP Lenders, the Prepetition Agents and the DIP Lenders, respectively, among others, and the terms of the DIP Facilities are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration. All of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facilities and the DIP Documents, including, the Obligations (as defined in the Senior DIP Documents or the Junior DIP Documents, as applicable, collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Agents and the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code,

12

and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(g)    The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  The permission granted herein on an interim basis to enter into the DIP Documents and to borrow up to an aggregate principal amount of $93,620,000 is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  This Court concludes that entry of this Order is in the best interests of the Debtors and their estates and creditors as its implementation will, among other things, allow the Debtors to facilitate their chapter 11 goals and maximize the value of their assets.

(h)    Based upon the record before the Court, the terms of the DIP Facilities have been negotiated at arm's length and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors and their estates and creditors and are consistent with the Debtors' fiduciary duties.

(i)    As a condition to the entry into the DIP Documents and the extension of credit under the DIP Facilities, the Debtors agreed that upon entry of this Order, the Debtors shall apply the proceeds of the DIP Collateral as set forth in paragraph 9 below.

5.    <u>Authorization of the Financing and the DIP Documents.</u>

(a)    The Debtors are hereby authorized and directed to execute, issue, deliver, enter into and adopt, as the case may be, the DIP Documents to be delivered pursuant hereto or thereto or in connection herewith or therewith, including, without limitation, the Budget (as defined herein) .

13

(b)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and, without further application to the Court, to pay all fees referred to in this Interim Order and in the DIP Documents including, without limitation, the reasonable fees and out-of-pocket expenses of the professionals of the DIP Agents and the DIP Lenders, including their financial advisor Houlihan Lokey.

(c)    The Debtors are further hereby authorized to execute, deliver and perform one or more amendments or modifications to the applicable DIP Documents for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the DIP Facilities among the applicable DIP Lenders, in each case in such form as the Debtors, the applicable DIP Agent and the applicable DIP Lenders may agree (it being understood that no further approval of this Court shall be required for non-material amendments to the applicable DIP Documents (and any fees paid in connection therewith) or modifications of the Budget pursuant to the terms of paragraph 12 hereof).  Notice of any modifications shall be filed with the Court and served upon counsel to any official committee of creditors that may be appointed in these Cases (the "Committee"), the Prepetition Agents, those persons who have formally appeared and requested service in the Cases pursuant to Bankruptcy Rule 2002 and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").

(d)    The Debtors are further hereby authorized and directed to (i) make the non-refundable payment to the DIP Agents or the DIP Lenders, as the case may be, of any fees and other amounts due, including any reimbursement of indemnified obligations referred to in

14

the DIP Documents (and in any separate letter agreements between such applicable parties and the Debtors in connection with the DIP Facilities) and reasonable costs and expenses as may be due from time to time, including, without limitation, the reasonable fees and expenses of the professionals retained as provided for in the DIP Documents, without the need to file retention motions or fee applications; (ii) perform of all other acts required under or in connection with the DIP Documents, including the granting and perfection of the DIP Liens and the Superpriority Claims as permitted herein and therein; and (iii) cause the execution and delivery of and performance under the Guarantees.

(e)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms.  No obligation, payment, transfer or grant of a security or other interest under the DIP Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, set-off, recoupment or counterclaim.

6.    <u>Superpriority Claims</u>.

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code

15

(the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and their estates and all proceeds thereof, subject only to the payment of the Carve Out (as defined below) to the extent specifically provided for herein.  Any payments, distributions or other proceeds received on account of such Superpriority Claims shall be promptly delivered to the applicable DIP Agent to be applied or further distributed by the applicable DIP Agent on account of the applicable DIP Obligations in such order as is specified in this Order and the applicable DIP Documents.  The Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The Superpriority Claims granted hereunder to the Junior DIP Lender shall be immediately junior in priority and subject to the Superpriority Claims of the Senior DIP Lenders.

     (b)     For purposes hereof, the "Carve Out" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) and 31 U.S.C. § 3717; (ii) all reasonable fees and expenses incurred by a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iii) to the extent allowed at any time, but subject in all respects to the Budget (as defined in below) and the terms of this Order, all accrued and unpaid fees, disbursements, costs and expenses ("Professional Fees") (other than any monthly fee, restructuring fee, sale fee or other success fee of any investment bankers or financial advisors of the Debtors), incurred by professionals or professional firms whose retention has been approved by the Court during these Cases pursuant to sections 327 and 1103 of the Bankruptcy Code (collectively, "Professional Persons"), retained by the Debtors and

16

the Committee, if any, at any time before or on the first business day following delivery by any DIP Agent of a Carve Out Trigger Notice (as defined below), to the extent such Professional Fees are allowed by the Bankruptcy Court whether prior to or after delivery of a Carve Out Trigger Notice; and (iv) after the first business day following delivery by any DIP Agent of the Carve Out Trigger Notice, to the extent allowed by the Bankruptcy Court whether prior to or after delivery of a Carve Out Trigger Notice, all unpaid fees, disbursements, costs and expenses incurred by Professional Persons, in an aggregate amount not to exceed $1,000,000, with no more than $250,000 of that amount allocable to professionals retained by a Committee, if any (the amount set forth in this clause (iv) being the "Carve-Out Cap"); *provided*, *however*, that no party may use the Collateral, the DIP Facilities, the Carve-Out or the Carve-Out Cap or any portion or proceeds of the foregoing in connection with (1) objecting to or contesting the validity or enforceability of the Interim Order or Final Order or any obligations outstanding under the DIP Documents or the Prepetition Documents;  (2) asserting or prosecuting any claims or defenses or causes of action against the DIP Agents, the DIP Lenders or their respective agents, affiliates, representatives, attorneys or advisors or preventing, hindering or otherwise delaying the DIP Agents' or the DIP Lenders' assertion, enforcement or realization on the Collateral or Superpriority Claims once an Event of Default has occurred and is continuing in accordance with the DIP Documents and this Interim Order; (3) seeking to modify any of the rights granted under the Interim Order or Final Order to the DIP Agents, any DIP Lender, any Prepetition Agent or any Prepetition Secured Party, or for any act which has the effect of materially or adversely modifying or compromising the rights and remedies of any DIP Agent or any DIP Lender as set forth in any DIP Documents or any Prepetition Agent or any Prepetition Secured Party as set forth in the applicable Prepetition Documents; (4) making any payment in settlement or

