Exhibit D
Senior DIP Note Purchase and Guaranty Agreement

**REICHHOLD, INC.**

**SENIOR SECURED NOTES**

**AND**

**ADDITIONAL NOTES**

———————

**NOTE PURCHASE AND GUARANTY AGREEMENT**

**DATED AS OF [October ___, 2014]**

# TABLE OF CONTENTS

### (Not Part of Agreement)

**Page**

1    AUTHORIZATION, ETC.......................................................................... 1

    1A.    Authorization of Issue .........................................................................1

    1B.    Interest on the Notes ..........................................................................2

2    PURCHASE AND SALE OF SECURITIES ............................................ 2

    2A.    Closing..................................................................................................2

3    CONDITIONS OF CLOSING .................................................................. 3

    3A.    Closing..................................................................................................3

4    PREPAYMENTS; MATURITY ................................................................ 6

    4A.    Required Repayment at Maturity ........................................................6

    4B.    Required Repayment from Alternative DIP Facility...........................6

    4C.    Mandatory Prepayment with Excess Proceeds ...................................6

    4D.    Retirement of Notes.............................................................................6

    4E.    Payments Free and Clear of Taxes .....................................................7

5    AFFIRMATIVE COVENANTS .............................................................. 11

    5A.    Financial Statements..........................................................................11

    5A.    Budget Covenants.  The Issuer shall ensure that at no time any of the
        following occur, each a "Budget Covenant": .....................................12

    5B.    Certificates; Other Information .........................................................13

    5C.    Notices ...............................................................................................15

    5D.    Preservation of Corporate Existence, Etc .........................................17

    5E.    Maintenance of Property ...................................................................17

    5F.    Insurance............................................................................................17

    5G.    Payment of Obligations .....................................................................17

    5H.    Compliance with Laws ......................................................................18

    5I.    Inspection of Property and Books and Records.................................18

    5J.    Use of Proceeds .................................................................................18

    5K.    Further Assurances ............................................................................18

    5L.    Environmental Matters ......................................................................19

-i-

|       | 5M. | Milestones | 20 |
|       | 5N. | Post-Closing Obligations | 20 |
|       | 5O. | Information Required by Rule 144A | 20 |
|       | 5P. | Chapter 11 Cases | 20 |
|       | 5Q. | Intellectual Property | 20 |
| 6     |     | NEGATIVE COVENANTS | 22 |
|       | 6A. | Limitation on Liens | 22 |
|       | 6B. | Disposition of Assets | 24 |
|       | 6C. | Consolidations and Mergers | 25 |
|       | 6D. | Loans and Investments | 25 |
|       | 6E. | Limitation on Indebtedness | 27 |
|       | 6F. | Transactions with Affiliates | 27 |
|       | 6G. | Reserved | 28 |
|       | 6H. | Use of Proceeds | 28 |
|       | 6I. | Contingent Obligations | 28 |
|       | 6J. | Compliance with ERISA | 29 |
|       | 6K. | Restricted Payments | 30 |
|       | 6L. | Change in Business | 31 |
|       | 6M. | Reserved | 31 |
|       | 6N. | Changes in Accounting, Name and Jurisdiction of Organization | 31 |
|       | 6O. | Amendments to Material Agreements; Indebtedness Documents; Etc | 31 |
|       | 6P. | No Negative Pledges; Issuance of Stock | 32 |
|       | 6Q. | OFAC; Patriot Act | 32 |
|       | 6R. | Sale-Leasebacks | 32 |
|       | 6S. | Reserved | 32 |
|       | 6T. | Capital Expenditures | 32 |
|       | 6U. | Superpriority Claims | 33 |
|       | 6V. | Intellectual Property | 33 |
| 7     |     | GUARANTY | 33 |
|       | 7A. | Guaranty of the Obligations | 33 |
|       | 7B. | Contribution by Guarantors | 33 |
|       | 7C. | Payment by Guarantors | 34 |
|       | 7D. | Liability of Guarantors Absolute | 34 |

52719/0001-11044714v1

| | 7E. | Waivers by Guarantors | 36 |
| | 7F. | Guarantors' Rights of Subrogation, Contribution, Etc | 37 |
| | 7G. | Subordination of Other Obligations | 38 |
| | 7H. | Continuing Guaranty | 38 |
| | 7I. | Authority of Guarantors or the Issuer | 38 |
| | 7J. | Financial Condition of the Issuer | 38 |
| | 7K. | Bankruptcy, Etc | 38 |
| 8 | | DEFAULT AND REMEDIES | 39 |
| | 8A. | Acceleration | 39 |
| | 8B. | Rescission of Acceleration | 45 |
| | 8C. | Notice of Acceleration or Rescission | 45 |
| | 8D. | Payment Priorities | 45 |
| | 8E. | Other Remedies | 46 |
| 9 | | REPRESENTATIONS AND WARRANTIES | 46 |
| | 9A. | Corporate Existence and Power | 46 |
| | 9B. | Corporate Authorization; No Contravention | 46 |
| | 9C. | Governmental Authorization | 47 |
| | 9D. | Binding Effect | 47 |
| | 9E. | Litigation | 47 |
| | 9F. | No Default | 48 |
| | 9G. | ERISA Compliance | 48 |
| | 9H. | Use of Proceeds; Margin Regulations | 48 |
| | 9I. | Ownership of Property; Liens | 48 |
| | 9J. | Taxes | 49 |
| | 9K. | Financial Condition | 49 |
| | 9L. | Environmental Matters | 50 |
| | 9M. | Regulated Entities | 50 |
| | 9N. | Reserved | 50 |
| | 9O. | Labor Relations | 50 |
| | 9P. | Intellectual Property | 51 |
| | 9Q. | Reserved | 52 |
| | 9R. | Reserved | 52 |
| | 9S. | Ventures, Subsidiaries and Affiliates; Outstanding Stock | 52 |

|  | 9T. | Jurisdiction of Organization; Chief Executive Office | 52 |
|  | 9U. | Deposit Accounts and Other Accounts | 52 |
|  | 9V. | Reserved | 52 |
|  | 9W. | Reserved | 52 |
|  | 9X. | Centre of Main Interest | 52 |
|  | 9Y. | Full Disclosure | 53 |
|  | 9Z. | Foreign Assets Control Regulations and Anti-Money Laundering | 53 |
|  | 9AA. | Patriot Act | 53 |
|  | 9BB. | Rule 144A | 53 |
|  | 9CC. | Offering of Notes | 53 |
|  | 9DD. | Priority and Liens | 54 |
| 10 | | REPRESENTATIONS AND COVENANTS OF EACH PURCHASER | 55 |
|  | 10A. | Nature of Purchase | 55 |
| 11 | | COLLATERAL AGENT | 55 |
|  | 11A. | Appointment and Authorization of Collateral Agent | 55 |
|  | 11B. | Delegation of Duties | 56 |
|  | 11C. | Liability of Agent | 56 |
|  | 11D. | Reliance by Agent | 57 |
|  | 11E. | Notice of Default or Event of Default | 57 |
|  | 11F. | Credit Decision | 57 |
|  | 11G. | Costs and Expenses; Indemnification | 58 |
|  | 11H. | Successor Agent | 59 |
|  | 11I. | Collateral Matters | 59 |
|  | 11J. | Agency for Perfection | 60 |
|  | 11K. | Payments by Agent to the Holders | 60 |
| 12 | | DEFINITIONS; ACCOUNTING MATTERS | 60 |
|  | 12A. | Terms | 60 |
|  | 12B. | Accounting Terms and Determinations; Interpretation | 87 |
| 13 | | MISCELLANEOUS | 87 |
|  | 13A. | Note Payments | 87 |
|  | 13B. | Expenses; Indemnification; Limitation of Liability | 88 |
|  | 13C. | Consent to Amendments | 89 |
|  | 13D. | Form, Transfer and Exchange of Notes; Lost Notes | 90 |

52719/0001-11044714v1

13E. Persons Deemed Owners ...................................................................91

13F. Survival of Representations and Warranties; Entire Agreement ...........91

13G. Successors and Assigns ....................................................................91

13H. Independence of Covenants ..............................................................91

13I. Notices ............................................................................................91

13J. Payments Due on Non-Business Days ................................................92

13K. Satisfaction Requirement .................................................................92

13L. Governing Law ...............................................................................92

13M. Submission to Jurisdiction ...............................................................92

13N. Service of Process ...........................................................................92

13O. Waiver of Jury Trial ........................................................................93

13P. Judgments .......................................................................................93

13Q. Currency .........................................................................................93

13R. Severability .....................................................................................93

13S. Descriptive Headings; Advice of Counsel; Interpretation...................93

13T. Counterparts ....................................................................................94

13U. Severalty of Obligations ..................................................................94

13V. Separate Investment Decisions, Etc...................................................94

13W. Confidentiality ................................................................................94

13X. Press Release and Related Matters ...................................................95

52719/0001-11044714v1

<u>SCHEDULES</u>

PURCHASER SCHEDULE

| | | |
|---|---|---|
| SCHEDULE 3A | -- | CLOSING CONDITIONS |
| SCHEDULE 5M | -- | MILESTONES |
| SCHEDULE 5N | -- | POST-CLOSING ACTIONS |
| SCHEDULE 6A | -- | EXISTING LIENS |
| SCHEDULE 6A-1 | -- | OTHER PERMITTED LIENS |
| SCHEDULE 6D | -- | EXISTING INVESTMENTS |
| SCHEDULE 6E | -- | EXISTING INDEBTEDNESS |
| SCHEDULE 6I | -- | EXISTING CONTINGENT OBLIGATIONS |
| SCHEDULE 9C | -- | GOVERNMENTAL AUTHORIZATIONS |
| SCHEDULE 9G | -- | ERISA MATTERS |
| SCHEDULE 9I | -- | TITLE TO PROPERTIES |
| SCHEDULE 9J | -- | TAXES |
| SCHEDULE 9L | -- | ENVIRONMENTAL MATTERS |
| SCHEDULE 9O | -- | LABOR RELATIONS |
| SCHEDULE 9S | -- | VENTURES, SUBSIDIARIES, AFFILIATES; OUTSTANDING STOCK |
| SCHEDULE 9T | -- | JURISDICTION OF ORGANIZATION; CHIEF EXECUTIVE OFFICE |

<u>EXHIBITS</u>

| | | |
|---|---|---|
| EXHIBIT A | -- | FORM OF NOTE |
| EXHIBIT B | -- | FORM OF DISBURSEMENT DIRECTION LETTER |
| EXHIBIT C | -- | [RESERVED] |
| EXHIBIT D | -- | [RESERVED] |
| EXHIBIT E | -- | [RESERVED] |
| EXHIBIT F | -- | FORM OF COUNTERPART AGREEMENT |
| EXHIBIT G | -- | FORM OF ASSIGNMENT AGREEMENT |
| EXHIBIT H | -- | FORM OF COPYRIGHT SECURITY AGREEMENT |
| EXHIBIT I | -- | FORM OF PATENT SECURITY AGREEMENT |
| EXHIBIT J | -- | FORM OF TRADEMARK SECURITY AGREEMENT |

52719/0001-11044714v1

REICHHOLD HOLDINGS US, INC.

_____

_____

As of October ___, 2014

To Each Person Named in the
Purchaser Schedule Attached Hereto

Ladies and Gentlemen:

The undersigned, Reichhold, Inc., a Delaware corporation (the **"Issuer"**), as issuer, and Reichhold Holdings US, Inc., a [Delaware] corporation (the "**Company**"), as parent guarantor, hereby agree with each party hereto named as a purchaser in the Purchaser Schedule attached hereto (herein called the **"Purchasers"**) as set forth below.[1]  Reichhold Industries, Inc., a Delaware corporation ("**US Holdings**"), is a party hereto solely (i) as a Guarantor pursuant to Paragraph 7 and (ii) with respect to Paragraphs 4B, 5A, 5D, 5M, 8 and 9 hereto.  Reference is made to Paragraph 12A hereof for definitions of capitalized terms used herein and not otherwise defined herein.  Cantor Fitzgerald Securities is party hereto as the Agent.

1  **AUTHORIZATION, ETC.**

   1A.    **Authorization of Issue**.

   (1)    **Senior Secured Notes.**  The Issuer has authorized the issuance to the Purchasers of its senior secured promissory notes in the initial aggregate principal amount of $          , to be dated the date of issue thereof, to mature on the Maturity Date, to bear interest as provided in Paragraph 1B below and to be in the form of **Exhibit A** hereto (the **"Notes"**).  The term **"Notes"** as used herein shall include each senior secured promissory note delivered pursuant to any provision of this Agreement and each senior secured promissory note delivered in substitution or exchange for, or otherwise in respect of, any other Note pursuant to any such provision.

   (2)    **Guaranty**.  Each Guarantor has authorized its continuing guaranty of the Notes and the other Obligations as provided under Paragraph 7 hereof.  The term **"Guarantor"** as used herein shall include each of the Persons signatory hereto as initial Guarantors and each other Person that becomes a party hereto as a Guarantor pursuant to a Counterpart Agreement or otherwise guarantees, pursuant to Paragraph 7, or otherwise, all or any part of the Obligations, in each such case, unless and until specifically released in writing from its guarantee obligations by the Required Holder(s) or if all of the Stock

---

[1] Inclusion of Paying Agent under consideration.

and Stock Equivalents of such Person owned by any Transaction Party are sold or transferred in a transaction permitted under this Agreement (including pursuant to a waiver or consent), to the extent that, after giving effect to such transaction, such Person would not be required to guaranty any Obligations pursuant hereto.

**1B.    Interest on the Notes**.    The Issuer shall pay interest on the unpaid principal amount of the Notes at the rates, time and manner set forth below.

(1)    **Rate of Interest**.    Subject to <u>Paragraph 1B(3)</u>, each Note shall bear interest on the unpaid principal amount thereof from and including the date issued through but excluding the date such Note is paid in full (whether upon final maturity, by prepayment, acceleration or otherwise) at the rate of 12.00% per annum; *provided,* that the Issuer may elect (by giving each Holder written notice of such election at least five Business Days prior to such Interest Payment Date) on any Interest Payment Date to pay all or a portion of such accrued interest by adding (on such Interest Payment Date) such accrued interest but at a rate equal to 14% per annum to the outstanding principal amount of the Notes (**"PIK Interest"**).    At the request of a Holder, such PIK Interest may be evidenced by a Note.    Interest on the Notes shall be computed on the basis of a 360-day year and twelve 30-day months.

(2)    **Interest Payments**.    Interest on each Note shall be payable (a) quarterly in arrears on the last day of March, June, September and December of each year (each such date an **"Interest Payment Date"**), commencing on the first such date occurring after the date of issuance of such Note, (b) upon any prepayment with respect to such Note (to the extent accrued on the amount being prepaid) and (c) on the Maturity Date (or such other time as such Note becomes due and payable, whether by acceleration or otherwise).

(3)    **Default Rate**.    After the occurrence and during the continuance of an Event of Default, the entire unpaid principal amount of the Notes (and interest on all overdue payments of principal of, and, to the fullest extent permitted by applicable law, interest on, the Notes) and all other Obligations then outstanding or payable shall bear interest at a rate per annum equal to 2.00% per annum above the rate otherwise payable under <u>Paragraph 1(B)(1)</u> (the **"Default Rate"**); and shall be payable upon demand.

(4)    **Cash Payment at Maturity**.    Notwithstanding anything herein or in the Notes to the contrary, any payment of accrued but unpaid interest at the maturity of a Note (or at such other time as payment of the principal amount of such Note or any portion thereof is due (as a result of prepayment, acceleration or otherwise)) shall be made entirely and exclusively in cash.

**2        PURCHASE AND SALE OF SECURITIES.**

**2A.    Closing**.    On the Closing Date, the Issuer hereby agrees to sell to each Purchaser, and, subject to the terms and conditions herein set forth, each Purchaser agrees to purchase from the Issuer, the aggregate principal amount of Notes set forth in the column "Initial Aggregate Amount of Notes" opposite such Purchaser's name in the Purchaser Schedule attached hereto at the purchase price of 94% of the principal amount thereof.    The Issuer will deliver to each

-2-

Purchaser, at the office of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, one or more Notes, in each case, registered in such Purchaser's name (or, if specified in the Purchaser Schedule, in the name of the nominee(s) for such Purchaser specified in the Purchaser Schedule), evidencing the aggregate principal amount of Notes to be purchased by such Purchaser and in the denomination or denominations specified with respect to such Purchaser in the Purchaser Schedule against payment of the purchase price thereof by transfer of immediately available funds on the closing date, which (subject to the satisfaction or waiver of the conditions precedent set forth in Paragraph 3A hereto) shall be on or about October __, 2014 or any other date upon which the Issuer and the Purchasers may mutually agree in writing (herein called the **"Closing Date"**), for credit to the account or accounts as shall be specified in a letter, in substantially the form of **Exhibit B** hereto, from the Issuer to the Purchasers prior to the Closing Date.

**3      CONDITIONS OF CLOSING.**

    **3A.      Closing.** Each Purchaser's obligation to purchase and pay for each Note to be purchased by such Purchaser hereunder is subject to the satisfaction, on or before the Closing Date, of the following conditions

        (1)      **Documents**. Such Purchaser shall have received original counterparts or, if satisfactory to such Purchaser, certified or other copies of all of the following, each duly executed and delivered by the party or parties thereto, in form and substance satisfactory to such Purchaser, dated the Closing Date unless otherwise indicated herein, and in full force and effect on the Closing Date:

            (a)      This Agreement and the Notes to be purchased by such Purchaser on the Closing Date;

            (b)      the Agent's Fee Letter;

            (c)      the Intercompany IP License Agreement;

            (d)      the Security Agreement;

            (e)      a Secretary's Certificate signed by the Secretary or Assistant Secretary and one other officer of each Transaction Party and US Holdings certifying, among other things (i) as to the name, title and true signature of each officer of such Person authorized to sign the Transaction Documents to which such Person is a party and the other documents to be delivered in connection with this Agreement, (ii) that attached thereto is a true, accurate and complete copy of the organizational document of such Person, certified by the relevant governmental authority of the jurisdiction of organization of such Person as of a recent date, (iii) that attached thereto is a true, accurate and complete copy of the By-laws or similar organizational document (or, if applicable, operating agreement) of such Person as in effect as of the Closing Date and as in effect immediately prior to and at all times since the adoption of the resolutions referred to in <u>clause (iv)</u> below and (iv) that attached thereto is a true, accurate and complete copy of the resolutions of the board of directors or other governing body

-3-

of such Person, duly adopted at a meeting or, if permitted, by unanimous written consent of such board of directors or such other governing body, authorizing the execution, delivery and performance of the Transaction Documents to which such Person is a party, and that such resolutions have not been amended, modified, revoked or rescinded, are in full force and effect; and

(f)    a certificate of good standing for each of the Transaction Parties and US Holdings from (i) the relevant governmental authority of the jurisdiction of such Person's organization in each case dated as of a recent date and (ii) to the extent applicable, the relevant governmental authority of each jurisdiction in which each Transaction Party is required to be qualified to transact business as a foreign entity in each case dated as of a recent date (other than such jurisdictions where the failure to be in good standing could not reasonably be expected to cause a Material Adverse Effect).

(2)    **Opinions of Transaction Parties' Counsel.**  Such Purchaser shall have received from [Latham & Watkins LLP/CS], as US counsel for US Holdings and the Transaction Parties, an opinion letter dated the Closing Date, in form and substance reasonably satisfactory to the Purchasers.

(3)    **Representations and Warranties.**  The representations and warranties contained in Paragraph 9 hereof and in the other Transaction Documents shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) on and as of the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall have been true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date, both immediately prior to and immediately after giving effect to the issuance of the Notes on the Closing Date and the consummation of the transactions contemplated by the Transaction Documents to occur on the Closing Date, and the Issuer shall have delivered to such Purchaser an Officer's Certificate, dated the Closing Date, to such effect.

(4)    **No Material Adverse Change.**  No event, change, effect, development or circumstance since December 31, 2013 shall have occurred that has had or would reasonably be expected to have a Material Adverse Effect, and no event has occurred or circumstances exist that may result in such Material Adverse Effect in either case other than the commencement of the Chapter 11 Cases.

(5)    **Junior DIP Loans.**  The Interim DIP Order shall have been entered in the Chapter 11 Cases on an interim basis, and such order shall not have been appealed, stayed reversed, vacated, amended or modified, and the term loans contemplated to be made to the Issuer under the Intercompany DIP Agreement on the Closing Date shall have been made (either prior to or simultaneously with the purchase and sale of the Notes hereunder).

(6)    **Payoff of Certain Existing Debt.**  Such Purchaser shall have received evidence satisfactory to it of (i) the repayment in full, and termination, of all liabilities

-4-

and obligations of US Holdings, the Company and their respective Subsidiaries under or otherwise with respect to the Existing Indebtedness concurrently with the funding of the Notes, (ii) the release and termination of Liens with respect to the Existing Indebtedness to the extent reasonably practicable and (iii) the execution and delivery by the lenders and/or agents thereunder of customary pay off letters and releases.

(7)     **Closing Fee.**  As provided in Paragraph 2A, the purchase price of the Notes includes a closing fee equal to 6.00% of the aggregate principal amount of the Notes in the form of original issue discount.

(8)     **Fees and Expenses.**  Without limiting the provisions of Paragraph 13B hereof, the Company shall have paid (or contemporaneously will pay) (i) the reasonable out-of-pocket expenses of each Purchaser and the Agent incurred prior to the Closing Date in connection herewith and the Transactions and other transactions contemplated hereby and (ii) the reasonable fees, charges and disbursements of counsel and any other professional advisors to the Purchasers and the Agent incurred prior to the Closing Date in connection herewith and the Transactions and other transactions contemplated hereby.

(9)     **Sources and Uses.**  Such Purchaser shall have received from the Issuer a statement of sources and uses of funds relating to consummation of the Transactions, the Intercompany DIP Loan Agreement and all related transactions, together with a flow of funds spreadsheet in each case prepared in reasonable detail.

(10)     **No Litigation.**  There shall be no unfavorable ruling with respect to the Transaction Documents or the Transactions and other transactions contemplated hereby, and, except for the Chapter 11 Cases, no pending material litigation or other proceedings (private or governmental) that challenges or purports to challenge any aspect of (or otherwise limit or restrict) the Transaction Documents, the Transactions or the other transactions contemplated hereby.

(11)     **Patriot Act.**  No later than five days prior to the Closing Date (or such shorter period following the request), the Issuer and each of the other Transaction Parties shall have provided all documentation and other information to each Purchaser that is required by any Governmental Authority under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, and that has been requested by any Purchaser in writing prior to such date.

(12)     **Budget.**  The Purchasers shall have received and be satisfied with the Initial Budget.

(13)     **First Day Orders.**  The Chapter 11 Cases shall have been commenced by the US Debtors and the same shall be a debtor and a debtor-in-possession. All "first day" orders and pleadings of the US Debtors shall (i) have been entered by the Bankruptcy Court, and all motions and documents in connection with such orders shall have been filed with, or submitted to, the Bankruptcy Court, in each case in form and substance (including the amounts of any monetary relief requested therein) reasonably satisfactory to the Agent and the Required Holders and in each case providing the relief requested

therein, (ii) the Agent and the Required Holders shall have had reasonable opportunity to review all such "first day" orders and pleadings prior to their filing or submission, and (iii) none of such orders shall have been appealed, stayed, reversed, vacated, amended or modified.

(14)    **Miscellaneous.**  All other documents, search results, instruments, financing statements and other legal matters in connection with the transactions contemplated by this Agreement or reasonably requested by the Collateral Agent, any other Agent or a Purchaser shall have been delivered, executed or recorded and shall be in form and substance reasonably satisfactory to each Purchaser.

**4**    **PREPAYMENTS; MATURITY.**  The Notes shall be subject to prepayment and repayment as set forth herein.

**4A.    Required Repayment at Maturity.**  The entire outstanding principal amount of the Notes, together with all accrued and unpaid interest thereon, shall become due and payable in cash on the Maturity Date (or, if earlier, as otherwise provided in this Agreement or the Notes).

**4B.    Required Repayment from Alternative DIP Facility.**  The proceeds of any Alternative DIP Facility shall be used to indefeasibly repay in full in cash the entire outstanding principal amount of the Notes, together with all accrued and unpaid interest thereon.

**4C.    Mandatory Prepayment with Excess Proceeds.**

(1)    **Notice.**  In the event any of US Holdings, the Issuer or any other Transaction Party receives any Excess Proceeds, the Issuer shall, no later than 5 Business Days after receipt of such Excess Proceeds, give written notice of such event to each Holder (an **"Excess Proceeds Prepayment Event"**). Such notice shall contain, and shall constitute, an irrevocable offer to prepay Notes in an aggregate amount equal to such Excess Proceeds on the date specified in such notice (the **"Excess Proceeds Prepayment Date"**) which date shall be not less than 3 Business Days or more than 10 Business Days after the date of notice. Such prepayment in respect of the Notes shall be due and payable on the Excess Proceeds Prepayment Date. Such prepayment shall be made at 100% of the principal amount of such Notes, together with accrued and unpaid interest on such Notes accrued through the date of prepayment and will be payable in cash only. Notwithstanding the foregoing, the Transaction Parties and their Subsidiaries shall be permitted to reinvest up to $1,500,000 in the aggregate of Excess Proceeds in fixed or capital assets so long as notice thereof shall be given to the Holders on or before the Excess Proceeds Prepayment Date and if and to the extent any such Excess Proceeds are not so reinvested within six months of such notice, then the Issuer shall repay the Notes as provided herein by the amount not so reinvested.

(2)    **Application.**  In any prepayment of the Notes pursuant to this Paragraph 4B, the principal amount so prepaid shall be allocated to the Notes in proportion to the respective outstanding principal amounts thereof.

