IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x
In re:                                                       :  Chapter 11
                                                             :
                                                             :  Case No. 14-_____ (_____)
REICHHOLD HOLDINGS US, INC., et al.,                         :
                                                             :  Joint Administration Requested
       Debtors.[1]                                           :
                                                             :
------------------------------------------------------------ X

## DECLARATION OF ROBERT A. DEL GENIO IN SUPPORT OF DEBTORS' MOTION FOR APPROVAL OF DEBTOR-IN-POSSESSION FINANCING

I, Robert A. Del Genio, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

      1.    I am a managing member of CDG Group ("CDG"), a global turnaround and crisis management firm which maintains offices at 650 Fifth Avenue, New York, New York 10019, as well as in Los Angeles, California. CDG specializes in providing restructuring advisory, turnaround management, value enhancement and transaction advisory services. I have more than 30 years of experience assisting clients on corporate restructurings and recapitalizations.

      2.    I submit this declaration (the "Declaration") in support of the motion of the above-captioned debtors and debtors-in-possession (the "Debtors") for approval of debtor-in-possession financing (the "Motion").[2] As a result of my time with the Debtors, my review of

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Reichhold Holdings US, Inc. (5768), Reichhold, Inc. (4826), Canadyne Corporation (7999), and Canadyne-Georgia Corporation (7170). The street address for the Debtors is 1035 Swabia Ct., Durham, NC 27703.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

relevant documents and my discussions with members of the Debtors' management team, I am generally familiar with the Debtors' business operations, their financial condition and their capital structure. I am over the age of 18, competent to testify, and authorized to submit this Declaration on behalf of the Debtors. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

3. Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' management and the Debtors' other professionals, my review of relevant documents or my opinion, based on my experience and knowledge of the Debtors' business operations, their financial condition and their capital structure. In making this Declaration, I also have relied on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified and provided to me for my benefit in preparing this Declaration.

4. As of the Petition Date, the Debtors did not have sufficient liquidity to operate their businesses and could not fund the administration of these Chapter 11 cases without the need for debtor-in-possession financing. Toward that end, before the Petition Date, the Debtors retained CDG to, among other things, critically examine the Debtors' business operations and funding requirements. In or about April 2014, given the Debtors' operating losses and reduced liquidity, the Debtors and their advisors contacted four (4) potential lenders and received one (1) financing proposal from a prospective lender in anticipation of a potential Chapter 11 filing. In May 2014, however, the Debtors secured the Oaktree Term Loans, alleviating the need for a DIP loan at that time.

5. In August 2014, the Debtors met with the holders of the Senior Secured Notes to address the current state of the Debtors' business operations and need for additional

financing while they explored strategic alternatives. Given the Debtors' liquidity constraints and limited available cash, the Debtors and their advisors renewed their efforts to secure a DIP loan. They contacted and solicited DIP financing proposals from seven (7) prospective lenders including their existing lenders and bondholders, traditional lenders and non-traditional lenders. The Debtors and their advisors explored two types of financing structures with the prospective lenders – funding for the Reichhold Companies' United States operations only and a global financing solution for the Reichhold Companies' United States and rest of world ("ROW") businesses and affiliates. The nature of the Debtors' prepetition capital structure made procuring financing challenging. Most notable of these challenges was the fact that there was insufficient collateral value, at normal advance rates, owned by the Debtors to enable them to attract traditional lenders willing to provide the liquidity the Debtors needed.

6. The Debtors ultimately received four (4) proposals for DIP financing. None of the prospective lenders were willing to provide a DIP facility secured only by the Debtors' collateral. Instead, all four of the proposals required security from the Reichhold Companies' ROW businesses to fund the cash needs of the Debtors. In evaluating these proposals, the Debtors' primary objective was to find a financing source that would (a) provide sufficient liquidity to allow the Debtors the necessary runway to operate their businesses while utilizing the Chapter 11 process to effectuate a 363 Sale, (b) avoid the costs and risks (including possible delay) associated with potential litigation surrounding the selection of any particular financing option, and (c) provide competitive terms to the Debtors for such financing.

7. After careful review and extensive negotiation of the DIP financing proposals, the Debtors' Board of Directors determined in its business judgment that the proposal from the DIP Lenders represented the best option for the Debtors and their businesses. Of the

alternative DIP proposals, the Debtors selected the financing to be provided directly and indirectly by certain of the holders of the Prepetition Secured Notes who are the DIP Lenders for a variety of reasons. The DIP Lenders' financing avoids the possibility of a priming fight on the first day of the chapter 11 proceeding since if the Debtors were to grant liens on their assets to secure another DIP, an objection was anticipated by the holders of the Senior Secured Notes who have a pledge of the equity of the Debtor entity whose assets would serve as collateral. In addition, the DIP Lenders' proposal provides significantly greater availability than the alternative proposal as there is no borrowing base requirement, it offers a PIK option in lieu of cash payments and it provides for an original issue discount instead of upfront fees resulting in additional liquidity to the Debtors.

8. Unless this Court authorizes the debtor-in-possession financing, the Debtors will be unable to fund their day-to-day operating expenses and the administration of these cases. Absent sufficient funds to support the Debtors' operations, the value of the Debtors' assets and operations will quickly erode and their ability to consummate an orderly sale of their assets under section 363 of the Bankruptcy Code and maximize value will be significantly jeopardized, to the detriment of the Debtors' estates and all stakeholders.

9. The Debtors filed for chapter 11 protection to stabilize their business, sell their assets as a going concern and conduct a winddown of the balance of their operations—all in an effort to maximize recoveries for the Debtors' creditors. Unless the Debtors have the liquidity to get through a sale process, creditors likely will recover almost no value. The DIP Facilities requested in the Motion will provide the Debtors with necessary liquidity, thereby preserving value and facilitating recoveries for creditors.

10.     Moreover, based on my experience, the terms and conditions of the DIP Facilities are fair, reasonable and appropriate under the circumstances presented, and were negotiated by the parties in good faith and at arms' length, with all parties represented by experienced counsel.  The Debtors are unable to obtain sufficient unsecured credit, allowable solely as an administrative expense, to enable the preservation and continuation of the Debtors' operation spending a Section 363 Sale.

11.     Accordingly, I believe that the proposed DIP Facilities, which affords the DIP Lenders senior liens on unencumbered assets and junior liens on encumbered assets, will allow the Debtors to continue their operations in the ordinary course, and to meet their ordinary course obligations, maintain prudent cash balances and satisfy their liquidity needs during the pendency of the anticipated sale process.  I respectfully believe the Debtors' entry into the DIP Facilities is an exercise of their sound business judgment and should be approved in all respects.

Dated: Wilmington, Delaware
       September ____, 2014

_____
Robert A. Del Genio