## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
In re:                                                   : Chapter 11
                                                         :
REICHHOLD HOLDINGS US, INC., et al.,                     : Case No. 14-12237 (MFW)
                                                         :
            Debtors.¹                                    : Jointly Administered
                                                         :
                                                         : Bidding Procedures Hearing Date: Dec. 2, 2014 at 9:30 a.m.
                                                         : Bidding Procedures Objection Deadline: Nov. 25, 2014 at 4:00 p.m.
                                                         : Sale Hearing Date: To Be Determined
                                                         : Sale Objection Deadline: To Be Determined
-------------------------------------------------------- x
```

**DEBTORS' MOTION FOR (I) ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE; (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER APPROVAL OF THE SALE; AND (C) APPROVING NOTICE OF RESPECTIVE DATE, TIME AND PLACE FOR AUCTION AND FOR HEARING ON APPROVAL OF THE SALE AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) ORDER AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; AND (B) ASSUMPTION AND ASSIGNMENT OF <u>CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors"), by and through their undersigned counsel, hereby submit this motion (the "Motion")

pursuant to Sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. § 101 *et*

*seq.* (as amended, the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal Rules

of Bankruptcy Procedure (each a "Bankruptcy Rule," and collectively, the "Bankruptcy Rules")

and Rules 6004-1 and 9006-1(e) of the Local Rules of Bankruptcy Practice and Procedure of the

United States Bankruptcy Court for the District of Delaware (each, a "Local Rule," and

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Reichhold Holdings US, Inc. (5768), Reichhold, Inc. (4826), Canadyne Corporation (7999), and Canadyne-Georgia Corporation (7170). The street address for the Debtors is 1035 Swabia Ct., Durham, North Carolina 27703.

collectively, the "Local Rules"), for (I) an order (the "Bidding Procedures Order") substantially

in the form attached hereto as **Exhibit A** (A) approving the Debtors' proposed bidding

procedures (the "Bidding Procedures") attached hereto as **Exhibit B** to be employed in

connection with the proposed sale of substantially all of the Debtors' assets (the "Purchased

Assets") to Reichhold Acquisitions Holdings LLC, a wholly owned U.S. subsidiary of Reichhold

Holdings International B.V. (the "Stalking Horse Purchaser") pursuant to the Asset Purchase

Agreement, dated as of November 12, 2014, by and among the Debtors (collectively, the

"Sellers") and the Stalking Horse Purchaser (the "Stalking Horse Agreement",[2] a copy of which

is attached hereto as **Exhibit C**);[3] (B) scheduling an auction (the "Auction") and a hearing to

consider approval of the sale of the Purchased Assets (the "Sale Hearing"); and (C) approving

notice substantially in the form attached hereto as **Exhibit D** of the respective date, time and

place for the Auction and the Sale Hearing (the "Auction and Sale Hearing Notice") for approval

of the sale of the Purchased Assets and the assumption and assignment of certain executory

contracts and unexpired leases as set forth in the Stalking Horse Agreement (the "Assigned

Contracts" and "Assigned Leases"); and (II) an order (the "Sale Order"[4] authorizing (A) the sale

of the Purchased Assets to the Stalking Horse Purchaser, or to the bidder with the highest and

best bid (the "Successful Bidder") at the Auction, free and clear of Liens (as defined in the

Stalking Horse Agreement), claims and encumbrances (other than with respect to Permitted

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Stalking Horse Agreement.

[3] Due to the voluminous nature of the Schedules to the APA, the Debtors will not serve those Schedules with the Motion. The Disclosure Schedules can be found free of charge (i) at www.loganandco.com and (ii) are on file with the Clerk of the Bankruptcy Court. Additionally, the Schedules will be made available upon request of the Debtors' counsel.

[4] The Sale Order will be agreed to before the hearing on the Bidding Procedures Order.

Liens and Assumed Liabilities); and (B) the Debtors' assumption and assignment of the
Assigned Contracts and Assigned Leases pursuant to and as described in the Stalking Horse
Agreement. In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.       This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. This
matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N) and (O). Venue of this
proceeding and this Motion is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and
1409.

2.       The statutory predicates for the relief sought herein are Sections 105(a), 363(b),
(f), (k), (l) and (m), 365(a) and (b) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004,
6006, 9006, and 9007.

## INTRODUCTION

3.       The Debtors, in consultation with their professional advisors, diligently evaluated
a number of options to address their liquidity concerns before the commencement of these
Chapter 11 Cases. Based on their evaluations, and in the exercise of their business judgment, the
Debtors have concluded that the best way to maximize value for the benefit of their estates and
creditors is to sell the Purchased Assets and assume and assign the Assigned Contracts and the
Assigned Leases. Toward this end, the Debtors have executed the Stalking Horse Agreement
with the Stalking Horse Purchaser to provide for the sale of the Purchased Assets and for the
Debtors' assumption and assignment to the Stalking Horse Purchaser of the Assigned Contracts
and the Assigned Leases. The transactions contemplated by the Stalking Horse Agreement are
designed to preserve the jobs of a substantial portion of the Debtors' employees and to avoid the
further deterioration in asset values through a prompt sale of the Purchased Assets. The Debtors
seek to expose the Purchased Assets to competitive bidding through an Auction pursuant to the

3

Bidding Procedures. If there is no higher and better offer at the Auction, the Debtors will seek the Court's approval of a sale to the Stalking Horse Purchaser.

4. Pursuant to this Motion, the Debtors request that the Court enter the proposed Bidding Procedures Order, which approves the Bidding Procedures, the Auction and Sale Hearing Notice and schedules the Sale Hearing. Upon conclusion of the Auction and selection of the highest and best bid, the Debtors request that the Court enter the proposed Sale Order, which authorizes the sale to the Stalking Horse Purchaser, or alternatively, to the Successful Bidder at the Auction, free and clear of Liens, claims and encumbrances (other than with respect to Permitted Liens and Assumed Liabilities) and the assumption and assignment of the Assigned Contracts and Assigned Leases.

5. The Debtors also seek approval pursuant to Section 365 of the Bankruptcy Code to assume and assign the Assigned Contracts and the Assigned Leases to the Stalking Horse Purchaser (or Successful Bidder).

## FACTUAL BACKGROUND

6. On September 30, 2014 (the "Petition Date"), the Debtors filed voluntary petitions in this Court commencing cases for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the Declaration of Roger L. Willis, the Chief Financial Officer and Treasurer of Reichhold, Inc., in Support of Chapter 11 Petitions and First-Day Pleadings [Docket No. 13] (the "Willis Declaration"), filed on the Petition Date and fully incorporated herein by reference.

7. The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

8.      On October 14, 2014, the Office of the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "UCC").

A.    **The DIP Facilities**

9.      On the Petition Date, the Debtors filed a motion (the "DIP Motion") seeking approval of a senior debtor-in-possession facility from funds managed by Third Avenue Management, JP Morgan and Black Diamond (the "Senior DIP Lenders") and a junior debtor-in-possession facility (collectively, the "DIP Facilities") from their non-debtor affiliate, Reichhold Holdings International B.V. (the "Junior DIP Lender" which together with the Senior DIP Lenders are collectively referred to as the "DIP Lenders"). On October 2, 2014, the Court granted interim approval of the DIP Motion [Docket No. 54].

10.     The DIP Facilities include various conditions to the Debtors' ability to borrow, including the Debtors' compliance with certain "sale milestones" that establish a timeline for the sale of the Purchased Assets. In particular, under the DIP Facilities, the Debtors agreed to file motions for court approval of the Stalking Horse Agreement and procedures governing the sale of the Debtors' assets by no later than October 27, 2014 . The Debtors and DIP Lenders subsequently agreed to extend that date to November 12, 2014.

B.    **Prepetition Marketing Efforts and the Stalking Horse Agreement**

11.     As described in the Willis Declaration, in May 2012, approximately 99% of senior unsecured notes due from Reichhold Industries Inc. were replaced with senior secured notes. After completing the exchange offer, the Debtors, together with their non-debtor affiliates (collectively, the "Reichhold Companies") devoted significant time and resources to exploring strategic alternatives to maximize value for the benefit of all stakeholders. Toward that end, the Reichhold Companies engaged Moelis & Company to pursue those alternatives which included, but were not limited to, a potential sale of the Reichhold Companies and a transaction with one

5

of the industry players that would consolidate the composite industry. At that time, however, a strategic alternative was not available due, in part, to the Debtors' significant legacy liabilities. The Reichhold Companies, therefore, determined that a more structured transaction was necessary. Given their diminishing financial profile, the Reichhold Companies determined that finding an equity partner was critical. The management of the Reichhold Companies expended significant time meeting with potential equity partners. An equity deal, however, did not materialize.

12.    Upon securing term loans from OCM Reichhold Holdings, Ltd., an affiliate of Oaktree Capital Management, L.P. in May of 2014, which provided the Debtors with additional liquidity, the Reichhold Companies again focused their efforts to secure a transaction with a leading global industry player. The Debtors' financial position, however, continued to decline. Despite their best efforts, the Reichhold Companies were unable to secure a combination transaction with another industry player.

13.    Given the Debtors' lack of liquidity to fund their operations, the Debtors retained CDG Group, LLC ("CDG") to, among other things, critically examine the Debtors' business operating and funding requirements. The Debtors and their advisors pursued alternatives for debtor in possession financing in an effort to maximize value of the Debtors' assets through a sale pursuant to Section 363 of the Bankruptcy Code. As set forth above, before the Petition Date, the Debtors secured the DIP Facilities. The DIP Facilities contemplate that Reichhold Holdings International B.V., or its assignee, will serve as the stalking horse bidder for the Debtors' assets pursuant to a credit bid of a portion of the Debtors' junior debtor-in-possession facility. To that end, on November 4, 2014, the Debtors and Stalking Horse Purchaser entered into the Stalking Horse Agreement.

