### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

------------------------------------------------------------------------- x
:
*In re:*                                                  :    Chapter 11
:
REICHHOLD HOLDINGS US, INC., *et al.*       :    Case No. 14-12237 (MFW)
:
:    (Jointly Administered)
:
Debtors.[1]                            :    **Re: Dkt. Nos. 14 & 221**
:
:    **Hearing Date: December 2, 2014 at 9:30 a.m.**
:    **Objection Deadline: November 25, 2014**
:    **(Committee and PBGC only)**
------------------------------------------------------------------------- x

### OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' (I) MOTION FOR ENTRY OF A FINAL ORDER APPROVING DEBTOR-IN-POSSESSION FINANCING AND (II) MOTION FOR ENTRY OF AN ORDER APPROVING BIDDING PROCEDURES

The Official Committee of Unsecured Creditors (the "Committee") of the above-caption debtors and debtors-in-possession (the "Debtors"), by its co-counsel, Hahn & Hessen LLP and Blank Rome LLP, submits this omnibus objection (the "Objection") to (A) *Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing Debtors' to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (II) Granting Liens and Superpriority Claims; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* [Dkt. No. 14] (the "DIP Financing Motion") and (B) *Debtors' Motion for (I) Order (A) Approving Bidding Procedures in Connection with the Sale of Substantially all of the Debtors'' Assets Pursuant to Sections 363 and 363 of the Bankruptcy Code; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale; and (C) Approving Notice of Respective Date, Time and Place for Auction and*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Reichhold Holdings US, Inc. (5768), Reichhold, Inc. (4826), Canadyne Corporation (7999) and Canadyne-Georgia Corporation (7170). The Debtors' address is 1035 Swabia Ct., Durham, NC 27703.

*for Hearing on Approval of the Sale and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Order Authorizing (A) The Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances; and (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Dkt. No. 221] (the "Bid Procedures Motion")[2].  In support of the Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.    The current structure of the DIP Facility and the proposed transaction established by the Senior Secured Noteholders will not only chill the bidding, but will also make it difficult, if not impossible, for a third-party to overcome the hurdles embedded in the proposed transaction in order to be able to bid effectively for the Debtors' assets.

2.    The Committee's primary objection is that the Senior Secured Noteholders have used their unique position as the primary beneficiaries of the assets of the Rest of the World to orchestrate a financing arrangement and proposed transaction that likely makes the proposed sale of the Debtors' U.S.-assets to the Senior Secured Noteholders a *fait accompli*.  Significantly, the Senior Secured Noteholders have both overleveraged the Debtors' estates by using the assets of the Rest of the World as additional security while simultaneously transferring, as a condition to the DIP Facility, a significant asset of the Debtors' estates—their intellectual property.  Moreover, the nature of the proposed transaction—a "loan to own" scenario—obviates the need for credit bidding rights, as such rights will have the attendant effect of depressing, rather than enhancing, the value of the Debtors' assets.  At a minimum, the Senior Secured Noteholders, who seek to avail themselves of the privileges associated with the chapter 11 process, must pay for the costs

---

[2]        Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms as in the DIP Financing Motion, the Interim Order (defined below) or the Bid Procedures Motion, as applicable.

associated with such process.  Accordingly, the Committee takes issue with the crippling effect the proposed structure of the DIP Facility and the terms of the proposed Bidding Procedures will have on the sales process.  Moreover, the Senior Secured Noteholders' inclusion of a lien on avoidance actions under chapter 5 of the Bankruptcy Code (including the proceeds of such actions) is improper and must be struck from the collateral securing the DIP Facility, as the proceeds of such actions are intended for the benefit of unsecured creditors.

3.      Based upon the foregoing, the Committee submits that the final DIP order and the current Bidding Procedures should not be approved unless significant modifications are made to provide for a fair, transparent auction process for the Debtors' assets in order to make certain that a robust sales process is accomplished and value is maximized for the Debtors' estates and all of their creditors.

### BACKGROUND

4.      On September 30, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court").    The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

5.      On October 14, 2014 (the "Formation Date"), the Office of the United States Trustee for the District of Delaware appointed seven of the Debtors' largest unsecured creditors to serve as members of the Committee.  The Committee is presently comprised of the following seven members: (i) Pension Benefit Guaranty Corporation; (ii) Stepan

Company; (iii) Americas Styrenics; (iv) Evonik Corporation; (v) United Steelworkers; (vi) Alnor Oil Company, Inc.; and (vii) the Estate of Anna R. Hartgrave.

6.     On the Formation Date, the Committee selected Hahn & Hessen LLP and Blank Rome LLP to serve as co-counsel to the Committee and Capstone Advisory Group, LLC to serve as its financial advisor.

## THE PREPETITION CAPITAL STRUCTURE

7.     Prior to the Petition Date, Debtor Reichhold, Inc. and non-Debtor Reichhold Industries Limited obtained a term loan (the "Prepetition Oaktree Term Loan") from OCM Reichhold Holdings, Ltd., an affiliate of Oaktree Capital Management, L.P. ("Oaktree"). As of the Petition Date, the amount outstanding under the Prepetition Oaktree Term Loan was approximately $73 million.