17

satisfaction of any prepetition or administrative expense claim, unless in compliance with the

DIP Documents and, with respect to the payment of any prepetition claim or non-ordinary course

administrative expense claim, separately approved by the Court pursuant to a filing in form and

substance acceptable to the applicable DIP Agent; (5) objecting to, contesting, delaying,

preventing or interfering with in any way the exercise of rights and remedies by the DIP Agents

and the DIP Lenders with respect to the applicable Collateral once an Event of Default has

occurred; (6) except as expressly provided by the DIP Documents, making any payment or

distribution to any affiliate, equity holder, or insider of the Debtors outside of the ordinary course

of business; (7) using or seeking to use any insurance proceeds related to the Collateral except as

permitted by the DIP Documents or otherwise with the consent of the applicable DIP Agent and,

to the extent provided in the applicable DIP Documents, the DIP Lenders; or (8) a request,

without the prior consent of the applicable DIP Agent, and, to the extent provided in the

applicable DIP Documents, the DIP Lenders, for authorization to obtain debtor in possession

financing pursuant to section 364(c) or (d) of the Bankruptcy Code that does not indefeasibly

discharge in full in cash the DIP Obligations immediately upon the closing of such financing.

For purposes of the foregoing, the term "Carve-Out Trigger Notice" shall mean a written notice

delivered by the applicable DIP Agent to the Debtors and their lead counsel, the U.S. Trustee, the

Prepetition Agents, and lead counsel to the Committee, if any, which notice may be delivered

following the occurrence and during the continuation of an Event of Default under the applicable

DIP Documents, expressly stating that the Carve-Out Cap is invoked and the Event of Default

that is alleged to have occurred and be continuing.  For the avoidance of doubt and

notwithstanding anything to the contrary herein or elsewhere, the Carve Out shall be senior to all

DIP Obligations and liens securing the DIP Obligations.  Nothing herein shall be construed to

18

impair the ability of any party to object to the allowance by the Court of any of the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii) and (iv) above.

(c)     The DIP Agents and DIP Lenders shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection with these Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Order or otherwise shall be construed (i) to obligate the DIP Agents or the DIP Lenders in any way to pay compensation to or to reimburse expenses of any Professional Persons, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve Out if actual allowed Professional Fees are higher in fact than reflected in the Budget (as defined below); or (iii) as consent to the allowance of any professional fees or expenses of any Professional Persons.  Any funding of the Carve Out shall be added to and made a part of the DIP Obligations and secured by the Collateral and otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code and applicable law.  The DIP Agents' and DIP Lenders' liens and claims shall, however, be subject to the Carve Out as set forth in this Interim Order.

7.     <u>DIP Liens.</u>

As security for the DIP Obligations, effective and perfected upon the date of this Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by any DIP Agent or DIP Lender of, or over, any DIP Collateral, the security interests and liens identified in subparagraphs (a) and (b) below are hereby granted to the DIP Agents for their own benefit and the respective benefit of the applicable DIP Lender (all property identified in clauses (a), (b) and (c) below, together with all

19

other property to which the applicable DIP Agent is granted a lien under the applicable DIP Documents (other than as expressly excluded pursuant to this Order), being collectively referred to as the "DIP Collateral"), subject to (a) the terms of the DIP Facilities and (b) only in the event of the occurrence and during the continuance of an Event of Default, to the payment of the Carve-Out as provided herein, (all such liens and security interests granted to the DIP Agents, for their respective benefits and for the benefit of the respective DIP Lenders, pursuant to this Order and the DIP Documents, the "DIP Liens").  Notwithstanding the foregoing, any DIP Agent may take any action (and are, to the extent necessary in connection therewith, hereby granted relief from the automatic stay), to evidence, confirm, validate or perfect, or to ensure the contemplated priority of, such liens, and the Debtors shall execute and deliver to the DIP Agents and the DIP Lenders all such financing statements, notices and other documents as the DIP Agents or any DIP Lender may reasonably request in connection therewith and shall deliver account control agreements or other documentation in respect of and evidencing perfection of all collection and deposit accounts to the extent required by the DIP Documents.

(a)    First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior (but subject to the priorities set forth in the DIP Documents) security interest in and lien upon all pre- and postpetition tangible and intangible property of the Debtors and the Debtors' estates, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or to valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code) (collectively, "Unencumbered Property"), including without limitation, all inventory, accounts receivable, general intangibles, chattel paper, contracts,

20

owned real estate, real and personal property leaseholds, property, plants, fixtures and machinery and equipment, vehicles, vessels, deposit accounts, cash and cash collateral of the Debtors (whether maintained with the applicable DIP Agent or otherwise) and any investment of such cash and cash collateral, letter of credit rights, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property and stock of subsidiaries of the Debtors.  Unencumbered Property shall exclude (x) the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but, subject only to and effective upon entry of the Final Order, shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise ("Avoidance Proceeds") and (y) any property which any DIP Agent discovers a lien on prior to entry of the Final Order (the "Excluded Property").

      (b)   Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest (subject to the priorities set forth in the DIP Documents) in and lien upon all pre- and postpetition tangible and intangible property of the Debtors and the Debtors' estates (other than the Excluded Property and property described in clauses (a) or (c) of this paragraph 7, as to which the liens and security interests in favor of the DIP Agents will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, or to any valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which

21

security interests and liens in favor of the DIP Agents are junior to such valid, perfected and unavoidable liens.