**4D.    Retirement of Notes.**  The Transaction Parties shall not, and shall not permit any of their Subsidiaries or Affiliates to, prepay or otherwise retire in whole or in part prior to their

-6-

stated final maturity (other than by prepayment pursuant to Paragraph 4B or upon acceleration of such final maturity pursuant to Paragraph 8A), or purchase or otherwise acquire, directly or indirectly, any Note. Any Notes prepaid or otherwise retired or purchased or otherwise acquired by any Transaction Party or any of its Subsidiaries or Affiliates shall not be deemed to be outstanding for any purpose under this Agreement or otherwise and shall be immediately cancelled.

**4E.    Payments Free and Clear of Taxes.**

(1)    Subject to Paragraphs 4D(4) and 4D(7), and except where otherwise required by any Requirement of Law, any and all payments by the Issuer to each Holder under this Agreement shall be made free and clear of, and without deduction or withholding in any jurisdiction for, any and all present or future Taxes.

(2)    In addition, the Issuer shall pay any present or future stamp or documentary taxes or duties or any other excise or property taxes, charges or similar levies, but (i) excluding any taxes measured on the income of any Holder, which arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement, any Note or any other Transaction Document and (ii) any Excluded Taxes (such taxes described in this Paragraph 4D(2) and not excluded by clauses (i) or (ii) hereof, hereinafter referred to as **"Other Taxes"**).

(3)    Subject to Paragraph 4D(7), the Issuer shall indemnify and hold harmless each Holder for the full amount of Taxes or Other Taxes (including any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Paragraph 4D) paid by such Holder and any liability (including penalties, interest, additions to tax and reasonable expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted [by the relevant Government Authority][2]; *provided* that the Issuer shall not be required to indemnify a Holder for any Taxes or Other Taxes unless such Holder makes a written demand for indemnification within one year of the date on which such Taxes or Other Taxes were required to be paid to any taxing authority.  Payment under this indemnification shall be made within 30 days from the date any Holder makes written demand therefor.

(4)    If the Issuer shall be required by law to deduct or withhold any Taxes or Other Taxes from or in respect of any sum payable hereunder to any Holder, then, subject to Paragraph 4D(7):

(a)    the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Paragraph 4D) such Holder receives an amount equal to the sum it would have received had no such deductions or withholdings been made;

(b)    the Issuer shall make such deductions or withholdings; and

---

[2] LW tax comments under review by PW tax.

(c)       the Issuer shall pay the full amount deducted or withheld to the relevant taxation authority or other authority in accordance with applicable law.

(5)       Within 30 days after the date of any payment by the Issuer of Taxes or Other Taxes under <u>Paragraph 4D(4)(c)</u>, the Issuer shall furnish to the applicable Holder the original or a certified copy of a receipt evidencing payment thereof, or other evidence of payment reasonably satisfactory to the applicable Holder.

(a)       Each Holder that is not a US Holder (a **"Non-US Holder"**) shall deliver to the Issuer two copies of each U.S. Internal Revenue Service Form W-8BEN or W-8BEN-E (claiming exemption, if available, from, or a reduction of, U.S. withholding tax under an income tax treaty), Form W-8ECI (claiming exemption from U.S. withholding tax because the income is effectively connected with the U.S. trade or business) or Form W-8IMY (and all applicable attachments) (and in each case, together with any required statements or certifications), or any subsequent versions thereof or successors thereto, or, in the case of a Non-US Holder entitled to claim and claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," a Form W-8BEN or W-8BEN-E, or any subsequent versions thereof or successors thereto and a certificate representing that such Non-US Holder is not a "bank" for purposes of Section 881(c) of the Code, is not a 10% shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Issuer and is not a controlled foreign corporation related to the Issuer (within the meaning of Section 864(d)(4) of the Code)), in each case, properly completed and duly executed by such Non-US Holder claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by the Issuer under this Agreement, the Notes and the other Transaction Documents.  Such forms shall be delivered by each Non-US Holder on or before the date it becomes a Non-US Holder and upon the reasonable request of the Issuer.  In addition, each Non-US Holder shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-US Holder.  Each Non-US Holder shall promptly notify the Issuer at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Issuer (or any other form of certification adopted by the U.S. taxing authorities for such purpose).  In addition, if a payment made to a Holder hereunder or any Note would be subject to U.S. federal withholding tax imposed by FATCA if such Holder fails to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Holder shall deliver to the Issuer (A) a certification signed by the chief financial officer, principal accounting officer, treasurer or controller and (B) other documentation reasonably requested by the Issuer sufficient for the Issuer to comply with its obligations under FATCA and to determine that such Holder has complied with such applicable reporting requirements[or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (a), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

-8-

(b)      Each Holder that is a United States person (as such term is defined in Section 7701(a)(30) of the Code) (a **"US Holder"**), shall, on or before the date it becomes a US Holder, deliver to the Issuer, such form or forms, certificates or documentation, including two original copies of Internal Revenue Service Form W-9, as reasonably requested by the Issuer to confirm or establish that such US Holder is not subject to deduction, withholding, or backup withholding of United States federal income tax with respect to any payments to such US Holder.

(c)      Each Holder that is otherwise entitled to an exemption from or reduction of U.S. federal, state or local withholding tax or non-U.S. withholding tax under the law of a jurisdiction in which the Issuer is located or does business, or any treaty to which such jurisdiction is a party, with respect to payments under the Transaction Documents shall deliver to the Issuer, at the time or times reasonably requested by the Issuer, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.

Notwithstanding clauses (a), (b) and (c) of this Paragraph 4D(6), a Holder shall not be required to deliver any form pursuant to this Paragraph 4D(6) that such Holder is not legally able to deliver.

(6)      The Issuer will not be required to pay any additional amounts in respect of Taxes or Other Taxes pursuant to Paragraph 4D(4) to any Holder, or be obligated to indemnify such Holder under Paragraph 4D(3):

(a)      if the obligation to pay such additional amounts or to indemnify would not have arisen but for a failure by such Holder to comply with Paragraph 4D(6); or

(b)      if the obligation to pay such additional amounts or to indemnify arises as a result of (i) such Holder, at the time such Holder becomes a Holder or designates a new lending office, not being entitled to complete exemption from deduction or withholding of tax in respect of payments by the Issuer hereunder or (ii) any laws, rules or regulations in effect at the time such Holder becomes a Holder or designates a new lending office, except (x) to the extent that such Holder is an assignee of another Holder and such other Holder was entitled at the time of the assignment to receive such additional amounts under Paragraph 4D(4) and (y) to the extent that Holder changes its lending office per the Issuer's request pursuant to Paragraph 4D(9) and such Holder would have otherwise been entitled (taking into effect the new lending office) to receive such additional amounts under Paragraph 4D(4) to the extent that such Holder or its assignor (if any) was entitled at the time of designation of a new lending office or assignment to receive additional amounts under Paragraph 4D(4).

(7)      All amounts set out, or expressed in this Agreement, a Note or any other Transaction Document to be payable by a Transaction Party to a Holder or an agent hereunder which (in whole or in part) constitute the consideration for a supply or

-9-

supplies [by a Holder or an agent hereunder to a Transaction Party] for VAT purposes shall be deemed to be exclusive of any VAT which is chargeable on such supply or supplies, and accordingly, if VAT is or becomes chargeable on any supply made by a Holder or agent under this Agreement, a Note or any other Transaction Document and the Holder or such agent is required to account to the relevant tax authority for the VAT, that the Issuer shall pay to the Holder or such agent (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of such VAT (and such Holder or agent shall promptly provide an appropriate VAT invoice to the Issuer).

(8)     If the Issuer is required to pay additional amounts to any Holder pursuant to Paragraph 4D(4) or indemnify any Holder pursuant to Paragraph 4D(3), then such Holder shall use its reasonable efforts (consistent with legal and regulatory restrictions) to change the jurisdiction of its lending office or to file any certificate or document reasonably requested by the Issuer so as to eliminate any such additional payment or indemnification obligation by the Issuer which may thereafter accrue if such change in the judgment of such Holder is not otherwise disadvantageous to such Holder.  If any Holder determines, in its reasonable discretion, that it has received a refund of any credit of any Taxes or Other Taxes as to which it has been indemnified by the Issuer or with respect to which the Issuer has paid additional amounts pursuant to this Paragraph 4D, it shall pay to the Issuer an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Issuer under this Paragraph 4D with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of such Holder, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided,* that the Issuer, upon the request of such Holder, agrees to repay the amount paid over to the Issuer (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Holder in the event such Holder is required to repay such refund to such Governmental Authority.  This Paragraph 4D(9) shall not be construed to require any Holder to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Issuer or any other Person.

(9)     If any Tax or Other Tax was not correctly or legally asserted, the Holder shall, upon the Issuer's reasonable request and at the expense of the Issuer, provide such documents then available to such Holder to the Issuer as are necessary to enable the Issuer to reasonably contest such Tax or Other Tax pursuant to appropriate proceedings (so long as providing such documents shall not result in any liability to such Person and doing so is otherwise permitted under applicable law as reasonably determined by such Person).  This Paragraph 4D(10) shall not require any Holder to make available its tax returns or any other information relating to taxes that it deems confidential.

For the avoidance of doubt, nothing herein shall (a) restrict the right of any Holder to arrange its tax affairs as it shall deem appropriate or (b) require any Holder to disclose any information regarding its tax affairs or computations to the Issuer or any other Person other than as shall be necessary to permit the Issuer to determine whether the payment of amounts would be

-10-

required to be made pursuant to the provisions of this Paragraph 4D; *provided, however,* no Holder shall be obligated to disclose any of its tax returns to the Issuer or any other Person.

**5    AFFIRMATIVE COVENANTS.** Each Transaction Party covenants and agrees that, so long as any Note or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied, it shall perform all covenants in this Paragraph 5:

**5A.    Financial Statements.** Each Transaction Party shall maintain, and shall cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit the preparation of financial statements in conformity with GAAP (*provided* that quarterly and monthly financial statements shall not be required to have footnote disclosures and are subject to normal year-end adjustments). The Issuer shall deliver to the Holders and to each Agent appointed hereunder by Electronic Transmission and, in the case of clause (2) below, in detail reasonably satisfactory to the Required Holder(s):

(1)    as soon as available, but not later than 120 days after the end of each Fiscal Year, a copy of the audited consolidated balance sheets of US Holdings and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, and accompanied by the report of an nationally-recognized independent certified public accounting firm reasonably acceptable to the Required Holder(s) which report shall contain an unqualified opinion stating that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP;

(2)    as soon as available, but not later than 45 days after the end of each Fiscal Quarter of each year, (i) a copy of the unaudited consolidated and consolidating balance sheets of US Holdings and its Subsidiaries, and the related consolidated and consolidating statements of income, shareholders' equity (consolidated financial statements only) and cash flows as of the end of such Fiscal Quarter and for the portion of the Fiscal Year then ended, in each case, certified on behalf of US Holdings by an appropriate Responsible Officer of US Holdings as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of US Holdings and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures and (ii) a report setting forth in comparative form with respect to the statements of income the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the most recent projections for the current Fiscal Year delivered pursuant to Paragraph 5D(4) and discussing the reasons for any significant variations; and

(3)    as soon as available, but not later than 30 days after the end of each fiscal month of each year (other than the last fiscal month of each Fiscal Quarter), (i) a copy of the unaudited consolidated and consolidating balance sheets of US Holdings and its Subsidiaries, and the related consolidated and consolidating statements of income and

-11-

cash flows as of the end of such fiscal month and for the portion of the Fiscal Year then ended, all certified on behalf of US Holdings by an appropriate Responsible Officer of US Holdings as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of US Holdings and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures and (ii) a report setting forth in comparative form with respect to the statements of income the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the most recent projections for the current Fiscal Year delivered pursuant to <u>Paragraph 5D(4)</u>.

    **5B.**    **Budget.**  Prior to the Petition Date and commencing with the week during which the Petition Date occurs, the Issuer shall deliver to the Agent the budget (the "<u>Initial Budget</u>"), which is an initial 13-week budget, containing line items of sufficient detail to reflect the US Debtors' consolidated projected receipts and disbursements for such 13-week period, including, without limitation, the anticipated weekly uses of the DIP Loans and cash collateral for such period, and which shall provide, among other things, for the payment of the fees and expenses, including professional fees, relating to the DIP Loans, ordinary course expenses, fees and expenses related to the Cases, and working capital and other general corporate needs, which Initial Budget shall be in form and substance acceptable and approved by the Agent and the Required Holders, in their sole discretion (as such Initial Budget shall be amended, supplemented and/or extended in the manner set forth the DIP Order (the "<u>Budget</u>"); and (b) on or before 5:00 p.m. prevailing Eastern Time on the 20th day of each month following the Petition Date, commencing with October 20, 2014, the US Debtors shall furnish a monthly supplement to the Initial Budget (or the previously supplemented Budget, as the case may be), covering a 13-week period that commences with the week such supplement is delivered, together with a variance analysis from the Budget (or the previously supplemented Budget, as the case may be). Such monthly supplements to the Budget shall become the Budget upon the earlier of (a) written acknowledgement from the Agent or the Agent's financial advisor that the proposed supplement is substantially in the form of the Initial Budget  (or the previously supplemented Budget, as the case may be) and is otherwise in form and substance acceptable to and as approved by the Agent (provided that any proposed changes in the proposed supplement to any of the Budget figures already covered by the Initial Budget (or the previously supplemented Budget, as the case may be) must be satisfactory to the Agent in their sole discretion) or (b) within 10 Business Days after receipt of such proposed supplement by the Agent, provided that the Agent has not provided a written objection to the proposed supplement; the Initial Budget (or the previously supplemented Budget, as the case may be) shall remain the Budget if the Agent objects to the proposed supplement and until such time as the Agent provides written acknowledgement that a revised version of the proposed supplement is otherwise in form and substance acceptable to and as approved by the Agent.  Notwithstanding anything herein or in the DIP Order to the contrary, unless specifically authorized hereunder or in writing by the Agent or as may be provided in the Budget, no cash collateral may be paid or transferred to any non-Debtor subsidiary or affiliate of the US Debtors.

    **5C.**    **Budget Covenants.**  The Issuer shall ensure that at no time any of the following occur, each a "Budget Covenant":

-12-

(i)    a negative variance by 15% or more from the designated "Operating Receipts" line in the Budget, tested on a cumulative weekly basis over a rolling four-week period and commencing with the week that the Petition Date occurs; or

(ii)    a negative variance by 15% or more from the designated "Operating Disbursements" line in the Budget, tested on a cumulative weekly basis over a rolling four-week period and commencing with the week that the Petition Date occurs; or

(iii)    Liquidity (as defined below) of the US Debtors is less than the below minimum level at any time during the applicable month:

| Applicable Month | Minimum Liquidity |
|---|---|
| October 2014 | $14.0 million |
| November 2014 | $15.3 million |
| December 2014 | $13.6 million |
| January 2015 | $9.0 million |
| February 2015 | $10.5 million |

For purposes of this Budget Covenant, "Liquidity" shall be determined as the sum of: (1) the greater of (x) zero or (y) $100 million *minus* all net proceeds borrowed under the DIP Loans or any replacement thereof; *plus* (2) the aggregate cash balance of the Debtors on a consolidated basis; or

(iv)    Any Debtor makes any disbursement not contemplated by the Budget (giving effect to the foregoing variances) and without having received the prior written consent of the Agent and the Required Holders (in their sole discretion).

(c)    The US Debtors shall deliver to the Agent (copies of which the US Debtors shall promptly furnish to counsel to and financial advisors of the Agent), by 5:00 p.m. prevailing Eastern Time on Wednesday of each week (commencing on Wednesday, October 8th, 2014) , a variance report setting forth, in reasonable detail, any differences between any actual receipts (as applicable) and disbursements versus proposed receipts (as applicable) and disbursements set forth in the Budget for the prior week, together with a statement certifying compliance with the Budget Covenants and certifying that no disbursements inconsistent with the Budget have been made.

**5D.    Certificates; Other Information.**  The Issuer shall make available to each Holder by Electronic Transmission or other appropriate means:

(1)    together with each delivery of financial statements pursuant to Paragraph 5A(2), a management discussion and analysis report, in reasonable detail, signed by the chief financial officer of each of US Holdings and the Issuer, describing the operations

-13-

and financial condition of US Holdings and its Subsidiaries for the Fiscal Quarter and the portion of the Fiscal Year then ended;

(2)     promptly after the same are filed, copies of all financial statements and regular, periodic or special reports which such Person may make to, or file with, any Governmental Authority;

(3)     as soon as available and in any event no later than the last day of each Fiscal Year of US Holdings and the Issuer, (i) projections of US Holdings and the Company (and their respective Subsidiaries') consolidated financial performance for the forthcoming Fiscal Year on a month by month basis (which shall include consolidated balance sheets of US Holdings, the Company and their Consolidated Subsidiaries and the related consolidated statements of income, shareholders' equity and cash flows) and (ii) an annual insurance summary;

(4)     unless otherwise delivered pursuant to Paragraph 5A, promptly upon receipt thereof, copies of any final reports submitted by US Holdings' or the Company's certified public accountants in connection with each annual, interim or special audit or review of any type of the financial statements or internal control systems of US Holdings, the Company or any other Transaction Party made by such accountants, including any comment letters submitted by such accountants to management of US Holdings, the Company or any other Transaction Party in connection with their services;

(5)     not less than two Business Days prior to entering into a change, modification, amendment, revision, waiver or consent to the Intercompany DIP Loan Agreement or any other DIP Loan Documents, written notice (together with copies of all executed instruments relating thereto) of any such change, modification, amendment, revision, waiver or consent thereto;

(6)     promptly after the same are sent, all reports and other written information delivered to the agent or the lenders pursuant to the Intercompany DIP Loan Agreement relating to the management, business, results of operations or financial condition of US Holdings or any of its Subsidiaries, copies of such reports, statements and other information (excluding routine matters such as borrowing requests, continuation/conversion notices, availability certificates and other routine correspondence), except to the extent that such information has already been delivered to the Holders in accordance with the terms hereof;

(7)     at least three (3) Business Days' prior written notice and copies of all motions, pleadings, objections, responses, documents, agreements, and other filings (collectively, the "**Filings**") to be filed by or on behalf of any Transaction Party in the Bankruptcy Court and any of the Filings that shall be filed with, or submitted to, the Bankruptcy Court, shall be in each case in form and substance (including the amounts of any monetary relief requested therein) reasonably satisfactory to the Agent and the Required Holders; and

-14-

(8)      promptly, such additional business, financial, corporate affairs, and other information relating to the financial condition of US Holdings, the Company or any of their respective Subsidiaries as any Holder or the Collateral Agent may from time to time reasonably request.

**5E.   Notices.**   The Issuer shall notify promptly each Holder (by Electronic Transmission) of each of the following (and in no event later than three Business Days after a Responsible Officer becoming aware thereof):

(1)      the occurrence or existence of any Default or Event of Default;

(2)      other than as a result of the Chapter 11 Cases, any breach or non-performance of, or any default under, any Contractual Obligation of any Transaction Party or any of its Subsidiaries, or any violation of, or non-compliance with, any Requirement of Law, which, in either case, would reasonably be expected to result, either individually or in the aggregate, in Liabilities of at least $1,000,000, including a description of such breach, non-performance, default, violation or non-compliance and the steps, if any, such Person has taken, is taking or proposes to take in respect thereof;

(3)      any dispute, litigation, investigation, proceeding or suspension which may exist at any time between any Transaction Party or any Subsidiary of a Transaction Party and any Governmental Authority (after giving effect to the coverage and policy limits of any relevant insurance policies) which would reasonably be expected to result, either individually or in the aggregate, in Liabilities of at least $1,000,000;

(4)      Other than the Chapter 11 Cases, the commencement of, or any material development in, any litigation or proceeding affecting any Transaction Party or any of its Subsidiaries or its respective property (i) in which the amount of damages claimed is $1,000,000 or more, (ii) which, if adversely determined, would reasonably be expected to have a Material Adverse Effect or (iii) in which the relief sought is an injunction or other stay of the performance of this Agreement, any other Transaction Document, any DIP Loan Document or any Sale Document;

(5)      (i) the receipt by the Company or one of its Subsidiaries of any notice of violation of or potential liability or similar notice under Environmental Law that would reasonably be expected to have a Material Adverse Effect, (ii)(A) Releases, (B) the existence of any condition that could reasonably be expected to result in violations of or Liabilities under, any Environmental Law or (C) the commencement of, or any material change to, any action, investigation, suit, proceeding, audit, claim, demand, dispute alleging a violation of or Liability under any Environmental Law which in the case of clauses (A), (B) and (C) above, in the aggregate for all such clauses, would reasonably be expected to result in a Material Adverse Effect, (iii) the receipt by the Company or one of its Subsidiaries of notification that any Property of any Transaction Party is subject to any Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities that would reasonably be expected to result in a Material Adverse Effect and (iv) any proposed acquisition or lease of Real Estate, if such acquisition or lease would reasonably be expected to result in a Material Adverse Effect;

-15-

(6)      (i) on or prior to any filing by any Transaction Party or one of its Subsidiaries or, to the knowledge of a Transaction Party, by any ERISA Affiliate of any notice of any reportable event under Section 4043 of ERISA or intent to terminate any Title IV Plan, a copy of such notice, (ii) promptly, and in any event within 10 days, after any officer of any Transaction Party knows or has reason to know that a request for a minimum funding waiver under Section 412 of the Code has been filed with respect to any Title IV Plan or Multiemployer Plan, a notice describing such waiver request and any action that any Transaction Party or one of its Subsidiaries or an ERISA Affiliate proposes to take with respect thereto, together with a copy of any notice filed with the PBGC or the IRS pertaining thereto, and (iii) promptly, and in any event within 10 days after any officer of a Transaction Party knows or has reason to know that an ERISA Event will or has occurred, a notice describing such ERISA Event, and any action that a Transaction Party or ERISA Affiliate proposes to take with respect thereto, together with a copy of any notices received from or filed with the PBGC, IRS, Multiemployer Plan or other Benefit Plan pertaining thereto;

(7)      any Material Adverse Effect occurrence subsequent to the Closing Date;

(8)      any material change in accounting policies or material change in financial reporting practices by US Holdings, the Company, any other Transaction Party or any of their respective Subsidiaries;

(9)      any labor controversy resulting in or threatening to result in any strike, work stoppage, boycott, shutdown or other labor disruption against or involving any Transaction Party or any of its Subsidiaries would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(10)      the creation, establishment or acquisition of any Subsidiary by a Transaction Party or one of its Subsidiaries or the issuance by or to a Transaction Party or one of its Subsidiaries of Stock or Stock Equivalent; and

(11)      (i) the creation, or filing with the IRS or any other Governmental Authority, of any Contractual Obligation or other document extending, or having the effect of extending, the period for assessment or collection of any income, franchise or other material taxes with respect to any Tax Affiliate and (ii) the creation of any Contractual Obligation of any Tax Affiliate, or the receipt of any request directed to any Tax Affiliate, to make any adjustment under Section 481(a) of the Code, by reason of a change in accounting method or otherwise, which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Each notice pursuant to this Paragraph 5C shall be in electronic form accompanied by a statement by a Responsible Officer of the Issuer, setting forth details of the occurrence referred to therein, and stating, if applicable, what action the Issuer or other Person proposes to take with respect thereto and at what time.   Each notice under Paragraph 5C(1) shall describe with particularity any and all clauses or provisions of this Agreement or other Transaction Document that have been breached or violated.

-16-

**5F.    Preservation of Corporate Existence, Etc.** Each Guarantor and the Issuer shall, and the Company shall cause each of its Subsidiaries to:

(1)    preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of incorporation, organization or formation, as applicable, except as permitted by Paragraph 6C;

(2)    preserve and maintain in full force and effect all rights, privileges, qualifications, permits, licenses and franchises necessary in the normal conduct of its business except as permitted by Paragraphs 6B or 6C or except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(3)    use its commercially reasonable efforts, in the Ordinary Course of Business, to preserve the goodwill and business of the customers, suppliers and others having material business relations with it, the non-preservation of which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5G.    Maintenance of Property.** Except as otherwise permitted hereunder, each Transaction Party shall maintain, and shall cause each of its Subsidiaries to maintain, and preserve all its Property which is used or useful in its business in good working order and condition, ordinary wear and tear excepted and shall make all necessary repairs thereto and renewals and replacements thereof except as permitted under Paragraph 6B or where the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**5H.    Insurance.** Each Transaction Party shall, and shall cause each of its Subsidiaries to, maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the Property and their respective businesses (including policies of life, fire, theft, product liability, public liability, Flood Insurance, property damage, other casualty, employee fidelity, workers' compensation, business interruption and employee health and welfare insurance) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of the Company) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of a similar size and character. Notwithstanding the requirement above, Federal Flood Insurance shall not be required for (x) Real Estate not located in a Special Flood Hazard Area or (y) Real Estate located in a Special Flood Hazard Area in a community that does not participate in the National Flood Insurance Program.