52719/0001-11008480v8

14.     Immediately after the Petition Date - and even before the Debtors entered into the Stalking Horse Agreement - CDG began to market the Debtors' assets.  CDG contacted 164 interested parties, 72 of which are strategic buyers and 92 are financial buyers.  Of the 161 contacted, CDG sent out 58 teasers and 62 non-disclosure agreements.  Thirty-four(34) non-disclosure agreements were executed, and those buyers were immediately provided access to the due diligence data room.

## RELIEF REQUESTED

15.     By this Motion, the Debtors respectfully request, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, the entry of (I) an order: (A) approving the Bidding Procedures to be employed in connection with the sale of the Purchased Assets pursuant to Sections 363 and 365 of the Bankruptcy Code; (B) scheduling the Auction and the Sale Hearing; and (C) approving the Auction and Sale Hearing Notice; and, upon conclusion of the Auction and selection of the highest and best bid at the Auction, entry of (II) an order authorizing: (A) the sale of the Assets free and clear of Liens, claims and encumbrances  (other than with respect to Permitted Liens Assumed Liabilities); and (B) the assumption and assignment of the Assigned Contracts and Assigned Leases.

## THE PROPOSED SALE OF THE PURCHASED ASSETS

### C.     The Stalking Horse Agreement

16.     A summary of the principal terms of the Stalking Horse Agreement, including terms that are required to be highlighted pursuant to Local Bankruptcy Rule 6004-1, is as follows:[5]

---

[5] The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse Agreement.  In the event of any inconsistencies between the provisions of the Stalking Horse Agreement and the terms herein, the terms of the Stalking Horse Agreement shall govern.  Capitalized terms used in this section of the Motion and not otherwise defined shall have the meaning ascribed to them in the Stalking Horse Agreement.

a.   Purchase Price: Section 3.1 of the APA provides at the Closing, the
Stalking Horse Purchaser shall (i) surrender and release a portion of the
Junior DIP Obligations equal to fifteen million dollars ($15,000,000)
(such aggregate amount, as may be increased pursuant to Section 3.1(b) of
the Stalking Horse Agreement, the "Credit Bid Amount"), (ii) waive and
release all Junior DIP Obligations not included in the Credit Bid Amount
(which may be adjusted, as per below), and (iii) make a payment to Sellers
in an amount equal to the difference, if any, between (A) the Sellers'
Closing Costs and Wind Down Expenses and (B) Retained Cash (the
"Closing Cash Shortfall"). The Credit Bid Amount together with the
payment of the Closing Cash Shortfall and the assumption by the Stalking
Horse Purchaser or Designated Purchasers of the Assumed Liabilities shall
constitute the Purchase Price.

Sellers Closing and Wind Down Expenses is defined in the Stalking Horse
Agreement as follows: (x) an amount estimated in good faith by the
Sellers and as set forth on Section 1.1(f) of the Sellers Disclosure
Schedule to the Stalking Horse Agreement and as may be updated prior to
the Closing, but in no event in excess of, in the aggregate, $2,464,000.00
(subject to increase to be agreed upon by the Stalking Horse Purchaser and
the Sellers for amounts under clauses (ii), (iv) and (vi) below[6]) for (i) the
wind-down of the Sellers' bankruptcy estates with respect to: (A) the costs
of preparation of financial reports and Tax Returns in connection with the
wind down of the Sellers' bankruptcy estate, and (B) all professional fees
to be incurred in connection with any of the foregoing, (ii) amounts
necessary for the Sellers to pay Taxes allocated to, or retained by, the
Sellers under this Agreement to the extent they are priority Administrative
Expenses and are otherwise not an Assumed Liability under Section 2.3(l)
of the Stalking Horse Agreement; (iii) fees payable to the United States
Trustee; (iv) accrued and unpaid professional, consulting and investment
banking fees and commissions that have been allowed by the Bankruptcy
Court, whether before or after the Closing; (v) insurance premiums in an
amount not to exceed One Hundred Eighty Nine Thousand Dollars
($189,000.00), and (vi) other post-petition accrued and unpaid operating
expenses that (A) are not otherwise an Assumed Liability or (B) not
included in the DIP Budget, and (y) the amount, which shall in no event
exceed One Million Six Hundred and Thirty Six Thousand Dollars
($1,636,000) and which shall be reasonably agreed to by Sellers and
Stalking Horse Purchaser before the Bid Procedures Order is entered by

---

[6] The amounts with respect to such clauses (ii), (iv) and (vi) must be agreed upon by the Stalking Horse
Purchaser and Sellers not less than two Business Days prior to date of the hearings before the Bankruptcy Court for
approval of the Bidding Procedures and the final approval of the Senior and Junior DIP Facilities, presently set for
December 2, 2014. If the parties do not reach an agreement, the Debtors reserve the right to adjourn or withdraw the
Motion.

the Bankruptcy Court, that is reasonably necessary in Sellers' good faith judgment to be spent (A) for the closure and/or abandonment of Excluded Real Property including for any Environmental Liabilities and Obligations and (B) for the closure or abandonment of environmental investigation or remediation projects or other work conducted by Sellers on properties not owned by any of the Sellers, including for any Environmental Liabilities and Obligations of the Sellers under any consent decrees, court orders, regulatory or administrative decrees or similar orders from any Governmental Body to enable Sellers to terminate such projects or other work, in each case of the foregoing clause (A) and (B), that the Sellers reasonably believes (1) would be required by law, (2) would constitute an Administrative Expense or (3) would be non-dischargeable. In the event Purchaser exercises its right to exclude any of the Owned Real or Leased Real Property (other than the Non-Operating Real Property) from the Purchased Assets as provided in Section 8.15 of the Stalking Horse Agreement, the parties must reasonably agree on the increase in the potential maximum amount of $1,636,000 amount referred to above for closure and/or abandonment of such property as provided in (A) above.

At any time prior to the Auction Date, the Stalking Horse Purchaser may at its sole discretion increase the Purchase Price, including by (i) increasing the Credit Bid Amount by up to the full amount of the Junior DIP Obligations and/or (ii) paying additional cash consideration and assumption of additional liabilities. In the event of any of the foregoing, the parties will amend the Stalking Horse Agreement to make such changes and modifications as necessary.

b.   Purchased Assets: Section 2.1 of the Stalking Horse Agreement provides that the Stalking Horse Purchaser shall and shall cause the relevant Designated Purchasers to purchase, acquire, accept from the applicable Seller such Sellers' right, title and interest in, to and under all assets, properties, rights and interests of every kind and description, tangible or intangible of the Sellers used or held for use in the conduct of the Business, other than Excluded Assets, free and clear of Liens, including the following: (i) all Purchased Contracts, including all options to renew or extend and any and all audit rights provided for in such Purchased Contracts; (ii) all fixed assets, leasehold improvements, vehicles, production equipment assets, machinery and equipment; (iii) all inventory owned by the Sellers, (iv) all other tangible personal property and interests therein owned by any Seller; (v) all prepaid expenses, prepaid rents, utility deposits, advance payments and deposits on contractual obligations made in connection with the Business, but excluding prepayments with respect to Excluded Contracts; (vi) all claims and rights under contracts, supplier agreements, purchase orders, work orders, leases of equipment, machinery, production machinery, tooling and other items of personal property; (vii) all Permits used or held for use in the conduct of the Business; (viii) all Sellers' Records; (ix) all rights of any Seller with

respect to the Purchased Owned Real Property; (x) the Purchased Real Property Leases; (xi) all rights of any Seller under non-disclosure, confidentiality or similar agreements entered into with third parties in connection with the sale of the Business or any part of the Business; (xii) all rights, claims, causes of action, defenses and credits of any Seller related to any Purchased Asset or Assumed Liability; (xiii) all warranties, guarantees and similar rights related to the Purchased Assets; (xiv) all cash and cash equivalents of the Sellers in excess of the Retained Cash; (xv) all accounts receivable relating to the Business; (xvi) the Purchased Intellectual Property; (xvii) all Chapter 11 Deposits; (xviii) other than as set forth in the Stalking Horse Agreement, all insurance policies and rights and claims thereunder relating to the Business and Purchased Assets; (ixx) all of the Company's right, title and interest in the Company's equity interest in Resimon, C.A. and the right to any distribution; (xx) all goodwill and other intangible assets associated with the (a) Trademarks including the Purchased Intellectual Property and (b) the Business; (xxi) the Purchased IT Assets.

c.      Excluded Assets:  Section 2.2 of the Stalking Horse Agreement provides that the Sellers shall, at the Closing retain, and the Stalking Horse Purchaser and Designated Purchaser shall not acquire, any right, title or interest in the following assets, properties, rights and interests of the Sellers: (i) all rights, claims, causes of action and credits to the extent relating to any Excluded Asset or Excluded Liability, including any such item to the extent arising under any guarantee, warranty, indemnity or similar right in favor of a Seller in respect of an Excluded Asset or Excluded Liability; (ii) except for the Debtors' interest in Resimon, any shares of capital stock or other equity interests of any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller; (iii) the Retained Records; (iv) cash and cash equivalents of the Sellers, in an aggregate amount not to exceed Sellers Closing and Wind Down Expenses; (iv) all Avoidance Actions; (v) all Excluded Contracts; (vi) all Excluded Owned Real Property; (vii) all Excluded Leased Real Property; (viii) any Additional Excluded Assets that Purchaser elects to exclude from the Purchased Assets; and (ix) (A) all insurance policies and Contracts, insurance claims, net insurance proceeds received or to be received, and proceedings, to the extent solely related to the assets set forth in the foregoing clauses of Section 2.2 of the Stalking Horse Agreement, (B) any insurance policies and Contracts, claims, net insurance proceeds received or to be received and proceedings under any such policies that have policy periods that ended no later than January 1, 1986 that provide or may provide coverage for any asbestos claims arising from any products sold by the Sellers prior to such date, and (C) any directors and officers insurance policies.