8.     In addition, prior to the Petition Date, Reichhold Industries, Inc., the Debtors' indirect parent and a non-Debtor, issued $206,578,066 of 9%/11% Senior Secured Notes (the "Senior Secured Notes")[3] pursuant to that certain Indenture due 2017 (the "Indenture").  As of the Petition Date, the outstanding aggregate principal amount of Senior Secured Notes was approximately $255,395,165.   Reichhold Holdings US, Inc. and Reichhold Inc., each a Debtor in these cases, issued an upstream guarantee of the Senior Secured Notes.

## THE DIP FACILITY

9.     On the Petition Date, as part of a prearranged, multi-stage transaction (the "Proposed Transaction"), the Debtors filed the DIP Financing Motion [Dkt. No. 14] seeking entry of interim and final orders authorizing the Debtors to obtain senior secured

---

[3]     The Senior Secured Notes were issued following an exchange offer whereby the Senior Secured Notes were exchanged for the then outstanding Senior Unsecured Notes.  The Senior Secured Notes accrue cash interest at 9% and payment-in-kind interest at 11%, with payments due annually on November 1 and May 1.

144370.01600/22354062v.1

post-petition financing on a super-priority basis in an amount of up to $106 million (the "DIP Facility") consisting of the following:

- up to $53,190,000 (the "Senior DIP Loan") through issuance by Debtor Reichhold, Inc. of those certain Senior Secured Promissory Notes to Third Avenue Management, JP Morgan and Black Diamond, as the senior lenders (the "Senior DIP Lenders")[4] in accordance with that certain *Note Purchase and Guaranty Agreement* (the "Senior DIP Note Agreement"); and

- up to $53,190,000 (the "Junior DIP Loan") from Reichhold Holdings International B.V., a non-Debtor foreign affiliate ("Reichhold B.V." or "Junior DIP Lender") through issuance by Reichhold B.V. of those certain Senior Secured Promissory Notes to the Senior DIP Lenders in the principal amount of $85.1 million (the "ROW Note")[5] in accordance with that certain *Note Purchase and Guaranty Agreement* (the "Junior DIP Note Agreement" and together with the Senior DIP Note Agreement, the "DIP Agreements").

10. On October 2, 2014, the Court entered an order approving the DIP Facility on an interim basis (the "Interim Order") and scheduling a hearing to consider entry of a final order (the "Final Order")[6] granting the relief requested in the DIP Financing Motion. The Interim Order authorized the Debtors to access approximately $94 million of the DIP Facility (inclusive of a 6% original issue discount fee (the "OID Fee")), comprised of the full amount of the Senior DIP Loan and $40.43 million of the Junior DIP Loan. The DIP Facility was used to repay the Prepetition Oaktree Term Loan, which consisted of approximately $64.3 million owed by Debtor Reichhold, Inc. and $8.7 million owed by non-Debtor Reichhold Industries Limited.

---

[4]     The Senior DIP Lenders are also three holders (the "Senior Secured Noteholders") of the Prepetition Senior Secured Notes.

[5]     A portion of the proceeds generated through the issuance of the ROW Note were used to pay off all amounts outstanding (approximately $28.9 million) under a facility (the "GAC Facility") with GA Capital LLC, the secured lender for the non-Debtors' Rest of the World operations. After satisfying the amounts outstanding under the GAC Facility, the Junior DIP Lender will use the remaining amounts borrowed under the ROW Note, plus additional cash on hand, to provide the Junior DIP Loan to the Debtors in the aggregate amount of up to $53.19 million.

[6]     The hearing on the Final Order was initially scheduled for October 27, 2014 at 2:00 p.m. (ET). The hearing has since been adjourned to December 2, 2014 at 9:30 a.m. (ET).

11.    The second phase of the Proposed Transaction consists of the following: (a) a consensual foreclosure by Wells Fargo Bank, N.A., as Indenture Trustee, on behalf of and for the benefit of the Senior Secured Noteholders, of the equity pledged under the Indenture, which will result in the Senior Secured Noteholders owning 65% of the voting shares of the non-Debtor rest-of-the-world affiliates (the "Rest of the World") and 100% of the non-voting preferred shares of the Rest of the World, including the Junior DIP Lender and (b) entry into an asset purchase agreement under which the Junior DIP Lender will act as the stalking horse purchaser (the "Stalking Horse Purchaser") to purchase substantially all of the Debtors' assets under section 363 of the Bankruptcy Code (collectively, the "Proposed Sale").  The ultimate result of phase two of the Proposed Transaction is that the Senior Secured Noteholders will succeed as the owners of both the Debtors' assets, stripped of its legacy liabilities, and the assets of the Rest of the World, with existing equity retaining 35% of the voting shares of the Rest of the World.