(c)    <u>Liens Senior to Certain Other Liens</u>. The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) unless otherwise provided for in the DIP Documents, any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors.

8.    <u>Priority of DIP Liens</u>. Notwithstanding anything to the contrary herein, the DIP Liens granted hereunder under the Junior DIP Facility shall be immediately junior in priority and subject to the DIP Liens granted to the Senior DIP Lenders.

9.    <u>Application of Proceeds of Collateral, Payments and Collections</u>.

As a condition to the entry into the DIP Documents and the extension of credit under the DIP Facilities, the Debtors agreed that proceeds of DIP Collateral and any amounts held on account of the DIP Collateral, and all payments and collections received by the Debtors shall be applied as follows:

(a)    Upon Maturity Date or an Event of Default (as such terms are defined in the applicable DIP Documents), and at all times upon receipt of payments in connection with a sale or disposition of DIP Collateral outside the ordinary course of business:  (i) *first*, to permanently reduce the DIP Obligations under the Senior DIP Facility and all other obligations owing to the Senior DIP Agent and/or the Senior DIP Lenders until indefeasibly paid in full in cash in accordance with the Senior DIP Documents and this Order; (ii) *second*, to permanently

22

reduce the DIP Obligations under the Junior DIP Facility and all other obligations owing to the Junior DIP Agent and/or the Junior DIP Lenders until indefeasibly paid in full in cash in accordance with the Junior DIP Documents and this Order; and (iii) *third,* to the estates. Following Maturity Date or an Event of Default, as the case may be, prior to application of proceeds in items (i) through (iii) of the immediately preceding sentence funds sufficient to fund the Carve-Out Cap shall first be wired to the Debtors.  The Debtors shall hold these funds in an interest-bearing account in trust for the benefit of parties claiming under the Carve-Out Cap, and upon satisfaction of all such claims any remaining funds shall be returned to the DIP Agents for application in accordance with this paragraph 9.

(b)    Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in these Cases or any successor cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of the DIP Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Agents' and the DIP Lenders' obligation to extend credit under their respective DIP Facilities, including subsequent to the confirmation of any plan with respect to the Debtors and the Debtors' estates, and such financing is secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agents to be applied as set forth in this paragraph 9.

10.    Disposition of DIP Collateral; Rights of DIP Agents and DIP Lenders. The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral without the prior written consent of the DIP Agents (and no such consent shall be

23

implied, from any other action, inaction or acquiescence), except as expressly permitted in the DIP Documents.

            11.    <u>Protection of DIP Lenders' Rights</u>.

          (a)    Notwithstanding section 362 of the Bankruptcy Code, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agents and the DIP Lenders to exercise all rights and remedies provided for in the DIP Documents and Interim Order, including to take any or all of the following actions, without further order of or application or motion to this Court, immediately upon the occurrence of an Event of Default (as defined in the DIP Documents) and, but subject in all respects to clause (b) of paragraph 17 and the Carve Out Cap as set forth in clause (b) of paragraph 6, upon seven (7) days' prior written notice (which seven days' notice period (the "<u>Notice Period</u>") shall run concurrently with any notice provided under the DIP Documents) to the Debtors and the Creditors' Committee, if any, of any DIP Agent's intent to exercise such rights and remedies: (i) immediately terminate the Debtors' use of any cash collateral; (ii) freeze monies or balances in the Debtors' accounts and sweep all funds contained therein and apply the same to pay the DIP Obligations; (iii) declare all DIP Obligations to be immediately due and payable; (iv) immediately set-off any and all amounts in accounts maintained by the Debtors with any DIP Agent or any DIP Lender or on their behalf against the DIP Obligations, or otherwise enforce any and all rights against the Collateral in the possession of the DIP Agents or any of the DIP Lenders or being held on their behalf, including, without limitation, disposition of the Collateral solely for application towards the DIP Obligations; and (v) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Documents or applicable law to effect the repayment of the DIP Obligations; *provided*

24

*that* the Debtors shall not have the right to contest the enforcement of the remedies set forth in this Order and the DIP Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth herein or in the applicable DIP Documents; and *provided further* that during the Notice Period, but subject in all respects to clause (b) of paragraph 17 and paragraph 20, the Debtors shall have no authority to borrow under the DIP Facilities, and the DIP Agents may terminate the DIP Facilities and declare all DIP Obligations to be immediately due and payable, and the Debtors' authority to use cash collateral shall be as set forth in the Budget (as defined below) and limited solely to payment of expenses critical to preservation of the Debtors' estates and the payment of the fees, costs and expenses to administer these Cases, as agreed by the DIP Agents in their sole discretion. The Debtors, the Prepetition Agents and the Prepetition Secured Creditors shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agents and the DIP Lenders set forth in this Order and in the DIP Documents.

(b)    In no event shall the DIP Agents, the DIP Lenders, the Prepetition Agents or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

12.    <u>Approved Budget</u>.

(a)    For purposes of this Order, the term "<u>Budget</u>" means the following: (a) the budget, attached hereto as <u>Exhibit A</u>, the "<u>Initial Budget</u>," which is an initial 13-week budget delivered by the Debtors to the DIP Agents prior to the Petition Date and commencing with the week during which the Petition Date occurs, containing line items of sufficient detail to reflect the Debtors' consolidated projected receipts and disbursements for such 13-week period,

25

including, without limitation, the anticipated weekly uses of the DIP Facilities and cash

collateral for such period, and which shall provide, among other things, for the payment of the

fees and expenses, including professional fees, relating to the DIP Facilities, ordinary course

expenses, fees and expenses related to the Cases, and working capital and other general

corporate needs, which Initial Budget shall be in form and substance acceptable and approved

by the DIP Agents and DIP Lenders, in their sole discretion (as such Initial Budget shall be

amended, supplemented and/or extended in the manner set forth herein and in the Final Order