**5I.    Payment of Obligations.** Other than Prepetition Obligations in respect of the US Debtors, each Transaction Party shall, and shall cause each of their respective Subsidiaries to, pay, discharge and perform as the same shall become due and payable or required to be performed, all their respective material obligations and liabilities, including, except where the failure to perform would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

52719/0001-11044714v1

**5J.    Compliance with Laws.**  Each Guarantor and the Issuer shall, and the Company shall cause each of its Subsidiaries to, comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except where the failure to comply would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**5K.    Inspection of Property and Books and Records.**  Each Guarantor and the Issuer shall maintain, and the Company shall cause each of its Subsidiaries to maintain, proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person.  Each Guarantor and the Issuer shall, and the Company shall cause each of its Subsidiaries to, with respect to each owned, leased, or controlled property, permit at any reasonable time during normal business hours and with reasonable notice (or at any time during normal business hours with at least one day's notice if an Event of Default exists), the Collateral Agent or any Holder or any representative thereof to inspect the properties and operations of such Person; and permit at any reasonable time during normal business hours and with reasonable notice (or at any time with at least one day's notice if an Event of Default exists), the Collateral Agent or any Holder or any representative thereof to visit their respective offices, to discuss financial matters with its officers, and to examine (and, at the expense of the Issuer or the applicable Subsidiary, photocopy extracts from) any of its books or other records.  Such Persons are irrevocably authorized to rely upon a copy of this Agreement as authority for such discussions and communication.  All such inspections by the Collateral Agent or a Holder shall be at the Issuer's expense, *provided* that so long as no Event of Default exists, (1) no Holder shall conduct visitations or inspections more than one time each per Fiscal Year and (2) the Issuer shall not be required to reimburse any such Holder for expenses of visitations or inspections more frequently than once each Fiscal Year.

**5L.    Use of Proceeds.**  The Issuer and the other Transaction Parties shall use the proceeds of the Notes solely as follows: (i) for working capital in accordance with the Budget and to pay costs and expenses of the Transactions and costs and expenses required to be paid pursuant to Paragraph 3A and (ii) to repay the Existing Indebtedness.

**5M.    Further Assurances**.

(1)    Each Transaction Party on behalf of themselves and their Subsidiaries and US Holdings shall ensure that all written information, exhibits and reports furnished to the Holders and the Collateral Agent in connection herewith (other than financial projections or information of a general economic or general industry nature) do not and will not contain any untrue statement of a material fact and do not and will not omit to state any material fact or any fact necessary to make the statements contained therein (taken as a whole) not misleading in light of the circumstances in which made, and will promptly disclose to the Holders and the Collateral Agent and correct any defect or error that may be discovered therein or in any Transaction Document or in the execution, acknowledgement or recordation thereof.

(2)    Promptly (and in any event within two Business Days) upon request by the Required Holder(s) or the Collateral Agent or as otherwise contemplated in Paragraph 5P

-18-

hereto, US Holdings and the Transaction Parties shall (and shall cause each of their Subsidiaries to) take such additional actions and execute such documents as the Required Holder(s) or the Collateral Agent may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement or any other Transaction Document and (ii) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Holders or the Collateral Agent the rights granted hereunder or under any other Transaction Document, whether granted as of the Closing Date or hereafter intended to be granted to the Holders under any Transaction Document. Without limiting the generality of the foregoing and subject to the provisions of Paragraph 5P hereof, the Transaction Parties shall, and shall cause each of their Subsidiaries to, guaranty the Obligations and grant security in regard thereof as soon as reasonably practicable following a request therefor by the Required Holders.

(3)       Notwithstanding anything to the contrary in this Agreement or any other Transaction Document, any Transaction Document that contains a guaranty by a Transaction Party of any of the Obligations or pursuant to which a Transaction Party grants a Lien in any of its assets to secure any of the Obligations, shall be subject to the Security Principles and Security Limitations, and, in addition, the Transaction Parties shall not be required to grant Liens as security for the Obligations in any of the following assets:  (i) equity interest in any person that is not a wholly owned subsidiary of a Transaction Party if the organizational or governance documents of such person prohibit the grant of a security interest therein without the consent of any third party, (ii) any assets owned by any subsidiaries of the Company that are not Transaction Parties, (iii) any vehicle, (iv) any assets to the extent that, and for so long as, the Company reasonably determines that granting a Lien in such assets would (x) violate any applicable law or regulation, (y) violate a contractual obligation binding on any Transaction Party or the asset or that would trigger any termination right under any such contractual obligation, or (z) that would require any governmental consent, approval, license or authorization, (v) any right, title or interest in any license, contract or agreement to which any Transaction Party is a party or any of its right, title or interest thereunder to the extent, but only to the extent, that such a grant would violate the terms of such license, contract or agreement, or would result in a breach of the terms of, or constitute a default under, any such license, contract or agreement to which any Transaction Party is a party, (vi) any equipment or other asset owned by any Transaction Party that is subject to a purchase money lien or Capitalized Lease Obligation, if the contract or other agreement in which the Lien is granted (or the documentation providing for such Capitalized Lease Obligation) prohibits or requires the consent of any Person other than a Transaction Party as a condition to the creation of any other Lien on such equipment or asset, (vii) any asset if the grant of a Lien therein would, individually or in the aggregate, result in material adverse tax consequences to a Transaction Party or subject, directly or indirectly, any Transaction Party to a material amount of foreign income or withholding tax, and (viii) any other assets if the Required Holders and the Company reasonably determine that the cost or burden of creating or perfecting a Lien therein would be excessive in view of the benefits to be obtained by the Holders therefrom.

**5N.    Environmental Matters.** Each Transaction Party shall, and shall cause each of its Subsidiaries to, comply with, and maintain its Real Estate, whether owned, leased, subleased

or otherwise operated or occupied, in compliance with, all applicable Environmental Laws (including by implementing any Remedial Action necessary to achieve such compliance) or that is required by orders and directives of any Governmental Authority to the extent necessary to the ownership or occupation of such Real Estate, except where the failure to comply would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect. Without limiting the generality of the foregoing, if any Release shall occur that could reasonably be expected to have a Material Adverse Effect, the Transaction Party shall, or shall cause the applicable Subsidiary to, act promptly and diligently to implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain, in all material respects, the value and marketability of the property and to comply with all Environmental law and shall report to the Agent on all such actions.

**5O.    Milestones.**  The Transaction Parties shall ensure that each of the events or actions set out in Schedule 5O occurs or is completed within the time period applicable to such event or action.

**5P.    Post-Closing Obligations.**  The Transaction Parties shall ensure that each post closing action set out in **Schedule 5P** is completed within the time period applicable to such post-closing action.

**5Q.    Information Required by Rule 144A.**  The Issuer shall, upon the request of any Holder, provide such Holder, and any qualified institutional buyer designated by such Holder, such financial and other information as such Holder may reasonably determine to be necessary in order to permit compliance with the information requirements of Rule 144A under the Securities Act in connection with the resale of Notes, except at such times as the Issuer is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.  For the purpose of this Paragraph 5Q, the term **"qualified institutional buyer"** shall have the meaning specified in Rule 144A under the Securities Act.

**5R.    Chapter 11 Cases.**  The Issuer shall use commercially reasonable efforts to obtain any required Bankruptcy Court's approval of the Transactions and consummate the Transactions on the terms set forth in the Transaction Documents, the DIP Loan Documents and the Sale Documents.

**5S.    Intellectual Property.**

(1)    Each Transaction Party (either itself or through its Affiliates) shall (i) continue to use each Trademark owned by such Transaction Party and that is material to such Transaction Party's business in order to maintain such Trademark in full force free from any claim of abandonment for non-use, (ii) maintain, consistent with reasonable business judgment, the quality of products and services offered under such Trademark and take all commercially reasonable steps to ensure that all licensed users of such Trademark maintain quality standards as established by such Transaction Party, (iii) use commercially reasonable efforts to use such Trademark with the appropriate notice of registration and all other notices and legends required by applicable law, (iv) not knowingly (and not knowingly permit any licensee or sublicensee thereof to) do any act or knowingly

-20-

omit to do any act whereby such Trademark would be reasonably likely to become invalidated or impaired in any material way, except, in each case, where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(2)        Each Transaction Party shall use, and use commercially reasonable efforts to require its licensees to use, proper statutory notice in connection with the use of the Intellectual Property owned by such Transaction Party.

(3)        Each Transaction Party shall notify the Collateral Agent if it knows that any application or registration included in the Material Intellectual Property owned or licensed by a Transaction Party has become or is reasonably likely to become, forfeited, abandoned or dedicated to the public, or of any adverse determination of any Governmental Authority regarding any Transaction Party's ownership of or right to use, or the validity of, any such Intellectual Property or such Transaction Party's right to register the same, to own and maintain the same or use the same.

(4)        Each Transaction Party shall take all necessary steps, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of Material Intellectual Property owned by a Transaction Party, including the payment of required fees and taxes, the filing of responses to office actions issued by the United States Patent and Trademark Office and the United States Copyright Office, the filing of applications for renewal or extension, the filing of affidavits of use and affidavits of incontestability, the filing of divisional, continuation, continuation-in-part, reissue, and renewal applications or extensions, the payment of maintenance fees, and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings, except, in each case, where such Transaction Party shall have determined that the pursuit or maintenance of such Intellectual Property is no longer desirable or necessary in the conduct of such Transaction Party's business and where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(5)        In the event that any Transaction Party becomes aware that any Material Intellectual Property owned by a Transaction Party has been infringed, misappropriated or diluted in any respect by another party, such Transaction Party shall take such actions and cause its Affiliates to take such actions, as such Transaction Party shall deem reasonably appropriate under the circumstances or as the Collateral Agent may reasonably request, to protect, maintain, enforce and preserve the full value of such Intellectual Property.

(6)        Each Transaction Party agrees that, should it obtain an ownership interest in or exclusive license to use any item of Intellectual Property which is not owned by or exclusively licensed to any Transaction Party as of the date

-21-

hereof (the "**After-Acquired Intellectual Property**"), (i) the Security Agreement shall automatically apply thereto, (ii) any such After-Acquired Intellectual Property, and in the case of Trademarks, the goodwill of the business connected therewith or symbolized thereby, shall automatically become part of the Collateral, and (iii) within ninety days after such Transaction Party acquires such ownership interest or learns of such exclusive license, as applicable, it shall give written notice thereof to the Collateral Agent in accordance herewith.

(7)     Upon the request of the Collateral Agent, each Transaction Party agrees to execute a Copyright Security Agreement, Patent Security Agreement or Trademark Security Agreement substantially in the form set forth on Exhibits H, I, and J, as applicable, with respect to both its Intellectual Property and its After-Acquired Intellectual Property (in each case, that are owned by a Transaction Party and are registered or filed with a Governmental Authority) in order to record the security interest granted herein to the Collateral Agent for the benefit of the Secured Parties with the United States Patent and Trademark Office, the United States Copyright Office, and any other applicable Governmental Authority.

**5T.**     Each Transaction Party shall take all reasonably necessary steps to protect the secrecy of all Trade Secrets that are material to such Transaction Party's business, except where such Transaction Party shall have determined that protecting the secrecy of such Trade Secrets is no longer desirable or necessary in the conduct of such Transaction Party's business and where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

**6**     **NEGATIVE COVENANTS.**  Each Transaction Party covenants and agrees that, so long as any Note or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied, it shall perform all covenants in this Paragraph 6:

**6A.**     **Limitation on Liens.**  Neither the Issuer nor Transaction Party shall, and no Transaction Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired, other than the following ("**Permitted Liens**"):

(1)     any Lien existing on the Property of a Transaction Party or a Subsidiary of a Transaction Party on the Closing Date and set forth in **Schedule 6A** or any Permitted Refinancing thereof, including replacement Liens on the Property currently subject to such Liens securing Indebtedness permitted by Paragraph 6E(3);

(2)     Liens securing the Obligations;

(3)     Liens for taxes, fees, assessments or other governmental charges (i) which are not past due or remain payable without penalty, or (ii) the non-payment of which is permitted by Paragraph 5G;

(4)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other similar Liens arising in the Ordinary Course of Business which are not delinquent

-22-

for more than 90 days or remain payable without penalty or which are being contested in good faith and by appropriate proceedings diligently prosecuted, which proceedings have the effect of preventing the forfeiture or sale of the Property subject thereto and for which adequate reserves in accordance with GAAP are being maintained;

    (5)    Liens consisting of pledges or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation or to secure the performance of tenders, statutory obligations, surety, stay, customs and appeals bonds, bids, leases, governmental contract, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or to secure liability to insurance carriers;

    (6)    Liens consisting of judgment or judicial attachment liens (other than for payment of taxes, assessments or other governmental charges) in respect of judgments the existence of which do not constitute an Event of Default, *provided* that the enforcement of such Liens is effectively stayed;

    (7)    easements, rights of way, servitudes, covenants, conditions, restrictions, reservations, licenses, agreements, minor defects or other irregularities in title, and other similar encumbrances incurred in the Ordinary Course of Business which, either individually or in the aggregate, are not substantial in amount or otherwise, and which do not in any case materially detract from the value, current use, occupancy or operation of the Property subject thereto or interfere in any material respect with the ordinary conduct of the businesses of any Transaction Party or any Subsidiary of any Transaction Party;

    (8)    junior Liens securing Indebtedness outstanding under the Intercompany DIP Loan Agreement;

    (9)    Liens securing Capital Lease Obligations; *provided,* that such Liens attach solely to the Property being leased in such transactions;

    (10)    any interest or title of a lessor or sublessor under any lease permitted by this Agreement;

    (11)    Liens arising from the filing of precautionary uniform commercial code financing statements with respect to any lease permitted by this Agreement;

    (12)    non-exclusive licenses and sublicenses granted by a Transaction Party or any Subsidiary of a Transaction Party and leases and subleases (by a Transaction Party or any Subsidiary of a Transaction Party as lessor or sublessor) to third parties in the Ordinary Course of Business not interfering in any material respect with the business of the Transaction Parties or any of their Subsidiaries;

    (13)    Liens in favor of collecting banks arising by operation of law under Section 4-210 of the Uniform Commercial Code or similar laws or, with respect to collecting banks located in the State of New York, under Section 4-208 of the Uniform Commercial Code;

(14)    Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law or under contractual terms and conditions encumbering deposits (including without limitation pledges in favor of account banks under their standard business terms and the Liens created under the Cash Pooling Arrangements);

(15)    Liens arising out of consignment or similar arrangements for the sale of goods entered into by the Company or any Subsidiary of the Company in the Ordinary Course of Business;

(16)    Liens in favor of customs and revenue authorities arising as a matter of law which secure payment of customs duties in connection with the importation of goods in the Ordinary Course of Business;

(17)    building codes, zoning ordinances and other laws, ordinances, rules, orders or determinations of any federal, state, county, municipal or other Governmental Authority heretofore, now or hereafter enacted, made or issued by any such Governmental Authority affecting the Property, or any portion thereof, which would not result in a Material Adverse Effect;

(18)    such other Liens described on **Schedule 6A-1** hereto; and

(19)    Liens securing obligations other than Indebtedness for borrowed money, *provided* the aggregate outstanding amount of the obligations secured thereby at any one time, and the fair market value of assets subject to such Liens, in each case, does not exceed $1,000,000.

**6B.    Disposition of Assets.**  No Transaction Party shall, and no Transaction Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any Property (including the Stock of any Subsidiary of any Transaction Party, whether in a public or private offering or otherwise, and accounts and notes receivable, with or without recourse) or enter into any agreement to do any of the foregoing, except:

(1)    dispositions of inventory, or worn out or surplus equipment, or other Property no longer used or useful in the business of the Transaction Parties and their Subsidiaries as determined by the Transaction Parties and their Subsidiaries in good faith, all in the Ordinary Course of Business;

(2)    dispositions not otherwise permitted hereunder which are made for fair market value and the mandatory offer to prepay the Notes with the Net Proceeds of such disposition is made if and to the extent required by Paragraph 4F; *provided,* that (i) at the time of any disposition, no Event of Default shall exist or shall result from such disposition, (ii) not less than 75% of the aggregate sales price from such disposition shall be paid in cash, and (iii) the aggregate fair market value of all assets so sold by the Transaction Parties and their Subsidiaries, together, shall not exceed in any Fiscal Year $1,500,000;

-24-

(3)    (i) dispositions of Cash Equivalents and (ii) conversions of Cash Equivalents into cash or other Cash Equivalents;

(4)    [Reserved];

(5)    any disposition of Property that constitutes an Event of Loss, *provided* the mandatory offer to prepay the Notes with the Net Proceeds of such Event of Loss is made if and to the extent required by Paragraph 4B;

(6)    dispositions of defaulted Accounts on a non-recourse basis for collection purposes for fair value and in the Ordinary Course of Business;

(7)    non-exclusive licenses, sublicenses, leases or subleases granted to third parties in the Ordinary Course of Business not materially interfering with the business of the Transaction Parties or any of their Subsidiaries;

(8)    dispositions or other transfers of assets or Property from (i) any Transaction Party to another Transaction Party, (ii) any Subsidiary of the Company that is not a Transaction Party to the Company, (iii) any Subsidiary of a Transaction Party to a Transaction Party or another Subsidiary of a Transaction Party, (iv) any Restricted Payments permitted under Paragraph 6R or (v) the Company to any other Transaction Party; *provided* that the aggregate fair market value of assets disposed of or transferred from the Company to other Transaction Parties shall not exceed $1,500,000 in the aggregate;

(9)    the Sale Transaction; and

(10)    dispositions of equity interests in joint ventures pursuant to the documentation governing such joint ventures.

**6C.    Consolidations and Mergers.** No Transaction Party shall, and no Transaction Party shall suffer or permit any of its Subsidiaries to, merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except Permitted Acquisitions and except upon prior written notice to the Collateral Agent and the Holders, any Subsidiary of the Company may merge with, or dissolve or liquidate into, or convey, transfer, lease or otherwise dispose of all or substantially all of its assets to, the Issuer or a Wholly-Owned Subsidiary of the Company that is a Transaction Party and any Subsidiary of the Company that is not a Transaction Party may merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of all or substantially all of its assets to, or dissolve or liquidate into any Wholly-Owned Subsidiary of the Company.

**6D.    Loans and Investments.** No Transaction Party shall and no Transaction Party shall suffer or permit any of its Subsidiaries to (i) purchase or acquire any Stock or Stock Equivalents, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of a Subsidiary, (ii) make any Acquisitions, or any other acquisition of all or substantially all of the assets of another Person, or of any business or division of any Person, including without limitation, by way of merger, consolidation or other combination or

(iii) make or purchase any advance, loan, extension of credit or capital contribution to or any other investment in, any Person (the items described in clauses (i), (ii) and (iii) are referred to as **"Investments"**), except for:

      (1)      Investments in cash and Cash Equivalents;

      (2)      Investments into the Company or by the Company or any of its Subsidiaries into Wholly-Owned Subsidiaries of the Company either existing on the Closing Date or entered into in the Ordinary Course of Business;

      (3)      loans and advances to employees, officers and directors in the Ordinary Course of Business not to exceed $500,000 in the aggregate at any time outstanding;

      (4)      Investments received as the non-cash portion of consideration received in connection with transactions permitted pursuant to Paragraph 6B(2);

      (5)      Investments acquired in connection with the settlement of delinquent Accounts in the Ordinary Course of Business or in connection with the bankruptcy or reorganization of suppliers or customers;

      (6)      [Reserved];

      (7)      Investments existing on the Closing Date and set forth on **Schedule 6D**, including any modifications, replacements, renewals or extensions thereof which do not increase the amount thereof;

      (8)      Investments comprised of Contingent Obligations permitted by Paragraph 6I;

      (9)      [Reserved];

      (10)      Investments comprised of Indebtedness owing to a Transaction Party or any of the Company's Subsidiaries from another participant arising under Cash Pooling Arrangements;

      (11)      the Company and its Subsidiaries may make and own Investments consisting of extensions of credit in the nature of accounts receivable and notes receivable arising from the granting of trade credit in the Ordinary Course of Business;

      (12)      the Company and its Subsidiaries may make and own Investments in the Ordinary Course of Business consisting of endorsements for collection or deposit;

      (13)      Investments permitted under Paragraph 6C; and

      (14)      other Investments (valued at cost at the time of each Investment) in an aggregate amount outstanding at any time not to exceed $1,000,000 so long as no Default or Event of Default has occurred and is continuing or would arise as a result of such Investment.

-26-

**6E.    Limitation on Indebtedness.**  No Transaction Party shall, and no Transaction Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(1)    the Obligations;

(2)    Indebtedness consisting of Contingent Obligations permitted pursuant to Paragraph 6I;

(3)    Indebtedness existing on the Closing Date, including Capital Lease Obligations, or Indebtedness with respect to committed financing facilities available to be incurred or drawn by a Transaction Party or a Subsidiary of the Company as of the Closing Date, in each case, as set forth in **Schedule 6E** and including any Permitted Refinancings thereof;

(4)    Indebtedness not to exceed $2,000,000 in the aggregate consisting of Capital Lease Obligations entered on and after the Closing Date and Permitted Refinancings thereof;

(5)    intercompany Indebtedness permitted pursuant to Paragraph 6D(2);

(6)    Indebtedness outstanding under the Intercompany DIP Loan Agreement;

(7)    other unsecured Indebtedness not exceeding in the aggregate at any time outstanding $1,000,000 so long as no Default or Event of Default has occurred and is continuing or would arise as a result of the incurrence of such Indebtedness;

(8)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is repaid within five Business Days of the incurrence thereof;

(9)    [Indebtedness of [Reichhold Inc.] to the other parties participating in the Cash Pooling Arrangements evidencing such other parties' deposits into the Cash Pooling Arrangements, and Indebtedness of such other parties to [Reichhold Inc.] evidencing such other parties' withdrawals from the Cash Pooling Arrangements;] and

(10)    customary indemnification obligations, purchase price adjustments and, to the extent in effect on the Closing Date, earnouts and similar obligations (so long as the same are unsecured and are not payable so long as an Event of Default has occurred and is continuing) in favor of sellers in connection with Investments otherwise permitted hereunder.

**6F.    Transactions with Affiliates.**  No Transaction Party shall, and no Transaction Party shall suffer or permit any of its Subsidiaries to, enter into any transaction with any Affiliate of US Holdings or the Company or of any their respective Subsidiaries, except:

-27-

(1)        as expressly permitted by this Agreement or contemplated herein, including the Intercompany IP License Agreement, the Intercompany DIP Loan Agreement and all documentation ancillary thereto or executed in connection therewith;

(2)        transactions among Transaction Parties and their respective Subsidiaries to the extent not prohibited hereunder, including Contingent Obligations permitted by Paragraph 6I;

(3)        customary indemnification payments to directors or officers of US Holdings, the Company and its Subsidiaries in the Ordinary Course of Business;

(4)        the Company and its Subsidiaries may enter into, and may make payments under, employment agreements, severance and other similar compensatory arrangements with officers, employees and directors of the Company and such Subsidiaries in the Ordinary Course of Business; or

(5)        unless otherwise prohibited elsewhere in this Agreement, in the Ordinary Course of Business and pursuant to the reasonable requirements of the business of such Transaction Party or such Subsidiary upon terms no less favorable to such Transaction Party or such Subsidiary than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of the Company or such Subsidiary and which, if the fair market value of such transaction exceeds $500,000, are disclosed in writing to the Holders; provided that in no event shall any Transaction Party transfer or dispose of any assets or Property to any of the US Debtors other than the Junior DIP Loans.

**6G.    Reserved**.

**6H.    Use of Proceeds.**  No Transaction Party shall, and no Transaction Party shall suffer or permit any of its Subsidiaries to, use any portion of the proceeds from the issuance and sale of the Notes, directly or indirectly, to purchase or carry Margin Stock or repay or otherwise refinance Indebtedness of any Transaction Party or others incurred to purchase or carry Margin Stock, or otherwise in any manner which is in contravention of any Requirement of Law or in violation of this Agreement.

**6I.    Contingent Obligations.**  No Transaction Party shall, and no Transaction Party shall suffer or permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Contingent Obligations except (i) in respect of the Obligations, or any other Indebtedness or Permitted Liens permitted hereunder and (ii) the following Contingent Obligations:

(1)        endorsements for collection or deposit in the Ordinary Course of Business;

(2)        Rate Contracts entered into in the Ordinary Course of Business for bona fide hedging purposes and not for speculation and other hedging arrangements relating to foreign currency exposure, in the Ordinary Course of Business and not for speculative purposes; *provided*, that promptly after entering into any such Rate Contract the Issuer will give written notice thereof to the Holders;

-28-

(3)        Contingent Obligations of the Transaction Parties and their Subsidiaries existing as of the Closing Date and listed in **Schedule 6I**, including extension and renewals thereof which do not increase the amount of such Contingent Obligations (except by an amount equal to any premium or other similar amount paid, and fees and expenses incurred in connection with, such modification, extension or renewal) or impose materially more restrictive or adverse terms on the Transaction Parties or their Subsidiaries as compared to the terms of the Contingent Obligation being renewed or extended;

(4)        Contingent Obligations arising with respect to customary indemnification obligations, purchase price adjustments, performance based earnouts and similar obligations (in the case of earnouts and similar obligations, so long as the same are not payable so long as an Event of Default has occurred and is continuing) in favor of (i) sellers in connection with Permitted Acquisitions and (ii) purchasers in connection with dispositions permitted under Paragraph 6B(2);

(5)        Contingent Obligations arising under guaranties of obligations of any Transaction Party or any of their respective Subsidiaries, which obligations are otherwise permitted hereunder; *provided* that if such obligation is subordinated to the Obligations, such Contingent Obligation shall be subordinated to the same extent;

(6)        Contingent Obligations incurred in the Ordinary Course of Business with respect to surety and appeals bonds, performance bonds and other similar obligations;

(7)        Contingent Obligations to insurers required in connection with worker's compensation and other insurance coverage incurred in the Ordinary Course of Business;

(8)        customary Contingent Obligations in connection with sales, other dispositions and leases of Transaction Parties permitted under this Agreement;

(9)        guaranties made by any Transaction Party or any Subsidiary of any Transaction Party of obligations (not constituting debt for borrowed money) of any other Transaction Party owing to vendors and suppliers incurred in the Ordinary Course of Business;

(10)        cash collateralized letters of credit outstanding as of the date hereof in a maximum aggregate amount not to exceed $[13,743,950.76] so long as such letters of credit have not expired or been terminated; and

(11)        other Contingent Obligations not exceeding $1,000,000 in the aggregate at any time outstanding.