52719/0001-11008480v8

d.    Assumed Liabilities:  Section 2.3 of the Stalking Horse Agreement provides that the Stalking Horse Purchaser or the relevant Designated Purchaser shall assume and perform and discharge in accordance with their respective terms the following Liabilities: (i) Assumed 503(b)(9) Claims with respect to certain specified vendors not to exceed $14 million; (ii) Assumed Accounts Payable; (iii) Cure Costs; (iv) Liabilities under all Purchased Contracts arising from and after the Closing Date; (iv) Accrued PTO; (v) accrued salary, wages, incentive payments and related payroll taxes and expense reimbursement with respect to the Employees that arise on or after the Petition Date but before the Closing; (vi) liability of Sellers for Employee's health insurance claim under Seller's health insurance plans; (vii) liabilities of Sellers for Employees' worker compensation claims for accidents or injuries occurring after the Petition but prior to the Closing Date that constitute Administrative Expenses; (viii) liabilities of Sellers for severance and/or termination payments to any Employee who is not a Transferred Employee to the extent such payments constitute Administrative Expenses and are not paid prior to the Closing Date; (viii) Liabilities under the Senior DIP Facility; (vii) all Transfer Taxes; and (viii) all unpaid real estate taxes with respect to any of the Purchased Real Property.

e.    Excluded Liabilities:  Section 2.4 of the Stalking Horse Agreement provides that the Stalking Horse Purchaser shall not assume and shall not be deemed to have assumed, any of the following Liabilities: (i) all Liabilities relating to the Business, the Purchased Assets or the ownership, operation or conduct thereof arising prior to the Closing Date (other than those specifically set forth in Section 2.3 of the Stalking Horse Agreement; (ii) all Liabilities for accrued expenses and accounts payable of the Business other than Assumed Accounts Payable; (iii) all Liabilities arising out of any of the Excluded Assets; (iv) all Environmental Liabilities and Obligations; (v) all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of the rights of any third parties or caused by the use of Purchased Intellectual Property; (vi) all Liabilities for any Taxes of any Seller and all liability for Taxes in respect of the Purchased, other than Taxes assumed; (vii) all Excluded Employee Liabilities; (viii) all Liabilities arising as a result of any Legal Proceedings; (ix) all Liabilities arising under any Indebtedness of any Seller or any obligations or Liabilities to equity holders of any Seller, other than the Indebtedness under the Senior DIP Facility; (x) all Liabilities with respect to any fees, costs and expenses incurred by or on behalf of any Seller in connection with or arising from the Bankruptcy Case; (xi) all Liabilities (a) existing as of the Petition Date that are subject to compromise under the Bankruptcy Case and (b) to the extent not otherwise expressly assumed in the Stalking Horse Agreement; (xii) all Liabilities relating to any theories of law or equity involving successors or transferees; (xiii) all Liabilities under the Stalking Horse Agreement and each other agreement, document or instrument contemplated thereby; (xiv)

11

all liability, warranty and similar claims for damages or injury; and (xv) Legal Proceedings.

f.    Termination.  Section 4.4 of the Stalking Horse Agreement provides for termination of the agreement prior to the Closing as follows: (i) upon written notice if the Closing has no occurred on or before the Termination Date due to a material breach of any representation, warranty, covenant or agreed by the Stalking Horse Purchaser or any Seller; (ii) by mutual written consent; (iii) if the Stalking Horse Purchaser or any Seller breaches any representation, warranty or covenant and such breach (a) cannot be cured and (b) has not been cured as set forth in Section 4.4 of the Stalking Horse Agreement; (iv) if there is in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by the Stalking Horse Agreement; (v) if any Seller enters into a definitive agreement with respect to a Competing Transaction, the Bankruptcy Court approves a Competing Transaction or a Competing Transaction is consummated; (vi) if the Bidding Procedures Order has not been entered by December 3, 2014; (vii) if the Sale Order is not entered by January 9, 2015; (viii) if the Bankruptcy Case is covered to a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee is appointed in the Bankruptcy Case; or (ix) if there shall be excluded from the Purchased Assets any Purchased Contract that is not assignable or transferable.

g.    Agreements with Management:  There are no formal contracts or agreements between the Stalking Horse Purchaser and the Debtors' management.  The Stalking Horse Purchaser has asked the Debtors' management to continue in their current positions for the non-Debtor affiliates after the foreclosure of the stock of Reichhold Industries Inc. in Reichhold Holdings Luxembourg, S.a.r.l. (the "Foreclosure").  There is, however, no understanding or agreement regarding tenure, severance or any other employment-related issues.  If the Stalking Horse Purchaser is the successful bidder at the Auction, it is assumed the Debtors' management will be asked to assume similar positions with the Purchaser. It is anticipated that before the Foreclosure and the sale of the Purchased Assets, the parties will negotiate and enter into formal contractual arrangements.

h.    Sale to Insider.  The Stalking Horse Purchaser is a wholly owned subsidiary of Reichhold Holdings International B.V., an affiliate of the Debtors.  On or before the Closing Date, however, the holders of the 2017 Senior Secured Notes will become the owners of the Stalking Horse Purchaser as a result of a consensual foreclosure or other transfer of the stock of Reichhold Industries Inc. in Reichhold Holdings Luxembourg, S.a.r.l., the ultimate holding company of all of the non-Debtor affiliates

12

that operate outside of North America or through another agreed upon mechanism.

i.      <u>Private Sale/No Competitive Bidding</u>:  As noted above, the Debtors seek to expose the Purchased Assets to competitive bidding through an Auction pursuant to the Bidding Procedures.  If there is no higher and better offer at the Auction, the Debtors will support a sale to the Stalking Horse Purchaser.

j.      <u>Closing and Other Deadlines</u>:  As set forth in Section 4.1 of the Stalking Horse Agreement, the Closing Date shall be three (3) Business Days following the satisfaction or waiver of the obligations set forth in Section Article IX of the Stalking Horse Agreement.

k.      <u>Good Faith Deposit</u>: None.

l.      <u>Interim Arrangements with Stalking Horse Agreement</u>:  None.

m.      <u>Use of Proceeds</u>:  As set forth above, the Purchase Price is a credit bid. Additionally, the Stalking Horse Agreement provides for the payment of Sellers Closing and Wind Down Expenses (as defined in the Stalking Horse Agreement).

n.      <u>Tax Exemption</u>:  None.

o.      <u>Record Retention</u>:  Pursuant to Section 2.1(h) of the Stalking Horse Agreement, all of Sellers' Business Records are being sold.  Sellers will have access to certain records pursuant to Section 10.3 of the Stalking Horse Agreement.

p.      <u>Sale of Avoidance Actions</u>:  None.  Pursuant to Section 8.16 of the Stalking Horse Agreement, the Sellers shall not commence, assign, convey or abandon any Avoidance Action against any of the Sellers' ordinary course vendors, contract counterparties, contractors and other suppliers of composite application related services.

q.      <u>Requested Findings as to Successor Liability</u>:  The Debtors are seeking a finding in the Sale Order that Stalking Horse Purchaser is not a successor.

r.      <u>Credit Bid</u>:  As set forth above, the Purchase Price includes the Credit Bid Amount.

s.      <u>Releases</u>.  None

t.      <u>Request for Bankruptcy Rule 6004(h) Waiver</u>: As set forth below, the Debtors are requesting a waiver of the fourteen (14) day stay.

52719/0001-11008480v8

**D.**    **Bidding Procedures**

17.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by auction.  The Debtors believe that good cause exists to expose the Purchased Assets to sale at auction and to approve the procedures proposed herein.  An auction conducted substantially in accordance with the Bidding Procedures will enable the Debtors to obtain the highest and best offers for the Purchased Assets, thereby maximizing the value for the estates.

18.    The Debtors will permit existing interested parties and any new prospective purchasers to perform reasonable due diligence with respect to the Purchased Assets and will assist them with such efforts, including providing such potential purchasers with reasonable access to the Debtors' books, records, facilities, customers and executives.  This process will culminate in an Auction prior to the Sale Hearing, at which time a sale of the Purchased Assets to either the Purchaser or the Successful Bidder shall be submitted to the Court for its approval.

19.    While all interested bidders should read the Bidding Procedures (attached hereto as **Exhibit B**) in its entirety, the following describes the salient points of the Bidding Procedures and discloses certain information required pursuant to Local Rule 6004-1:[7]

a.    Bid Requirements: Any bid by a Bidder must be submitted in writing and determined by the Debtors, in consultation with the Consultation Parties, to have satisfied the following requirements:

(1)    Good Faith Deposit:  Each Bid must be accompanied by a deposit in the amount of ten percent (10%) of the purchase price contained in the Modified Asset Purchase Agreement, before any reductions for assumed indebtedness, to an interest-bearing escrow account to

---

[7] The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

be identified and established by the Debtors (the "Good Faith Deposit").