## THE BID PROCEDURES AND SALE MOTION

12.    On November 12, 2014, the Debtors proceeded with the second phase of the Proposed Transaction by filing the Bid Procedures Motion which sought, *inter alia*, (a) approval of bidding procedures (the "Bidding Procedures") to govern the sale of substantially all of its assets to Reichhold Acquisitions Holdings, LLC, a wholly owned U.S. subsidiary of non-Debtor Reichhold B.V., the Stalking Horse Purchaser and (b) approval of that certain *Asset Purchase Agreement* (the "Stalking Horse APA"), by and among the Debtors and the Stalking Horse Purchaser, as the stalking horse bid.  The Stalking Horse APA includes a "credit bid" of $15 million of the Junior DIP Loan, while reserving the Stalking Horse Purchaser's right to credit bid up to the full amount of the Junior DIP Loan plus the OID Fee (increasing the potential credit bid to approximately $43 million).

6

## OBJECTION

I.    **The DIP Facility Makes the Proposed Sale a *Fait Accompli***

13.    The structure of the DIP Facility "stacks the deck" against other potential bidders with the attendant result of ensuring that the Proposed Sale to the Senior Secured Noteholders is a foregone conclusion.  The DIP Facility consists of up to $106 million of financing, already discounted by the substantial OID Fee.  In addition, rather than providing the DIP Facility directly to the Debtors secured by only the Debtors' assets, the Senior Secured Noteholders have orchestrated the financing (both directly through the Senior DIP Loan and indirectly through the Junior DIP Loan), to place more debt on the Debtors' assets, while simultaneously securing such additional financing by the assets of the Rest of the World.  While this structure may not be alarming when evaluating the DIP Facility on a stand-alone basis, it is highly problematic when viewed in light of the Proposed Sale.

14.    The Proposed Transaction is a multi-stage transaction that contemplates first the consensual foreclosure by the Senior Secured Noteholders of the equity interests in the Rest of the World, at which point non-Debtor Reichhold B.V., as the Junior DIP Lender and Stalking Horse Purchaser, will be owned by the Senior Secured Noteholders and existing equity holders.  Following the foreclosure, in order to purchase the Debtors' assets under section 363 of the Bankruptcy Code, the proposed Stalking Horse Purchaser will (i) either assume the Senior DIP Loan or bid a cash component (in order to pay back the Senior Secured Noteholders as the Senior DIP Lenders) and (ii) credit bid the Junior DIP Loan.  This structure results in a transaction in which the Senior Secured Noteholders are virtually assured of keeping the Reichhold family of businesses together, cleansed of its legacy liabilities with a small infusion of additional capital.  By contrast, the Debtors are

7

only seeking to sell their U.S.-based assets as part of the bankruptcy process pursuant to section 363 of the Bankruptcy Code.  The Debtors' financial advisor and investment banker testified at the first-day hearing that a proposed purchaser would need to bid at least $94 million to cover the Debtors' outstanding indebtedness and compete with the Stalking Horse. Oct. 2, 2014 Hr'g. Tr. at 75.  However, a review of the Debtors' prepetition capital structure and statements made by the Debtors at the first-day hearing, indicate that the Debtors' assets may only support financing of at most, $70-$75 million.[7]  Yet, the Senior Secured Noteholders have saddled the Debtors, both directly and indirectly, with up to $106 million of financing (secured not only by the Debtors' assets but by the assets of the Rest of the World as well), which must be satisfied before any third-party can compete for the sale. Moreover, unlike the Senior Secured Noteholders who have financed the DIP Facility but intend on purchasing and/or becoming the eventual owners of the entire Reichhold family of businesses (the Debtors' assets and the assets of the Rest of the World), a third-party must satisfy both the Senior DIP Loan and Junior DIP Loan in order to compete with the Senior Secured Noteholders for the U.S. Debtor-assets *only*.  While the current Stalking Horse APA only seeks to credit bid $15 million of the Junior DIP Loan and release the balance due under the Junior DIP Loan, the Stalking Horse Purchaser reserves its right to credit bid the full-amount of the Junior DIP Loan.  This directly diminishes the likelihood for a competitive process, as the Stalking Horse Purchaser can continue to credit bid the Junior DIP Loan with the expectation of owning the entire Reichhold family of businesses, while a potential third-party purchaser is bidding the same dollars to purchase the Debtors' U.S.

---

[7]        The Debtors' financial advisor and investment banker testified at the first-day hearing that the Debtors did not receive any proposals for financing the Debtors' assets on a stand-alone basis, which was due, in part, to the fact that the Debtors' assets in their view only support a borrowing base of between $55 to $70 million, depending on the time of year. Oct. 2, 2014 Hr'g. Tr. at 73-75.

assets only.  This process establishes an unfair advantage to the Senior Secured Noteholders over potential third-party purchasers, at the expense of the Debtors' estates and its creditors.