(the "Budget"); and (b) on or before 5:00 p.m. prevailing Eastern Time on the 20th day of each

month following the Petition Date, commencing with October 20, 2014, the Debtors shall

furnish a monthly supplement to the Initial Budget (or the previously supplemented Budget, as

the case may be), covering a 13-week period that commences with the week such supplement

is delivered, together with a variance analysis from the Budget (or the previously supplemented

Budget, as the case may be).  Such monthly supplements to the Budget shall become the

Budget upon the earlier of (a) written acknowledgement from the DIP Agents or the DIP

Agents' financial advisor that the proposed supplement is substantially in the form of the Initial

Budget  (or the previously supplemented Budget, as the case may be) and is otherwise in form

and substance acceptable to and as approved by the DIP Agents (provided that any proposed

changes in the proposed supplement to any of the Budget figures already covered by the Initial

Budget (or the previously supplemented Budget, as the case may be) must be satisfactory to the

DIP Agents in their sole discretion) or (b) within 10 Business Days after receipt of such

proposed supplement by the DIP Agents, provided that the DIP Agents have not provided a

written objection to the proposed supplement; the Initial Budget (or the previously

supplemented Budget, as the case may be) shall remain the Budget if the DIP Agents object to

the proposed supplement and until such time as the DIP Agents provide written acknowledgement that a revised version of the proposed supplement is otherwise in form and substance acceptable to and as approved by the DIP Agents.  Notwithstanding anything herein or in the DIP Documents to the contrary, unless specifically authorized hereunder or in writing by the DIP Agents or as may be provided in the Budget, no cash collateral may be paid or transferred to any non-Debtor subsidiary or affiliate of the Debtors.

(b)    The Borrower shall ensure that at no time any of the following occur, each a "Budget Covenant":

(i)    a negative variance by 15% or more from the designated "Operating Receipts" line in the Budget, tested on a cumulative weekly basis over a rolling four-week period and commencing with the week that the Petition Date occurs; or

(ii)    a negative variance by 15% or more from the designated "Operating Disbursements" line in the Budget, tested on a cumulative weekly basis over a rolling four-week period and commencing with the week that the Petition Date occurs; or

(iii) Liquidity (as defined below) of the Debtors is less than the below minimum level at any time during the applicable month:

| Applicable Month | Minimum Liquidity |
| --- | --- |
| October 2014 | $14.0 million |
| November 2014 | $15.3 million |
| December 2014 | $13.6 million |
| January 2015 | $9.0 million |
| February 2015 | $10.5 million |

For purposes of this Budget Covenant, "Liquidity" shall be determined as the sum of:  (1) the greater of (x) zero or (y) $100 million *minus* all net proceeds borrowed

27

under the DIP Facilities or any replacement thereof; *plus* (2) the aggregate cash balance of the Debtors on a consolidated basis; or

(iv)     Any Debtor makes any disbursement not contemplated by the Budget (giving effect to the foregoing variances) and without having received the prior written consent of the Budget Approval Parties (in their sole discretion).

(c)     The Debtors shall deliver to the DIP Agents (copies of which the Debtors shall promptly furnish to counsel to and financial advisors of the DIP Agent and the DIP Lenders), by 7:00 p.m. prevailing Eastern Time on Wednesday of each week (commencing on Wednesday, October 8th, 2014) , a variance report setting forth, in reasonable detail, any differences between any actual receipts (as applicable) and disbursements versus proposed receipts (as applicable) and disbursements set forth in the Budget for the prior week, together with a statement certifying compliance with the Budget Covenants and certifying that no disbursements inconsistent with the Budget have been made.

13.     <u>Limitation on Charging Expenses Against Collateral</u>.  Subject to and effective only upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Agents and the DIP Lenders, as the case may be with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the DIP Agents or the DIP Lenders.  In no event shall the DIP Agents or the

28

DIP Lenders be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

        14.    <u>Payment of Fees and Expenses</u>.  Except as set forth in this paragraph 14, no payments (including professional fees and expenses) with respect to the DIP Obligations, including pursuant to paragraph 5 of this Order, shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines, and no recipient of any such payments shall be required to file any interim or final fee applications with the Court or otherwise seek Court's approval of any such payments.  A copy of each invoice submitted to the Debtors for the professional fees and expenses to the extent incurred by such professionals after the Petition Date shall be provided by the Debtors to the U.S. Trustee contemporaneously with the delivery of such invoice to the Debtors.  Any such invoice shall include the number of hours billed and a reasonably detailed description of the services provided and the expenses incurred by the applicable professional; *provided, however*, that any such invoice may be redacted to protect privileged, confidential or proprietary information.  To the extent that the U.S. Trustee has an objection to the fees and expenses of any such professional, the U.S. Trustee shall be afforded ten (10) calendar days after receipt of such invoice to submit to the applicable professional, the Debtors, counsel to the DIP Agent and counsel to the Committee, if any, a written objection to the reasonableness of such fees, which must contain a specific basis for the objection.  If any objection is properly submitted as set forth above and cannot be resolved and/or withdrawn within ten (10) calendar days after such objection has been properly submitted, the Court shall adjudicate the matter and fashion an appropriate remedy.  Payment of any such costs, fees and expenses shall not be delayed based on any objections thereto, and the relevant

agent or professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final non-appealable order of the Bankruptcy Court.

15.    <u>Credit Bid</u>.  The DIP Agents and the DIP Lenders, respectively, shall have the respective right to credit bid under section 363(k) of the Bankruptcy Code a portion of or all of their respective claims in connection with a sale of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization.

16.    <u>Perfection of DIP Liens</u>.