**6J.        Compliance with ERISA.**  No ERISA Affiliate shall cause or suffer to exist (1) any event that could result in the imposition of a Lien on any asset of a Transaction Party or a Subsidiary of a Transaction Party with respect to any Title IV Plan or Multiemployer Plan or (2) any other ERISA Event, that would, in the aggregate, have a Material Adverse Effect.

**6K.    Restricted Payments.** No Transaction Party shall, and no Transaction Party shall suffer or permit any of its Subsidiaries to, (i) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Stock or Stock Equivalent, (ii) purchase, redeem or otherwise acquire for value any Stock or Stock Equivalent now or hereafter outstanding or (iii) make any payment or prepayment of principal of, premium, if any, interest, fees, redemption, exchange, purchase, retirement, defeasance, sinking fund or similar payment with respect to, Subordinated Indebtedness (the items described in clauses (i), (ii) and (iii) above are referred to as **"Restricted Payments"**); except that (A) any Wholly-Owned Subsidiary of the Company may declare and pay dividends to the Company or any Wholly-Owned Subsidiary of the Company, and (B) any Subsidiary of the Company that is not a Wholly-Owned Subsidiary of the Company may make dividends or distributions to the Company or any other Subsidiary of the Company and to any other minority shareholders of such Subsidiary to the extent such minority shareholders do not receive an amount greater than their respective pro rata shares (in accordance with such Persons' respective ownership interests) of net income on a per annum basis, and except that:

(1)        the Company and any of its Subsidiaries may make distributions to US Holdings and any intermediate parent entity which are promptly used to pay such entity's operating expenses and other corporate overhead costs and expenses (including, without limitation, legal, audit, accounting and similar expenses payable to third parties), which are incurred in the Ordinary Course of Business and attributable to the ownership or operations of the Company and its Subsidiaries; *provided* that (i) the aggregate amount so distributed shall not exceed $1,000,000 in any Fiscal Year and (ii), no Default or Event of Default has occurred and is continuing or would arise as a result of such distributions;

(2)        [Reserved];

(3)        [in the event that US Holdings is treated as a pass-through or disregarded entity for income tax purposes, US Holdings or Parent may make tax distributions to its members (collectively, **"Tax Distributions"**) *provided* and only to the extent each of the following shall have been satisfied:

(a)        Tax Distributions may be made [quarterly/annually] *provided*:

(i)        such Tax Distributions are made to the members of US Holdings on a pro rata basis in proportion to their respective percentage interests in US Holdings' (except as otherwise required below);

(ii)        the aggregate amount of such Tax Distributions does not exceed, [quarterly/annually], an amount equal to, US Holdings' good faith estimate of the Applicable Tax (as hereinafter defined) with respect to such taxable year, less the amount paid, if any, with respect to prior quarters of such taxable year;

(b)        no later than five Business Days prior to making any Tax Distribution, the Issuer shall have delivered to the Holders a certificate duly executed and completed by a financial officer of the Issuer stating the amount of

-30-

the Tax Distribution and containing a schedule, in reasonable detail, setting forth the calculation thereof;][3]

(4)    in the event any Transaction Party files a consolidated, combined, unitary or similar type income tax return with any Person, such Transaction Party may make distributions to permit such Person to pay federal and state income taxes then due and payable, franchise taxes and other similar licensing expenses incurred in the Ordinary Course of Business; *provided*, that the amount of such distribution shall not be greater than the amount of such taxes or expenses that would have been due and payable by such Transaction Party, and in each case, its relevant Subsidiaries, had such Transaction Party not filed a consolidated, combined, unitary or similar type return with such Person; and

(5)    the Company shall be entitled to distribute or pay to any direct or indirect parent entity amounts necessary to pay taxes and other liabilities that are required to maintain its legal existence.

**6L.    Change in Business.**  No Transaction Party shall, and no Transaction Party shall permit any of its Subsidiaries to, engage in any line of business substantially different from those lines of business carried on by it on the Initial Closing Date or business, operations and activities reasonably related thereto or a reasonable extension, development or expansion thereof or ancillary thereto.  The Company shall not engage in any business activities or own any Property other than (i) ownership of the Stock and Stock Equivalents of each of its Subsidiaries, (ii) performance of its obligations under the Transaction Documents, the DIP Loan Documents to which it is a party or the Sale Documents to which it is a party and (iii) activities and contractual rights incidental to maintenance of its corporate existence and the related activities described in the foregoing clauses (i) and (ii).

**6M.    Reserved.**

**6N.    Changes in Accounting, Name and Jurisdiction of Organization.**  No Transaction Party shall, and no Transaction Party shall suffer or permit any of its Subsidiaries to, (1) make any significant change in accounting treatment or reporting practices, except as required or permitted by GAAP, (2) change the Fiscal Year or method for determining Fiscal Quarters of any Transaction Party or of any consolidated Subsidiary of any Transaction Party, (3) change its name as it appears in official filings in its jurisdiction of organization or (4) change its jurisdiction of organization, in the case of clauses (3) and (4), without at least 10 days' prior written notice to the Holders.

**6O.    Amendments to Material Agreements; Indebtedness Documents; Etc.**  No Transaction Party shall, and no Transaction Party shall permit any of its Subsidiaries, to (i) amend, supplement, waive or otherwise modify any provision of (i) any Intercompany DIP Loan Document or (ii) any Material Agreement in a manner materially adverse to the Holders or which would reasonably be expected to have a Material Adverse Effect.

---

[3] To be reviewed by tax counsel.

**6P.    No Negative Pledges; Issuance of Stock.**

(1)        Except as set forth in this Agreement or in any other Material Agreement as in effect on the date hereof, no Transaction Party shall, and no Transaction Party shall permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of any Transaction Party or Subsidiary to pay dividends or make any other distribution on any of such Transaction Party's or such Subsidiary's Stock or Stock Equivalents or to pay fees, including management fees, or make other payments and distributions to the Company or any other Transaction Party.  No Transaction Party shall, and no Transaction Party shall permit any of its Subsidiaries to, directly or indirectly, enter into, assume or become subject to any Contractual Obligation prohibiting or otherwise restricting the existence of any Lien upon any of its assets, whether now owned or hereafter acquired except (i) in connection with any document or instrument governing Liens permitted pursuant to Paragraph 6A; *provided* that any such restriction contained therein relates only to the asset or assets subject to such permitted Liens, and (ii) any prohibition or limitation that consists of customary restrictions and conditions contained in any agreement relating to the sale or other disposition of any Property permitted under Paragraph 6B (other than sales or dispositions to a Transaction Party or any Subsidiary of a Transaction Party) pending the consummation of such sale or disposition, but only with respect to the Property subject to such sale or disposition.

(2)        No Transaction Party shall issue any Stock or Stock Equivalents if such issuance would result in a Change of Control.

**6Q.    OFAC; Patriot Act.**  No Transaction Party shall, and no Transaction Party shall permit any of its Subsidiaries to fail to comply with the laws, regulations and executive orders referred to in Paragraphs 9Z and 9AA.

**6R.    Sale-Leasebacks.**  No Transaction Party shall, and no Transaction Party shall permit any of its Subsidiaries to, engage in a sale leaseback, synthetic lease or similar transaction involving any of its assets or property unless both the sale and any Indebtedness incurred thereby are permitted hereunder.

**6S.    Reserved.**

**6T.    Capital Expenditures.**  The Transaction Parties and their Subsidiaries shall not make or commit to make Capital Expenditures for any Fiscal Year set forth below in excess of the amount set forth in the table below (the **"Capital Expenditure Limitation"**) with respect to such Fiscal Year.

| Fiscal Year Ending | Capital Expenditure Limitation |
|---|---|
| December 31, 2014 | [$_____ ] |
| Each Fiscal Year ending thereafter | [$_____ ] |

*provided, however,* in the event the Transaction Parties and their Subsidiaries do not expend the entire Capital Expenditure Limitation in any Fiscal Year, the Transaction Parties and their Subsidiaries may carry forward to the immediately succeeding Fiscal Year 50% of the unutilized portion. All Capital Expenditures shall first be applied to reduce the applicable Capital Expenditure Limitation and then to reduce the carry-forward from the previous Fiscal Year, if any.

**6U.    Superpriority Claims.**    No US Debtor, any Transaction Party or any of their respective subsidiaries or affiliates shall incur, create, assume, suffer to exist or permit any other Superpriority Claim that is pari passu with or senior to the claims of the Agent and the Purchasers against the US Debtors except with respect to the Carve-Out.

**6V.    Intellectual Property.**

(1)    Each Transaction Party (either itself or through its Affiliates) shall not do any act, or omit to do any act, whereby any Patent or Copyright (or a portion thereof) owned by such Transaction Party and that is material to such Transaction Party's business would be reasonably likely to become invalidated, impaired, forfeited, abandoned or dedicated to the public, other than in the ordinary course of business and where such forfeiture, abandonment or dedication to the public could not reasonably be expected to have a Material Adverse Effect.

(2)    Each Transaction Party (either itself or through Affiliates) agrees that it shall not knowingly do any act that uses any Intellectual Property to infringe, misappropriate or violate the intellectual property rights of any other person if such act could reasonably be expected to have a Material Adverse Effect.

# 7    GUARANTY.

**7A.    Guaranty of the Obligations.**    Subject to the provisions of the DIP Order, Paragraph 7B, the Security Principles and Security Limitations, as applicable, by the execution hereof or a Counterpart Agreement, each Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to each Holder and the Collateral Agent the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code) (collectively, the **"Guaranteed Obligations"**).

**7B.    Contribution by Guarantors.**    All Guarantors desire to allocate among themselves (collectively, the **"Contributing Guarantors"**), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a **"Funding Guarantor"**) under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. **"Fair Share"** shall mean, with respect to a Contributing Guarantor as of any date of

determination, an amount equal to (1) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (2) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations Guaranteed. **"Fair Share Contribution Amount"** shall mean, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the Bankruptcy Code or any comparable applicable provisions of any state or other applicable law; *provided*, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of this Paragraph 7B, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor. **"Aggregate Payments"** shall mean, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (A) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including, without limitation, in respect of this Paragraph 7B), minus (B) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Paragraph 7B. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor. The allocation among Contributing Guarantors of their obligations as set forth in this Paragraph 7B shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Paragraph 7B.

   **7C.**  **Payment by Guarantors.** Subject to Paragraph 7B, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Holder or the Collateral Agent may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Issuer to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code or other similar law), Guarantors will upon demand pay, or cause to be paid, in cash, to the Holders (or the Collateral Agent on behalf of the Holders), an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Issuer becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Issuer for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Collateral Agent and the Holders as aforesaid.

   **7D.**  **Liability of Guarantors Absolute.** Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

-34-

(1)     this Guaranty is a guaranty of payment when due and not of collectability;

(2)     this Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(3)     the Holders may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Issuer and any Holder with respect to the existence of such Event of Default;

(4)     the obligations of each Guarantor hereunder are independent of the obligations of the Issuer and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Issuer, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Issuer or any of such other guarantors and whether or not the Issuer is joined in any such action or actions;

(5)     payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid. Without limiting the generality of the foregoing, if any Holder (or the Collateral Agent on behalf of the Holders) is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(6)     subject to any other relevant provisions of this Agreement or any other Transaction Document, any Holder, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) subject to the rights afforded the Collateral Agent to act on behalf of the Holders, enforce and apply any security now or hereafter held by or for the benefit of such Holder in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Holder may have against any such security, in each case as such Holder in its

-35-

discretion may determine subject to the rights of the Collateral Agent and otherwise in a manner consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Issuer or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Transaction Documents; and

(7)    this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Transaction Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Transaction Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Transaction Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Transaction Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Holder might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Holder's consent to the change, reorganization or termination of the corporate structure or existence of any Transaction Party, US Holdings or any of their Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which the Issuer may allege or assert against any Holder or the Collateral Agent in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**7E.    Waivers by Guarantors.**  To the fullest extent permitted by law, each Guarantor hereby waives, for the benefit of the Holders and the Collateral Agent: (1) any right to require

any Holder or the Collateral Agent, as a condition of payment or performance by such Guarantor, to (i) proceed against the Issuer, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Issuer, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Holder in favor of the Issuer or any other Person or (iv) pursue any other remedy in the power of any Holder whatsoever; (2) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Issuer or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Issuer or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (3) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (4) any defense based upon any Holder's or the Collateral Agent's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (5) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Holder protect, secure, perfect or insure any security interest or lien or any property subject thereto; (6) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Issuer and notices of any of the matters referred to in Paragraph 7D and any right to consent to any thereof; and (7) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

      **7F.    Guarantors' Rights of Subrogation, Contribution, Etc.**  Until the Guaranteed Obligations shall have been indefeasibly paid in full, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Issuer or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (1) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Issuer with respect to the Guaranteed Obligations, (2) any right to enforce, or to participate in, any claim, right or remedy that any Holder now has or may hereafter have against the Issuer and (3) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Holder or the Collateral Agent.  In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including, without limitation, any such right of contribution as contemplated by Paragraph 7B. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any

-37-

rights of subrogation, reimbursement or indemnification such Guarantor may have against the Issuer or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Holder or the Collateral Agent may have against the Issuer, to all right, title and interest any Holder or the Collateral Agent may have in any such collateral or security, and to any right any Holder or the Collateral Agent may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been paid in full, such amount shall be held in trust for the Holders and shall forthwith be paid over to the Holders (or the Collateral Agent) to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

**7G.    Subordination of Other Obligations.**  Any Indebtedness of the Issuer or any Guarantor now or hereafter held by any Guarantor (the **"Obligee Guarantor"**) is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Holders and shall forthwith be paid over to the Holder to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

**7H.    Continuing Guaranty.**  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full.  Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**7I.    Authority of Guarantors or the Issuer.**  It is not necessary for any Holder or the Collateral Agent to inquire into the capacity or powers of any Guarantor, the Issuer or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**7J.    Financial Condition of the Issuer.**  Any credit extension may be made to the Issuer or continued from time to time without notice to or authorization from any Guarantor regardless of the financial or other condition of the Issuer at the time of any such grant or continuation, as the case may be.  No Holder shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Issuer.  Each Guarantor has adequate means to obtain information from the Issuer on a continuing basis concerning the financial condition of the Issuer and its ability to perform its obligations under the Transaction Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Issuer and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Holder or the Collateral Agent to disclose any matter, fact or thing relating to the business, operations or conditions of the Issuer now known or hereafter known by any Holder.

**7K.    Bankruptcy, Etc.**

(1)    So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Required Holder(s) (or the Collateral Agent

-38-

acting at their direction), commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Issuer or any other Guarantor. The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Issuer or any other Guarantor or by any defense which the Issuer or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(2)    Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (1) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Holders that the Guaranteed Obligations which are Guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Issuer of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay the Holders (or the Collateral Agent), or allow the claim of the Holders in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(3)    In the event that all or any portion of the Guaranteed Obligations are paid by the Issuer, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Holder as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

## 8    DEFAULT AND REMEDIES.

**8A.    Acceleration.** If any of the following events shall occur and be continuing for any reason whatsoever (and whether such occurrence shall be voluntary or involuntary or come about or be effected by operation of law or otherwise):

(1)    **Non-Payment.** Any Transaction Party or US Holdings fails (i) to pay when and as required to be paid herein, any amount of principal of any Note, including after maturity of the Notes or (ii) to pay within three Business Days after the same shall become due, interest on any Note, any fee or any other amount payable hereunder or pursuant to any other Transaction Document; or

(2)    **Representation or Warranty.** Any representation, warranty or certification by or on behalf of US Holdings, any Transaction Party or any of its Subsidiaries made or deemed made herein, in any other Transaction Document, or which

52719/0001-11044714v1

is contained in any certificate, document or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Transaction Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made; or

(3)  **Specific Defaults.** US Holdings or any Transaction Party fails to perform or observe any term, covenant or agreement of it contained in [(i) Paragraph 5A, 5D(2) or 5F and such default shall continue unremedied for a period of three Business Days, (ii) Paragraph 5D(1) and such default shall continue unremedied for a period of five Business Days or (iii) Paragraph 4 (other than Paragraph 4E), 5B, 5C, 5K, 5L, 5O or Paragraph 6 hereof;] or

(4)  **Other Defaults.** US Holdings, any Transaction Party or Subsidiary of any Transaction Party fails to perform or observe any other term, covenant or agreement contained in this Agreement or any other Transaction Document, and such default shall continue unremedied for a period of 15 days after the earlier to occur of (i) the date upon which a Responsible Officer of any Transaction Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Issuer by any Holder; or

(5)  **Default Under Intercompany DIP Loan Agreement/Dutch NPA.** An event of default under the Intercompany DIP Loan Agreement or the Dutch NPA shall occur and be continuing, and such event of default continues unremedied after the applicable grace or notice period, if any, specified or results in any loans thereunder becoming due prior to stated maturity or any commitment to advance credit thereunder shall terminate; or

(6)  **Cross-Default.** US Holdings, any Transaction Party or any Subsidiary of any Transaction Party (i) fails to make any payment in respect of any Indebtedness (other than the Obligations) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $1,000,000 when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such failure continues after the applicable grace or notice period, if any, specified in the document relating thereto on the date of such failure; or (ii) fails to perform or observe any other condition or covenant, or any other event shall occur or condition exist, under any agreement or instrument relating to any such Indebtedness if the effect of such failure, event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause such Indebtedness to be declared to be due and payable prior to its stated maturity (without regard to any subordination terms with respect thereto) unless such holder, holders or beneficiary or beneficiaries, as the case may be, waived such default in writing; *provided, however,* that this subclause (ii) shall not apply to any [Prepetition Obligations or] secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted under

-40-

Paragraph 6B and under the documents providing for such Indebtedness and such Indebtedness shall have been paid in full upon consummation of such sale or transfer; or

(7)     **Insolvency; Voluntary Proceedings.** Excluding the Chapter 11 Cases with respect to the US Debtor, US Holdings or any Transaction Party or any their respective Subsidiaries ceases or fails: (i) generally fails to pay, or admits in writing its inability to pay, its debts as they become due, subject to applicable grace periods, if any, whether at stated maturity or otherwise; (ii) except as expressly permitted under Paragraph 6C, voluntarily ceases to conduct its business in the ordinary course; (iii) commences any Insolvency Proceeding with respect to itself; or (iv) takes any action to effectuate or authorize any of the foregoing; or

(8)     **Involuntary Proceedings.** Excluding the Chapter 11 Cases with respect to the US Debtors, (i) any involuntary Insolvency Proceeding is commenced or filed against US Holdings, any Transaction Party or any of their respective Subsidiaries, or any writ, judgment, warrant of attachment, execution or similar process, is issued or levied against a substantial part of any such Person's Properties, and any such proceeding or petition shall not be dismissed, or such writ, judgment, warrant of attachment, execution or similar process shall not be released, vacated or fully bonded within 60 days after commencement, filing or levy; (ii) UA Holdings, any Transaction Party or any of their respective Subsidiaries admits the material allegations of a petition against it in any Insolvency Proceeding, or an order for relief (or similar order under non-U.S. law) is ordered in any Insolvency Proceeding; or (iii) US Holdings, any Transaction Party or any of their respective Subsidiaries acquiesces in the appointment of a receiver, trustee, custodian, conservator, liquidator, mortgagee in possession (or agent therefor), or other similar Person for itself or a substantial portion of its Property or business; or

(9)     **Monetary Judgments.** One or more judgments, non-interlocutory orders, decrees or arbitration awards shall be entered against US Holdings, any one or more of the Transaction Parties or any Subsidiaries of a Transaction Party involving in the aggregate a liability of $1,000,000 or more (excluding amounts covered by insurance to the extent the relevant independent third-party insurer has not denied coverage therefor), and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of 30 days after the entry thereof; or

(10)     **Non-Monetary Judgments.** One or more non-monetary judgments, orders or decrees shall be rendered against US Holdings, any one or more of the Transaction Parties or any Subsidiaries of a Transaction Party which has or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(11)     **Change of Control.** A Change of Control shall have occurred; or

(12)     **Sale Transaction.** Once filed, the Sale Motion shall have been withdrawn or is no longer being pursued; or the US Debtors shall be in breach or shall fail to comply

-41-

with the terms of the DIP Orders or, following the entry thereof, the Bid Procedures Order, in either case, in any material respect; or

(13)     **Transaction Documents.** The Stalking Horse Agreement terminates for any reason without the Sale Transaction having been consummated thereunder, or any material provision of any Transaction Document or Sale Document shall for any reason (other than a termination thereof in accordance with their terms hereof or thereof or breach by any party thereto that is not a US Debtor or Transaction Party) cease to be valid and binding on or enforceable against US Holdings, any Transaction Party or any Subsidiary of any Transaction Party party thereto, or US Holdings, any Transaction Party or any Subsidiary of any Transaction Party shall so state in writing or bring an action to limit its obligations or liabilities hereunder or thereunder; or the performance by US Holdings or any Transaction Party of its obligations under any material provision of any Transaction Document or Sale Document shall become unlawful (other than as already expressly contemplated therein); or

(14)     **Additional Events of Default.**

(a)     The entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(b)     The entry of an order appointing a chapter 11 trustee in any of the Chapter 11 Cases;

(c)     The entry of an order in any of the Chapter 11 Cases appointing an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code);

(d)     The filing of any pleading by any US Debtor, Transaction Party or any of their respective subsidiaries or affiliates, seeking, or otherwise consenting to, any of the matters set forth in clauses (a) through (c) above;

(e)     Without the consent of the Agent and the Required Holders, the filing of any motion by the US Debtors seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any prepetition creditor;

(f)     (A) An amendment, supplement or other modification shall have been made to, or a consent or waiver shall have been granted with respect to any departure by any person from the provisions of this Agreement, the other Transaction Documents, the DIP Loan Documents or the Sale Documents, in each case, that is materially adverse to the Agent's or the Purchasers' interests or inconsistent with this Agreement, the other Transaction Documents, the DIP Loan Documents or the Sale Documents, (B) the US Debtors, any Transaction Party or any of their respective subsidiaries or affiliates shall have commenced or participated in furtherance of any transaction, other than transactions expressly permitted by this Agreement, the other Transaction Documents, the DIP Loan

-42-

Documents or the Sale Documents, (C) the Bankruptcy Court shall terminate or reduce the period pursuant to section 1121 of the Bankruptcy Code during which the US Debtors have the exclusive right to file a plan of reorganization and solicit acceptances thereof, (D) the Bankruptcy Court shall grant relief that is inconsistent with the transactions contemplated hereunder in any material respect and that is materially adverse to the Agent's or the Purchasers' interests or inconsistent with this Agreement, the other Transaction Documents, the DIP Loan Documents or the Sale Documents, (E) any of the US Debtors or any of their subsidiaries or affiliates shall file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with the transactions contemplated hereunder and such motion or pleading has not been withdrawn prior to the earlier of (x) three Business Days of the Issuer receiving notice from the Agent and (y) entry of an order of the Bankruptcy Court approving such motion or pleading;

(g)    The entry of the Final DIP Order shall not have occurred within 30 days after the Petition Date (or such later date as approved by the Agent and the Required Holders), or there shall be a breach by any US Debtor of any material provisions of the Interim DIP Order (prior to entry of the Final DIP Order) or the Final DIP Order, or the Interim DIP Order (prior to entry of the Final DIP Order) or Final DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Agent and the Required Holders;

(h)    The entry of an order in the Chapter 11 Cases charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Purchasers under which any person takes action against the Collateral or that becomes a final non-appealable order or the commencement of other actions that is materially adverse to the Agent, the Purchasers or their respective rights and remedies under this Agreement and related documents or the DIP Loan Documents in any of the Chapter 11 Cases or inconsistent with this agreement and related documents and that is not dismissed or overruled within 20 days of commencement;

(i)    The entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure (or granting a deed in lieu of foreclosure) against any material assets of the US Debtors, any Transaction Party or any of their respective subsidiaries or affiliates;

(j)    The entry of an order by the Bankruptcy Court allowing any claims or charges, other than permitted under this Agreement and the DIP Loan Documents, entitled to superpriority under section 364(c)(1) of the Bankruptcy Code pari passu or senior to the DIP Loans, or there shall arise (A) any claim having priority over any or all administrative expenses of the kind specified in section 503(b) or section 507(b) of the Bankruptcy Code (other than the Carve-Out) or (B) any Lien on the Collateral having a priority senior to or pari passu

-43-

with the Liens and security interests granted herein, except as expressly provided herein or in the Interim DIP Order or the Final DIP Order (but only in the event specifically consented to by Agent), whichever is then in effect;

(k)    The entry of any order by the Bankruptcy Court granting, or the filing by any US Debtor of any motion or other request with the Bankruptcy Court seeking, authority to use any cash proceeds of any of the Collateral or to obtain any financing under section 364 of the Bankruptcy Code other than the DIP Loans, in each case without the consent of the Agent and the Required Holders;

(l)    Filing of any papers by any US Debtor in the Chapter 11 Cases seeking entry of, or entry of any order approving or modifying any of the Transaction Documents, the DIP Loan Documents, the DIP Loans or the Sale Documents, in a form and substance not satisfactory to the Agent and the Required Holders, in their sole discretion;

(m)    Any action by any of the US Debtors or any other party in interest in the Chapter 11 Cases relating to any of the Management and Technical Services Agreements, the Intercompany IP License Agreement or any other license or lease, including, without limitation, filing of any motion or other filing seeking to reject or terminate any of the Management and Technical Services Agreements, the Intercompany IP License Agreement or any other license or lease, in each case without consent of the Agent and the Required Holders;

(n)    Any lien or security interest purported to be created under the DIP Orders, any of the Transaction Documents or DIP Loan Documents shall cease to be, or shall be asserted by any of the US Debtors, the Transaction Parties or any of their respective subsidiaries or affiliates not to be, a valid and perfected lien on or security interest in any of the Collateral, with the priority set forth in the DIP Orders, the Transaction Documents and the DIP Loan Documents;

(o)    Any US Debtor makes any material payments on account of any prepetition indebtedness or payables other than payments pursuant to "first day" orders entered by the Bankruptcy Court and set forth in the Budget;

(p)    A sale of any part of the Collateral pursuant to section 363 of the Bankruptcy Code not expressly permitted by any of the Transaction Documents or the DIP Loan Documents without the consent of the  Agent and Required Holders; or

(q)    Any US Debtor, any Transaction Party or any of their respective subsidiaries or affiliates, or any Person claiming by or through them, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Agent or any of the Purchasers relating to the Transaction Documents, the DIP Loans, the DIP Loan Documents or the Sale Documents;

-44-

then, (a) if such event is an Event of Default specified in clause (1) of this Paragraph 8A, the Required Holders may, at their option (or the Collateral Agent acting at the direction of the Required Holders, by notice in writing to the Issuer, declare all Notes to be, and each such Note shall thereupon be and become, immediately due and payable at par together with interest accrued thereon, without presentment, demand, protest or other notice of any kind, all of which are hereby waived, (b) if such event is an Event of Default specified in clause (5), (7), (8) or (14) of this Paragraph 8A, all of the Notes at the time outstanding shall automatically become immediately due and payable together with interest accrued thereon, without any requirement of presentment, demand, protest or notice of any kind, all of which are hereby waived and (c) if such event is not an Event of Default specified in clause (5), (7), (8) or (14) of this Paragraph 8A (as a result of which the Notes have already been accelerated), the Required Holders may at their option (or the Collateral Agent acting at the direction of the Required Holders), by notice in writing to the Issuer, declare all of the Notes to be, and all of the Notes shall thereupon be and become, immediately due and payable together with interest accrued thereon, without any requirement of presentment, demand, protest or other notice of any kind, all of which are hereby waived. US Holdings and each Transaction Party acknowledges, and the parties hereto agree, that each Holder has the right to maintain its investment in the Notes free from repayment by the Issuer (except as specifically provided in Paragraph 4 hereof) and without the occurrence of an Event of Default.