(2)   <u>Executed Agreement</u>:  Each Bid must be based on the Stalking Horse Agreement and must include binding, executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (a "Modified Asset Purchase Agreement").  A Bid must also include a copy of the Stalking Horse Agreement marked against the Modified Asset Purchase Agreement to show all changes requested by the Bidder (including those related to purchase price and to remove any provisions that apply only to the Stalking Horse Purchaser).  Each Modified Asset Purchase Agreement must provide a representation that the Qualified Bidder will (a) make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), if applicable, and (b) submit and pay the fees associated with all necessary filings under the HSR Act as soon as reasonably practicable; <u>provided</u>, <u>however</u>, the timing and likelihood of receiving HSR Act approval will be a consideration in determining the highest and best Bid.

(3)   <u>Scope of Bid</u>:  A Bid must indicate whether it contemplates the purchase of some or all of the Purchased Assets.  If a Bid is for less than all of the Purchased Assets, the Bid must identify which assets are included in the Bid.

(4)   <u>Minimum Bid</u>: A Bid must, individually or in conjunction with one or more Bids, have a purchase price, including any assumption of liabilities, that in the Debtors' reasonable business judgment has a value greater than the sum of (1) the Purchase Price (as defined in the Stalking Horse Agreement) plus (2) $1,000,000 (the "Minimum Bid"); <u>provided</u>, <u>however</u>, in the event that a potential bidder asserts a Bid for less than all of the Purchased Assets, the Debtors, after consultation with the Consultation Parties, shall preliminarily determine whether such bid (a "Preliminarily Qualified Bid") is a Qualified Bid (defined herein) even if by combining the consideration provided by such bid with other Preliminarily Qualified Bids, such combined bids do not have a value greater than the Minimum Bid; <u>provided further</u>, <u>however</u>, for such Preliminarily Qualified Bid to be a Qualified Bid and such bidder to bid at the Auction, the consideration provided by a Preliminarily Qualified Bid for less than all of the Purchased Assets, when combined with the consideration provided by other Preliminarily Qualified Bids for less than all of the Purchased Assets, must have a value equal to or greater than the Minimum Bid.

15

(5)     Designation of Assigned Contracts and Leases:  A Bid must identify with particularity each and every executory contract and unexpired lease with respect to which the Bidder seeks assignment from the Debtors.

(6)     Designation of Assumed Liabilities:  A Bid must identify all liabilities which the Bidder proposes to assume.

(7)     Corporate Authority:  A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction; provided that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

(8)     Disclosure of Identity of Bidder:  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Purchased Assets (or some subset of the Purchased Assets), including any equityholders, in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.  A Bid must also fully disclose any connections or agreements with the Debtors, the Stalking Horse Purchaser or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer, director or equity security holder of the Debtors.

(9)     Proof of Financial Ability to Perform:  A Bid must include written evidence that the Debtors may conclude, in consultation with their advisors and the Consultation Parties, demonstrates that the Bidder has the necessary financial ability to close the Alternate Transaction and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction.  Such information must include, *inter alia*, the following:

(a)     contact names and numbers for verification of financing sources;

(b)     evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a

16

recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Alternate Transaction;

(c)     the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

(d)     a description of the Bidder's pro forma capital structure; and

(e)     any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to close the Alternate Transaction.

(10)    <u>Regulatory and Third Party Approvals</u>:  A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction, and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Modified Asset Purchase Agreement, those actions the Bidder will take to ensure receipt of such approval(s) as promptly as possible).

(11)    <u>Contact Information and Affiliates</u>:  The Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

(12)    <u>Contingencies</u>:  Each Bid (1) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Debtors than those set forth in the Stalking Horse Agreement and (2) may not be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of unperformed due diligence, including with respect to Environmental Laws (as defined in the Stalking Horse Agreement).

(13)    <u>Irrevocable</u>:  Each Bid must be irrevocable until five (5) business days after the Sale Hearing, <u>provided</u> that if such Bid is accepted as the Successful Bid or the Backup Bid, such Bid shall continue to

52719/0001-11008480v8

remain irrevocable, subject to the terms and conditions of the
Bidding Procedures.

(14)    <u>Compliance with Diligence Requests</u>:  The Bidder submitting the
Bid must have complied with reasonable requests for additional
information and due diligence access from the Debtors to the
satisfaction of the Debtors.

(15)    <u>Confidentiality Agreement</u>:  To the extent not already executed,
the Bid must include an executed confidentiality agreement in
form and substance reasonably satisfactory to the Debtors.

(16)    <u>Termination Fees</u>:  The Bid must not entitle the Bidder to any
break-up fee, termination fee, expense reimbursement or similar
type of payment or reimbursement and, by submitting the Bid, the
Bidder waives the right to pursue a substantial contribution claim
under 11 U.S.C. § 503 related in any way to the submission of its
Bid or participation in any Auction.

(17)    <u>Closing Date</u>:   The Bid must include a commitment to close the
transactions contemplated by the Modified Asset Purchase
Agreement by January 30, 2015.

(18)    <u>Qualified Bid</u>.  A Bid received from a Bidder that meets the above
requirements shall constitute a Qualified Bid for such assets and
such Bidder shall constitute a Qualified Bidder.

b.    <u>Bid Deadline.</u> Each bid must be transmitted in writing (in both PDF and
Word format) so as to be **actually received** by counsel to the Debtors, the
Debtors' financial advisor, the Stalking Horse Bidder, counsel to the
Stalking Horse Bidder, counsel to the UCC and the UCC's financial
advisors on or before December 30, 2014 at 5:00 p.m. (prevailing Eastern
Time) (the "Bid Deadline").

c.    <u>Auction Participation.</u>  The Debtors, the Consultation Parties, the DIP
Lenders, the Stalking Horse Purchaser and any other Qualified Bidder, in
each case, along with their representatives and counsel, shall attend the
Auction (such attendance to be in person); <u>provided</u>, <u>however</u>, that any
creditor may attend (but not participate) in the Auction if they provide
written notice of their intention to attend the Auction on or before the Bid
Deadline.  Such written notice must be sent to counsel for the Debtors via
electronic mail.  In addition, only the Stalking Horse Purchaser and such
other Qualified Bidders will be entitled to make any Bids at the Auction.

d.    <u>The Auction.</u> If one or more Qualified Bids, other than the Stalking Horse
Bid, are received by the Bid Deadline, the Debtors will conduct the
Auction to determine the Successful Bidder with respect to the Debtors'
Assets. If no Qualified Bid (other than the Stalking Horse Bid) is received

18

by the Bid Deadline, the Debtors shall not conduct the Auction and shall accept the Stalking Horse Agreement, in which case the Stalking Horse Agreement shall be the Successful Bid and the Stalking Horse Purchaser shall be the Successful Bidder. If one or more Qualified Bids for substantially all of the Purchased Assets are submitted by the Bid Deadline, the Auction shall take place on January 6, 2015 at 10:00 a.m. (prevailing Eastern Time) at the offices of Hahn & Hessen, LLP, lead counsel for the UCC, 488 Madison Avenue, 14th Floor, New York, New York, 10022, or such other place as Sellers shall designate and notify all Qualified Bidders, the Stalking Horse Purchaser and its counsel, the DIP Agents and their counsel and the UCC and their counsel.

e.     <u>Terms of Overbids</u>. To submit an Overbid, a Bidder must comply with the following conditions:

(1)     <u>Minimum Overbid Increments.</u>  Any Overbid for all or a subset of the Purchased Assets after and above the respective Auction Baseline Bid shall be made in increments valued at not less than $500,000 in cash or in cash equivalents, or other forms of consideration acceptable to the Debtors, in consultation with the Consultation Parties. The Stalking Horse Purchaser shall be entitled to submit Overbids in cash, cash equivalents or other forms of consideration, or additional credit bid amounts up to the allowed amount of the Stalking Horse Purchaser's claim. Pursuant to section 363(k) of the Bankruptcy Code, the Stalking Horse Purchaser shall be authorized to credit bid additional amounts owed under the Junior DIP Facility (as defined in the DIP Order) not included in the Stalking Horse Agreement, before being required to bid with cash.

(2)     <u>Remaining Terms Are the Same as for Qualified Bids</u>: Except as modified in the Bidding Procedures, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, <u>provided</u>, <u>however</u>, that the Bid Deadline shall not apply. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse Agreement or Modified Asset Purchase Agreement, as the case may be, in connection therewith. Any Overbid must remain open and binding on the Bidder. At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors in consultation with the Consultation Parties), a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) reasonably demonstrating such Bidder's ability to close the Alternate Transaction proposed by such Overbid.

(3)     <u>Backup Bidder</u>. Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise best Qualified Bid at the Auction, as determined by the Debtors, after consultation with the Consultation Parties, in the exercise of their reasonable business judgment, shall be designated the backup bidder (the "Backup Bidder").

f.      <u>Reservation of Rights</u>. Except as otherwise provided in the Stalking Horse Agreement, the Bidding Procedures or the Bidding Procedures Order, the Debtors further reserve the right as they may reasonably determine to be in the best interest of their estates, in consultation with the Consultation Parties to:  (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or best proposal and which is the next highest or best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtors and their estates; (e) waive terms and conditions set forth in the Bidding Procedures with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth in the Bidding Procedures; (h) continue or cancel the Auction and/or Sale Hearing in open court, or by filing a notice on the docket of the Debtors' Chapter 11 Cases, without further notice to creditors or other parties in interest; and (i) modify the Bidding Procedures and implement additional procedural rules that the Debtors determine, in their business judgment, in consultation with the Consultation Parties, will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties; <u>provided</u>, <u>however</u>, any modification or additions to the Bidding Procedures shall not be materially inconsistent with any Bankruptcy Court order, the Stalking Horse Agreement, the Bidding Procedures Order or any other Order of the Court.