## II.    The License Agreement is an Improper Post-Petition Transfer and Unlawfully Binds a Third-Party Purchaser Prior to the Sale

15.    The Senior DIP Note Agreement and the Junior DIP Note Agreement contemplate, as a condition precedent to closing the DIP Facility, entry by the Purchasers (as such term is defined in the DIP Agreements, as applicable) into that certain *Intra-Group Intellectual Property License Agreement* (the "License Agreement"). Senior DIP Note Agreement, § 3A(c); Junior DIP Note Agreement, § 3A(c).  The Committee has serious concerns that requiring the Debtors to enter into this License Agreement at this time and prior to the auction: (1) strips the Debtors of a significant asset (without any evidence of the value received in exchange for the transfer of such license); (2) given that such transfer is occurring as part of the DIP Facility and well-ahead of the sales process, the License Agreement improperly binds a third-party purchaser into a potentially harmful agreement with the Rest of the World; and (3) the License Agreement amounts to nothing more than an "assignment in gross" of the Debtors' intellectual property rights, requiring invalidation.

16.    The Debtors have not filed a copy of the License Agreement with the Court. The only mention of such arrangement is the Debtors' statement in the DIP Financing Motion that, among other conditions precedent to funding under the DIP Facility, "reciprocal license agreements for the use of intellectual property shall have been executed and delivered." DIP Financing Motion, at ¶ 10.  However, a copy of the License Agreement obtained by the Committee reveals that the License Agreement purports to grant a mutual, perpetual, non-exclusive, worldwide, royalty-free license to the Rest of the World of a valuable asset of the Debtors—their intellectual property—with no value to be received by

9

the Debtors in exchange for such asset. Once again, the Senior Secured Noteholders, as the primary beneficiaries of the Rest of the World, are using their unique position and the bankruptcy process to force the Debtors to relinquish, what appears to be a potentially valuable asset, to the benefit of the Rest of the World.[8] While the Debtors have maintained that the License Agreement is merely the documentation of an existing undocumented sharing arrangement, the Senior Secured Noteholders should not have *carte blanche* to loot the Debtors' estates of significant value under the guise of additional security for the DIP Facility in contravention of the sales process. As with the overleveraging of the Debtors' estates, the License Agreement similarly tips the scale in favor of the Senior Secured Noteholders by directly diminishing the desirability and value to potential independent bidders of the Debtors' assets on a stand-alone basis.

17.    Finally, requiring the entry into the License Agreement as a condition to the DIP Facility and in advance of the sale process, establishes a prejudicial uncompetitive advantage for the Senior Secured Noteholders in the event they are not the winning bidder for the Debtors' assets by improperly binding a potential third-party purchaser to the terms of such License Agreement. To the extent a third-party manages to overcome the difficult hurdles previously mentioned and succeeds as the ultimate owner of the Debtors' assets, such third-party will be bound by the terms of the License Agreement and may be required to share their patents, trademarks, trade secrets and other intellectual property with a competitor in the future, without any consideration. This is particularly troubling since the License Agreement seemingly includes all current intellectual property of the Debtors,

---

[8]    Despite the Committee's repeated requests for information regarding the value of the Debtors' and the Rest of the World's various intellectual property (including patents, trademarks and know-how) and information regarding the historical use of such intellectual property between the Debtors and the Rest of the World, such information has been slow coming and the Committee is still investigating the issues surrounding the Debtors' intellectual property. Accordingly, the Committee reserves all claims with respect to any improper transfer of the Debtors' intellectual property, including the License Agreement.

including new technologies that the Debtors have recently developed or are in the process of developing.

18.     Moreover, it appears that the assignment of the Debtors' trademarks under the License Agreement amounts to nothing more than an "assignment in gross", as such assignment does not include the Debtors' goodwill or other assets.  See Goldberg v. Cuzcatlan Bevs., Inc. (In re Impact Distribs.), 260 B.R. 48, 54 (Bankr. S.D. Fla. 2001) (courts will generally invalidate a bare assignment of a trademark, apart from genuine goodwill, assets, trade secrets or management, as an "assignment in gross"); Mister Donut of Donut Am., Inc. v. Mr. Donut, Inc., 418 F.2d 838, 842 (9th Cir. 1969) (stating that the assignment was in gross because there had been no transfer of "customer lists, merchandise, equipment, recipes, decals or other goods"); PepsiCo, Inc. v. Grapetter Co., 416 F.2d 285, 290 (8th Cir. 1969) (holding the transfer invalid when the assignee did not acquire any of the assignor's assets, such as the formula or process by which the soft drink was manufactured). Thus, the assignment of the Debtors' trademarks to the Rest of the World under the License Agreement must be invalidated.  Based upon the foregoing, in order to prevent the Senior Secured Noteholders from chilling the bidding and stripping the Debtors of these valuable assets, the License Agreement must be severed from the DIP Facility and only considered at the time of any sale hearing.  This will give potential third-party bidders the opportunity to weigh in on whether the proposed License Agreement is as beneficial to the Debtors' business operations as it is to the Rest of the World.

144370.01600/22354062v.1

**III.     The OID Fee is Excessive on its Face and Egregious When Viewed in Light of the Proposed Sale to the Senior Secured Noteholders**

19.     The Committee objects to the OID Fee as it is not only excessive on its face, but when coupled with the Proposed Sale, is egregious and thwarts any potential for alternative bids.