(a)    The DIP Agents and the DIP Lenders are hereby authorized, but not required, to file or record financing statements or take control over deposit accounts and securities accounts, in each case, in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agents on behalf of the respective DIP Lenders in their discretion, choose to file such financing statements or take control over deposit accounts and securities accounts, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and on the date of entry of this Order.  Upon the request of the DIP Agents, without any further consent of any party, the DIP Agents, the Debtors and each DIP Lender are authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agents to further perfect the DIP Liens.

(b)    A certified copy of this Order may, in the discretion of the DIP Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.  For the

avoidance of doubt, the automatic stay provisions of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agents to take all actions, as applicable, referenced in this subparagraph (b) and in the immediately preceding subparagraph (a).

(c)    Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the granting of post-petition liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lenders in accordance with the terms of the DIP Documents or this Order.

17.    <u>Preservation of Rights Granted Under the Order.</u>

(a)    Except as expressly provided herein or in the DIP Documents, no claim or lien having a priority senior to or *pari passu* with those granted by this Order to the DIP Agents or the DIP Lenders shall be granted or allowed while any portion of the DIP Obligations or the Commitment Amount (as defined in the DIP Documents), as the case may be, remain outstanding, and the DIP Liens shall not be subject to or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or subordinate to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

31

(b)    In addition to the Events of Default set forth in the DIP Documents, unless all DIP Obligations shall have been indefeasibly paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the Debtors to use cash collateral hereunder if any of the Debtors seek, or if there is entered, unless the DIP Agents have otherwise consented:  (i) any modification or extension of this Order without the prior written consent of the DIP Agents, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agents, (ii) an order converting or dismissing these Cases and such order shall not have been reversed or vacated within ten (10) days; (iii) an order appointing a chapter 11 trustee in these Cases and such order shall not have been reversed or vacated within ten (10) days, (iv) an order appointing an examiner with enlarged powers in these Cases and such order shall not have been reversed or vacated within ten (10) days, (v) an order providing for a change of venue with respect to these Cases and such order shall not have been reversed or vacated within ten (10) days; (vi) an order approving a plan of reorganization or the sale of all or substantially all of the Collateral (except to the extent permitted under the DIP Documents) shall have been entered which does not provide for the repayment in full in cash of the DIP Obligations (other than any contingent obligations not yet due and payable) upon the consummation thereof.  If an order dismissing these Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Superpriority Claims, priming liens, security interests and replacement security interests granted to the DIP Agents and the DIP Lenders, including the DIP Liens pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order (and that such Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding such dismissal,

32

remain binding on all parties in interest, including the priorities set forth herein and in the DIP

Documents) until all DIP Obligations shall have been paid and satisfied in full and (y) this

Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing

the claims, liens and security interests referred to in clause (x) above.

       (c)    If any or all of the provisions of this Order are hereafter reversed,

modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the

validity of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP

Agents of the effective date of such reversal, modification, vacation or stay or (ii) the validity

or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP

Documents with respect to any DIP Obligations.  Notwithstanding any such reversal,

modification, vacation or stay, any use of cash collateral or DIP Obligations incurred by the

Debtors to the DIP Agents or the DIP Lenders prior to the actual receipt of written notice by

the DIP Agents of the effective date of such reversal, modification, vacation or stay shall be

governed in all respects by the original provisions of this Order, and the DIP Agents and the

DIP Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in

section 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Documents with

respect to all uses of cash collateral and proceeds of the DIP Facility and DIP Obligations.

       (d)    Except as expressly provided in this Order or in the DIP Documents, the

DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Agents and

the DIP Lenders granted by the provisions of this Order and the DIP Documents shall survive,

and shall not be modified, impaired or discharged by the entry of an order converting any of

these Cases to a case under chapter 7, dismissing these Cases, approving the sale of any

Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by

33

the DIP Documents) or the entry of an order confirming a plan of reorganization in these Cases (except an acceptable plan to the DIP Agents and DIP Lenders under the DIP Documents) and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations. The terms and provisions of this Order and the DIP Documents shall continue in these Cases, in any successor case, or in any superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, the Superpriority Claims, and all other rights and remedies of the DIP Agents and the DIP Lenders under the DIP Documents granted by the provisions of this Order shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash as set forth herein and the DIP Documents.

18.     Exculpation. Nothing in this Interim Order, the DIP Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Agent or any DIP Lender any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts. In addition, (a) the DIP Agents and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by the Debtors; *provided that*, (i) the foregoing shall not apply to any act or omission by the DIP Agents or the DIP Lenders that constitutes gross negligence or willful misconduct by the DIP Agents or the DIP Lenders as finally determined by a court of competent jurisdiction.

19.    <u>Effect of Stipulations On Third Parties</u>.  The stipulations and admissions contained in this Order, including, without limitation, in paragraph 3 of this Order, shall be binding upon the Debtors and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) in all circumstances.  The stipulations and admissions contained in this Order, including, without limitation, in paragraph 3 of this Order, shall be binding upon all other parties in interest, including, without limitation, any statutory or nonstatutory committees appointed or formed in these Cases (including the Committee) and any other person or entity acting on behalf of the Debtors' estates, unless the Committee, if any, or any other party in interest, after obtaining requisite standing that has been granted by this Court, (a) has timely and properly filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia,* in paragraph 19) by no later than (i) with respect to the Committee, the date that is sixty (60) days after the Committee's formation, or (ii) with respect to a party in interest, no later than the date that is seventy-five (75) days after the entry of this Order (the "<u>Challenge Period</u>"), (x) challenging the validity, enforceability, priority or extent of the applicable Prepetition Debt or the applicable Prepetition Agent's or the Prepetition Secured Creditors' liens on the Prepetition Collateral or (y) otherwise asserting or prosecuting any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, "<u>Claims and Defenses</u>") against the applicable Prepetition Agent or any of the applicable Prepetition Secured Creditors or any of such parties' affiliates, representatives, attorneys or advisors in connection with matters related to the applicable Prepetition Documents, the Prepetition Debt, the Prepetition Collateral, and (b) there is a final order in favor of the plaintiff sustaining any such challenge or claim in such timely filed adversary proceeding or