     **8B.    Rescission of Acceleration.**  At any time after any or all of the Notes shall have been declared immediately due and payable pursuant to Paragraph 8A, the Required Holder(s) (or the Collateral Agent acting at the direction of the Required Holders may, by notice in writing to the Issuer, rescind and annul such declaration and its consequences if (1) the Issuer shall have paid all overdue interest on the Notes, the principal of any Notes which have become due otherwise than by reason of such declaration, and interest on such overdue interest and overdue principal at the rate specified in the Notes, (2) the Issuer shall not have paid any amounts which have become due solely by reason of such declaration, (3) all Events of Default and Defaults, other than non-payment of amounts which have become due solely by reason of such declaration, shall have been cured or waived pursuant to Paragraph 13C and (4) no judgment or decree shall have been entered for the payment of any amounts due pursuant to the Notes or this Agreement.  If any declaration of acceleration is rescinded and annulled as set forth in this Paragraph 8B, then all amounts which have become due and payable solely as a result of such declaration of acceleration shall no longer be due and payable and shall become due and payable at such time as provided under the terms of this Agreement.  No such rescission or annulment shall extend to or affect any subsequent Event of Default or Default or impair any right arising therefrom.

     **8C.    Notice of Acceleration or Rescission.**  Whenever any Note shall be declared immediately due and payable pursuant to Paragraph 8A or any such declaration shall be rescinded and annulled pursuant to Paragraph 8B, the Issuer shall promptly give written notice thereof to each Holder and the Collateral Agent after obtaining knowledge thereof.

     **8D.    Payment Priorities.**  Any payment on account of the Notes and Obligations following an Event of Default shall be applied as follows: [insert to follow]

-45-

**8E.    Other Remedies.**  If any Event of Default shall occur and be continuing, any Holder or the Collateral Agent (in either case acting at the direction of the Required Holders) may proceed to protect and enforce the Holders' and the Collateral Agent's rights under this Agreement, the other Transaction Documents and the Note(s) by exercising such remedies as are available to such Holder or the Collateral Agent in respect thereof under applicable law, either by suit in equity or by action at law, or both, whether for specific performance of any covenant or other agreement contained in this Agreement, the other Transaction Documents  or in aid of the exercise of any power granted in this Agreement; *provided* that any remedy with respect to the Collateral shall be exercisable solely by the Collateral Agent acting at the direction of the Required Holders.  No remedy conferred in this Agreement or any other Transaction Document upon any Holder or the Collateral Agent is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy conferred herein or now or hereafter existing at law or in equity or by statute or otherwise.

**9    REPRESENTATIONS AND WARRANTIES**.  US Holdings and each Transaction Party, jointly and severally, represent and warrant to each Holder that the following are, and after giving effect to the Transactions on the Closing Date will be, true, correct and complete:

**9A.    Corporate Existence and Power.**  US Holdings, each Transaction Party and each of Subsidiary of a Transaction Party:

(1)    is a corporation, limited liability company or limited partnership, as applicable, duly organized, validly existing and (to the extent such term is applicable in the Relevant Jurisdiction) in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable;

(2)    has the power and authority and all governmental licenses, authorizations, Permits, consents and approvals (i) necessary to own its assets and carry on its business, (ii) to execute, deliver and perform its obligations under the Transaction Documents to which it is a party and (iii) to execute, deliver and perform its obligations under the Transaction Documents to which it is a party;

(3)    is qualified to do business (to the extent such term is applicable in the Relevant Jurisdiction) in any jurisdiction where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect; and

(4)    is in compliance with all Requirements of Law;

except, in each case referred to in clause (2)(i), clause (3) or clause (4), to the extent that the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**9B.    Corporate Authorization; No Contravention.**  The execution, delivery and performance by US Holdings, each Transaction Party and each Subsidiary of a Transaction Party of this Agreement or any other Transaction Document to which such Person is party, have been duly authorized by all necessary action, and do not and will not:

(1)    contravene the terms of any of that Person's Organization Documents;

-46-

(2)        conflict with or result in any material breach or contravention of, or result in the creation of any Lien (other than a Permitted Lien) under, any document evidencing any material Contractual Obligation to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority to which such Person or its material Property is subject; or

(3)        violate any material Requirement of Law in any material respect.

**9C.    Governmental Authorization.** Except as specifically disclosed in **Schedule 9C** and subject in all respect to Paragraph 5N, the Security Principles and the Security Limitations, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, US Holdings, any Transaction Party or any Subsidiary of any Transaction Party of this Agreement or any other Transaction Document to which such Person is a party except (1) for recordings and filings in connection with the Liens granted to the Collateral Agent securing the Obligations, (2) those obtained or made on or prior to the Closing Date and (3) those which, if not obtained or made, would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**9D.    Binding Effect.** This Agreement and each other Transaction Document to which any Transaction Party is a party constitute the legal, valid and binding obligations of each such Person which is a party thereto, enforceable against such Person in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

**9E.    Litigation.** Other than the Chapter 11 Cases, there are no actions, suits, proceedings, claims or disputes pending, or to the knowledge of each Transaction Party, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, against any Transaction Party, any Subsidiary of any Transaction Party or any of their respective Properties which:

(1)        purport to affect or pertain to this Agreement, any other Transaction Document, any DIP Loan Document or Sale Document, or any of the transactions contemplated hereby or thereby; or

(2)        would reasonably be expected to result in equitable relief or monetary judgment(s), individually or in the aggregate which would reasonably be expected to result in a Material Adverse Effect.

No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this Agreement, any other Transaction Document, any DIP Loan Document or any Sale Document, or directing that the transactions provided for herein or therein not be consummated as herein or therein provided. As of the Closing Date, neither US Holdings, any Transaction Party nor any Subsidiary of any Transaction Party is the subject of an audit or, to each Transaction Party's knowledge, any review or investigation by any

-47-

Governmental Authority concerning the violation or possible violation of any Requirement of Law.

**9F.**   **No Default.**   No Default or Event of Default exists or would result from the incurring of any Obligations by US Holdings or any Transaction Party or the consummation of the Transactions.

**9G.**   **ERISA Compliance.**

(1)   **Schedule 9G** sets forth, as of the Closing Date, a complete and correct list of, and that separately identifies, (a) all Title IV Plans and (b) all Multiemployer Plans. Except where any such failure would not result in a Material Adverse Effect, each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law so qualifies.   On the Closing Date, no ERISA Event has occurred in connection with which obligations and liabilities (contingent or otherwise) remain outstanding or is reasonably expected to occur.

(2)   The execution and delivery of this Agreement and the issuance and sale of the Notes hereunder will not involve any transaction that is subject to the prohibitions of Section 406 of ERISA or in connection with which a tax could be imposed pursuant to Section 4975(c)(1)(A)-(D) of the Code.   The representation to each Purchaser in the first sentence of this Paragraph 9G(2) is made in reliance upon and subject to the accuracy of such Purchaser's representation in Paragraph 10B as to the sources of the funds used to pay the purchase price of the Notes to be purchased by such Purchaser.

**9H.**   **Use of Proceeds; Margin Regulations.**   The proceeds of the Notes are intended to be and shall be used solely for the purposes set forth in and permitted by Paragraph 5J, and are intended to be and shall be used in compliance with Paragraph 6H.   Neither US Holdings, any Transaction Party nor any Subsidiary of any Transaction Party is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.   Proceeds of the Notes shall not be used for the purpose of purchasing or carrying Margin Stock.   As of the Closing Date, neither US Holdings, any Transaction Party nor any Subsidiary of any Transaction Party owns any Margin Stock.

**9I.**   **Ownership of Property; Liens.**   The Company and each of its Subsidiaries has good record and insurable title in fee simple to, or valid leasehold interests in, all Real Estate, and good and valid title to all owned personal property and valid leasehold interests in all leased personal property, in each instance, necessary in the ordinary conduct of their respective businesses, except for defects in title that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.   To the knowledge of US Holdings or any Transaction Party, as of the Initial Closing Date, none of the Property of it or any of its Subsidiaries is subject to any Liens other than Permitted Liens.   All permits required to have been issued to enable the Real Estate to be lawfully occupied and used by the applicable Transaction Party or its Subsidiary for all of the purposes for which it is currently occupied and used by such Person have been issued and are in full force and effect, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

-48-

**9J.    Taxes.** Other than as set forth in **Schedule 9J**, all material income and franchise and other material tax returns, reports and statements (collectively, the **"Tax Returns"**) required to be filed by any Tax Affiliate have been filed with the appropriate Governmental Authorities, all such Tax Returns are true and correct in all material respects, and all taxes, assessments and other governmental charges and impositions reflected therein and all other material taxes otherwise due and payable have been paid prior to the date on which any Liability may be added thereto for non-payment thereof except for those contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the appropriate Tax Affiliate in accordance with GAAP. Proper and accurate amounts have been withheld by each Tax Affiliate from their respective employees for all periods in material compliance with the tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the respective Governmental Authorities. As of the Closing Date, no Tax Affiliate has participated in a listed transaction as defined under United States Treasury Regulation Section 1.6011-4(b)(2) or has been a member of an affiliated, combined or unitary group other than the group of which a Tax Affiliate is the common parent.

**9K.    Financial Condition.**

(1)    Each of (i) the audited financial statements of US Holdings and its Subsidiaries for the fiscal year ended December 31, 2013 and (ii) the unaudited consolidated balance sheet statements of income, shareholders' equity and cash flows as of June 30, 2014 for the six month period then ended:

(a)    were prepared in accordance with GAAP consistently applied throughout the respective periods covered thereby, except as otherwise expressly noted therein, subject to, in the case of the unaudited interim financial statements, normal year-end adjustments and the lack of footnote disclosures; and

(b)    present fairly in all material respects the consolidated financial condition of US Holdings and its Subsidiaries as of the dates thereof and results of operations for the periods covered thereby.

(2)    Other than the commencement of the Chapter 11 Cases, since December 31, 2013, there has been no Material Adverse Effect.

(3)    All financial performance projections delivered to the Holders, including the financial performance projections delivered on or prior to the Initial Closing Date, taken as a whole, represent US Holdings' good faith estimate of its future financial performance and are based on assumptions believed by US Holdings to be fair and reasonable at the time of delivery in light of the market conditions at the time of delivery, it being acknowledged and agreed by the Holders that projections as to future events are not to be viewed as facts, are subject to uncertainties and contingencies, many of which are beyond US Holdings and the Transaction Parties' control, and are not guaranties of financial performance, and that the actual results during the period or periods covered by such projections may differ from the projected results and such differences may be material.

**9L.    Environmental Matters.**

(1)    The current operations of the Transaction Parties at the Real Estate are, and have since January 1, 2011, been in compliance with the provisions of any applicable Environmental Law, except to the extent that any such noncompliance could not reasonably be expected to have a Material Adverse Effect.

(2)    Since January 1, 2011 (or prior to such time if not settled or resolved), there have been no citations, Environmental Notices or orders of noncompliance issued by a Governmental Authority to a Transaction Party at any Real Estate under any Environmental Laws, except as (i) could not reasonably be expected to have a Material Adverse Effect, (ii) is set forth in Schedule 9L or (iii) relates to government sanctioned remediation activities identified in Schedule 9L.

(3)    The Transaction Parties have provided to Holders and Agent environmental reports and other environmental documents that are reasonably sufficient to provide notice to the Holders and Agent of known regulatory actions and environmental conditions at the Real Estate that have resulted in or could reasonably be expected to result in a liability arising under Environmental Laws to the Transaction Parties in excess of $100,000.

(4)    The Transaction Parties acknowledge and agree that the Agent and Holders (a) are not now in control of any of the Real Estate, have not been in control of any of the Real Estate during the period of time the Real Estate has been owned or operated by the Transaction Parties, and are not now and never have been in control of the affairs of the Transaction Parties, and (b) do not have the capacity through the provisions of the Transaction Documents or otherwise to influence any Transaction Party's conduct with respect to the ownership, operation or management of any of the Real Estate or compliance with Environmental Laws.

**9M.    Regulated Entities.**  None of any Transaction Party, any Person directly owning any Transaction Party, or any Subsidiary of any Transaction Party, is (1) required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940 or (2) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other federal, state or foreign statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its obligations under the Transaction Documents.

**9N.    Reserved.**

**9O.    Labor Relations.**  There are no strikes, work stoppages, slowdowns or lockouts existing, pending (or, to the knowledge of any Transaction Party, threatened) against or involving any Transaction Party or any Subsidiary of any Transaction Party, except for those that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth on **Schedule 9O**, as of the Closing Date, there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Transaction Party or any Subsidiary of any Transaction Party.

**9P.    Intellectual Property**.

(1)        **Schedule 9P** sets forth a (correct and complete list of all Intellectual Property which is registered with a Governmental Authority or is the subject of an application for registration, in each case which is owned by a Transaction Party on the date hereof.  **Schedule 9P** also lists each material Intellectual Property License, other than licenses for "off-the-shelf", non-customized software that is readily and commercially available on non-discriminatory, reasonable terms and pricing for the public.

(2)        Neither the operation of the Company's and its Subsidiaries' business as currently conducted nor the use of any of Intellectual Property in connection therewith by the Company or any of its Subsidiaries conflicts with, infringes, misappropriates, dilutes, misuses or otherwise violates the Intellectual Property rights of any other person in any respect.

(3)        Neither the owned Intellectual Property set forth on Schedule 9P nor any other owned Material Intellectual Property is subject to any outstanding order, judgment or decree adversely affecting the Company's or any of its Subsidiaries' use thereof or their rights thereto except as could not reasonably be expected to have a Material Adverse Effect.  Except as disclosed on **Schedule 9P-1**, the Company and its Subsidiaries have sufficient rights to use all owned Material Intellectual Property and there is no litigation, opposition, cancellation, proceeding, objection or claim pending, or, to the knowledge of the Issuer, asserted or threatened against the Company or any of its Subsidiaries concerning the ownership, validity, registerability, enforceability, infringement or use of, or licensed right to use, any owned Intellectual Property set forth on **Schedule 9P**. [4]

(4)        Each Transaction Party that is party to the Intercompany IP License Agreement represents and warrants that (i) the rights it receives pursuant to such Intercompany IP License Agreement accurately reflect the type and territorial scope of any and all Intellectual Property that such Transaction Party uses in the conduct of its business that is owned by an Affiliate of such Transaction Party; and (ii) it does not use, or require the use of, any Intellectual Property owned or controlled by any of its Affiliates (x) that are not a party to the Intercompany IP License Agreement, or (y) in any territories or jurisdictions other than the territories and jurisdictions expressly licensed to such Transaction Party pursuant to the terms of the Intercompany IP License Agreement.

(5)        Each Transaction Party that is party to one or more Management and Technical Services Agreements represents and warrants that (i) the rights it receives pursuant to each such Management and Technical Services Agreement accurately reflect the type and scope of any and all services that such Transaction Party uses in the conduct of its business that are provided by an Affiliate of such Transaction Party; and (ii) it does

---

[4]    NOTE: A third party has threatened to oppose one of Reichhold's new trademark applications for a new product.  We are gathering the details of this application and threatened opposition, which will be detailed in the NPA disclosure schedules.  No opposition has actually been filed by such third party, although the window is still open for opposition filings to be submitted.

not use, or require the use of, any services from any of its Affiliates that are not a party to a Management and Technical Services Agreement.

**9Q.    Reserved.**

**9R.    Reserved.**

**9S.    Ventures, Subsidiaries and Affiliates; Outstanding Stock.**  Except as set forth on **Schedule 9S**, as of the Closing Date, no Transaction Party and no Subsidiary of any Transaction Party (1) has any Subsidiaries, or (2) is engaged in any joint venture or partnership with any other Person.  All issued and outstanding Stock and Stock Equivalents of each of the Transaction Parties and each of their respective Subsidiaries are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than, with respect to the Stock and Stock Equivalents of the Company and Subsidiaries of the Company, those provided for in the DIP Loan Documents or in favor of the Collateral Agent securing the Obligations.  All such securities of US Holdings and the Company were issued in compliance with all applicable state and federal laws concerning the issuance of securities.  As of the Closing Date, except as set forth on **Schedule 9S**, there are no pre-emptive or other outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Transaction Party may be required to issue, sell, repurchase or redeem any of its Stock or Stock Equivalents or any Stock or Stock Equivalents of its Subsidiaries.  Set forth on **Schedule 9S** is a true and complete organizational chart of US Holdings and all of its Subsidiaries as of the Closing Date.

**9T.    Jurisdiction of Organization; Chief Executive Office.  Schedule 9T** lists each Transaction Party's and each of its Subsidiaries' jurisdiction of organization or incorporation, legal name and organizational identification number, if any, and the location of such Transaction Party's chief executive office or sole place of business, in each case as of the date hereof.

**9U.    Deposit Accounts and Other Accounts.**  Each US Debtor, each Transaction Party and any of their respective subsidiaries and affiliates shall promptly comply with any requirement of the Agent as to the location or relocation of any of its deposit or other accounts and execute any documents which the Agent specifies to create or maintain in favor of the Agent a security over (and/or rights of set-off, consolidation or other rights in relation to) such accounts.

**9V.    Reserved.**

**9W.    Reserved.**

**9X.    Centre of Main Interest.**  In respect of a Transaction Party incorporated in the European Union, for the purpose of The Council of European Union Regulations No. 1346/2000 on Insolvency Proceedings (the "Regulation"), its centre of main interest (as that term is used in Article 3(1) of the Regulation) is situated in the jurisdiction of incorporation and it has no "establishment" (as that term is used in Article 2(h) of the Regulation) in any other jurisdiction, and its practice of central management, decision making, administration and the place at which its meetings of its board of directors are usually held, do not result in its centre of main interest being located in a jurisdiction other than that of its incorporation.

-52-

**9Y.    Full Disclosure.**   None of the representations or warranties made by US Holdings, any Transaction Party or any Transaction Party's Subsidiaries in the Transaction Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of US Holdings, any Transaction Party or any Transaction Party's Subsidiaries in connection with the Transaction Documents, when taken as a whole, contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not materially misleading as of the time when made or delivered after giving effect to all updates and supplements.    Projections, forecasts, financial estimates and information of a general economic or general industry nature are excluded from the scope of this Paragraph 9Y.

**9Z.    Foreign Assets Control Regulations and Anti-Money Laundering.**   Each Transaction Party, each Subsidiary of each Transaction Party and US Holdings is and will remain in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it. Neither US Holdings nor any Transaction Party or a Subsidiary (1) is a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "**SDN List**") with which a U.S. Person cannot deal with or otherwise engage in business transactions or (2) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person.

**9AA.    Patriot Act.**   The Transaction Parties, each of their Subsidiaries and US Holdings are in compliance with (1) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto, (2) the Patriot Act and (3) other federal state or foreign laws relating to "know your customer" and anti-money laundering rules and regulations.   No part of the proceeds of the Notes will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977or any similar laws.

**9BB.    Rule 144A.**   The Notes are not of the same class as any securities of the Issuer listed on a national securities exchange, registered under Section 6 of the Exchange Act or quoted in a U.S. automated inter-dealer quotation system.

**9CC.    Offering of Notes.**   Neither the Issuer nor any agent acting on its behalf has, directly or indirectly, offered the Notes or any similar security for sale to, or solicited any offers to buy the Notes or any similar security from, or otherwise approached or negotiated with respect thereto with, any Person other than the Purchasers, and neither the Issuer nor any agent acting on its behalf has taken or will take any action which would subject the issuance or sale of the Notes to the provisions of Section 5 of the Securities Act or to the provisions of any securities or Blue Sky law of any applicable jurisdiction.   Without limiting the foregoing, the sale of the Notes pursuant to this Agreement is exempt from the registration and prospectus delivery requirements

-53-

of the Securities Act.  In the case of each offer or sale of the Notes, no form of general solicitation or general advertising was used by the Issuer nor any agent acting on its behalf, including, but not limited to, advertisements, articles, notices or other communications published in any newspaper, magazine or similar medium or broadcast over television or radio, or any seminar or meeting whose attendees have been invited by any general solicitation or general advertising.  No similar securities have been issued and sold by the Issuer within the six-month period immediately prior to the date hereof.

**9DD.  Priority and Liens.**  (a)  Each US Debtor, Transaction Party and each of their respective subsidiaries and affiliates hereby covenants, represents and warrants that upon entry of each DIP Order, the Obligations of such party  hereunder and under the Transaction Documents:

(i)    pursuant to section 364(c)(1) of the Bankruptcy Code and subject to the Carve-Out, shall at all times constitute an allowed Superpriority Claim;

(ii)    pursuant to section 364(c)(2) of the Bankruptcy Code and subject to the Carve-Out, shall at all times be secured by first priority, valid, binding, enforceable and perfected security interests in, and Liens upon, all pre- and postpetition tangible and intangible property of the US Debtors and the US Debtors' estates, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or to valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code) (collectively, "Unencumbered Property"), including without limitation, all inventory, accounts receivable, general intangibles, chattel paper, contracts, owned real estate, real and personal property leaseholds, property, plants, fixtures and machinery and equipment, vehicles, vessels, deposit accounts, cash and cash collateral of the US Debtors (whether maintained with the Agent or otherwise) and any investment of such cash and cash collateral, including cash collateral, letter of credit rights, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property and stock of subsidiaries of the US Debtors (excluding any avoidance actions under the Bankruptcy Code (but including the proceeds therefrom)); and

(iii)    pursuant to section 364(c)(3) of the Bankruptcy Code and subject to the Carve-Out, shall at all times be secured by junior, valid, binding, enforceable and perfected security interests in, and Liens upon all pre- and postpetition tangible and intangible property of the US Debtors and the US Debtors' estates (other than the Excluded Property and property described in clauses (ii) or (iv) of this paragraph, as to which the liens and security interests in favor of the Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, or to any valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the Agent are junior to such valid, perfected and unavoidable liens; and

-54-

(iv)    The Agent's and Purchasers' Liens and Superpriority Claim as described in this Section 9DD shall have priority over any claims arising under section 506(c) of the Bankruptcy Code, and shall be subject and subordinate only to the Carve-Out. Except as set forth herein, no other claim having a priority superior to or pari passu with that granted to the Agent and the Purchasers by the Interim DIP Order and Final DIP Order, whichever is then in effect, shall be granted or approved while any Obligations under this Agreement or the DIP Loan Documents remain outstanding.

(b)    Except for the Carve-Out, no costs or expenses of administration shall be imposed against the Agent, any Purchaser or any of the Collateral under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, and each of the US Debtors hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Agent or the Purchasers.

(c)    Except for the Carve-Out, the Superpriority Claims shall at all times be senior to the rights of each US Debtor, any chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any chapter 7 trustee, or any other creditor (including, without limitation, postpetition counterparties and other postpetition creditors) in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 cases (if any of the UD Debtors' cases are converted to cases under chapter 7 of the Bankruptcy Code).

**10    REPRESENTATIONS AND COVENANTS OF EACH PURCHASER.**    Each Purchaser severally represents as follows:

**10A.   Nature of Purchase.**

(1)    Such Purchaser is acquiring the Notes to be purchased by it hereunder for its own account and not with a view to or for sale in connection with any distribution thereof within the meaning of the Securities Act, *provided* that the disposition of such Purchaser's property shall at all times be and remain within its control.

(2)    Such Purchaser is an institutional "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act.