g.      <u>Return of Good Faith Deposit</u>.  The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court.  The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing.  The Good Faith Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder 72 hours after the closing of the transaction with the Successful Bidder for the assets bid upon by the Backup Bidder.  Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon.  If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards the purchase prices.

20.     Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

21.     The Debtors believe that the foregoing Bidding Procedures provide an appropriate framework for the sale of the Purchased Assets in a uniform fashion and will enable the Debtors to review, analyze and compare all offers received to determine which offer is in the best interests of the Debtors' estates and creditors.  Moreover, given the Reichhold Companies' discussions regarding various business combinations with other industry players, the Debtors believe that the proposed deadlines and milestones for noticing, marketing and selling the Purchased Assets offer potential bidders ample opportunity to prepare and submit Qualified Bids for the Purchased Assets.  Therefore, the Debtors respectfully request that the Court approve the Bidding Procedures.

**E.      The Auction and Sale Hearing Notice and Notice of Motion**

22.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their creditors of the proposed sale of the Assets, including disclosure of the time and place of the Auction, the terms and conditions of the sale, and the deadline for filing any objections thereto. The Auction and Sale Hearing Notice (a copy of which is attached hereto as **Exhibit D**) contains information required under Rule 2002(a) and (c), and also includes details about the Bidding Procedures and the procedures for the submission of competing Bids.  This information will enable interested parties to participate in the Auction and the Sale Hearing if they so choose. The Debtors accordingly request that the Court approve the form and content of the Auction and Sale Hearing Notice.

21

23.      The Debtors propose to serve the Bidding Procedures Order and the Bidding

Procedures within two (2) business days of entry of the Bidding Procedures Order, by first-class

mail, postage prepaid, or email, where available, to (a) all entities known to have expressed an

interest in a transaction with respect to some or all of the Purchased Assets at any time and such

other parties identified by the Consultation Parties prior to the date hereof; (b) all entities known

to have asserted any lien, claim, interest or encumbrance in or upon any of the Purchased Assets;

(c) all federal, state and local environmental, regulatory or taxing authorities or recording offices

which have a reasonably known interest in the relief requested by the Motion; (d) the United

States Attorney's office; (e) the state Attorney General's offices where the Purchased Assets are

located; (f) the Securities and Exchange Commission; (g) the Internal Revenue Service;

(h) counsel to any official committee appointed in the Chapter 11 Cases, including counsel to the

UCC; (i) counsel to the agent for the Debtors' pre-petition lenders; (j) counsel to the agents for

the post-petition lenders; (k) the indenture trustee under the 2017 Senior Secured Notes; (l) all of

the labor unions that represent employees of any Debtor; (m) certain counterparties to executory

contracts and unexpired leases; and (m) those parties who have filed the appropriate notice

requesting notice of all pleadings filed in the Chapter 11 Cases.  On that date, the Debtors (or

their agents) will also serve by first-class mail, postage prepaid, the Auction and Sale Hearing

Notice upon all other known creditors of the Debtors.  The Debtors shall also cause notice

substantially in the form of the Auction and Sale Hearing Notice to be published in the national

edition of *The Wall Street Journal* within two (2) business days of the entry of the Bidding

Procedures Order, or as soon thereafter as practicable.  Additionally, the Debtors, in their

discretion, shall provide international notice of the proposed sale either through publication

22

substantially in the formation of the Auction and Sale Hearing Notice or by issuing a press release.

24.     The Debtors submit that (a) the notice to be provided through the Auction and Sale Hearing Notice and this Motion; and (b) the method of service and publication proposed herein constitutes good and adequate notice of the sale of the Purchased Assets and the proceedings to be had with respect thereto (including, but not limited to, the Auction and Sale Hearing).  Therefore, the Debtors respectfully request that the Court approve the foregoing notice procedures.

**F.     Assumption and Assignment of the Assigned Contracts and Assigned Leases**

25.     The Stalking Horse Agreement contemplates that the Debtors will assume and assign the Assigned Contracts and the Assigned Leases to the Stalking Horse Purchaser.  In accordance with the proposed Bidding Procedures Order and the Stalking Horse Agreement, the Debtors will serve a Cure Notice in the form attached hereto as **Exhibit E** on each counterparty to an Assigned Contract and Assigned Lease and their known counsel (the "Cure Notice").  The Cure Notice shall (i) state the cure amounts that the Debtors believe are necessary to assume such Assigned Contracts and Assigned Leases pursuant to section 365 of the Bankruptcy Code (the "Cure Amount"); (ii) notify the non-Debtor party that such party's contract or lease may be assumed and assigned to a purchaser of the Purchased Assets at the conclusion of the Auction; (iii) state the date of the Sale Hearing and that objections to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors; and (iv) state a deadline by which the non-Debtor party shall file an objection to the Cure Amount or to the assumption and assignment of the Assigned Contracts and/or Assigned Leases; provided, however, that the inclusion of a contract, lease or agreement on the Cure Notice shall not constitute an admission that such contract, lease or agreement is an executory

23

contract or lease.  If no Cure Amount is listed, the Debtors believe that no amount to cure

defaults under each respective executory contract or unexpired lease is owing to the Assigned

Contract or Assigned Lease counterparty. The Debtors reserve all of their rights, claims and

causes of action with respect to the contracts, leases and agreements listed on the Cure Notice.

      26.     The Debtors propose that, unless an Assigned Contract or Assigned Lease

counterparty files an objection to the Cure Amount contained in the Cure Notice (a "Cure

Objection") by a date to be fixed by the Court (or in the event the Stalking Horse Purchaser is

not the Successful Bidder, at or prior to the Sale Hearing, solely with respect to the issue of

adequate assurance), and serves the objection on (a) the Debtors, 1035 Swabia Ct. Durham,

North Carolina 27703 (Attn: Roger L. Willis (roger.willis@reichhold.com)); (b) counsel for the

Debtors, Cole, Schotz, Meisel, Forman & Leonard, P.A., 500 Delaware Avenue, Suite 1410,

Wilmington, Delaware 19801 (Attn: Norman L. Pernick (npernick@coleschotz.com); Marion M.

Quirk, Esq. (mmquirk@coleschotz.com) and Gerald H. Gline, Esq. (ggline@coleschotz.com));

(c) financial advisor to the Debtors, CDG Group, LLC, 650 Fifth Avenue, 20th Floor, New York,

New York 1019 (Attn: Robert A. Del Genio (rdelgenio@cdggroup.com) and John Strek

(jstrek@cdggroup.com)); (d) counsel to the UCC, (i) Hahn & Hessen LLP, 488 Madison

Avenue, 14th and 15th Floor, New York, New York, 10022, Attn: Mark S. Indelicato, Esq., Mark

T. Power, Esq. and Janine M. Figueiredo, Esq. (mindelicato@hahnhessen.com,

mpower@hahnhessen.com and jfigueiredo@hahnhessen.com) and (ii) Blank Rome LLP, 1201

Market Street, Suite 800, Wilmington, DE 19801, Attn: Bonnie Glantz Fatell, Esq. and Josef W.

Mintz, Esq. (fatell@blankrome.com and mintz@blankrome.com); (e) financial advisor to the

UCC, Capstone Advisory Group, LLC, Park 80 West, 250 Pehle Avenue, Suite 105, Saddle

Brook, New Jersey 07663, Attn: David Galfus, Finbarr T. O'Connor and Rick Wright

(dgalfus@captoneag.com, foconnor@capstoneag.com and rwright@capstoneag.com); (f)

counsel to the DIP Agents, (i) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000

North King Street, Wilmington, DE 19801, Attn: Pauline Morgan (pmorgan@ycst.com) and (ii)

Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY

10019, Attn: Andrew Rosenberg, Esq. and Elizabeth McColm, Esq. (arosenberg@paulweiss.com

and emccolm@paulweiss.com); (g) financial advisors to the DIP Agents, Houlihan Lokey

Capital, Inc., 10250 Constellation Blvd., 5th Floor, Los Angeles, CA 90067, Attn: Christopher R.

DiMauro and Geoffrey Coutts (gcoutts@hl.com and cdimauro@hl.com); (h) counsel to the

Stalking Horse Purchaser, (i) Latham & Watkins LLP, 885 Third Avenue, New York, New York

10022-4834, Attn: D.J. Baker (d.j.baker@law.com) and (ii) Morris, Nichols, Arsht & Tunnell,

LLP, 1201 North Market Street, 16th Floor, Wilmington, Delaware 19801, Attn: Derek C.

Abbott, Esq., (dabbot@mnat.com); (i) financial advisors to the Stalking Horse Purchaser, Moelis

& Company, 1999 Avenue of the Stars, Suite 1900, Los Angeles, California 90067, Attn: Robert

Flachs (Robert.flachs@moelis.com); and (j) the United States Trustee for the District of

Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Mark S.