20.     The Senior DIP Note Agreement and the Junior DIP Note Agreement authorize an OID Fee of 6.0%.  Senior DIP Note Agreement, § 3A(7); Junior DIP Note Agreement, § 3A(7).  However, this is not a transaction in which a 6.0% fee is appropriate. The DIP Facility is but one piece of a group of interrelated transactions established by the Senior Secured Noteholders to enable them to purchase the Debtors' assets and take ownership of the Rest of the World, while ridding the Debtors' estates of their significant legacy liabilities.  There is simply no reason in this case for the Senior Secured Noteholders to obtain the OID Fee, as the ultimate "prize" to the Senior Secured Noteholders is the Debtors' assets.  Rather, the Senior Secured Noteholders are using the OID Fee as a disguised bid-protection to the extent the Senior Secured Noteholders are not the ultimate purchasers of the Debtors' assets.

21.     Moreover, the OID Fee acts as a further advantage to the Senior Secured Noteholders at the expense of the Debtors' estates and jeopardizes the potential for a robust sales process.   The Interim Order authorizes the DIP Agents and the DIP Lenders to credit bid under section 363(k) of the Bankruptcy Code a portion of or all of their respective claims in connection with the Proposed Sale. Interim Order, ¶ 15.[9]  However, although the DIP Facility provides up to only $100 million of actual dollar-for-dollar financing, the Senior Secured Noteholders, as the driver of the Stalking Horse Purchaser, will (i) take-out the full

---

[9]     Although the Bid Procedures Motion only authorizes the Stalking Horse Purchaser to credit bid $15 million in the first instance, the Stalking Horse APA authorizes the Stalking Horse Purchaser to credit bid up to the full amount of the Junior DIP Loan.  Bid Procedures Motion, ¶ 6; Stalking Horse APA, § 3.1.

144370.01600/22354062v.1

amount of the Senior DIP Loan by either having Newco assume the obligations under the Senior DIP Loan ($53.19 million) or paying themselves $53.19 million (although only $50 million in actual financing was advanced to the Debtors) and (ii) be able to credit bid up to the full amount of the claim under the Junior DIP Loan (up to approximately $42.4 million), even though only $40 million in actual financing will likely be provided under the Junior DIP Loan based upon current projections.    Accordingly, the Stalking Horse Purchaser has an additional discrete, unfair advantage over potential bidders by virtue of the OID Fee.    Thus, the Committee submits that the Stalking Horse APA and Bidding Procedures must be modified to exclude the right of the Stalking Horse Purchaser to credit bid the OID Fee.

22.    Further, even if the Senior Secured Noteholders are entitled to an OID Fee, the Committee submits that a 6.0% OID Fee is excessive.    When viewed in the context of this transaction, the OID Fee exceeds 25% of the value of new funding (~$15 million to ~$20 million) provided to the Debtors and such new funding has only been provided to the Debtors over the course of a four (4) month period.    Accordingly, at a minimum, the OID Fee should be significantly reduced and should only be paid if, and only to the extent, the outstanding indebtedness under the DIP Facility is paid out in full to the DIP Lenders by a third-party purchaser.

**IV.    The Payoff of the Debt Owed to Oaktree by the Non-Debtor Foreign Affiliate was Improper**

23.    The Committee submits that the repayment of indebtedness owed to Oaktree by a non-Debtor foreign affiliate is an improper use of the proceeds from the DIP Facility.

24.    The Interim Order authorized the use of proceeds from the DIP Facility to pay-off the Prepetition Oaktree Term Loan, including the debt owed by non-Debtor

13

Reichhold Industries Limited. Underline Order, ¶ 3(d). The Debtors' professionals advised the Committee that the Debtors and Reichhold Industries Limited were jointly and severally liable for the indebtedness under the Prepetition Oaktree Term Loan. However, even if such indebtedness was joint and several with the Debtors, Reichhold Industries Limited is not a Debtor in these cases and there is no justification for pledging Debtor-assets, with a super-priority claim, to secure funds used to pay off a non-Debtor obligation. Further, there is no evidence regarding the assets of Reichhold Industries Limited, its ability to pay its obligations or its ability to repay this post-petition transfer from the Debtors.

25. The Debtors reported at the first-day hearing that they paid off the obligation owed by non-Debtor Reichhold Industries Limited to avoid a priming fight between Oaktree and the Senior Secured Noteholders with respect to such obligation. Oct. 2, 2014 Hr'g. Tr. at 54. However, as correctly pointed out by this Court at the first-day hearing, Reichhold Industries Limited could have severed the $8.7 million it borrowed under the Prepetition Oaktree Term Loan by obtaining a third-party loan to pay off the amount owed to Oaktree, secured by the assets of that entity. The Committee submits that in order to rectify this improper transfer of Debtor-assets to a non-Debtor foreign affiliate, the Debtors must either provide: (i) that the $8.7 million payoff of the obligations owed by non-Debtor Reichhold Industries Limited be excluded from the Debtors' obligations under the DIP Facility or (ii) that the assets of non-Debtor Reichhold Industries Limited be included in the assets proposed to be sold pursuant to section 363 of the Bankruptcy Code under the current Stalking Horse APA (which makes sense given that historically, the Debtors' operations were included with the Reichhold North American operations). Under either scenario, the Bidding Procedures and the Stalking Horse APA must be modified to either: (i) remove the

$8.7 million from the obligations owing under the DIP Facility or (ii) include the assets of

non-Debtor Reichhold Industries Limited as part of the Stalking Horse Purchaser's bid.