35

contested matter (a "Successful Challenge"); *provided that*, (i) all such Claims and Defenses are hereby irrevocably waived and relinquished by the Debtors as of the Petition Date and (ii) any challenge or claim shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be forever deemed waived, released and barred.  If the Challenge Period expires and a Successful Challenge has not occurred, (w) the Prepetition Debt and the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in these Cases, any successor case and any subsequent chapter 7 case, and (x) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected, not subject to recharacterization, subordination or avoidance, (y) the Prepetition Obligations, the Prepetition Liens on the Prepetition Collateral and the Prepetition Agents and the Prepetition Secured Creditors shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or 11 trustee appointed or elected for the Debtors after the expiration of the Challenge Period).  If any such adversary proceeding or contested matter is timely and properly filed, the stipulations and admissions contained in paragraph 3 of this Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or nonstatutory committee appointed or formed in these Cases (including the Committee) and on any other person or entity, except to the extent that such findings and admissions were expressly challenged in such adversary proceeding or contested matter.  Nothing in this Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or nonstatutory committees appointed or formed in these Cases

36

(including the Committee), standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Claims and Defenses with respect to the Prepetition Documents or the Prepetition Obligations.  Notwithstanding anything contrary herein, regardless of the outcome of any adversary proceeding or other process described in this paragraph 19, the DIP Obligations shall remain valid and binding obligations of the Debtors.

20.    <u>Limitation on Use of Financing Proceeds and Collateral</u>.  Notwithstanding anything herein or in any other order by this Court to the contrary, no party may use, and no borrowings, the Prepetition Collateral, the cash collateral, the Collateral, the DIP Facilities, the Carve-Out, the Carve-Out Cap or any portion or proceeds of the foregoing may be used in connection with (a) objecting, contesting or raising any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents or the Prepetition Documents, or the liens or claims granted under this Interim Order, the DIP Documents or the Prepetition Documents, (b) asserting any Claims and Defenses or causes of action against the DIP Agents, the DIP Lenders, the Prepetition Agents or the Prepetition Secured Parties or their respective agents, affiliates, representatives, attorneys or advisors, (c) objecting, contesting or raising any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the Dutch Notes Purchase Agreement (as such term is defined in the Intercreditor DIP Loan Agreement) and related documents or the liens or claims granted thereunder or asserting any claims or defenses or causes of action against the noteholders thereunder or their respective agents, affiliates, representatives, attorneys or advisors, (d) preventing, hindering or otherwise delaying the DIP Agents' or the DIP Lenders' assertion, enforcement or realization on the Collateral once an Event of Default has occurred and is continuing in accordance with the DIP Documents or this Interim Order, *provided that* the Debtors may contest or dispute whether an

37

Event of Default has occurred as provided for in paragraph 11(a) of this Interim Order, (e) seeking to modify any of the rights granted to the DIP Agents, the DIP Lenders, the Prepetition Agents or the Prepetition Secured Parties hereunder or under the DIP Documents and the Prepetition Documents, in each of the foregoing cases, without such parties' prior written consent, (f) paying any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) in accordance with the DIP Documents and the Budget, (g) using or seeking to use cash collateral except to the extent permitted under the DIP Documents and not otherwise prohibited hereunder, (h) selling or otherwise disposing of the Collateral except as permitted by the DIP Documents or otherwise with the consent of the DIP Agents or the DIP Lenders, or (i) using or seeking to use any insurance proceeds related to the Collateral, except as permitted by the DIP Documents or otherwise with the consent of the DIP Agent or the DIP Lenders.  Notwithstanding the foregoing, advisors to the Committee, if any, may investigate claims and issues with respect to the liens granted pursuant to the Prepetition Documents during the Challenge Period at an aggregate expense for such investigation, but not litigation, prosecution, objection or challenge thereto, not to exceed $75,000.

21.    <u>Payments Held in Trust</u>.  Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in Collateral, receives any proceeds of Collateral or receives any other payment with respect thereto from any other source prior to indefeasible satisfaction of all DIP Obligations under the DIP Documents, and termination of the Commitment Amount (as defined in the DIP Documents) in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of Collateral in

38

trust for the benefit of the DIP Agents and DIP Lenders and shall immediately turn over such proceeds to the DIP Agents, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

        22.   <u>Letters of Credit</u>.

        (a)   Notwithstanding paragraphs 7(a)–(c) of this Order, the DIP Obligations shall not be secured by, and the DIP Collateral shall not include, cash (the "<u>LC Cash Collateral</u>") held in that certain cash collateral account number 4427248014 (the "<u>Cash Collateral Account</u>") maintained by the Issuing Bank, securing reimbursement obligations under the Prepetition Letters of Credit outstanding as of the date of this Order, as set forth and pursuant to the Budget (the obligations thereunder the "<u>LC Obligations</u>"), issued by the Issuing Bank, *provided, however*, that upon termination or expiration of the Prepetition Letters of Credit, the DIP Obligations shall be automatically secured by, and the DIP Collateral shall automatically include all of the LC Cash Collateral.  If, as of the close of business on any business day, the balance maintained in the Cash Collateral Account exceeds an amount equal to $1.00 in excess of 105% of the aggregate face amounts of the LC Obligations then outstanding as of the close of business of such business day (such amount equal to 105% of the aggregate face amounts of the LC Obligations then outstanding, the "<u>LC Cash Collateral Limit</u>"), the Debtors shall promptly (but no later than 5:00 p.m. on the immediately succeeding business day) provide written notice to the DIP Agents of such excess amount and shall instruct the Issuing Bank to transfer any funds in excess of the LC Cash Collateral Limit to a deposit account subject to a deposit account control agreement in favor of the DIP Agents, for the benefit of their respective DIP Lenders (for application in accordance with paragraph 9 of

39

this Order), by no later than 5:00 p.m. on the second business day after the Issuing Bank
receives such instructions.