**11    COLLATERAL AGENT.**[5]

**11A.   <u>Appointment and Authorization of Collateral Agent</u>.**    Each Holder hereby designates and appoints Cantor Fitzgerald Securities ("**Cantor**") as its agent under this Agreement and the other Transaction Documents and each Holder hereby irrevocably authorizes the Collateral Agent to execute and deliver each of the Transaction Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Transaction Document and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent (together with any other agency role delegated to the Collateral

---

[5] The following agency provisions need to be conformed and expanded to include paying agent, if needed.

Agent or Cantor hereunder (collectively, the "**Agent**") by the terms of this Agreement or any other Transaction Document, together with such powers as are reasonably incidental thereto. Cantor agrees to act as agent for and on behalf of the Holders on the conditions contained in this Section 11. Any provision to the contrary contained elsewhere in this Agreement or in any other Transaction Document notwithstanding, the Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the other Transaction Documents, nor shall Agent have or be deemed to have any fiduciary relationship with any Holder, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Transaction Document or otherwise exist against the Agent. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Transaction Documents with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties. Each Holder hereby further authorizes the Collateral Agent to act as the secured party under each of the Transaction Documents that create a Lien on any item of Collateral. Except as expressly otherwise provided in this Agreement, the Agent, to the extent not required to act at the direction of the Required Holders, shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that the Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Transaction Documents. Without limiting the generality of the foregoing, or of any other provision of the Transaction Documents that provides rights or powers to the Collateral Agent or another Agent, as appropriate, the Holders agree that the Collateral Agent shall have the right to exercise the following powers as long as this Agreement remains in effect: (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, payments and proceeds of Collateral, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Transaction Documents, (c) receive, apply, and distribute payments and proceeds of the Collateral or otherwise as provided in the Transaction Documents, (d) open and maintain such bank accounts and cash management arrangements as the Collateral Agent deems necessary and appropriate in accordance with the Transaction Documents for the foregoing purposes, (f) perform, exercise, and enforce any and all other rights and remedies of the Holders with respect to any Transaction Party, the Obligations, the Collateral, or otherwise related to any of same as provided in the Transaction Documents, and (g) incur and pay such fees and expenses as the Collateral Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Transaction Documents.

     **11B.   Delegation of Duties**. Agent may execute any of its duties under this Agreement or any other Transaction Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.

     **11C.   Liability of Agent**. None of the Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Holders for any recital, statement, representation or warranty made by any Transaction Party or

Affiliates, or any officer or director thereof, contained in this Agreement or in any other Transaction Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any other Transaction Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Transaction Document, or for any failure of any Transaction Party or any other party to any Transaction Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Holders to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Transaction Document, or to inspect the books and records or properties of any Transaction Party.

**11D.    Reliance by Agent**. Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Issuer or counsel to any Holder), independent accountants and other experts selected by the Agent. Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Transaction Document unless the Agent shall first receive such advice or concurrence of the Holders or the Required Holders, as appropriate, as it deems appropriate and until such instructions are received, Agent shall act, or refrain from acting, as it deems advisable. If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Holders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Transaction Document in accordance with a request or consent of the Required Holders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Holders.

**11E.    Notice of Default or Event of Default**. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Holders and, except with respect to Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Holder or a Transaction Party referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default" Agent promptly will notify the Holders of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge. If any Holder obtains actual knowledge of any Event of Default, such Holder promptly shall notify the other Holders and Agent of such Event of Default. Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Holders in accordance herewith; provided, that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

**11F.    Credit Decision**. Each Holder acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of any Transaction Party or Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Holder. Each

-57-

Holder represents to Agent that it has, independently and without reliance upon any Agent-Related Person and based on such due diligence, documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of US Holdings and each Transaction Party or any other Person party to a Transaction Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Issuer. Each Holder also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Transaction Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of each Transaction Party or any other Person party to a Transaction Document. Except for notices, reports, and other documents expressly herein required to be furnished to the Holders by Agent, Agent shall not have any duty or responsibility to provide any Holder with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of US Holdings, any Transaction Party or any other Person party to a Transaction Document that may come into the possession of any of the Agent-Related Persons. Each Holder acknowledges that Agent does not have any duty or responsibility, either initially or on a continuing basis (except to the extent, if any, that is expressly specified herein) to provide such Holder with any credit or other information with respect to any Transaction Party, its Affiliates or any of their respective business, legal, financial or other affairs, and irrespective of whether such information came into Agent's or its Affiliates' or representatives' possession before or after the date on which such Holder became a party to this Agreement

   **11G.  Costs and Expenses; Indemnification**. Agent may incur and pay costs expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Transaction Documents, including court costs, attorney's fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not any Transaction Party is obligated to reimburse Agent or Holders for such expenses pursuant to this Agreement or otherwise. Agent is authorized and directed to deduct and retain sufficient amounts from payments or proceeds of the Collateral received by Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Holders. In the event Agent is not reimbursed for such costs and expenses by the Transaction Parties, each Holder hereby agrees that it is and shall be obligated to pay to Agent such Holder's ratable share thereof. Whether or not the transactions contemplated hereby are consummated, each of the Holders, on a ratable basis, shall indemnify and defend the Agent-Related Persons (to the extent not reimbursed by or on behalf of the Issuer and without limiting the obligation of the Issuer or any other Transaction Party to do so) from and against any and all Indemnified Liabilities; provided, that no Holder shall be liable for the payment to any Agent- Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct. Without limitation of the foregoing, each Holder shall reimburse Agent upon demand for such Holder's ratable share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses)

incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement or any other Transaction Document to the extent that Agent is not reimbursed for such expenses by or on behalf of the Issuer. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

**11H.** **Successor Agent.** Agent may resign as Agent upon thirty (30) days (ten (10) days if an Event of Default has occurred and is continuing) prior written notice to the Holders (unless such notice is waived by the Required Holders) and the Issuer (unless such notice is waived by the Issuer). If Agent resigns under this Agreement, the Required Holders shall be entitled, with (so long as no Event of Default has occurred and is continuing) the consent of the Issuer (such consent not to be unreasonably withheld, delayed, or conditioned), appoint a successor Agent for the Holders. If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Holders and the Issuer, a successor Agent. If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Holders may agree in writing to remove and replace Agent with a successor Agent from among the Holders with (so long as no Event of Default has occurred and is continuing) the consent of the Issuer (such consent not to be unreasonably withheld, delayed, or conditioned). In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this <u>Section 15</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor Agent has accepted appointment as Agent by the date which is thirty (30) days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the successor Agent as provided for above.

**11I.** **Collateral Matters.** The Holders hereby irrevocably authorize Agent to release any Lien on any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full of all of the Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if the Issuer certifies to Agent that the sale or disposition is permitted under <u>Paragraph 6B</u> (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which neither US Holdings, any Transaction Party nor any of Subsidiary of a Transaction Party owned any interest at the time Agent's Lien was granted nor at any time thereafter, (iv) constituting property leased or licensed to a Transaction Party under a lease or license that has expired or is terminated in a transaction permitted under this Agreement and to which no Transaction Party has any further interest, or (v) in connection with a credit bid or purchase following an Event of Default or pursuant to the Stalking Horse Agreement. The Holders hereby irrevocably authorize Agent, based solely upon the instruction of the Required Holders, to (a) consent to the sale of, credit bid, or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or (b) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any other sale or foreclosure conducted or consented to by Agent in accordance with applicable law in any judicial action or

proceeding or by the exercise of any legal or equitable remedy.  In connection with any such credit bid or purchase, (i) the Obligations owed to the Holders shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such contingent or unliquidated claims cannot be estimated without impairing or unduly delaying the ability of Agent to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the Collateral that is the subject of such credit bid or purchase) and the Holders whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the Collateral that is the subject of such credit bid or purchase (or in the equity interests of the any entities that are used to consummate such credit bid or purchase), and (ii) Agent, solely based upon the instruction of the Required Holders, may accept non-cash consideration, including debt and equity securities issued by any entities used to consummate such credit bid or purchase and in connection therewith Agent may reduce the Obligations owed to the Holders (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration.  Except as provided above, Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Holders, or (z) otherwise, the Required Holders.

      **11J.**   <u>**Agency for Perfection**</u>.  Agent hereby appoints each other Holder as its agent (and each Holders hereby accepts such appointment) for the purpose of perfecting Agent's Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the Code can be perfected by possession or control.  Should any Holder obtain possession or control of any such Collateral, such Holder shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

      **11K.**   <u>**Payments by Agent to the Holders.**</u>  All payments to be made by Agent to the Holders shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Agent. Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

**12**     **DEFINITIONS; ACCOUNTING MATTERS.**  For the purpose of this Agreement, the terms defined in <u>Paragraph 12A</u> (or within the text of any other paragraph) shall have the respective meanings specified therein and all accounting matters shall be subject to determination as provided in <u>Paragraph 12B</u>.

      **12A.**   **Terms**.

          *"Account"* shall mean, as at any date of determination, all "accounts" (as such term is defined in the UCC) of the Company and its Subsidiaries, including, without limitation, the unpaid portion of the obligation of a customer of the Company or any of

-60-

its Subsidiaries in respect of Inventory purchased by and shipped to such customer and/or the rendition of services by the Company or such Subsidiary, as stated on the respective invoice of the Company or such Subsidiary, net of any credits, rebates or offsets owed to such customer.

*"Acquisition"* shall mean any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of in excess of 50% of the Stock and Stock Equivalents of any Person or otherwise causing any Person to become a Subsidiary of the Company, or (c) a merger or consolidation or any other combination with another Person.

*"Affiliate"* shall mean, with respect to any Person, each officer, director, general partner or joint-venturer of such Person and any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person; *provided, however,* that no Holder shall be an Affiliate of any Transaction Party or of any Subsidiary of any Transaction Party solely by reason of the provisions of the Transaction Documents.  For purposes of this definition, "control" shall mean the possession of either (a) the power to vote, or the beneficial ownership of, 10% or more of the voting Stock of such Person (either directly or through the ownership of Stock Equivalents) or (b) the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

*"Agent"* shall mean Cantor Fitzgerald Securities, in its capacity as an agent for the Holders under the Transaction Documents or any successor in such capacity.

*"Agent-Related Persons"* mean the initial Agent or Collateral Agent and any successor Agent, in each case together with their respective Affiliates, and the officers, directors, employers, agents and attorneys-in-fact for such Persons and such Affiliates.

*"Agent's Fee Letter"* shall mean that certain fee letter dated as of the date hereof between the Issuer and the Collateral Agent.

*"Aggregate Payments"* shall have the meaning given in Paragraph 7B hereof.

*"Agreement"* shall mean this Note Purchase and Guaranty Agreement dated as of the Closing Date, as it may be amended,

-61-

restated, modified, supplemented or revised from time to time in accordance with the terms hereof then in effect

*"Alternative DIP Facility"* shall mean an alternative debtor-in-possession facility, the initial proceeds of which shall be used to refinance in full the Indebtedness outstanding under this Agreement, which shall be on terms and conditions reasonably acceptable to the Required Holders.

*"Alternative DIP Loan Agreement"* shall mean the loan agreement evidencing the Alternative DIP Facility.

*"Applicable Tax"* as defined in Paragraph 6K(5)(b) hereof.

*"Assignment Agreement"* shall mean an assignment agreement substantially in the form of **Exhibit G** hereto.

*"Attorney Costs"* shall mean and includes all reasonable and documented fees and disbursements of any law firm or other external counsel.

*"Bankruptcy Code"* shall mean the Federal Bankruptcy Reform Act of 1978.

*"Bankruptcy Court"* shall mean the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Chapter 11 Cases from time to time.

*"Benefit Plan"* shall mean any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Transaction Party incurs or otherwise has any obligation or liability, contingent or otherwise.

*"Bid Procedures Order"* shall mean an order approving procedures for bidding at an auction regarding a sale of substantially all of the assets of the Company and its Subsidiaries under section 363 of the Bankruptcy Code, in form and substance satisfactory to the Agent and the Required Holders, which order shall not have been appealed, stayed, reversed, vacated, amended or modified.

*"Board of Directors"* shall mean, as to any Person, such Person's board of directors if such Person is a corporation or, if such Person is not a corporation, such other body that holds powers or responsibilities that are comparable to the board of directors of a corporation (whether such body is called a board of directors or some other name), in each case including each committee thereof.

-62-

*"Budget"* shall have the meaning set forth in Section 5B hereof.

*"Budget Covenants"* shall have the meaning set forth in Section 5C hereof.

*"Business Day"* shall mean any day that is not a Saturday, Sunday or a day on which banks are required or authorized to close in New York, New York.

*"Called Principal"* shall mean, at any time, the principal amount (including any and all capitalized interest) of any Note that is to be prepaid at such time in accordance with Paragraph 4B or Paragraph 4E hereof or has become or is declared to be immediately due and payable pursuant to Paragraph 8 hereof.

*"Capital Expenditure Limitation"* as defined in Paragraph 6V(1) hereof.

*"Capital Expenditures"* shall mean, with respect to any Person for any period, the amount of all expenditures by such Person or its Subsidiaries during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed, but excluding without duplication (a) expenditures made during such period in connection with the replacement, substitution or restoration of existing assets or properties in the Ordinary Course of Business, (b) with respect to the purchase price of assets that are purchased substantially contemporaneously with the trade in of existing assets during such period, the amount that the gross amount of such purchase price is reduced by the credit granted by the seller of such assets for the assets being traded in at such time, and (c) expenditures during such period that, pursuant to a written agreement, are reimbursed by a third Person (excluding any Transaction Party or any of its Affiliates).

*"Capital Lease"* shall mean, with respect to any Person, any lease of, or other arrangement conveying the right to use, any Property by such Person as lessee that has been or should be accounted for as a capital lease on a balance sheet of such Person prepared in accordance with GAAP.  Notwithstanding the foregoing, all leases of any Person that are or would be treated as operating leases in accordance with GAAP on the Closing Date (whether or not such operating leases are in effect on the Closing Date) shall continue to be accounted for as operating leases (and not as Capital Leases) for purposes of this Agreement regardless of any change in GAAP following the Closing Date which would otherwise require such leases to be treated as Capital Leases.

-63-

*"Capital Lease Obligations"* shall mean, at any time, with respect to any Capital Lease, any lease entered into as part of any sale leaseback transaction of any Person or any synthetic lease, the amount of all obligations of such Person that is (or that would be, if such synthetic lease or other lease were accounted for as a Capital Lease) capitalized on a balance sheet of such Person prepared in accordance with GAAP.

*"Carve-Out"* has the meaning set forth in the DIP Order.

*"Cash Equivalents"* shall mean (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one (1) year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one (1) year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group or Moody's Investors Service, Inc., (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within one (1) year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $1,000,000,000, (e) deposit accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $1,000,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

-64-

[*"Cash Pooling Arrangements"* shall mean any cash management arrangements permitting the Transaction Parties to combine their credit and debt positions from various accounts into one account.]

*"Change of Control"* shall mean (i) US Holdings ceases to own and control (directly or indirectly) 100% of the issued and outstanding Stock and Stock Equivalents of the Company, free and clear of all Liens, rights, options, warrants or other similar agreements or understandings, other than Permitted Liens (ii) a "Change of Control" or other similar event shall occur, as defined in, or under, the Intercompany DIP Loan Agreement or (iii) the Company shall cease to own and control (directly or indirectly) 100% of the issued and outstanding Stock and Stock Equivalents of its current Subsidiaries, free and clear of all Liens, rights, options, warrants or similar agreements or understandings, other than Permitted Liens; provided that a Change of Control shall not be deemed to have occurred as a result of the consummation of the Sale Transaction as contemplated by the Stalking Horse Agreement.

*"Chapter 11 Cases"* shall mean the chapter 11 cases commenced on [insert] in the United States Bankruptcy Court with respect to the Company and certain of its Subsidiaries.

*"Closing Date"* shall have the meaning set forth in <u>Paragraph 2A</u> hereof.

*"Code"* shall mean the United States Internal Revenue Code of 1986, as amended.

*"Collateral"* shall mean any and all property of the Transaction Parties that secures the Obligations from time to time.

*"Collateral Agent"* shall mean Cantor Fitzgerald Securities, or any successor in such capacity.

*"Company"* shall have the meaning given in the introductory paragraph hereof.

*"Confidential Information"* shall have the meaning set forth in <u>Paragraph 13W</u> hereof.

*"Contingent Obligation"* shall mean, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person: (a) with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability

-65-

will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (c) under any Rate Contracts or other swap agreements (as such term is defined in Section 101 of the Bankruptcy Code); (d) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (e) for the obligations of another Person through any agreement to purchase, repurchase or otherwise acquire such obligation or any Property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another Person. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guarantied or otherwise supported or, if not a fixed and determined amount, the maximum amount so guarantied or supported.

*"Contractual Obligations"* shall mean, as to any Person, any provision of any security (whether in the nature of Stock, Stock Equivalents or otherwise) issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement (other than a Transaction Document) to which such Person is a party or by which it or any of its Property is bound.

*"Contributing Guarantors"* shall have the meaning given in Paragraph 7B hereof.

*"Copyrights"* shall mean (a) all copyrights arising under the laws of the United States, any other country, or union of countries, or any political subdivision of any of the foregoing, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith and rights corresponding thereto throughout the world, including all registrations, recordings and applications in the United States Copyright Office, and (b) all other rights of any kind whatsoever accruing thereunder or pertaining thereto including rights to receivables and royalties from the exploitation thereof.

*"Counterpart Agreement"* shall mean a Counterpart Agreement substantially in the form of **Exhibit F** pursuant to which a Person joins this Agreement as a Guarantor.

-66-

*"Default"* shall mean any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

*"Default Rate"* shall have the meaning given in <u>Paragraph 1B(3)</u> hereof.

*"DIP Loan Documents"* shall mean the Intercompany DIP Loan Agreement and all ancillary and security agreements executed and delivered in connection therewith.

*"DIP Loans"* shall mean the loans advanced to Reichhold Inc. pursuant to this Agreement and the Intercompany DIP Loan Agreement.

*"DIP Order"* shall mean an order (whether interim or final), in form and substance reasonably satisfactory to the Required Holders, entered in the Chapter 11 Cases approving the DIP Loan Documents and the transactions contemplated thereby.

*"Disqualified Institution"* shall mean those Persons that are direct operating company competitors of the Company that are in substantially the same business as the Company; *provided* that no Person a predominant portion of whose business involves banking, insurance, investment banking, broker/dealer, investment or similar activities (including, without limitation, any Person involved in the life insurance business or in the business of the investment of annuities or contributions to pension, retirement, medical or similar plans or arrangements, but excluding Persons a predominant portion of whose business involves private equity or venture capital investing) shall be deemed a competitor of the Company.

*"Disposition"* shall mean (a) the sale, lease, conveyance or other disposition of Property, other than sales or other dispositions expressly permitted under <u>Paragraphs 6B(1)</u>, <u>6B(3)</u>, <u>6B(6)</u>, <u>6B(7)</u> and <u>6B(8)</u> and (b) the sale or transfer by the Company or any Subsidiary of the Company of any Stock or Stock Equivalent issued by any Subsidiary of the Company and held by such transferor Person (other than a sale or transfer of the Stock or Stock Equivalents of a Subsidiary of the Company to the Company or a Subsidiary of the Company that is a Transaction Party.

*"Dollars"*, *"dollars"* and *"$"* each shall mean lawful money of the United States of America.

-67-

*"Dutch NPA"* shall mean that certain Note Purchase Agreement dated as of the Initial Closing Date by and among Reichhold Holdings International B.V., the purchasers party thereto and the collateral agent party thereto.

*"Electronic Transmission"* shall mean each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or other electronic medium approved by the Required Holder(s).

*"Environmental Laws"* shall mean all Requirements of Law and Permits imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the workplace, the environment and natural resources, and including public notification requirements and environmental transfer of ownership, notification or approval statutes.

*"Environmental Liabilities"* shall mean all Liabilities (including costs of Remedial Actions, natural resource damages and costs and expenses of investigation and feasibility studies, including the cost of environmental consultants and Attorneys' Costs) that may be imposed on, incurred by or asserted against any Transaction Party or any Subsidiary of any Transaction Party as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law or in connection with any environmental, health or safety condition or with any Release and resulting from the ownership, lease, sublease or other operation or occupation of property by any Transaction Party or any Subsidiary of any Transaction Party, whether on, prior or after the date hereof.

*"Environmental Notices"* shall mean a notice (whether written or oral) from any Governmental Authority or any other Person of a possible or alleged noncompliance with or liability under any Environmental Laws, including any complaints, citations, demands or requests from any Governmental Authority or any other Person for correction or remediation of any asserted violation of any Environmental Laws or any investigations concerning any asserted violation of any Environmental Laws.

*"ERISA"* shall mean the Employee Retirement Income Security Act of 1974.

*"ERISA Affiliate"* shall mean, collectively, any Transaction Party and any Person that is under common control or treated as a single

employer with, any Transaction Party, within the meaning of Section 414(b), (c), (m) or (o) of the Code.

*"ERISA Event"* shall mean any of the following: (a) a reportable event described in Section 4043(b) of ERISA (or, unless the 30-day notice requirement has been duly waived under the applicable regulations, Section 4043(c) of ERISA) with respect to a Title IV Plan; (b) the withdrawal of any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any ERISA Affiliate from any Multiemployer Plan; (d) with respect to any Multiemployer Plan, the filing of a notice of reorganization, insolvency or termination (or treatment of a plan amendment as termination) under Section 4041A of ERISA; (e) the filing of a notice of intent to terminate a Title IV Plan (or treatment of a plan amendment as termination) under Section 4041 of ERISA; (f) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (g) the failure to make any required contribution to any Title IV Plan or Multiemployer Plan when due; (h) the imposition of a lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of any ERISA Affiliate; (i) a Title IV plan is in "at risk" status within the meaning of Code Section 430(i); (j) a Multiemployer Plan is in "endangered status" or "critical status" within the meaning of Section 432(b) of the Code; and (k) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of any material liability upon any ERISA Affiliate under Title IV of ERISA other than for PBGC premiums due but not delinquent.

*"Event of Default"* shall mean any of the events specified in Paragraph 8A hereof, *provided* that there has been satisfied any requirement in connection with such event for the giving of notice, or the lapse of time, or the happening of any further condition, event or act.

*"Event of Loss"* shall mean, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property; (b) any pending or threatened institution of any proceedings for the condemnation or seizure of such Property or for the exercise of any right of eminent domain; or (c) any actual condemnation, seizure or taking, by exercise of the power of

-69-

eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"*Excess Proceeds*" shall mean any Net Proceeds from any Disposition or Event of Loss in a single transaction or series of transaction in an aggregate amount in excess of $100,000 in any Fiscal Year.

"*Excess Proceeds Prepayment Date*" shall have the meaning given in Paragraph 4F(1) hereof.

"*Excess Proceeds Prepayment Event*" shall have the meaning given in Paragraph 4F(1) hereof.

"*Exchange Act*" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Excluded Taxes*" *shall mean* with respect to each Holder or any other recipient of any payment to be made by or on account of any obligation of the Issuer hereunder, (i) taxes imposed on or measured by its net income or net profit (however denominated), including franchise or similar taxes imposed in lieu of such taxes, by the jurisdiction (or any political subdivision thereof) (a) under the laws of which such recipient is organized or incorporated, (b) in which such recipient's principal office is located or in which it otherwise does business, (c) in the jurisdiction in which such recipient maintains a lending office (or branch) or (d) as a result of any other present or former connection between such recipient and the jurisdiction (or political subdivision thereof) of the taxing authority imposing such Taxes or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such recipient having executed, delivered or performed its obligations or received a payment under, or having been a party to or having enforced, this Agreement or any other Transaction Document in such jurisdiction (or political subdivision thereof)), (ii) any branch profits tax or any similar taxes imposed by any jurisdiction described in clause (i) above or in which the Issuer is located and (iii) any taxes that are imposed by reason of FATCA.

"*Existing Indebtedness*" shall mean (a) that certain Credit Agreement, dated December 19, 2013 by and among Reichhold Holdings International B.V., the other borrowers and guarantors party thereto, GA Capital, LLC as agent, and Apollo Investment Corporation, as lender, as amended from time to time and (b) that certain Credit Agreement, dated October 7, 2005, by and among

-70-

the Issuer, Reichhold Industries Limited and the Company, each as obligors, Bank of America, N.A., as agent and certain lenders party thereto, as amended from time to time.

*"Existing Indenture"* shall mean that Indenture, dated as of May 8, 2012, among Reichhold Industries, Inc. and certain Guarantors named therein and Wells Fargo Bank, National Associate, as trustee and collateral agent.

*"Fair Share"* shall have the meaning given in Paragraph 7B hereof.

*"Fair Share Contribution Amount"* shall have the meaning given in Paragraph 7B hereof.

*"FATCA"* shall mean sections 1471, 1472, 1473 and 1474 of the Code, as of the date of this Agreement (or any amended successor version that is substantively comparable and not materially more onerous to comply with), current or future United States Treasury Regulations promulgated thereunder and published guidance with respect thereto, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any intergovernmental agreements entered into thereunder.

*"Federal Flood Insurance"* shall mean federally backed Flood Insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program.

*"Federal Reserve Board"* shall mean the Board of Governors of the Federal Reserve System, or any entity succeeding to any of its principal functions.

*"FEMA"* shall mean the Federal Emergency Management Agency, a component of the U.S. Department of Homeland Security that administers the National Flood Insurance Program.

*"Final DIP Order"* means a Final DIP Order entered by the Bankruptcy Court in substantially the form of the Interim DIP Order or otherwise in form and substance satisfactory to the Agent and the Required Holders, which approves this Agreement and the DIP Loan Documents on a final basis (as such order may be amended, modified or extended in a manner reasonably satisfactory to the Agent and the Required Holders).

-71-

*"Fiscal Quarter"* shall mean any of the quarterly accounting periods of the Transaction Parties ending on March 31, June 30, September 30 and December 31 of each year.