Kenney (Mark.Kenney@usdoj.gov), such counterparty shall (i) be forever barred from objecting

to the Cure Amount and from asserting any additional cure or other amounts arising prior to the

Closing Date with respect to such Assigned Contract or Assigned Lease and the Debtors,

Stalking Horse Purchaser and/or Successful Bidder shall be entitled to rely solely upon the Cure

Amount set forth in the Cure Notice; (ii) be deemed to have consented to the Debtors'

assumption and assignment of such Assigned Contract or Assigned Lease to the Stalking Horse

Purchaser; and (iii) be forever barred and estopped from asserting or claiming against the

Debtors, Stalking Horse Purchaser and/or Successful Bidder or any other assignee of the relevant

25

Assigned Contract or Assigned Lease that any additional amounts are due or defaults exist under

such Assigned Contract or Assigned Lease as of the Closing Date.

27.    In the event a Cure Objection is timely filed, the Cure Objection must (i) state the

basis for the objection and (ii) state with specificity what cure amount the party to the Assigned

Contract or Assigned Lease believes is required (in all cases with appropriate documentation in

support thereof) and, if applicable, include all requests for the provision of adequate assurance of

future performance by the Stalking Horse Purchaser..  If the Debtors and any objecting

counterparty cannot consensually resolve such party's Cure Objection, the Stalking Horse

Purchaser, Successful Bidder or any other assignee will segregate any disputed Cure Amounts

pending the resolution of any such disputes by the Court or mutual agreement of the parties.

Hearings on Cure Objections may be held (a) at the Sale Hearing, or (b) on such other date as the

Court may designate.

28.    The Stalking Horse Purchaser will provide all non-Debtor parties to Assigned

Contracts and Assigned Leases information regarding the Stalking Horse Purchaser's adequate

assurance of future performance pursuant to Section 365 of the Bankruptcy Code within one (1)

week prior to the deadline established for objecting to the approval of the sale.  The provision of

such information shall not bar, estop or otherwise enjoin any non-Debtor party to an Assigned

Contract or Assigned Lease from objecting at the Sale Hearing to the sufficiency of the adequate

assurance of future performance.

## GROUNDS FOR APPROVAL OF THE MOTION

### A.    The Bidding Procedures Are Fair and Are Designed to Maximize the Value Received for the Purchased Assets

29.    The Debtors believe that the Bidding Procedures are appropriate under Sections

105 and 363 of the Bankruptcy Code to ensure that the bidding process is fair and reasonable and

will yield the maximum value for their estates and creditors.  The Bidding Procedures proposed

herein are designed to maximize the value received for the Debtors' assets by facilitating a

competitive bidding process in which all potential bidders are encouraged to participate and

submit competing bids.  The Bidding Procedures provide potential bidders with sufficient notice

and opportunity to acquire information necessary to submit a timely and informed bid.  Thus, the

Debtors and all parties in interest can be assured that the consideration for the Purchased Assets

will be fair and reasonable.  At the same time, the Bidding Procedures provide the Debtors with

the opportunity to consider all competing offers and to select, in their reasonable business

judgment, and after consultation with the Consultation Parties (as defined in the Bidding

Procedures), the highest and best offer for the Purchased Assets.

30.     Accordingly, the Debtors believe the Court should approve the Bidding

Procedures.  Similar procedures have been previously approved by Courts in this District.  See

e.g., In re Synagro Technologies, Inc., Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013);

In re ICL Holding Company, Inc. (f/k/a LCI Holding Company, Inc.), Case No. 12-13319 (KG)

(Bankr. D. Del. Jan. 25, 2013); In re Vertis Holdings, Inc., Case No. 12-12821 (CSS) (Bankr. D.

Del. Nov. 2, 2012); In re A123 Systems, Inc., Case No. 12-12859 (KJC) (Bankr. D. Del. Nov. 8,

2012).

**B.     The Stalking Horse Purchaser Should Be Allowed To Credit Bid The Full Value Of the Junior DIP Facility**

31.     Section 363(k) of the Bankruptcy Code states: "[a]t a sale under subsection (b) of

[Section 363] of property that is subject to a lien that secures an allowed claim, if the holder of

such claim purchases such property, such holder may offset such claim against the purchase

price of such property."  11 U.S.C. § 363(k).  Indeed, "[i]t is beyond peradventure that a secured

creditor is entitled to credit bid its allowed claim."  See In re Fisker Auto. Holdings, Inc., 510

27

B.R. 55, 59(Bankr. D. Del. 2014)[8] (citing Radlax Gateway Hotel, LLC v. Amalgamated Bank,

132 S.Ct. 2065 (2012); In re Philadelphia Newspapers, LLC, 599 F.3d 298 (3d Cir. 2010)).

Where a secured creditors' claim is allowed, as is the case here, it is well settled in the Third

Circuit that secured creditors can bid up to the full face value of their secured claims under

Section 363(k).  In re Submicron Sys. Corp., 432 F.3d 448 (3d Cir. 2006); In re GWLS Holdings,

Inc., Slip Copy, 2009 WL 453110 (Bankr. D. Del. 2009).  This proposition is supported by other

district and bankruptcy courts.  See, e.g., In re SunCruz Casinos, LLC, 298 B.R. 833, 839

(Bankr. S.D. Fla. 2003) ("[T]he plain language of [Section 363(k)] makes clear that the secured

creditor may credit bid its *entire claim*, including any unsecured deficiency portion thereof."

(emphasis in original)); In re Morgan House Gen. P'ship, Nos. 96-MC-184 & 96-MC-185, 1997

WL 50419, at *1 (E.D. Pa. Feb. 7, 1997) (holding that secured creditors may bid "to the extent of

[their] claim" under § 363(k)); In re Midway Invs., Ltd., 187 B.R. 382, 391 n. 12 (Bankr. S.D.

Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's allowed claim,

including the secured portion and any unsecured portion thereof' (citing legislative history)

(alteration in original) (internal quotation marks omitted)); In re Realty Invs., Ltd. V, 72 B.R.

143, 146 (Bankr. C.D. Cal. 1987) (same); see also Criimi Mae Servs. Ltd. P'ship v. WDH

Howell, LLC (In re WDH Howell, LLC), 298 B.R. 527, 532 n. 8 (Bankr. D.N.J. 2003).

---

[8] In Fisker, Chief Judge Gross recently observed that the language in Section 363(k) that the Bankruptcy Court may "for cause order[ ] otherwise" justified limiting a secured creditor's credit bidding rights to the amount it paid for its secured claim.  See Fisker,55 B.R. at 59.  In that case, and critical to the court's ruling, the parties stipulated to the following facts (among others): "the assets offered for sale" would include "material assets that are not subject to properly perfected liens in favor of [the proposed credit bidder] and ... material assets where there is a dispute as to whether [the proposed credit bidder] has a properly perfected lien, which dispute is not likely subject to quick or easy resolution."  Id. at 58. In Fisker, the court was also concerned about the compressed timing that the stalking horse bidder was imposing (i.e. allowing only 24 business days for parties to object to the sale). Id. at 60. The concerns that the court in Fisker confronted simply do not apply here.  The Stalking Horse Purchaser, as DIP lender, clearly has a lien on all of the assets it is acquiring under its credit bid and there can be no reasonable dispute as to the validity of its liens and claims.

32.     Further, a plain reading of Section 363(k) would permit a DIP lender that maintains a lien on property securing its allowed claim to credit bid its debt to purchase property subject to that lien.  There have been numerous orders entered in the lower courts in the Third Circuit and outside the Third Circuit permitting DIP lenders to credit bid.  See, e.g., In re MEE Apparel LLC and MEE Direct LLC, Case No. 14-16484 (CMG) (Bankr. D.N.J. April 25, 2014) (approving DIP lender to credit bid); In re PTC Alliance Corp., Case No. 09-13395 (CSS), 2010 WL 5054210, at * 1 (Bankr. D. Del. March 10, 2010), Bidding Procedures Order (authorizing, among other parties, the DIP lender to credit bid the DIP credit facility pursuant to Section 363(k)); In re Champion Enters., Inc., Case No. 09-14019, 2010 WL 2723820, at *4 (Bankr. D. Del. March 2, 2010), Sale Order (finding that the credit bid from the DIP lender constitutes a valid, effective and enforceable credit bid pursuant to Sections 363(b), 363(k) and 363(n)); In re KLCG Prop., LLC, Case No. 09-14418, 2010 WL 5093146, at *17 (Bankr. D. Del. Jan. 28, 2010), Final DIP Order (holding that DIP Lender may exercise its rights to credit bid its indebtedness under Section 363(k) of the Bankruptcy Code); In re Delphi Corp., 2009 WL 2482146, at * 6 (Bankr. S.D.N.Y. July 30, 2009), Order Approving Modifications to First Amended Plan (noting that at the auction of the debtor's assets, the DIP agent on behalf of the DIP lenders made a credit bid for the debtor's assets, which was submitted in conformity with Section 363(k) of the Bankruptcy Code, in an amount equal to 100% of the principal and interest due and owing in respect of the DIP loan under the DIP credit agreement); In re Chrysler LLC, Case No. 09-50002, 2009 WL 1360863, at * 10 (Bankr. S.D.N.Y. May. 4, 2009), Interim DIP Order (the DIP Lenders may credit bid the loans and the additional notes under the DIP credit facility pursuant to Section 363(k) of the Bankruptcy Code).  Here, the Interim Order approving

29

the DIP Facilities provided that the DIP Lenders had the right to credit bid under Section 363(k) of the Bankruptcy Code.