**V.    Cause Exists to Limit the Credit Bid Rights of the Senior Secured Noteholders**

26.    It is well-established that a secured creditor is entitled to credit bid its allowed

claim. See 11 U.S.C. § 363(k).  The reasoning often articulated is to protect such creditor

against the risk that its collateral will be sold at a depressed price. Radlax Gateway Hotel,

LLC v. Amalgamated Bank, 132 S. Ct. 2065, 2070 n.2 (2012).  However, this right is not

absolute, as a secured lender's right to credit bid exists "unless the court for cause orders

otherwise." 11 U.S.C. § 363(k); In re Phila. Newspapers, LLC, 599 F.3d 298, 315-16 (3d

Cir. 2010) (noting that the right to credit bid is not absolute and citing to a myriad of cases

in which the right to credit bid has been denied).  As one court recently explained:

> The credit bid mechanism that normally works to protect secured
> lenders against the undervaluation of collateral sold at a bankruptcy
> sale does not always function properly when a party has bought the
> secured debt in a loan-to-own strategy in order to acquire the target
> company. In such a situation, the secured party may attempt to
> depress rather than to enhance market value. Credit bidding can be
> employed to chill bidding prior to or during an auction, or to keep
> prospective bidders from participating in the sales process.

In re The Free Lance-Star Publ'g Co., 512 B.R. 798, 806 (Bankr. E.D. Va. 2014).  In In re

Fisker Automotive Holdings, Inc., 510 B.R. 55, 60 (Bankr. D. Del. 2014), the court limited

a secured lender's right to credit bid for "cause", in part, because "there will be no bidding –

not just chilling the bidding – if the Court does not limit the credit bid." (emphasis in

original); see also Philadelphia Newspapers, 599 F.3d at 316 n.14 (the right to credit bid

may be denied "in the interest of any policy advanced by the [Bankruptcy] Code, such as to

ensure the success of the reorganization or to foster a competitive bidding environment");

15

Free Lance-Star, 512 B.R. at 806 (limiting credit bid rights because the secured lender's loan-to-own strategy depressed enthusiasm for the bankruptcy sale in the marketplace).

27.     The reasoning articulated in Fisker and Free Lance-Star is abundantly present here. The Senior Secured Noteholders are providing the DIP Facility as a mechanism to own not only the Debtors' assets, but the Rest of the World.  This is not a situation in which the right to credit bid is needed to protect against the risk that the Debtors' assets will be sold at a depressed price.  Rather, as articulated above, the Senior Secured Noteholders have structured the DIP Facility to "depress rather than to enhance market value." Free Lance-Star, 512 B.R. 806.  As indicated, the Senior Secured Noteholders have overleveraged the Debtors' assets with debt secured by the assets of the Rest of the World, while concomitantly, diminishing the value of the Debtors' estates by transferring the Debtors' intellectual property immediately prior to the commencement of the sales process.  Taken together, these actions will undoubtedly chill the bidding and "depress[ ] enthusiasm for the bankruptcy sale." Id.  In fact, the Senior Secured Noteholders have themselves recognized the potentially detrimental impact of their actions and have limited their right to credit bid, in the first instance, to $15 million (with the right to increase such credit bid to the full amount of the Junior DIP Loan).  Accordingly, to the extent the structure of the DIP Facility is not otherwise modified, at a minimum, in line with the reasoning of Fisker and Free Lance-Star, the Committee submits that cause exists to eliminate the credit bid rights of the Senior Secured Noteholders and the Bidding Procedures must be modified to exclude such right.

28.     Lastly, with respect to the proposed order approving the Bidding Procedures, the Committee has been advised that the Pension Benefit Guaranty Corporation ("PBGC"), a significant creditor of the Debtors' estates, has requested certain language be included in

16

the order to take into account and, if appropriate, attribute value as part of a bid, the possible assumption by a potential bidder of the single-employer defined benefit pension plan known as The Reichhold, Inc. Retirement Plan (the "Pension Plan"). The Pension Plan provides retirement benefits for approximately 4,571 of Debtors' employees and their beneficiaries. Assumption of the Pension Plan by a bidder would eliminate a significant potential liability of the Debtors' estates. The Committee supports inclusion of appropriate language to deal with and address the PBGC's concerns in the Bidding Procedures.