(b)    The LC Cash Collateral shall not be subject to the Carve-Out.

(c)    Notwithstanding the automatic stay imposed by section 362 of the
Bankruptcy Code, the Issuing Bank may send demands and notices (including, without
limitation, notices of non-renewal) relating to the Prepetition Letters of Credit in accordance
with the terms of the existing documents governing the Prepetition Letters of Credit, and, so
long as the Prepetition Letters of Credit have not been terminated or expired, may take any
action it deems appropriate to evidence or continue the perfection of its security interests in the
LC Cash Collateral with respect to such existing Prepetition Letters of Credit, *provided
however,* that such notices shall be provided, at least seven (7) days prior to any action by the
Issuing Bank, upon counsel for the Debtors, the DIP Agents, the DIP Lenders and any
Committee appointed in these Cases.

23.    <u>Access to the Debtors</u>.  In accordance with the terms of the DIP
Documents, the DIP Agents and their professionals shall be afforded continued reporting as to
Collateral amounts and reasonable access to the Collateral and the Debtors' business premises,
during normal business hours and upon reasonable advance notice, for purposes of verifying the
Debtors' compliance with the terms of this Interim Order.

24.    <u>Retention of Jurisdiction</u>.  This Court has and will retain exclusive
jurisdiction with respect to any and all disputes or matters under, or arising out of or in
connection with, either the DIP Documents or this Interim Order.

25.    <u>Order Governs</u>.  In the event of any inconsistency between the provisions
of this Interim Order or Final Order, if and when entered, and the DIP Documents, the provisions

of this Interim Order or Final Order, as applicable, shall govern.  Additionally, to the extent that there may be an inconsistency between the terms of this Interim Order or Final Order, if and when entered, and the Order Establishing Certain Case Management Procedures and Granting Related Relief, the terms of this Interim Order or Final Order, as applicable, shall govern.

26.    Binding Effect; Successors and Assigns. The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Prepetition Agents, the Prepetition Secured Parties, any statutory or nonstatutory committee appointed or formed in these Cases, and the Debtors and their successors and assigns (including any chapter 7 trustee, chapter 11 trustee or similar responsible person or similar designee or litigation trust hereinafter appointed or elected for the estate of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Lenders, the Prepetition Agent, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided, however*, that the DIP Agents and the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person or similar designee or litigation trust hereunder appointed or elected for the estate of the Debtors.  In determining to make any loan under the DIP Documents or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agents and the DIP Lenders shall not be deemed to be in control of the operations of or participating in the management of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

41

27.    <u>Effectiveness</u>.  This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof, and there shall be no stay of execution of effectiveness of this Order.

28.    <u>Final Hearing</u>.  The Final Hearing is scheduled for [_____] at _____ (EST) before this Court.  The Debtors shall promptly mail copies of this Order (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice of the extraordinary provisions described in the introductory language to this Order) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served no later than _____, at 4:00 p.m. (ET) upon:  (a) the U.S. Trustee; (b) the Debtors; (c) counsel to the Debtors, Cole, Schotz, Meisel, Forman & Leonard, P.A., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attention: Norman L. Pernick, Esq. npernick@coleschotz.com and Stuart Komrower, Esq. skomrower@coleschotz.com); (d) counsel to the Senior DIP Agent, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064 (Attn:  Andrew N. Rosenberg, Esq.); (e) counsel to the Junior DIP Agent, Latham & Watkins LLP, 885 Third Avenue, New York, NY  10022-4834 (Attn:  Mark Broude, Esq.); (d) counsel to the Prepetition Oaktree Term Loan Agent and Issuing Bank, Parker, Hudson, Rainer & Dobbs LLP, 1500 Marquis Two Tower, 285 Peachtree Center Avenue NE, Atlanta, Georgia 30303 (Attn: C. Edward Dobbs, Esq., ced@phrd.com, and James S. Rankin, Jr., Esq., jsr@phrd.com); (g) counsel to the Prepetition Secured Notes Agent; and (h) counsel to any official committee then appointed in these Cases.