*"Fiscal Year"* shall mean any of the annual accounting periods of the Transaction Parties ending on December 31 of each year.

*"Flood Insurance"* shall mean, for any Real Estate located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance that (a) meets the requirements set forth by FEMA in its Mandatory Purchase of Flood Insurance Guidelines and (b) shall be in an amount equal to the lesser of (i) the replacement value of the Real Estate and (ii) the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by the Required Holder(s), with deductibles not to exceed $50,000.

*"Funding Guarantor"* shall have the meaning given in Paragraph 7B hereof.

*"GAAP"* shall mean generally accepted accounting principles in the United States of America, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions and comparable stature and authority within the accounting profession) that are applicable to the circumstances as of the date of determination. Subject to Paragraph 13B, all references to "GAAP" shall be to GAAP applied consistently with the principles used in the preparation of the financial statements described in Paragraph 9K(1).

*"Governmental Authority"* shall mean any nation, sovereign or government, any state or other political subdivision thereof, any agency, authority or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including any central bank, regulatory body, supra-national entity (including the SEC and European Union and the European Central Bank) and any self-regulatory organization (including the National Association of Insurance Commissioners).

*"Guaranteed Obligations"* shall have the meaning given in Paragraph 7A hereof.

*"Guarantor"* shall have the meaning given in Paragraph 1A(2) hereof.

*"Guaranty"* shall mean the guaranty of each Guarantor set forth in
<u>Paragraph 7</u>.

*"Hazardous Material"* shall mean any substance, material or
waste that is classified, regulated or otherwise characterized under
any Environmental Law as hazardous, toxic, a contaminant or a
pollutant or by other words of similar meaning or regulatory effect,
including without limitation, petroleum or any fraction thereof,
asbestos, polychlorinated biphenyls and radioactive substances.

*"Holder"* shall mean a Person that is a holder of a Note in such
capacity.

*"Holder Group"* shall mean each of the Holders and Agent, or any
one or more of them.

*"Indebtedness"* of any Person shall mean, without duplication: (a)
all indebtedness for borrowed money; (b) all obligations issued,
undertaken or assumed as the deferred purchase price of Property
or services, including earnouts (to the extent actually earned and
valued in accordance with GAAP) (other than trade payables and
expenses entered into or incurred in the Ordinary Course of
Business); (c) the face amount of all letters of credit issued for the
account of such Person and without duplication, all drafts drawn
thereunder and all reimbursement or payment obligations with
respect to letters of credit, surety bonds and other similar
instruments issued by such Person; (d) all obligations evidenced by
notes, bonds, debentures or similar instruments, including
obligations so evidenced incurred in connection with the
acquisition of Property, assets or businesses; (e) all indebtedness
created or arising under any conditional sale or other title retention
agreement, or incurred as financing, in either case with respect to
Property acquired by such Person (even though the rights and
remedies of the seller or lender under such agreement in the event
of default are limited to repossession or sale of such Property); (f)
all Capital Lease Obligations; (g) the principal balance outstanding
under any synthetic lease, off-balance sheet loan or similar off
balance sheet financing product; (h) all obligations, whether or not
contingent, to purchase, redeem, retire, defease or otherwise
acquire for value any of its own Stock or Stock Equivalents (or any
Stock or Stock Equivalent of a direct or indirect parent entity
thereof) prior to the date that is 180 days after the Maturity Date,
valued at, in the case of redeemable preferred Stock, the greater of
the voluntary liquidation preference and the involuntary liquidation
preference of such Stock plus accrued and unpaid dividends; (i) all
indebtedness referred to in clauses (a) through (h) above secured
by (or for which the holder of such Indebtedness has an existing

-73-

right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; and (j) all Contingent Obligations described in clause (a) of the definition thereof in respect of indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above.  The amount of Indebtedness of any Person for purposes of clause (i) where no such Indebtedness has been expressly assumed by such Person shall be deemed to be equal to the lesser of (x) the aggregate unpaid amount of such Indebtedness and (y) the fair market value of the property encumbered thereby as determined by such Person in good faith.  Notwithstanding the foregoing, "Indebtedness" shall not include purchase price holdbacks arising in the Ordinary Course of Business in respect of a portion of the purchase price of an asset to satisfy unperformed obligations of the seller of such asset.

*"Indemnified Liabilities"* shall have the meaning set forth in Paragraph 13B(4) hereof.

*"Indemnitees"* shall have the meaning set forth in Paragraph 13B hereof.

*"Initial Budget"* shall have the meaning in Section 5B hereof.

*"Insolvency Proceeding"* shall mean (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (b) any general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case in (a) and (b) above, undertaken under U.S. federal, state or foreign law, including the Bankruptcy Code.

*"Intellectual Property"* shall mean all (a) Trademarks; (b) Patents and other discoveries, whether patentable or not; (c) Trade Secrets; (d) Copyrights and (e) any other similar intellectual property or proprietary rights.

*"Intercompany DIP Loan Agreement"* shall mean that certain Secured Promissory Note dated the date hereof issued by Reichhold, Inc. in favor of Reichhold Holdings International B.V.

*"Intercompany IP License Agreement"* shall mean that certain Intra-group Intellectual Property License Agreement, entered into

-74-

as of [●], 2014, by and among Reichhold Holdings Luxembourg S.a.r.l., a company organized under the laws of Luxembourg; Reichhold Investments B.V., a company organized under the laws of the Netherlands; Reichhold, Inc., a Delaware corporation (formerly named Reichhold Chemicals, Inc.); Reichhold Industries Ltd, a corporation originally incorporated under the laws of Ontario, Canada and continued under the laws of British Columbia, Canada; Reichhold Quimica de Mexico S.A. de C.V. a corporation organized under the laws of Mexico; Reichhold, Inc. (Panama) a corporation organized under the laws of Panama and having a branch in Jebel Ali Free Trade Zone, Dubai, United Arab Emirates; Reichhold do Brasil, Ltda, a corporation organized under the laws of Brazil; Reichhold Trading (Beijing) Ltd. a corporation organized under the laws of China; Reichhold Polymers (Tianjin) Ltd, a corporation organized under the laws of China; Reichhold India Private Ltd. a corporation organized under the laws of India; Reichhold S.r.l. a corporation organized under the laws of Italy; Reichhold UK Limited, a corporation organized under the laws of the United Kingdom; Reichhold S.A.S. a corporation organized under the laws of France; and Reichhold AS, a corporation organized under the laws of Norway.

*"Interest Payment Date"* shall have the meaning given in Paragraph 1B(2) hereof.

*"Interim DIP Order"* means an order entered by the Bankruptcy Court approving this Agreement and the DIP Loan Documents on an interim basis under the Code, in substantially the form satisfactory to the DIP Agent and the Required Holders (as such order may be amended, modified or extended in a manner satisfactory to the DIP Agent and the Required Holders).

*"Inventory"* shall mean all of the "inventory" (as such term is defined in the UCC) of the Company and its Subsidiaries, including, but not limited to, all merchandise, raw materials, parts, supplies, work in process and finished goods intended for sale, together with all the containers, packing, packaging, shipping and similar materials related thereto, and including such inventory as is temporarily out of the Company's or such Subsidiary's custody or possession, including inventory on the premises of others and items in transit.

*"Investment"* shall have the meaning given in Paragraph 6D hereof.

*"IRS"* shall mean the Internal Revenue Service of the United States and any successor thereto.

-75-

*"Junior DIP Loans"* shall mean the loans advanced by Reichhold Holdings International B.V to Reichhold Inc. pursuant to the Intercompany DIP Loan Agreement.

*"Liabilities"* shall mean all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses (including without limitation, those incurred upon any appeal or in connection with the preparation for and/or response to any subpoena or request for document production relating thereto), in each case of any kind or nature (including interest accrued thereon or as a result thereof and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

*"Lien"* shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, license, lien (statutory or otherwise), easement, right of way or other encumbrance on title to real property, security interest or other security arrangement and any other preference, priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

*"Management and Technical Services Agreements"* shall mean various services agreements and any amendments, modifications or supplements thereto with respect to general management, finance, accounting, treasury, tax, business development, finance, legal and risk management, information technology and related areas entered into from time to time by the Company and/or its subsidiaries or affiliates, including, without limitation, that certain (a) U.S. Service Agreement for Management Services by and between Reichhold, Inc. and Reichhold Management, Inc., Reichhold Holdings US, Inc. and Reichhold Industries, Inc.; (b) Business Support Agreement by and between Reichhold, Inc. and Reichhold India Pvt. Ltd.; (c) Technical Assistance Agreement by and between Reichhold, Inc. and Reichhold India Pvt. Ltd.; (d) Management Services Agreement by and between Reichhold, Inc. and Reichhold Quimica de Mexico S.A. de C.V.; (e) Management Services Agreement by and between certain members of the Reichhold Group; and (f) any other similar agreement, in each case as may be amended, modified or supplemented from time to time.

*"Margin Stock"* shall mean "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

*"Material Adverse Effect"* shall mean an effect that results in or causes, or could reasonably be expected to result in or cause, a material adverse change in any of (a) the financial condition, business, performance, operations or Property of the Company and its Subsidiaries, or US Holdings and its Subsidiaries, in either case, taken as a whole; (b) the ability of any Transaction Party, any Subsidiary of any Transaction Party or any other Person (other than a Holder) to perform its obligations under any Transaction Document or any DIP Loan Document; or (c) the validity or enforceability of any Transaction Document or any DIP Loan Document or the rights and remedies of the Holders under any Transaction Document or DIP Loan Document.

*"Material Agreements"* shall mean those agreements identified on Schedule 12A-3 or any agreements which replace, modify or supercede such agreements.

*"Material Environmental Liabilities"* shall mean Environmental Liabilities exceeding $1,000,000 in the aggregate.

*"Material Intellectual Property"* shall mean all Intellectual Property that is material to a Transaction Party's business.

*"Maturity Date"* shall mean February 27, 2015.

*"Mortgaged Real Estate"* shall mean any parcel (or parcels operated together) of Real Estate owned in fee by the Company and having a fair market value (on a per-property basis) of at least $[_____] as of the Closing Date, as reasonably determined by the Agent. A list of the Mortgaged Real Estate is annexed hereto as Schedule [____].

*"Moody's"* shall mean Moody's Investors Service, Inc.

*"Multiemployer Plan"* shall mean any multiemployer plan, as defined in Section 3(37) or 4001(a)(3) of ERISA, as to which any ERISA Affiliate incurs liability or otherwise has any obligation to contribute.

*"National Flood Insurance Program"* shall mean the program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in

-77-

participating communities and provides protection to property owners through a federal insurance program.

*"Net Proceeds"* shall mean proceeds in cash, checks or other cash equivalent financial instruments (including Cash Equivalents) as and when received by the Person making a Disposition, as well as insurance proceeds and condemnation and similar awards received on account of an Event of Loss, net of: (a) in the event of a Disposition (i) the direct costs relating to such Disposition (including brokers' fees or commissions, legal, accounting and other professional and transactional fees) excluding amounts payable to the Company or any Affiliate of the Company; (ii) sale, use or other transaction taxes paid or payable as a result thereof and the Company's good faith estimate of income or gains taxes as a result of any gain recognized in connection with such asset sale or other disposition during the tax period in which the sale occurs (after taking into account any available tax credits or deductions and any tax-sharing arrangements) and amounts provided as a reserve, in accordance with GAAP, against any liabilities under any indemnification obligations associated with such Disposition; *provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Proceeds; and (iii) amounts required to be applied to repay principal, interest and penalties on Indebtedness secured by a senior Permitted Lien on the asset which is the subject of such Disposition and (b) in the event of an Event of Loss, (i) all money actually applied to repair or reconstruct the damaged Property or Property affected by the condemnation or taking, (ii) all of the costs and expenses reasonably incurred in connection with the collection of such proceeds, award or other payments, and (iii) any amounts retained by or paid to parties having superior rights to such proceeds, awards or other payments.

*"Non-US Holder"* shall have the meaning given in Paragraph 4D(6) hereof.

*"Notes"* shall have the meaning given in Paragraph 1A(1) hereof.

*"Notice of Issuance"* shall have the meaning set forth in Paragraph 2B hereof.

*"Obligations"* shall mean the Notes and all other Indebtedness, advances, debts, liabilities, obligations, covenants and duties owing by any Transaction Party to any Holder, Agent or any other Person required to be indemnified, that arises under any Transaction Document, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty,

-78-

indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired, or whether or not allowed in any bankruptcy or similar proceeding.

*"Obligee Guarantor"* shall have the meaning given in <u>Paragraph 7B</u> hereof.

*"Officer's Certificate"* of any Person, shall mean a certificate signed in the name of such Person by its Chief Executive Officer, its Chief Financial Officer, its Controller, its President, one of its Vice Presidents or its Treasurer.  Unless the context otherwise clearly requires, any reference to an "Officer's Certificate" is a reference to an Officer's Certificate of the Issuer.

*"Ordinary Course of Business"* shall mean, in respect of any transaction involving any Person, the ordinary course of such Person's business, as conducted by any such Person (and subject to <u>Paragraph 6L</u> hereof in the case of a Transaction Party or Subsidiary thereof) and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Transaction Document.

*"Organization Documents"* shall mean, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation, and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

*"Other Taxes"* shall have the meaning given in <u>Paragraph 4D(2)</u> hereof.

*"Parent Guarantor"* shall mean US Holdings.

*"Patents"* shall mean (a) all letters patent of the United States, or any other country, all registrations and recordings thereof, all applications for letters patent of the United States or any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office

-79-

or agency of the United States, any State of Territory thereof, or any other country and all patentable inventions and improvements described and claimed in any of the foregoing, (b) all reissues, continuations, continuations-in-part, divisions, renewals, or extensions thereof and all amendments and supplements thereto and improvements thereon, and (c) including in the case of each of (a) and (b), all rights corresponding thereto in the United States and in every other country, including the right to make, use, lease, license, sell and otherwise transfer the technology or inventions disclosed therein, all income and proceeds thereof and all license royalties and proceeds of infringement suits.

*"Patriot Act"* shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56.

*"PBGC"* shall mean the United States Pension Benefit Guaranty Corporation and any successor thereto.

[*"Perfection Certificate"* shall mean a certificate in substantially the form attached hereto as Exhibit -.][6]

*"Permits"* shall mean, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

*"Permitted Lien"* shall have the meaning given in <u>Paragraph 6A</u> hereof.

*"Permitted Refinancing"* shall mean Indebtedness constituting a refinancing or extension of Indebtedness permitted under <u>Paragraph 6E(3)</u>, <u>(4)</u>, or <u>(7)</u> that (a) has an aggregate outstanding principal amount not greater than the aggregate principal amount of the Indebtedness being refinanced or extended plus applicable fees and expenses of the transaction, plus reasonable fees, expenses and premiums payable in connection with such refinancing, (b) has a weighted average maturity (measured as of the date of such refinancing or extension) and maturity no shorter than that of the Indebtedness being refinanced or extended, (c) is not entered into as part of a sale leaseback transaction, (d) is not secured by a Lien on any assets other than the collateral securing

---

[6] To discuss as post-closing obligation.

the Indebtedness being refinanced or extended, (e) the obligors of which are the same as the obligors of the Indebtedness being refinanced or extended and (f) is otherwise on terms no less favorable to the Transaction Parties and their Subsidiaries, taken as a whole, than those of the Indebtedness being refinanced or extended.

*"Permitted Transferee"* means (1) any Holder and (2) with respect to any Holder which is a trust, partnership, limited partnership, corporation or limited liability company (i) any entity that controls, or is controlled by, or is under common control with such Holder, or any Holder from any entity that controls, or is controlled by, or is under common control with such Holder and (ii) the record owners of such Holder, if any, or the beneficiaries of such Holder as a distribution pursuant to law, the governing instrument or charter of such Holder, or the dissolution of such Holder.

*"Person"* shall mean any individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Governmental Authority.

*"Petition Date"* shall mean September __, 2014.

*"PIK Interest"* shall have the meaning given in <u>Paragraph 1B(1)</u> hereof.

 *"Property"* shall mean any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

*"Proposed Prepayment Date"* shall have the meaning given in <u>Paragraph 4E(3)</u> hereof.

*"Purchasers"* shall have the meaning given in the introductory paragraph hereof.

*"Rate Contracts"* shall mean swap agreements (as such term is defined in Section 101 of the Bankruptcy Code) and any other agreements or arrangements designed to provide protection against fluctuations in interest rates.

*"Real Estate"* shall mean any real property owned, leased, subleased, licensed or sublicensed by any Transaction Party or any Subsidiary of any Transaction Party.

*"Related Persons"* shall mean, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor (including those retained in connection with the satisfaction or attempted satisfaction of any condition set forth in <u>Paragraph 3</u>) and other consultants and agents of or to such Person or any of its Affiliates.

*"Release"* shall mean a release as defined in CERCLA or any other applicable Environmental Laws.

*"Remedial Action"* shall mean all actions required to (a) clean up, remove, treat or in any other way address any Hazardous Material in the indoor or outdoor environment, (b) prevent or minimize any Release so that a Hazardous Material does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre remedial studies and investigations and post-remedial monitoring and care with respect to any Hazardous Material.

*"Required Holder(s)"* shall mean the Holder or Holders of more than 50.0% of the aggregate principal amount of the Notes from time to time outstanding.

*"Requirement of Law"* shall mean, with respect to any Person, the common law and any federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

*"Responsible Officer"* shall mean the chief executive officer or the president of the Issuer or US Holdings, as the case may be, or any other officer having substantially the same authority and responsibility; or, with respect to compliance with financial covenants or delivery of financial information, the chief financial officer or the treasurer of the Issuer or US Holdings, as the case may be, or any other officer having substantially the same authority and responsibility.

-82-

*"Restricted Payments"* shall have the meaning given in <u>Paragraph 6K</u> hereof.

*"Relevant Jurisdiction"* shall mean in respect of any Transaction Party incorporated or organized in a jurisdiction outside the United State, the jurisdiction of incorporation or organization of such Transaction Party.

*"Sale Documents"* shall mean the Stalking Horse Agreement, the Transition Services Agreement, the Intercompany IP License Agreement and the other agreements, documents, certificates and instruments now or hereafter executed or delivered by any Transaction Party or any Subsidiary or Affiliate of a Transaction Party in connection with any of the foregoing.

*"Sale Motion"* shall mean a motion in form and substance reasonably acceptable to the Required Holders which seeks authority to conduct a sales process under section 363 of the Bankruptcy Code for the assets of the Company and its Subsidiaries as contemplated by the Sale Documents (subject to higher and better offers).

*"Sale Transaction"* the sale of all or substantially all of the assets of the Company and its Subsidiaries as contemplated by the Sale Motion.

*"S&P"* shall mean Standard & Poor's Ratings Services.

*"SDN List"* shall have the meaning given in <u>Paragraph 9AA</u> hereof.

*"SEC" shall mean* the United States Securities and Exchange Commission.

*"Securities Act" shall mean* the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

*"Security Agreement"* shall mean Guaranty and Security Agreement, dated as of _____, 2014, among Reichhold, Inc., certain other grantors party thereto and Cantor Fitzgerald Securities, as Collateral Agent.

*"Senior Secured Notes"* shall mean those certain Senior Secured Notes due 2017 issued pursuant to the Existing Indenture.

*"Software"* shall mean (a) all computer programs, including source code and object code versions, (b) all data, databases and

-83-

compilations of data, whether machine readable or otherwise, and (c) all documentation, training materials and configurations related to any of the foregoing.

*"Special Flood Hazard Area"* shall mean an area that FEMA's current flood maps indicate has at least a 1% chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

*"Stalking Horse Agreement"* shall mean an asset purchase agreement in form and substance reasonably acceptable to the Required Holders which provides for the purchase by Reichhold Holdings International B.V. of substantially all of the assets of the Company and its Subsidiaries through, among other things, a credit bid of the DIP Loans advanced under the Intercompany DIP Loan Agreement.; *provided, however* that the Required Holders may alternatively provide for the purchase of substantially all of the assets of Reichhold US and its Subsidiaries through a credit bid of the Notes.

*"Stock"* shall mean all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

*"Stock Equivalents"* shall mean all securities convertible into or exchangeable for Stock or any other Stock Equivalent and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Stock or any other Stock Equivalent, whether or not presently convertible, exchangeable or exercisable.

*"Subordinated Indebtedness"* shall mean any Indebtedness of any Transaction Party or any Subsidiary of any Transaction Party which is subordinated to the Obligations as to right and time of payment and as to other rights and remedies thereunder and having such other terms as are, in each case, reasonably satisfactory to the Required Holder(s).

*"Subsequent Closing Date"* shall have the meaning set forth in Paragraph 2B hereof.

*"Subsidiary"* shall mean, with respect to any Person, any corporation, partnership, joint venture, limited liability company, association or other entity, the management of which is, directly or indirectly, controlled by, or of which an aggregate of more than

-84-

50% of the voting Stock is, at the time, owned directly or indirectly by, such Person or one or more Subsidiaries of such Person.

*"Superpriority Claim"* shall mean a claim against a US Debtor in any of the Chapter 11 Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c) and/or 726 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other nonconsensual Lien, levy or attachment.

*"Tax Affiliate"* shall mean, (a) the Company and its Subsidiaries and (b) any Affiliate of the Company with which the Company files or is eligible to file consolidated, combined or unitary tax returns.

*"Tax Distributions"* as defined in Paragraph 6K(5) hereof.

*"Tax Returns"* shall have the meaning set forth in Paragraph 9J hereof.

*"Tax"* or *"Taxes" shall mean* any and all present or future taxes, levies, imposts, deductions, charges, liabilities or withholdings imposed by any Governmental Authority, including interest, penalties and additions to tax with respect thereto, other than Excluded Taxes and Other Taxes.

*"Title IV Plan"* shall mean a pension plan subject to Title IV of ERISA, other than a Multiemployer Plan, to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

*"Trade Secrets"* shall mean (a) all trade secrets and all other confidential or proprietary information and know-how including rights in drawings, formulae, schematics, designs, plans, processes, supplier lists, customer lists, business plans, databases, business methods and prototypes now or hereafter owned or used in the business of an entity throughout the world (all of the foregoing being collectively called a "Trade Secret"), whether or not such Trade Secret has been reduced to a writing or other tangible form, and (b) the right to sue for past, present and future infringement of any Trade Secret, and all proceeds of the foregoing, including royalties, income, payments, claims, damages, and proceeds of suit.

-85-

*"Trademark"* shall mean all United States, state and foreign trademarks, trade names, corporate names, company names, business names, domain names, fictitious business names, trade dress, service marks, certification marks, collective marks, logos, all indicators of the source of goods or services and all registrations and applications for any of the foregoing, all extensions or renewals of any of the foregoing, all of the goodwill of the business connected with the use of and symbolized by the foregoing, the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill, and all proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages, and proceeds of suit.

*"Transaction Documents"* shall mean this Agreement, the Notes, any Counterpart Agreement, the Security Agreement, the Intercompany IP License Agreement, the Transition Services Agreement and the other agreements, documents, certificates and instruments now or hereafter executed or delivered by any Transaction Party or any Subsidiary or Affiliate of a Transaction Party in connection with any of the foregoing.

*"Transaction Parties"* "or *"Transaction Party"* shall mean the Issuer, the Company and each other Person which becomes a Guarantor (other than US Holdings).

*"Transactions"* shall mean transactions contemplated by this Agreement, the other Transaction Documents, the DIP Loan Documents and the Sale Documents.

*"Transferee"* shall mean any direct or indirect transferee of all or any part of any Note purchased by any Purchaser under this Agreement.

*"Transition Services Agreement"* shall mean a transition services agreement between the Company and Reichhold Holdings International B.V. in form and substance reasonably acceptable to the Required Holders.

*"UCC"* shall mean the Uniform Commercial Code of any applicable jurisdiction and, if the applicable jurisdiction shall not have any Uniform Commercial Code, the Uniform Commercial Code as in effect from time to time in the State of New York.

*"United States"* and *"U.S."* each means the United States of America.

*"US Debtors"* shall mean each of the Subsidiaries of US Holdings that is a debtor in the Chapter 11 Cases.

*"US Holder"* shall have the meaning given in <u>Paragraph 4D(6)</u> hereof.

*"US Holdings"* shall have the meaning given in the introductory paragraph hereof.

*"VAT"* shall mean (a) any tax imposed in compliance with the Council Directive of November 28, 2006 on the common system of value added tax (EC Directive 2006/112) and (b) any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to such tax referred to in paragraph (a) above, or imposed elsewhere.

*"Wholly-Owned Subsidiary"* of a Person means any Subsidiary of such Person, all of the Stock and Stock Equivalents of which (other than directors' qualifying shares required by law) are owned by such Person, either directly or through one or more Wholly-Owned Subsidiaries of such Person.

**12B.   Accounting Terms and Determinations; Interpretation.**   All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP.  If any change in GAAP results in a change in the calculation of the financial covenants or interpretation of related provisions of this Agreement, then the Issuer and the Holders agree to amend such provisions of this Agreement so as to equitably reflect such changes in GAAP with the desired result that the criteria for evaluating the Company's financial condition shall be the same after such change in GAAP as if such change had not been made, *provided,* that, until such time as the financial covenants and the related provisions of this Agreement have been amended in accordance with the terms of this <u>Paragraph 13B</u>, the calculations of financial covenants and the interpretation of any related provisions shall be calculated and interpreted in accordance with GAAP as in effect immediately prior to such change in GAAP.