33.    Accordingly, the Stalking Horse Purchaser can bid any portion, or the full face value (as the Stalking Horse Agreement proposes), of the Junior DIP Facility under and to the fullest extent permitted by Section 363(k) of the Bankruptcy Code.

**C.    Approval of the Sale is Warranted Under Bankruptcy Code Section 363(b)**

34.    Compelling business justifications exist for the proposed sale of the Purchased Assets pursuant to the Stalking Horse Agreement.  The Debtors do not have sufficient liquidity or access to financing to fund their operations beyond the proposed time frame for selling the Purchased Assets as set forth above.  Accordingly, the Debtors have determined that it is in the best interests of their creditors and estates to sell the Purchased Assets to the Stalking Horse Agreement according to the Bidding Procedures and other terms and conditions set forth in the Stalking Horse Agreement.  Among other things, the Stalking Horse Agreement provides what the Debtors believe is the best possible opportunity to (a) preserve the going-concern value of the Purchased Assets, (b) preserve jobs for a large percentage of the Debtors' employees, and (c) obtain the highest value for the Purchased Assets for the benefit of the Debtors' estates and creditors.

35.    Notwithstanding the Debtors' belief that the terms of the Stalking Horse Agreement are fair and reasonable, the Purchased Assets will still be exposed to higher and better offers. The sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code will enable the Purchased Assets to be transferred expeditiously, which is necessary to maximize and preserve the going-concern value of the Purchased Assets.

52719/0001-11008480v8

36.    Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).

37.    Following the decision in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986), courts have used the "sound business purpose" standard for approving sales pursuant to Section 363. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (elements necessary for approval of a Section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

38.    The "sound business purpose" test requires a debtor to establish:  "(1) a sound business purpose exists; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith."  In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing Del. & Hudson Ry. Co., 124 B.R. at 176).

39.    As discussed above, based upon an analysis of their ongoing and future business prospects, the Debtors have concluded that, in light of the distressed nature of the Debtors' business, and the Debtors' inability to raise additional capital, the sale of the Purchased Assets represents the best manner in which to maximize the value to creditors of the Debtors' estates and therefore satisfies the "sound business purpose" test for the sale of assets outside the ordinary course of business under Section 363(b) of the Bankruptcy Code.  Preservation of

31

enterprise value for the benefit of all constituencies is a compelling circumstance, and

maximization of asset value for the benefit of all creditors is a sound business purpose,

warranting authorization of the proposed sale of the Purchased Assets.

40.     The Debtors are confident that their efforts have yielded a fair and reasonable

price for the Purchased Assets under the circumstances.  The Debtors, the Court, and all parties

in interest can be assured that the Purchased Assets will be sold for fair market value.

Consequently, fairness and reasonableness of the consideration to be received from the Stalking

Horse Purchaser ultimately will be demonstrated by adequate "market exposure" and an Auction

process – the best means for establishing whether a fair and reasonable price is being paid.

41.     In addition to a fair and reasonable value offered by the Stalking Horse Purchaser,

the Stalking Horse Agreement is the product of vigorous arms'-length, good faith negotiations

between the parties.  The negotiations involved substantial time and energy by the parties and

their professionals, and the Stalking Horse Agreement reflects a give-and-take and compromises

by both sides.

**D.      The Purchased Assets Should be Sold Free and Clear of Liens, Claims and Encumbrances under 11 U.S.C. § 363(f)**

42.     The Debtors also submit that the sale of the Purchased Assets should be free and

clear of any and all Liens, claims and encumbrances that may be asserted by any third party

(other than with respect to Assumed Liabilities).  Section 363(f) of the Bankruptcy Code permits

a debtor to sell property free and clear of third-party interests only if:

> (1) applicable nonbankruptcy law permits sale of such property
> free and clear of such interests; (2) such entity consents; (3) such
> interest is a lien and the price at which such property is to be sold
> is greater than the aggregate value of all liens on such property; (4)
> such interest is in bona fide dispute; or (5) such entity could be
> compelled, in a legal or equitable proceeding, to accept a money
> satisfaction of such interest.

32

11 U.S.C. § 363(f).  Since Section 363(f) is written in the disjunctive, any of the five conditions,

including the "consent" of the lienholders, provides authority to sell free and clear of liens.  See

Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988); In re

Pacific Energy Resources Ltd., et al., Case No. 09-10785 (KJC) (Bankr. D. Del. Aug. 18, 2009);

In re Flying J Inc., et al., Case No. 08-1334 (MFW) (Bankr. D. Del. July 27, 2009); In re Eddie

Bauer Holdings, Case No. 09-12099 (MFW) (Bankr. D. Del. July 23, 2009); In re Hancock

Fabrics, Inc., Case No. 07-10353 (BLS) (Bankr. D. Del. April 30, 2007); In re Copelands'

Enters. Inc., Case No. 06-10853 (MFW) (Bankr. D. Del. Nov. 29, 2006); In re Three A's

Holdings, LLC, Case No. 06-10886 (BLS) (Bankr. D. Del. Nov. 17, 2006).

43.     The Debtors submit that each lien that is not an Assumed Liability satisfies at

least one of the five conditions of Section 363(f) of the Bankruptcy Code, and that any such lien

will be adequately protected by either being paid in full at the time of closing, or by having it

attach to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess

with respect thereto.  The Debtors accordingly request that the Purchased Assets be transferred to

the Stalking Horse Purchaser, or to the Successful Bidder at Auction, free and clear of Liens

(other than with respect to Permitted Liens and Assumed Liabilities) with such liens to attach to

the proceeds of the sale as set forth herein.

44.     The Debtors will send to any purported lienholders both the Auction and Sale

Hearing Notice and notice of this Motion (with the Motion and exhibits attached).  The Debtors

believe that such lienholders do not object to the proposed sale.  Accordingly, the Debtors

request that unless any party asserting a Lien in any of the Purchased Assets (other than with

respect to Assumed Liabilities and Permitted Liens except as otherwise provided in the Sale

52719/0001-11008480v8

Order) timely objects to this Motion, all such parties shall be deemed to have consented to any sale approved at the Sale Hearing.

45.    The Debtors also submit that it is appropriate to sell the Purchased Assets free and clear of successor liability relating to the Debtors' businesses.  Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors. Courts have consistently held that a buyer of a debtor's assets pursuant to a Section 363 sale takes free and clear from successor liability relating to the debtor's business.  See e.g., In re Ormet, 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an under-funded pension plan); In re Tran World Airlines, Inc., 322 F.3d 283, 288-290 (3d Cir. 2003) (sale of assets pursuant to Section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); In re Leckie Smokeless Coal Co., 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); In re Insilco Techs., Inc., 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that 363 sale permits a buyer to take ownership of property without concern that a creditor will file suite based on a successor liability theory); see also In re General Motors Corp., 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) (holding that "[T]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction"); In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction").

34

46.      The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, the Debtors would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid amounts.  To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Purchased Assets free and clear.

E.      **A Successful Bidder Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

47.      Pursuant to Section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., Case No. 03-51524, 2007 WL 1428477 (Bankr. D.N.J. May 11, 2007); Abbotts Dairies of Penn., 788 F.2d at 147.

48.      The Stalking Horse Agreement was negotiated at arm's-length, with both parties represented by their own counsel.  Accordingly, the Debtors request that the Sale Order include a provision that the Successful Bidder for the Purchased Assets is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code.  The Debtors believe that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Purchased Assets.

F.      **Assumption and Assignment of Certain Assigned Contracts and Assigned Leases**

49.      As required by the Stalking Horse Agreement, and in order to enhance the value to the Debtors of the Assets (by curtailing further administrative liability to the estates and eliminating substantial rejection claims) the Debtors request authority, under Section 365 of the

35

Bankruptcy Code, to assume and assign the Assigned Contracts and Assigned Leases to the

Stalking Horse Purchaser or, alternatively, to the Successful Bidder at the Auction.  The Debtors

further request that the order approving the sale of the Purchased Assets provide that the

Assigned Contracts and Assigned Leases will be transferred to, and remain in full force and

effect for the benefit of, the Stalking Horse Purchaser (or the Successful Bidder at Auction)

notwithstanding any provisions in the Assigned Contracts and Assigned Leases, including those

described in Sections 365(b)(2), (f)(1) and (f)(3) of the Bankruptcy Code, that prohibit such

assignments.

      50.     The Debtors may, subject to Court approval, assume and assign executory

contracts and unexpired leases under Section 365 of the Bankruptcy Code.  11 U.S.C. § 365(a).

Courts routinely approve motions to assume, assume and assign, or reject executory contracts or

unexpired leases upon a showing that a debtor's decision to take such action will benefit the

debtor's estate and is an exercise of sound business judgment.  See, e.g., L.R.S.C. Co. v. Rickel

Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 298 (3d Cir. 2000); Sharon Steel

Corp. v. National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 39-40 (3d Cir.

1989); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006); In re Network Access

Solutions, 330 B.R. 67, 75 (Bankr. D. Del. 2005); Computer Sales Int'l v. Federal Mogul (In re

Federal Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003); In re HQ Global Holdings, Inc.,

290 B.R. 507, 511 (Bankr. D. Del. 2003); In re ANC Rental Corp., 278 B.R. 714, 723 (Bankr. D.

Del. 2002).  Further, such relief has been recently granted by this Court and other courts in this

jurisdiction.  See, e.g., In re Pacific Energy Resources Ltd., et al., Case No. 09-10785 (KJC)

(Bankr. D. Del. Aug. 18, 2009); In re Flying J Inc., et al., Case No. 08-1334 (MFW) (Bankr. D.