## VI.    Other Issues Requiring Modification/Clarification

29.    Finally, based on its review to date, the Committee has identified several other problematic provisions of the Interim Order which must be resolved before the Final Order is entered:

- Release of Oaktree and the Senior Secured Noteholders:  The Interim Order includes stipulations as to the validity of the liens securing the Prepetition Secured Notes and a waiver of the right to challenge the validity of the liens securing the Prepetition Secured Notes and the Prepetition Oaktree Term Loan Indebtedness. Interim Order, ¶¶ 3(c), 3(f). However, at this time, there is simply no reason to authorize such releases. The 2012 exchange offer in which the Senior Secured Notes became secured involved substantial non-Debtor parties and complex interrelated transactions including upstream guarantees that need to be analyzed. Moreover, the Committee is still investigating the collateralization and repayment of the Prepetition Oaktree Term Loan. Given the foregoing, it is inappropriate to provide such releases in the Final Order.

- Liens on Avoidance Actions:  The Interim Order grants the DIP Lenders replacement liens and superpriority claims on all unencumbered collateral of the Debtors, including, upon entry of the Final Order, "any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise …" Interim Order, ¶ 7(a). However, a grant of liens to the Debtors' secured creditors on the proceeds of avoidance actions is inappropriate and inconsistent with the intent behind avoidance actions, which is to allow the debtor-in-possession to recover certain payments on behalf of all creditors. Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 250 (3d Cir. 2000).  See also

17

Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.), 226 F.3d 237, 243-47 (3d Cir. 2000) (holding that state law fraudulent transfer claim is not an asset of the debtor). Thus, the Final Order should be modified to remove the proceeds of avoidance actions from the collateral securing the DIP Facility because the Debtors do not possess the authority to grant a security interest in the Avoidance Actions for the exclusive benefit of the DIP Lenders.

- <u>Budget Oversight</u>: The Interim Order denies the Committee one of its most important policing functions—oversight of the Debtors' budget. Specifically, the Interim Order provides that the Budget and any supplements thereto shall be in form and substance acceptable by the DIP Agents and the DIP Lenders, *in their sole discretion*.  <u>Interim Order,</u> ¶ 12. The Final Order should require the Debtors to consult with the Committee when any modifications or amendments to the Budget are contemplated.

- <u>Insufficient Budget for Committee Professionals:</u> Given the size and complexities of these cases, the current budget is insufficient as it pertains to the Committee. As it stands, the Debtors have budgeted almost $700,000 of fees and expenses for their professionals, with significantly more for the Senior Secured Noteholders' professionals, while reserving only approximately $275,000 for the Committee's professionals.  In order for the Committee to participate meaningfully in these cases and to discharge its fiduciary duties, the budget for the Committee (its counsel and financial advisors) must be increased.

- <u>The fees sought by the Senior Secured Noteholders in their capacity as DIP Lenders must be severed from those sought as the Stalking Horse Purchaser:</u> The Interim Order provides for the payment of fees and expenses incurred by the DIP Lenders. <u>Interim Order,</u> ¶ 5.  The Senior Secured Noteholders, however, are acting as both the DIP Lenders and the Stalking Horse Purchaser.   To the extent the Senior Secured Noteholders seek reimbursement of fees and expenses associated with the purchase of the Debtors' assets, such reimbursement must not be paid pursuant to the DIP Agreement.  Rather, any fees and expenses sought to be reimbursed in connection with the sale of the Debtors' assets should only be reimbursed pursuant to a separate order of the Court approving such bid protections.   Thus, if the Senior Secured Noteholders seek reimbursement of any fees and expenses pursuant to the DIP Agreements, such fees and expenses must be limited to those incurred by the Senior Secured Noteholders, *solely in their capacity as the DIP Lenders.*

- <u>Challenge Period</u>: The Interim Order provides the Committee with a sixty (60) day challenge period, which includes the investigation of not only the Oaktree transaction, but the 2012 transaction involving the Senior Secured Notes as well.   However, given the complexities of these cases, the

144370.01600/22354062v.1

Committee submits that a period of 120 days from the entry of the Final DIP Order, and in any case subject to extension by order of the Bankruptcy Court for cause shown as required by the Local Rules, is a reasonable period of time for the Committee to undertake its investigation, particularly given the complexity and size of these cases and the many pending motions and events which require the Committee's attention at this stage of the proceedings.  At a minimum, the Committee should be granted standing to commence challenge actions or at the very least, a motion for standing filed by the Committee should toll the deadline set forth in the proposed Final Order.

- Modification of Automatic Stay:  The Interim Order provides that the automatic stay shall automatically be vacated and modified upon an Event of Default to the extent necessary to permit the DIP Agents and DIP Lenders to exercise all rights and remedies provided for in the DIP Documents and Interim Order. Interim Order, ¶ 11(a).  However, given the insider relationship of the existing management with the Senior Secured Noteholders, the Committee submits that the Final Order should require the DIP Agents and DIP Lenders to filed a motion on an expedited basis seeking to lift the automatic stay in accordance with section 362 of the Bankruptcy Code in the event of a default.