42

Dated:    October ____, 2014
          Wilmington, Delaware

                                    _____
                                    UNITED STATES BANKRUPTCY JUDGE

Exhibit A
Budget

**Reichhold U.S. Weekly DIP Forecast**

*($ in MM)*

| | File Date Projected 10/3/2014 | Projected 10/10/2014 | Projected 10/17/2014 | Projected 10/24/2014 | Projected 10/31/2014 | Projected 11/7/2014 | Projected 11/14/2014 | Projected 11/21/2014 | Projected 11/28/2014 | Projected 12/5/2014 | Projected 12/12/2014 | Projected 12/19/2014 | Projected 12/25/2014 | Projected 1/2/2015 | Projected 1/9/2015 | Projected 1/16/2015 | Projected 1/23/2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flow Before Bankruptcy Items:** | | | | | | | | | | | | | | | | | |
| Operating Receipts | $ 9.2 | $ 9.1 | $ 9.2 | $ 9.5 | $ 8.1 | $ 10.2 | $ 7.5 | $ 9.9 | $ 9.3 | $ 6.8 | $ 8.8 | $ 8.2 | $ 8.7 | $ 2.1 | $ 8.8 | $ 7.2 | $ 6.1 |
| Operating Disbursements | (6.0) | (11.5) | (9.8) | (9.6) | (10.2) | (6.7) | (9.7) | (8.0) | (8.2) | (8.2) | (9.7) | (6.5) | (9.1) | (4.8) | (6.8) | (8.1) | (6.4) |
| Non-Operating (Excl. PIK Interest) | (0.8) | (0.5) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Cash Flow Before Bankruptcy Items** | $ 2.5 | $ (3.0) | $ (0.6) | $ (0.1) | $ (2.1) | $ 3.5 | $ (2.2) | $ 1.9 | $ 1.1 | $ (1.4) | $ (0.9) | $ 1.7 | $ (0.5) | $ (2.7) | $ 1.9 | $ (0.9) | $ (0.3) |
| **Bankruptcy Related Costs:** | | | | | | | | | | | | | | | | | |
| Professional Fees | $ (0.0) | $ - | $ (0.6) | - | (0.5) | - | $ - | (0.6) | (0.8) | - | - | (0.6) | - | (0.7) | - | (0.8) | $ - |
| DIP Cash Interest - Senior Secured DIP Facility | - | - | - | - | (0.5) | - | | | (0.5) | | | | (0.5) | | | | |
| DIP Cash Interest - Jr. DIP Facility From ROW | - | - | - | - | (0.5) | - | | | (0.5) | | | | (0.5) | | | | |
| First Day Payments | (3.9) | - | - | - | - | - | | | | | | | | | | | |
| **Total Bankruptcy Related Costs** | $ (3.9) | $ - | $ (0.6) | $ - | $ (1.0) | $ - | $ - | $ (0.6) | $ (1.8) | $ - | $ - | $ (0.6) | $ (1.0) | $ (0.7) | $ - | $ (0.8) | $ - |
| **Cash Flow Before Revolver** | $ (1.4) | $ (3.0) | $ (1.2) | $ (0.1) | $ (3.1) | $ 3.5 | $ (2.2) | $ 1.3 | $ (0.8) | $ (1.4) | $ (0.9) | $ 1.1 | $ (1.4) | $ (3.4) | $ 1.9 | $ (1.7) | $ (0.3) |
| Pre-Petition Revolver Draw / (Payback) | $ (73.8) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Senior Secured DIP | 50.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Jr. DIP Loan to Reichhold, Inc. From ROW | 38.0 | - | - | - | - | - | - | - | - | - | - | - | - | 3.0 | - | - | - |
| **Net Cash Flow** | $ 12.8 | $ (3.0) | $ (1.2) | $ (0.1) | $ (3.1) | $ 3.5 | $ (2.2) | $ 1.3 | $ (0.8) | $ (1.4) | $ (0.9) | $ 1.1 | $ (1.4) | $ (0.4) | $ 1.9 | $ (1.7) | $ (0.3) |
| Beginning Cash | $ 1.6 | $ 14.4 | $ 11.4 | $ 10.2 | $ 10.1 | $ 7.0 | $ 10.6 | $ 8.3 | $ 9.7 | $ 8.9 | $ 7.5 | $ 6.6 | $ 7.7 | $ 6.3 | $ 5.8 | $ 7.8 | $ 6.1 |
| Net Cash Flow | 12.8 | (3.0) | (1.2) | (0.1) | (3.1) | 3.5 | (2.2) | 1.3 | (0.8) | (1.4) | (0.9) | 1.1 | (1.4) | (0.4) | 1.9 | (1.7) | (0.3) |
| **Ending Cash** | $ 14.4 | $ 11.4 | $ 10.2 | $ 10.1 | $ 7.0 | $ 10.6 | $ 8.3 | $ 9.7 | $ 8.9 | $ 7.5 | $ 6.6 | $ 7.7 | $ 6.3 | $ 5.8 | $ 7.8 | $ 6.1 | $ 5.8 |

**Reichhold U.S. Weekly DIP Forecast**

($ in MM)

| | Projected 1/30/2015 | Projected 2/6/2015 | Projected 2/13/2015 | Projected 2/20/2015 | Maturity Projected 2/27/2015 | Total |
|---|---|---|---|---|---|---|
| **Cash Flow Before Bankruptcy Items:** | | | | | | |
| Operating Receipts | $ 6.8 | $ 8.8 | $ 5.9 | $ 10.0 | $ 5.9 | $ 175.9 |
| Operating Disbursements | (8.6) | (5.8) | (7.3) | (7.9) | (11.7) | (180.7) |
| Non-Operating (Excl. PIK Interest) | - | - | - | - | - | (1.3) |
| **Total Cash Flow Before Bankruptcy Items** | $ (1.7) | $ 3.0 | $ (1.5) | $ 2.0 | $ (5.8) | $ (6.1) |
| **Bankruptcy Related Costs:** | | | | | | |
| Professional Fees | $ (0.7) | $ - | $ - | $ (0.8) | $ (0.7) | $ (6.3) |
| DIP Cash Interest - Senior Secured DIP Facility | (0.6) | - | - | - | (0.5) | (2.6) |
| DIP Cash Interest - Jr. DIP Facility From ROW | (0.6) | - | - | - | (0.5) | (2.6) |
| First Day Payments | - | - | - | - | - | (3.9) |
| **Total Bankruptcy Related Costs** | $ (1.9) | $ - | $ - | $ (0.8) | $ (1.7) | $ (15.3) |
| **Cash Flow Before Revolver** | $ (3.7) | $ 3.0 | $ (1.5) | $ 1.3 | $ (7.5) | $ (21.4) |
| Pre-Petition Revolver Draw / (Payback) | $ - | $ - | $ - | $ - | $ - | $ (73.8) |
| Senior Secured DIP | - | - | - | - | - | 50.0 |
| Jr. DIP Loan to Reichhold, Inc. From ROW | - | - | - | - | - | 41.0 |
| **Net Cash Flow** | $ (3.7) | $ 3.0 | $ (1.5) | $ 1.3 | $ (7.5) | $ (4.2) |
| Beginning Cash | $ 5.8 | $ 2.1 | $ 5.1 | $ 3.7 | $ 4.9 | $ 1.6 |
| Net Cash Flow | (3.7) | 3.0 | (1.5) | 1.3 | (7.5) | (4.2) |
| **Ending Cash** | $ 2.1 | $ 5.1 | $ 3.7 | $ 4.9 | $ (2.6) | $ (2.6) |