## 13      MISCELLANEOUS.

**13A.   Note Payments.**   The Issuer agrees that, so long as any Purchaser shall hold any Note, it will make payments of principal of, and interest on such Note, which comply with the terms of this Agreement, by wire transfer of immediately available funds for credit (not later than 1:00 p.m., prevailing New York, New York time, on the date due) to such Purchaser's account or accounts as specified in the Purchaser Schedule attached hereto, or such other account or accounts in the United States as such Purchaser may designate in writing, notwithstanding any contrary provision herein or in any Note with respect to the place of payment.[7]  Each Purchaser agrees that, before disposing of any Note, such Purchaser will make a notation thereon (or on a schedule attached thereto) of all principal payments previously made thereon and of the date to which interest thereon has been paid.  The Issuer agrees to afford the benefits of this <u>Paragraph</u>

---

[7] Consider need for Paying Agent.

52719/0001-11044714v1

13A to any Transferee which shall have made the same agreement as each Purchaser has made in this Paragraph 13A.

**13B.   Expenses; Indemnification; Limitation of Liability.**   Whether or not the transactions contemplated hereby shall be consummated, the Issuer agrees to pay, and indemnify and save the Collateral Agent, any paying agent, each Purchaser, Holder and Transferee (and their respective owners, officers, directors, trustees, employees, Affiliates and agents (collectively, **"Indemnitees"**)) harmless against liability for:

(1)      (a) all stamp and documentary taxes and similar charges, (b) all reasonable business due diligence expenses (including travel expenses) and (c) without limiting any other provision of this Paragraph 13B, all reasonable transportation, duplication, search, filing and recording and other out-of-pocket fees and expenses, in each case arising in connection with this Agreement or any of the other Transaction Documents, the DIP Loan Documents or the Sale Documents;

(2)      all reasonable and documented out-of-pocket fees and expenses of counsel and other advisors incurred in connection with any of the Transaction Documents, the DIP Loan Documents or the Sale Documents including in respect of the (a) preparation, negotiation, execution, delivery and administration of any Transaction Document whether or not the transactions contemplated thereby are consummated, (b) any proposed waiver, amendment, supplement or other modification of, or proposed consent under, any Transaction Document, the DIP Loan Documents or the Sale Documents whether or not such proposed action shall be effected or granted, (c) termination of any Transaction Document or any rights thereunder and payment of any obligations due thereunder, (d) responding to any subpoena or other legal process or informal investigative demand issued in connection with any Transaction Document, the DIP Loan Documents or the Sale Documents and (e) any judgment, liability, claim, order, decree, cost, fee, expense, action or obligation resulting from the consummation of the transactions contemplated hereby (including the use of the proceeds of the Notes) or any other Transaction Document, the DIP Loan Documents or the Sale Documents;

(3)      all documented costs and expenses of the Collateral Agent, any paying agent or any Holder in connection with the enforcement of this Agreement (including this Paragraph) and each other Transaction Document (including in connection with any "workout", restructuring or similar situation), whether or not in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, all fees and expenses of counsel and financial consultants) or with respect to advising any Holder as to its rights and responsibilities, or the protection or preservation of rights or interests, under any Transaction Document or with respect to negotiations thereunder arising out of any Default or Event of Default or any events or circumstances that may give rise to or constitute a Default or Event of Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto; and

-88-

(4)        any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, interest and penalties with respect thereto and out-of-pocket expenses and the fees and disbursements of counsel for such Indemnitees in connection with any investigative, administrative or judicial proceedings, whether or not such Indemnitees shall be designated a party thereto), whether absolute, accrued, conditional or otherwise and whether or not resulting from third party claims, which may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (a) any of the Transaction Documents, the Sale Documents, the DIP Loan Documents or any other matter related thereto or in connection therewith, (b) the agreement by each Purchaser to purchase the Notes or the use or intended use of the proceeds of the sale of the Notes, (c) any actual or alleged violation of any law (including Environmental Laws) by the Issuer or any Affiliates thereof, or (d) any Hazardous Materials (i) present on or under any real property owned, leased or used, at any time, by any Transaction Party or any of its Subsidiaries, (ii) released from or onto any such Property, or (iii) generated by any Transaction Party or any of its Subsidiaries (collectively, the "**Indemnified Liabilities**"); *provided, however,* that the Issuer shall not have any obligation to an Indemnitee hereunder with respect to Indemnified Liabilities to the extent such Indemnified Liabilities (x) are determined by a court of competent jurisdiction in a final and nonappealable judgment to have resulted primarily from the bad faith, gross negligence or willful misconduct of such Indemnitee or its Related Persons or material breach of this Agreement by that Indemnitee or its Related Persons; *provided, further, that* **WITHOUT LIMITING ANY OF THE FOREGOING, THE INDEMNITY HEREUNDER SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.** This Paragraph 13B(4) shall not apply with respect to taxes other than taxes that represent losses, claims, damages, etc. arising from any non-tax claim.

To the fullest extent permitted by applicable law, the Issuer shall not assert, and the Issuer hereby waives (and shall cause each of its Subsidiaries and Affiliates not to assert and to waive), any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages arising out of, in connection with, or as a result of, this Agreement, any other Transaction Document, the use of the proceeds of any Notes or any other Transaction Document or the Sale Document.

The obligations of the Issuer under this Paragraph shall survive the transfer of any Note or portion thereof or interest therein by any Purchaser or Transferee and the payment of any Note. All payments required under the terms of this Paragraph to be made to, or for the benefit of, any Indemnitee shall be due and payable in full promptly upon any demand therefor by such Indemnitee.

**13C.    Consent to Amendments.** This Agreement may be amended, and the Issuer may take any action herein prohibited, or omit to perform any act herein required to be performed by it, if the Issuer shall obtain the written consent to such amendment, action or omission to act, of

-89-

the Required Holder(s) except that, (1) without the written consent of the Issuer and each Holder or Holders of all Notes at the time outstanding, no amendment to this Agreement shall change the maturity of any Note, or change the principal of, or the rate or time of payment of interest on any Note, or affect the time, amount or allocation of any prepayments, or change the proportion of the principal amount of the Notes required with respect to any consent, amendment, waiver or declaration and (2) without the written consent of the Issuer and each Holder affected thereby, no amendment to this Agreement shall amend this <u>Paragraph 13C</u>. Each Holder of any Note at the time or thereafter outstanding shall be bound by any consent authorized by this <u>Paragraph 13C</u>, whether or not such Note shall have been marked to indicate such consent, but any Notes issued thereafter may bear a notation referring to any such consent. No course of dealing between the Issuer and any Holder nor any delay in exercising any rights hereunder or under any Note shall operate as a waiver of any rights of any Holder. As used herein and in the Notes, the term "this Agreement" and references thereto shall mean this Agreement as it may from time to time be amended or supplemented.

**13D.    Form, Transfer and Exchange of Notes; Lost Notes.**  The Notes are issuable in denominations of at least $100,000, except as may be necessary to (i) reflect any principal amount not evenly divisible by $100,000 or (ii) enable the transfer by a Holder of its entire holding of Notes; *provided, however*, that no such minimum denomination shall apply to Notes issued upon transfer by any Holder of the Notes to any other entity or group of Affiliates with respect to which the Notes so issued or transferred shall be managed by a single entity. The Issuer shall keep at its principal office a register in which the Issuer shall provide for the registration of Notes and of transfers of Notes. Except during the occurrence and continuation of any Event of Default, any transfer by any Holder of all or any portion of its Notes shall be subject to the prior written consent of the Issuer, not to be unreasonably withheld or delayed; *provided,* that (1) the foregoing consent requirement shall not apply to (i) transfers to Permitted Transferees, (ii) transfers as required by applicable law and (iii) pledges of the Notes to secure Indebtedness of a Holder and (2) the Issuer shall be deemed to have consented to a transfer of Notes if the Issuer has failed to respond to a request for such consent within 10 Business Days. Notwithstanding the preceding sentence, the Notes may not be transferred to a Disqualified Institution. The Notes may be transferred upon surrender for registration of transfer of such Note at the principal office of the Issuer and the Issuer shall, at its expense, execute and deliver one or more new Notes of like tenor and of a like aggregate principal amount, registered in the name of such transferee or transferees. At the option of the Holder of any Note, such Note may be exchanged for other Notes of like tenor and of any authorized denominations, of a like aggregate principal amount, upon surrender of the Note to be exchanged at the principal office of the Issuer. Whenever any Notes are so surrendered for exchange, the Issuer shall, at its expense, execute and deliver the Notes which the Holder making the exchange is entitled to receive. Every Note surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer duly executed, by the Holder of such Note or such Holder's attorney duly authorized in writing. Any Note or Notes issued in exchange for any Note or upon transfer thereof shall carry the rights to unpaid interest and interest to accrue which were carried by the Note so exchanged or transferred, so that neither gain nor loss of interest shall result from any such transfer or exchange. Upon receipt of written notice from the Holder of any Note of the loss, theft, destruction or mutilation of such Note and, in the case of any such loss, theft or destruction, upon receipt of such Holder's unsecured indemnity agreement, or in the case of any such mutilation upon surrender and cancellation of such Note,

-90-

the Issuer will make and deliver a new Note, of like tenor, in lieu of the lost, stolen, destroyed or mutilated Note.

**13E.  Persons Deemed Owners.**  Prior to due presentment for registration of transfer, the Issuer may treat the Person in whose name any Note is registered as the owner and holder of such Note for the purpose of receiving payment of principal of, and interest on, such Note and for all other purposes whatsoever, whether or not such Note shall be overdue, and the Issuer shall not be affected by notice to the contrary.

**13F.  Survival of Representations and Warranties; Entire Agreement.**  All representations and warranties contained herein or made in writing by or on behalf of the Transaction Parties in connection herewith shall survive the execution and delivery of this Agreement, the Notes and the other Transaction Documents, the transfer by any Purchaser of any Note or portion thereof or interest therein and the payment of any Note, and may be relied upon by any Transferee, regardless of any investigation made at any time by or on behalf of any Purchaser or any Transferee.  Subject to the preceding sentence, this Agreement, the Notes and the other Transaction Documents embody the entire agreement and understanding between the Purchasers and the Transaction Parties and supersede all prior agreements and understandings relating to the subject matter hereof.

**13G.  Successors and Assigns.**  All covenants and other agreements in this Agreement contained by or on behalf of any of the parties hereto (including, for the avoidance of doubt, the representations in Paragraph 10A shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto (including, without limitation, any Transferee) whether so expressed or not; *provided*, that each such assignee shall be entitled to the benefit of Paragraphs 4D(3) and 4D(4) only to the extent such assignee delivers the tax forms such Holder is required to collect pursuant to Paragraphs 4D(6) and 4D(7) and then only to the extent of any amount to which such assignor would be entitled in the absence of any such assignment.

**13H.  Independence of Covenants.**  All covenants hereunder shall be given independent effect so that if a particular action or condition is prohibited by any one of such covenants, the fact that it would be permitted by an exception to, or otherwise be in compliance within the limitations of, another covenant shall not (1) avoid the occurrence of a Default or Event of Default if such action is taken or such condition exists or (2) in any way prejudice an attempt by any Holder to prohibit through equitable action or otherwise the taking of any action by any Transaction Party or any Subsidiary which would result in a Default or Event of Default.

**13I.  Notices.**  All written communications provided for hereunder shall be sent by an international recognized overnight delivery service (with charges prepaid) (or by telecopy if a copy thereof is sent on the same Business Day by the preceding method) and (1) if to any Purchaser, addressed to such Purchaser at the address specified for such communications in the Purchaser Schedule attached hereto, or at such other address as such Purchaser shall have specified to the Issuer in writing, (2) if to any other Holder, addressed to such other Holder at such address as such other Holder shall have specified to the Issuer in writing, and (3) if to any Transaction Party, addressed to it at: c/o [INSERT], Attention:  [INSERT], or at such other address as the Issuer shall have specified to each Holder in writing.

**13J.    Payments Due on Non-Business Days.**  Anything in this Agreement or the Notes to the contrary notwithstanding, any payment of principal of or interest on any Note that is due on a date other than a Business Day shall be made on the next succeeding Business Day without including the additional days elapsed in the computation of the interest payable on such next succeeding Business Day; *provided* that if the maturity date of any Note is other than a Business Day, then all payments due on such Note on such maturity date that are to be made on such next succeeding Business Day shall include such additional days elapsed in the computation of the interest payable on such next succeeding Business Day.

**13K.    Satisfaction Requirement.**  If any agreement, certificate or other writing, or any action taken or to be taken, is by the terms of this Agreement required to be satisfactory (but not reasonably satisfactory) to any Purchaser or to the Required Holder(s), the determination of such satisfaction shall be made by such Purchaser or the Required Holder(s), as the case may be, in the sole and exclusive judgment (exercised in good faith) of the Person or Persons making such determination.

**13L.    Governing Law.**  THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK (EXCLUDING ANY CONFLICTS OF LAW RULES WHICH WOULD OTHERWISE CAUSE THIS AGREEMENT TO BE CONSTRUED OR ENFORCED IN ACCORDANCE WITH, OR THE RIGHTS OF THE PARTIES TO BE GOVERNED BY, THE LAWS OF ANY OTHER JURISDICTION).

**13M.    Submission to Jurisdiction.**  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH TRANSACTION PARTY AND EACH HOLDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS. EACH TRANSACTION PARTY AND EACH HOLDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT OR ANY DOCUMENT RELATED HERETO. NOTWITHSTANDING THE FOREGOING, EACH OF THE PARTIES HERETO ACKNOWLEDGES THAT ANY APPEALS FROM THE COURTS DESCRIBED IN THE IMMEDIATELY PRECEDING SENTENCE MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE THOSE JURISDICTIONS.

**13N.    Service of Process.**  EACH TRANSACTION PARTY HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO SUCH TRANSACTION PARTY AT ITS ADDRESS SET FORTH IN PARAGRAPH 13I AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED FIVE DAYS AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE U.S. MAIL. NOTHING CONTAINED HEREIN SHALL AFFECT THE

RIGHT OF THE HOLDERS TO SERVE LEGAL PROCESS BY ANY OTHER MANNER PERMITTED BY LAW.

**13O.   Waiver of Jury Trial.**  EACH TRANSACTION PARTY AND EACH HOLDER WAIVES ITS RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY TRANSFEREE OR ASSIGNEE, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.  EACH TRANSACTION PARTY AND EACH HOLDER AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT EACH OF THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS.

**13P.   Judgments.**  Any payment made by the Issuer to any Holder or for the account of any such Holder in respect of any amount payable by the Issuer in Dollars, which payment is made in a foreign currency, whether pursuant to any judgment or order of a court or tribunal or otherwise, shall constitute a discharge of the obligations of the Issuer only to the extent of the amount of Dollars which may be purchased with such other foreign currency, on the day of payment.  The Issuer covenants and agrees that it shall, as a separate and independent obligation, which shall not be merged in any such judgment or order, pay or cause to be paid the amount payable in Dollars and not so discharged in accordance with the foregoing.

**13Q.   Currency.**  All moneys referred to in this Agreement, in the Notes and in the other Transaction Documents shall mean Dollars.

**13R.   Severability.**   Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**13S.   Descriptive Headings; Advice of Counsel; Interpretation.**   The descriptive headings of the several paragraphs of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.  Each party to this Agreement represents to the other parties to this Agreement that such party has been represented by counsel in connection with this Agreement, the Notes and the other Transaction Documents, that such party has discussed this Agreement, the Notes and the other Transaction Documents with its counsel and that any and all issues with respect to this Agreement, the Notes and the other Transaction Documents have been

-93-

resolved as set forth herein. No provision of this Agreement, the Notes or any other Transaction Document shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured, drafted or dictated such provision.

**13T.    Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.

**13U.    Severalty of Obligations.** The sales of securities to the Purchasers are to be several sales, and the obligations of the Purchasers under this Agreement are several obligations. No failure by any Purchaser to perform its obligations under this Agreement shall relieve any other Purchaser or the Issuer of any of its obligations hereunder, and no Purchaser shall be responsible for the obligations of, or any action taken or omitted by, any other Purchaser hereunder.

**13V.    Separate Investment Decisions, Etc.** Each Holder acknowledges and agrees for the benefit of each other Holder that: (1) no Holder shall be deemed or otherwise considered to be acting as an agent or in any other fiduciary capacity on behalf of another Holder by virtue of this Agreement, (2) it has without reliance upon any other Holder made its own credit and investment analysis and decision to enter into this Agreement and the other Transaction Documents to which it is a party, and (3) it will without reliance upon any other Holder continue to make its own credit and investment decisions in taking or not taking any action in connection with this Agreement and the other Transaction Documents to which it is a party. The Issuer acknowledges and agrees its rights shall not be increased or its obligations decreased as a result of the foregoing terms of this Paragraph.

**13W.    Confidentiality.** Agent and Holders each individually (and not jointly or jointly and severally) agree that all non-public information regarding the financial condition, operations, assets and existing and contemplated business plans of US Holdings, the Transaction Parties and their respective Subsidiaries (**"Confidential Information"**) delivered in connection herewith shall be treated by the Agent and the Holders in a confidential manner, and shall not be disclosed by the Agent or any Holder to Persons who are not parties to this Agreement, except that Confidential Information shall not include information that (a) was publicly known or otherwise known to such Holder prior to the time of such disclosure and was not provided to such Holder pursuant to a confidentiality agreement with a Transaction Party or one of its Affiliates, (b) subsequently becomes publicly known through no act or omission by such Holder or any Person acting on such Holder's behalf, (c) otherwise becomes known to such Holder (and not in breach of a confidentiality obligation owed to the Issuer or one of its Affiliates) other than through disclosure by any Transaction Party or (d) constitutes financial statements delivered to such Holder pursuant to this Agreement that are otherwise publicly available. Each Holder will maintain the confidentiality of such Confidential Information in accordance with procedures adopted by such Holder in good faith to protect confidential information of third parties delivered to such Holder, *provided* that such Holder may deliver or disclose Confidential Information to (i) its directors, trustees, officers, employees, agents, partners (general and limited) and affiliates, (ii) its professional advisors and service providers (including its accountants, attorneys and financial advisors and its prospective professional advisors and service providers) who agree to hold confidential the Confidential Information substantially in

-94-

accordance with the terms of this Paragraph, (iii) any other Holder of any Note, (iv) any Person to which it sells or offers to sell any Note or any part thereof or any participation therein or with whom a concurrent investment in a Transaction Party is proposed (if such Person has agreed to hold confidential the Confidential Information substantially in accordance with the terms of this Paragraph), (v) any Person from which it offers to purchase any security of a Transaction Party (if such Person has agreed to hold confidential the Confidential Information substantially in accordance with the terms of this Paragraph), (vi) any federal or state regulatory authority having jurisdiction over such Holder, (vii) to the existing and potential partners and lenders of such Holder or an affiliate thereof and any such Person's financial or legal advisors (if such Person has agreed to hold confidential the Confidential Information substantially in accordance with the terms of this Paragraph), or (viii) any other Person to which such delivery or disclosure may be necessary or appropriate (1) to effect compliance with any law, rule, regulation or order applicable to such Holder, (2) in response to any subpoena or other legal process, (3) in connection with any litigation to which such Holder is a party or (4) if an Event of Default has occurred and is continuing, to the extent such Holder may determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under the Transaction Documents.

    **13X.   Press Release and Related Matters.**   The Issuer shall not, and shall not permit any Subsidiary or Affiliate to, issue any press release or other public disclosure using the name, logo or otherwise referring to any Purchaser or of any of its Affiliates, the Transaction Documents or any transaction contemplated herein or therein to which a Purchaser or any of its Affiliates is party without the prior written consent of such Purchaser or such Affiliate except to the extent required to do so under applicable Requirements of Law and then, only after consulting with the applicable Purchaser(s).

**[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.  SIGNATURES ON THE FOLLOWING PAGE.]**

If you are in agreement with the foregoing, please sign this Agreement and deliver it to the other parties hereto, whereupon this Agreement shall become a binding contract among all of the parties hereto.

Very truly yours,

[REICHHOLD]

By: _____

Name:
Title:


**[insert]**

By: _____

Name:
Title:


**[Insert]**

By: _____

Name:
Title:

The undersigned hereby accepts and agrees to the foregoing Agreement as of the date first above written.

**[Insert]**

By: _____   _____

_____

_____
                                     Name:

        Title:   Authorized Representative

**[Insert]**

By: _____   _____

_____

_____
                                       Name:

        Title:   Authorized Representative

**Schedule 5M**

| | **MILESTONE** | **DEADLINE** |
|---|---|---|
| | **Reichhold:  Chapter 11 Milestones** | |
| 1. | US Debtors to have obtained entry of an interim DIP Order | By no later than October 2, 2014 |
| 2. | US Debtors to have completed marketing materials with respect to the sale of all or substantially all of the US Debtors' assets under Section 363 of the Bankruptcy Code or otherwise (the "363 Sale") | By no later than October 13, 2014 |
| 3. | US Debtors to have executed the Stalking Horse Agreement | By no later than October 27, 2014 |
| 4. | US Debtors to have filed (i) a motion seeking approval of the Bid Procedures Order with respect to the 363 Sale and (ii) a notice of selection of the proposal set forth in the Stalking Horse Agreement as the stalking horse bid in the 363 Sale | By no later than October 27, 2014 |
| 5. | US Debtors to have obtained entry of a final DIP Order | By no later than October 30, 2014 |
| 6. | US Debtors to have obtained entry of the Bid Procedures Order | By no later than November 19, 2014 |
| 7. | Deadline by which all bids must be actually received by the US Debtors in connection with the 363 Sale, in the form and manner specified in the Bid Procedures Order | By no later than December 17, 2014 |
| 8. | US Debtors to conduct an auction with respect to the 363 Sale | By no later than December 19, 2014 |
| 9. | US Debtors to have obtained entry of an order approving the 363 Sale winner | By no later than December 22, 2014 |
| 10. | US Debtors to have closed the 363 Sale | By no later than January 30, 2015 |

**Schedule 5N**
(Post Closing Items)[8]

1.  Within [ ● ] days of the Closing Date, deliver to the Agent certificates of insurance in form and substance reasonably satisfactory to the Purchasers naming the Collateral Agent as loss payee and additional insured.

2.  Within [ ● ] days of the Closing Date, deliver to the Agent a schedule of the Real Estate that constitutes all of the material Real Estate of the Company and each of its Subsidiaries as of the Initial Closing Date.

3.  [Within [ ● ] days of the Closing Date, deliver to the Agent a schedule of all of the issued and outstanding Stock of each Transaction Party and each Subsidiary of each Transaction Party is owned by each of the Persons as of the Initial Closing Date.]

4.  Within [ ● ] days of the Closing Date, deliver to the Agent a schedule of each Transaction Party's organizational identification number, if any, and the location of such Transaction Party's chief executive office or sole place of business as of the date of the Agreement.

5.  [Within [ ● ] days of the Closing Date, deliver to the Agent [*insert stock pledge requirements*].]

6.  Within [ ● ] days of the Closing Date, deliver to the Agent a perfection certificate to the reasonable satisfaction of the Agent in a form to be agreed.

7.  Within [ ● ] days of the Closing Date, deliver to the Agent a schedule of all banks and other financial institutions at which any Transaction Party or any of its Subsidiaries maintains deposit or other accounts as of the Initial Closing Date, and such schedule shall correctly identifies the name, address and any other relevant contact information reasonably requested by the Required Holder(s) with respect to each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

8.  On or before the date that is [●] days following the Closing Date (unless a later date is otherwise agreed to by the Agent in its sole discretion), deliver to the Agent a mortgage encumbering each parcel of the Mortgaged Real Estate, in form and substance reasonably acceptable to the Agent, sufficient to create a valid and enforceable first lien on the Mortgaged Real Estate and suitable for recording or filing, together with, [for any Real Estate located in the United States], the following additional items: (a) a fully paid policy of title insurance (or "pro forma" or marked up commitment having the same effect of a title insurance policy) (i) in form approved by Agent insuring the Lien of the mortgage encumbering such property as a valid first priority Lien, subject only to Permitted Liens, (ii) in an amount reasonably satisfactory to Agent, (iii) issued by a nationally recognized title insurance company reasonably satisfactory to Agent (the "Title Company") and (iv) that includes (A) such coinsurance and direct access reinsurance as the Agent may deem

---

[8] To be discussed.

necessary or desirable and (B) such endorsements or affirmative insurance reasonably required by the Agent, including a zoning endorsement (or, with respect to any property located in any jurisdiction in which a zoning endorsement is not available, a zoning compliance letter from the applicable municipality or a zoning report), in each case reasonably satisfactory to Agent, (b) a survey certified to Agent and the Title Company in form and substance reasonably satisfactory to the Agent and sufficient to provide survey coverage under the title insurance policy, (c) upon the request of the Agent, an appraisal complying with the requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, by a third-party appraiser selected or approved by the Agent, (d) an opinion of local counsel in form and substance reasonably acceptable to the Agent and regarding the enforceability, due authorization, execution and delivery of the mortgages and such other matters as the Agent may reasonably request, (e) Phase I environmental site assessment reports prepared in accordance with the current ASTM E1527 standard (to the extent not already provided) and reliance letters for such Phase Is (which Phase Is and reliance letters shall be in form and substance reasonably acceptable to Agent) and any other environmental information as the Agent shall reasonably request, (f) the following documents and instruments, in order to comply with the National Flood Insurance Reform Act of 1994 and related legislation (including the regulations of the Board of Governors of the Federal Reserve System): (1) a completed standard flood hazard determination form, (2) if the improvement(s) to the applicable Mortgaged Real Estate is located in a Special Flood Hazard Area, a notification to the Borrower that Flood Insurance coverage is not available because the community does not participate in the National Flood Insurance Program, (3) documentation evidencing that the Borrower received such notice, and (4) if Flood Insurance is available in the jurisdiction where the applicable Mortgaged Real Estate is located, a copy of the Flood Insurance policy, proof of payment for such policy, a declaration confirming that Flood Insurance has been issued, or such other evidence of Flood Insurance satisfactory to the Agent.