Del. July 27, 2009); In re Eddie Bauer Holdings, Case No. 09-12099 (MFW) (Bankr. D. Del.

July 23, 2009); In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. June 3,

2009); In re Hancock Fabrics, Inc., Case No. 07-10353 (BLS) (Bankr. D. Del. July 10, 2007); In

re Copelands' Enters. Inc., Case No. 06-10853 (MFW) (Bankr. D. Del. Nov. 29, 2006); In re

Three A's Holdings, LLC, Case No. 06-10886 (BLS) (Bankr. D. Del. Nov. 17, 2006).  The

assumption and assignment of the Assigned Contracts and the Assigned Leases set forth in the

Stalking Horse Agreement is a necessary part of the deal that the Debtors have struck with

Stalking Horse Purchaser.

   51. Section 365(b)(1) of the Bankruptcy Code requires that, if there has been a default

in a debtor's unexpired lease or executory contract, other than certain, nonmonetary defaults as

set forth in the statute, such unexpired lease or executory contract may not be assumed unless, at

the time of the assumption, (i) such default is cured or there is adequate assurance that such

default will be cured, (ii) compensation or adequate assurance of compensation is provided for

any actual pecuniary loss resulting from such default and (iii) adequate assurance of future

performance under the lease is provided.  11 U.S.C. § 365(b)(1)(A)-(C).

   52. Pursuant to the terms of the proposed Bidding Procedures Order, the Debtors will

send the Cure Notice to all counterparties to the Assigned Contracts and Assigned Leases,

notifying such counterparties of the potential assumption by the Debtors and assignment to the

Stalking Horse Purchaser (or to Successful Bidder at Auction) of the Assigned Contracts and the

Assigned Leases.  The Cure Notice will also set forth the Cure Amount owing for each such

Assigned Contract and Assigned Lease, according to the Debtors' books and records.

   53. Counterparties to the Assigned Contracts and Assigned Leases will be given time

(as will be set forth in the Bidding Procedures Order) to file an objection to the proposed Cure

Amount set forth in the Cure Cost Notice.  To the extent no objection is filed with regard to a

particular Cure Amount, such Cure Amount shall be binding on the Debtors, the Stalking Horse

Purchaser and the applicable Assigned Contract or Assigned Lease counterparty.  The payment

of the Cure Amounts specified in the Cure Notice (or a different amount either agreed to by the

Debtors or resolved by the Court as a result of a timely-filed objection by an Assigned Contract

or Assigned Lease counterparty) will be in full and final satisfaction of all obligations to cure

defaults and compensate the counterparties for any pecuniary losses under such contracts or

leases pursuant to Section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine, prior

to the Sale Hearing, that a particular lease or contract is not truly executory, and does not need to

be cured to transfer the Purchased Assets to the Stalking Horse Purchaser.

      54.      Section 365(f)(2)(B) of the Bankruptcy Code states that a debtor may assign its

unexpired leases and/or executory contracts if, *inter alia*, the assignee provides "adequate

assurance of future performance. "  11 U.S.C. § 365(f)(2)(B).  If necessary, the Stalking Horse

Purchaser, or the Successful Bidder at the Auction, will be required to submit, among other

things, written evidence of their ability to provide adequate assurance of future performance

under the applicable contracts.  Contract parties will also be able to challenge the Successful

Bidder's ability to provide adequate assurance at the Sale Hearing.

      55.      Any assumption and assignment of an Assigned Contract or Assigned Lease will

be subject to all of the provisions of such Assigned Contract or Assigned Lease, to the extent

required by applicable law and in accordance with applicable provisions of the Bankruptcy Code.

The Bidding Procedures are designed to ensure that any Successful Bidder is financially able and

prepared to undertake all of the relevant obligations under the Assigned Contracts and Assigned

Leases, and the Debtors will establish, as necessary, at the Sale Hearing, the requisite adequate

assurance of future performance pursuant to Section 365 of the Bankruptcy Code with respect to

52719/0001-11008480v8

the potential assumption and assignment of the Assigned Contracts and Assigned Leases. Consequently, assumption and assignment of the Assigned Contracts and the Assigned Leases is appropriate under the circumstances.

## G.    The Form, Manner and Extent of Notice of the Motion and the Proposed Sale are Appropriate and Adequate Under the Circumstances

56.    The Debtors will serve the Auction and Sale Hearing Notice and the Assumption Notice in accordance with the Procedures Order.

57.    The Debtors will have served this Motion (with all exhibits), and the Notice of Motion as set forth herein.  The notice of the proposed sale given by the Debtors sufficiently describes the terms and conditions of the proposed sale.

58.    Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service.  As discussed below, the content and manner of service of this Motion and the related notices satisfy all such requirements:

h.    Section 363 Notice – Section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and hearing."  Under Section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances."  11 U.S.C. § 102(1)(A).  As set forth above, creditors have been provided notice of the salient details regarding this Motion and the Sale Hearing.  Accordingly, notice is sufficient under Section 363 of the Bankruptcy Code.

i.    Bankruptcy Rule 2002 – Bankruptcy Rule 2002 requires twenty-one (21) days notice of the proposed sale of property other than in the ordinary course of business.  In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002.  As set forth above, the notice of this Motion that has been and will be provided by the Debtors satisfies each of these requirements.

j.    Bankruptcy Rules 6004 and 6006 – Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business complies with Bankruptcy Rule 2002.  As set forth above, the Debtors have

39

complied with Bankruptcy Rule 2002.  Bankruptcy Rule 6006 requires notice of a motion to assume and assign an executory contract or unexpired lease to be served on the counterparty to such contract or lease, as well as on other parties in interest as this Court may direct.  The Auction and Sale Hearing Notice, the Cure Cost Notice and this Motion have been or will be served on counterparties to the Assigned Contracts and Assigned Leases, thereby satisfying this requirement.

k.    Procedural Due Process – The notice of this Motion that is being provided, including notice being provided by publication as set forth above, is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object.  See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950).  Parties in interest have been and should be found to have been afforded adequate notice of this Motion.

59.    The Debtors submit that the notice they have provided and intend to provide both of the proposed sale and of this Motion is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

**H.    The Stay of the Sale Order Should be Waived**

60.    Pursuant to Bankruptcy Rules 6004(h) and 6006(d), an order authorizing the sale of property or the assignment of an unexpired lease is stayed for fourteen (14) days after the entry of an order unless the Court orders otherwise.

61.    The Debtors request that this Court order that such stay is not applicable with respect to the sale of the Assets and assignment of the Assigned Contracts and Assigned Leases. To require the Debtors to effectively be liable under the Assigned Contracts and Assigned Leases for an extra fourteen (14) days and to delay the closing and the resulting pay down of the Debtors' secured obligations will burden the estates and require unnecessary expenditures of the Debtors' limited resources.  The Debtors note that similar requests to waive the stay imposed under Bankruptcy Rules 6004(h) and 6006(d) have previously been granted by courts in this district.  See, e.g., In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); In re Nortel Networks Inc., et al., Case No. 09-10138 (Bankr. D. Del. Mar. 3, 2009); In re

40

Hancock Fabrics, Inc., Case No. 07-10353 (BLS) (Bankr. D. Del. April 30, 2007); In re

Copelands' Enters., Inc., Case No. 06-10853 (MFW) (Bankr. D. Del. Nov. 29, 2006); In re Three

A's Holdings, LLC, Case No. 06-10886 (BLS) (Bankr. D. Del., Nov. 17, 2006).

## NO PRIOR REQUEST

62.    No prior request for the relief sought herein has been requested from this Court or

any other court.

## NOTICE

63.    Notice of this Motion has been provided to: (a) all entities known to have

expressed an interest in a transaction with respect to some or all of the Purchased Assets at any

time and such other parties identified by the Consultation Parties prior to the date hereof; (b) all

entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the

Purchased Assets; (c) all federal, state and local environmental, regulatory or taxing authorities

or recording offices which have a reasonably known interest in the relief requested by the

Motion; (d) the United States Attorney's office; (e) the state Attorney General's offices where

the Purchased Assets are located; (f) the Securities and Exchange Commission; (g) the Internal

Revenue Service; (h) counsel to any official committee appointed in the Chapter 11 Cases,

including counsel to the UCC; (i) counsel to the agent for the Debtors' pre-petition lenders; (j)

counsel to the agents for the post-petition lenders; (k) the indenture trustee under the 2017 Senior

Secured Notes; (l) all of the labor unions that represent employees of any Debtor; (m) certain

parties to executory contracts and unexpired leases; and (n) those parties who have filed the

appropriate notice requesting notice of all pleadings filed in the Chapter 11 Cases.  The Debtors

submit that, under the circumstances, no other or further notice is required.

52719/0001-11008480v8

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested in this Motion and grant the Debtors such other and further relief as this Court deems just and proper.

Dated:  November 12, 2014
        Wilmington, Delaware

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____

Norman L. Pernick (I.D. No. 2290)
Marion M. Quirk (I.D. No. 4136)
Therese A. Scheuer (I.D. No. 5699)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

- and -

Gerald H. Gline
Felice R. Yudkin
25 Main Street
Hackensack, NJ 07602-0800
Telephone: (201) 489-3000
Facsimile: (201) 489-1536

*Counsel for Debtors and Debtors in Possession*

42