- Budget to Investigate Prepetition Conduct: The Interim Order provides the Committee with a limited $75,000 budget to investigate the alleged pre-petition liens on the Debtors' property and the various transactions related thereto.  Interim Order, ¶ 20.  The Interim Order also appears to prevent the Committee from expending the budgeted funds in "litigation, prosecution, objection or challenge" in the event the Committee's investigation leads to one or more causes of action. Id.  The Debtors' pre-petition financing transactions are relatively complex and involve not only the investigation of the extent, validity and perfection of the liens asserted under the Prepetition Oaktree Term Loan, but also the investigation of the 2012 refinancing of the Senior Secured Notes.  The Committee's investigation budget should be increased and the scope of the Committee's use of such budget should be expanded.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (requiring post-petition financing order to provide creditors' committee with a reasonable carve-out in order to preserve the adversary system).

- Waiver of Rights Under Section 552(b):  The Interim Order includes a waiver of the Debtors' rights to claim the "equities of the case" exception under Section 552(b) of the Bankruptcy Code. Interim Order, ¶ 13. The purpose of Section 552(b) and its "equity exception" is to prevent the appreciation in the value of collateral from providing a windfall to a secured creditor at the expense of unsecured creditors.  See Stanziale v. Finova Capital Corp. (In re Tower Air, Inc.), 397 F.3d 191, 205 (3d Cir. 2005) (section 552(b) is relevant "to prevent a secured creditor from

reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate") (citation omitted). A waiver of the "equity exception" should be authorized, if ever, only when it would be critical to the financing. There has been no such showing made in these cases. To the contrary, and without limitation, the Committee believes that the Debtors' businesses continue to develop new intellectual property and technology, the value of which should be preserved for the benefit of the Debtors' estates.

- Waiver of Rights Under Section 506(c): The Interim Order waives the Debtors' right to surcharge the Collateral pursuant to section 506(c) of the Bankruptcy Code. Interim Order, ¶ 13. In doing so, the Debtors have agreed, at this early stage of the chapter 11 cases, to pay for any and all expenses associated with the preservation and disposition of such collateral. Such provisions have been deemed unenforceable on the basis that they "operate as a windfall to the secured creditor at the expense of administrative claimants." Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.), 57 F.3d 321, 325 (3d Cir. 1995). Given the significant administrative expenses in this case, including, without limitation, administrative claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code, such a waiver should not be included in the proposed Final Order.

- Committee Right to Object to Payment of Fees and Expenses: The Interim Order appears to only provide the U.S. Trustee with the opportunity to object to the fees and expenses incurred by professionals retained by the DIP Agents and DIP Lenders. Interim Order, ¶ 14. Given that the Interim Order requires the invoices of such professionals to be provided to the Committee, the Committee submits that the exclusion of the right of the Committee to object appears to be an oversight and should be rectified. However, to the extent such exclusion is not an oversight, the Final Order should be modified to grant the Committee the authority to object.

## CONCLUSION

The Committee raises herein significant issues with the proposed DIP Facility and certain provisions of the Interim Order and the proposed order approving the Bidding Procedures that must be addressed prior to the entry of the Final Order. Accordingly, the Committee respectfully requests that the Proposed Transaction be modified and incorporated into revised orders that are satisfactory to the Committee.

144370.01600/22354062v.1

**WHEREFORE,** the Committee requests that the Court (i) sustain this Objection, (ii) enter an order modifying the proposed Final Order and the Bidding Procedures to the extent set forth herein, and (iii) granting such further relief as is deems just and proper.

Dated:  Wilmington, Delaware
　　　　November 25, 2014

　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　**BLANK ROME LLP**

　　　　　　　　　　　　　　　*/s/ Josef W. Mintz*
　　　　　　　　　　　　　　　Bonnie Glantz Fatell, Esq. (DE 3809)
　　　　　　　　　　　　　　　Josef W. Mintz, Esq. (DE 5644)
　　　　　　　　　　　　　　　1201 N. Market Street
　　　　　　　　　　　　　　　Wilmington, DE 19801
　　　　　　　　　　　　　　　Telephone:　(302) 425-6400
　　　　　　　　　　　　　　　Facsimile:　(302) 425-6464
　　　　　　　　　　　　　　　Email:　　　fatell@blankrome.com
　　　　　　　　　　　　　　　　　　　　mintz@blankrome.com

　　　　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　　**HAHN & HESSEN LLP**
　　　　　　　　　　　　　　　Mark S. Indelicato, Esq. *(pro hac vice)*
　　　　　　　　　　　　　　　Mark T. Power, Esq. *(pro hac vice)*
　　　　　　　　　　　　　　　488 Madison Avenue
　　　　　　　　　　　　　　　New York, New York 10022
　　　　　　　　　　　　　　　Telephone: (212) 478-7200
　　　　　　　　　　　　　　　Facsimile: (212) 478-7400
　　　　　　　　　　　　　　　E-mail:　　　mindelicato@hahnhessen.com
　　　　　　　　　　　　　　　　　　　　mpower@hahnhessen.com

　　　　　　　　　　　　　　　*Co-Counsel to The Official Committee of Unsecured*
　　　　　　　　　　　　　　　*Creditors of Reichhold Holdings U.S., Inc., et al.*

144370.01600/22354062v.1