**THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
--------------------------------------------------------x
                                            :
In re:                                      :   Chapter 11
                                            :
REICHHOLD HOLDINGS US, INC., et al.,        :   Case No. 14-12237 (MFW)
                                            :
                    Debtors.[1]             :   Jointly Administered
                                            :
--------------------------------------------------------x
```

**SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO
PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11
OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS**

**COLE SCHOTZ P.C.**
Norman L. Pernick (I.D. No. 2290)
Marion M. Quirk (I.D. No. 4136)
David W. Giattino (I.D. No. 5614)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

-and-

Gerald H. Gline
Felice R. Yudkin
25 Main Street
Hackensack, NJ 07602-0800
Telephone: (201) 489-3000
Facsimile: (201) 489-1536

*Counsel for Debtors and Debtors-in-
Possession*

Dated: November 19, 2015

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Reichhold Holdings US, Inc. (5768), Reichhold Liquidation, Inc. (f/k/a Reichhold, Inc.) (4826), Canadyne Corporation (7999), and Canadyne-Georgia Corporation (7170). The street address for the Debtors is 1035 Swabia Ct., Durham, North Carolina 27703.

# DISCLAIMER[2]

THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY PROVIDE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETIES BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN ARE QUALIFIED IN THEIR ENTIRETIES BY REFERENCE TO THE PLAN, THE EXHIBITS ATTACHED TO THE PLAN AND ANY PLAN SUPPLEMENT(S).  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.  THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER

---

[2] Terms used in this Disclaimer that are not otherwise defined shall have the meanings ascribed to such terms elsewhere in the Disclosure Statement.

LEGAL EFFECTS OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

52719/0001-11921553v11

## TABLE OF CONTENTS

ARTICLE 1  INTRODUCTION ..................................................................................................1
    A.    Purpose of the Disclosure Statement ...............................................................1
    B.    Disclosure Statement Enclosures.....................................................................2
    1.    Order Approving the Disclosure Statement......................................................2
    2.    Ballot................................................................................................................2
    3.    Notice...............................................................................................................2
    4.    Committee Support Letter.  A letter from the Committee, recommending that creditors vote in a Voting Class vote to accept the Plan..................................2
    C.    Final Approval of the Disclosure Statement and Confirmation of the Plan ..............2
    1.    Requirements ....................................................................................................2
    2.    Approval of the Plan and Confirmation Hearing.............................................2
    3.    Effect of Confirmation.....................................................................................2
    4.    Only Impaired Classes Vote ............................................................................2
    D.    Treatment and Classification of Claims and Interests; Impairment........................3
    E.    Voting Procedures and Voting Deadline ..........................................................6
    F.    Confirmation Hearing ......................................................................................7

ARTICLE II GENERAL INFORMATION REGARDING THE DEBTORS................................8
    A.    The Debtors' Formation...................................................................................8
    B.    The Debtors' Business and Employees.............................................................8
    C.    The Debtors' Corporate Headquarters ..............................................................9
    D.    The Debtors' Employees...................................................................................9
    E.    The Debtors' Corporate and Capital Structure ...............................................10
    1.    Secured Debt...................................................................................................10
    2.    Unsecured Debt...............................................................................................12
    F.    Summary of Events Leading to the Chapter 11 Filings...................................12
    1.    Declining Revenue, Operating Losses the Tightening of Trade Terms with Key Vendors and Shortage of Cash ...............................................................12
    2.    Unsustainable Legacy Liabilities...................................................................13
    3.    Efforts to Address Financial Constraints .......................................................14
    4.    Exploration of Strategic Alternatives.............................................................14
    5.    Appointment of Independent Board Members ................................................15
    6.    Use of Chapter 11 Process .............................................................................15

ARTICLE III THE CHAPTER 11 CASES ............................................................................15
    A.    Commencement of the Chapter 11 Cases .......................................................15
    B.    "First Day" Motions and Related Applications ..............................................16
    C.    Retention of Professionals and Appointment of the Committee .....................16
    1.    Retention of Debtors' Professionals ..............................................................16
    2.    Retention of Claims and Noticing Agent and Administrative Agent .......................17
    3.    Appointment of Committee and Retention of Committee Professionals...................17
    4.    Appointment of Retiree Committee................................................................17
    D.    Significant Events During the Chapter 11 Cases ............................................18
    1.    DIP Financing .................................................................................................18
    2.    Sale of Assets..................................................................................................20

| | | |
|---|---|---|
| 3. | Wind Down Budget | 22 |
| 4. | Operation of Asuza Plant pursuant to the Tolling Agreement with the Stalking Horse Purchaser | 22 |
| 5. | Settlement With Committee | 23 |
| 6. | Executory Contracts and Leases | 24 |
| 7. | Nonresidential Real Property Leases | 24 |
| 8. | Claims Process | 25 |
| 9. | Extension of Exclusive Periods | 26 |
| 10. | Turnover of Pension Plan | 26 |
| 11. | De Minimis Asset Sale Procedures | 27 |
| 12. | Sale of Surplus Properties | 28 |
| 13. | Environmental Settlements | 30 |
| E. | Termination of Retiree Plans | 32 |
| F. | Asbestos Litigation and Insurance | 33 |
| 1. | Asbestos Personal Injury Claims Against Reichhold, Inc. | 33 |
| 2. | Insurance Coverage | 33 |
| 3. | Defense and Indemnity Agreement and Proposed Cooperation Agreement | 34 |
| 4. | Factors that May Reduce Available Insurance Coverage | 34 |

ARTICLE IV SUMMARY OF PLAN .......................................................................35

| | | |
|---|---|---|
| I. | Classification and Treatment of Claims and Interests | 36 |
| II. | Means for Implementation of the Plan | 42 |
| III. | Provisions Regarding Distributions | 55 |
| IV. | Treatment of Executory Contracts and Unexpired Leases | 61 |
| V. | Allowance and Payment of Certain Administrative Claims | 63 |
| VI. | Effects of Confirmation | 64 |
| VII. | Miscellaneous Provisions | 68 |

ARTICLE V VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN .....................................................................................................................69

| | | |
|---|---|---|
| A. | General | 69 |
| B. | Parties in Interest Entitled to Vote | 70 |
| C. | Classes Impaired and Entitled to Vote under the Plan | 70 |
| D. | Voting Procedures and Requirements | 70 |
| 1. | Ballots | 70 |
| 2. | Returning Ballots | 70 |
| 3. | Voting | 71 |
| E. | Acceptance of Plan | 72 |
| F. | Confirmation Without Necessary Acceptances; Cramdown | 72 |
| 1. | No Unfair Discrimination | 73 |
| 2. | Fair and Equitable Test | 73 |

ARTICLE VI FEASIBILITY AND BEST INTERESTS OF CREDITORS ...................74

| | | |
|---|---|---|
| A. | Best Interests Test | 74 |
| B. | Feasibility | 75 |

52719/0001-11921553v11

ARTICLE VII EFFECT OF CONFIRMATION ..............................................................75
    A.    Binding Effect of Confirmation ....................................................................75
    B.    Good Faith ......................................................................................................75

ARTICLE VIII CERTAIN RISK FACTORS TO BE CONSIDERED................................75
    A.    Plan May Not Be Accepted............................................................................76
    B.    Certain Bankruptcy Law Considerations .....................................................76
    C.    Distributions to Holders of Allowed Claims Under The Plan .....................76
    D.    Conditions Precedent to Consummation of the Plan ....................................77
    E.    Certain Tax Considerations............................................................................77

ARTICLE IX CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...........77
    A.    Tax Consequences to the Debtors..................................................................78
    B.    Tax Consequences to Creditors .....................................................................79
    1.    Holders of Claims ..........................................................................................79
    2.    Non-United States Persons .............................................................................79
    C.    Tax Treatment of the Liquidating Trust........................................................79
    1.    Classification of the Liquidating Trust ..........................................................80
    2.    General Tax Reporting by the Trust and Beneficiary....................................80
    3.    Allocations of Taxable Income and Loss.......................................................81
    D.    Importance of Obtaining Professional Tax Assistance..................................82

ARTICLE X RECOMMENDATION AND CONCLUSION ...........................................82

52719/0001-11921553v11

## TABLE OF EXHIBITS

| Exhibit | Title |
|---------|-------|
| A | Second Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors |
| B | Chapter 7 Creditor Recovery Analysis |

# ARTICLE 1

# INTRODUCTION

**A.**    **Purpose of the Disclosure Statement**

On September 30, 2014 (the "Petition Date"), Reichhold Holdings US, Inc., Reichhold Liquidation, Inc. (f/k/a Reichhold, Inc.), Canadyne Corporation and Canadyne-Georgia Corporation (together, the "Debtors") filed voluntary petitions for relief (together, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

The Debtors have filed the Plan Of Liquidation Pursuant To Chapter 11 Of The Bankruptcy Code Proposed By The Debtors (including all exhibits thereto, and as may be amended, altered, modified or supplemented from time to time, the "Plan") with the Court.  A copy of the Plan is attached hereto as Exhibit A.

**Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan; provided, however, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") will have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.**

The Debtors submit this disclosure statement (as may be amended, altered, modified or supplemented from time to time, the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan.

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide certain information, as required under section 1125 of the Bankruptcy Code, to creditors who will have the right to vote on the Plan so they can make informed decisions in doing so. Creditors entitled to vote to accept or reject the Plan will receive a Ballot (as defined herein) together with this Disclosure Statement to enable them to vote on the Plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of the Chapter 11 Cases.  This Disclosure Statement also contains information regarding significant events that have occurred during the Chapter 11 Cases.  In addition, an overview of the Plan is included, which overview sets forth certain terms and provisions of the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan.  This Disclosure Statement also discusses the confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

B.    **Disclosure Statement Enclosures**

Accompanying this Disclosure Statement are:

1.    **Order Approving the Disclosure Statement**. A copy of the Court's order (without exhibits) (the "Solicitation Procedures Order") approving this Disclosure Statement and, among other things, establishing procedures for voting on the Plan, setting the deadline for objecting to the Plan and scheduling the Confirmation Hearing.

2.    **Ballot**. A ballot (the "Ballot") for voting to accept or reject the Plan, if you are the record Holder of a Claim in a Class entitled to vote on the Plan (each, a "Voting Class").

3.    **Notice**. A notice setting forth: (i) the deadline for casting Ballots either accepting or rejecting the Plan; (ii) the deadline for filing objections to confirmation of the Plan; and (iii) the date, time and location of the Confirmation Hearing (the "Notice").

4.    **Committee Support Letter.** **A letter from the Committee, recommending that creditors in a Voting Class vote to accept the Plan.**

C.    **Final Approval of the Disclosure Statement and Confirmation of the Plan**

1.    **Requirements**. The requirements for confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code. The requirements for what must be included in the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

2.    **Approval of the Plan and Confirmation Hearing**. To confirm the Plan, the Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

3.    **Effect of Confirmation**. Except as otherwise provided in the Plan or in the order confirming the Plan (the "Confirmation Order"), confirmation will affect the distribution of the Debtors' remaining assets. Confirmation serves to make the Plan binding upon the Debtors and all Creditors, Interest Holders and other parties in interest, regardless of whether they cast a Ballot to accept or reject the Plan.

4.    **Only Impaired Classes Vote**. Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders do not need to vote on such plan.

Under the Plan, Holders of Claims in Classes 1 (Secured Claims) and 2 (Priority Non-Tax Claims) are Unimpaired and therefore deemed to accept the Plan.

2

Under the Plan, Holders of Claims in Classes 3 (General Unsecured Claims) and 4 (Convenience Claims) are Impaired and are entitled to vote on the Plan.

Under the Plan, Holders of Claims and Interests in Classes 5 (Intercompany Claims) and 6 (Interests) are deemed to reject the Plan and are not entitled to vote on the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3 AND 4.

**D.    Treatment and Classification of Claims and Interests; Impairment**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. For a summary of the treatment of each Class of Claims and Interests, see Article IV, "Summary of Plan," below.

| Class Description | Estimated Amount of Allowed Claims (Approximate Amounts) | Status | Proposed Treatment |
|---|---|---|---|
| Administrative Claims Estimated Recovery: 100% | $506,000 to $2.7 million | Unclassified | On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, a Holder of an Allowed Administrative Claim (other than a Professional) shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Administrative Claim or (b) such other treatment as to which such Holder and the Debtors or the Liquidating Trustee, as applicable, shall have agreed upon in writing. |

| Class Description | Estimated Amount of Allowed Claims (Approximate Amounts) | Status | Proposed Treatment |
|---|---|---|---|
| Priority Tax Claims<br>Estimated Recovery: 100% | $91,000 to $341,000 | Unclassified | On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date or (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, a Holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Tax Claim or (b) such other treatment as to which such Holder and the Debtors or the Liquidating Trustee, as applicable, have agreed upon in writing. |
| Class 1:<br>Secured Claims<br>Estimated Recovery: 100% | $264,000 to $276,000 | Unimpaired | On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date or (ii) the date such Secured Claim becomes an Allowed Secured Claim, a Holder of an Allowed Secured Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Secured Claim, (a) Cash from the Debtors equal to the value of such Allowed Secured Claim, (b) a return of the Holder's Collateral securing the Secured Claim, (c) such treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be rendered Unimpaired or (d) such other treatment as to which such Holder and the Debtors or the Liquidating Trustee, as applicable, have agreed upon in writing. |

4

| Class Description | Estimated Amount of Allowed Claims (Approximate Amounts) | Status | Proposed Treatment |
|---|---|---|---|
| Class 2:<br>Priority Non-Tax Claims<br>Estimated Recovery: 100% | $3,600 to $229,000 | Unimpaired | On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date or (ii) the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, a Holder of an Allowed Priority Non-Tax Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Non-Tax Claim or (b) such other treatment as to which such Holder and the Debtors or the Liquidating Trustee, as applicable, have agreed upon in writing. |
| Class 3:<br>General Unsecured Claims<br>Estimated Recovery: less than 5% | $384,972,000 to $459,972,000 | Impaired | On the Effective Date, each Holder of an Allowed General Unsecured Claim that is not an Insured Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata share of the Liquidating Trust Interests. |
| Class 4:<br>Convenience Claims<br>Estimated Recovery: 5% | $907,000 to $1 million | Impaired | On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date or (ii) the date on which a Class 4 Convenience Claim becomes an Allowed Claim, each Holder of an Allowed Convenience Claim will receive Cash in the amount of 5% of the amount of its Allowed Convenience Class Claim. |
| Class 5:<br>Intercompany Claims<br>Estimated Recovery: 0% | $57 million | Impaired | On the Effective Date, all Intercompany Claims will be eliminated and the Holders of Intercompany Claims will not be entitled to, and will not receive or retain, any property or interest in property on account of such Claims. |

52719/0001-11921553v11

| Class Description | Estimated Amount of Allowed Claims (Approximate Amounts) | Status | Proposed Treatment |
|---|---|---|---|
| Class 6: Interests Estimated Recovery: 0% | N/A | Impaired | On the Effective Date, all Interests will be cancelled and each Holder thereof will not be entitled to, and will not receive or retain, any property or interest in property under the Plan on account of such Interests. |

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amount set forth in the table above. The Debtors are continuing to analyze the Claims in the Chapter 11 Cases and all objections to Claims have not yet been filed or fully litigated. Estimated Claim amounts for each Class are based upon the Debtors' review of their books and records and certain Proofs of Claim, and include estimates of a number of Claims that are contingent, disputed and/or unliquidated. Accordingly, there can be no assurances of the exact amount of the Allowed Claims at this time. Estimated percentage recoveries have been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims in each Class.

**E.    Voting Procedures and Voting Deadline**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. To ensure your vote is counted, you must (i) complete the Ballot, (ii) indicate your decision either to accept or reject the Plan in the boxes provided, and (iii) sign and return the Ballot(s) in the envelope provided.

TO BE COUNTED, EXCEPT AS SET FORTH BELOW, YOUR BALLOT WITH YOUR ORIGINAL SIGNATURE INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN **4:00 P.M. (EASTERN TIME) ON JANUARY 4, 2016** (THE "VOTING DEADLINE").

The following Ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

(i)     any Ballot or Master Ballot received after the Voting Deadline (unless extended by the Debtors);

(ii)    any Ballot or Master Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

(iii)   any Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

(iv)    any Ballot cast for a Claim scheduled as contingent, unliquidated or disputed or as zero;

(v)     any Ballot cast for a filed Claim to which the Debtors have objected to, and for which no Rule 3018(a) Motion has been filed by the Rule 3018(a) Motion Deadline (as such terms are defined in the Solicitation Procedures Order);

(vi)    any Ballot that indicates neither an acceptance nor a rejection, or indicates both an acceptance and a rejection, of the Plan;

(vii)    any Ballot (other than a Master Ballot) that casts part of its vote in the same Class to accept the Plan and part to reject the Plan;

(viii)    any form of Ballot or Master Ballot other than the official form sent by the Voting Agent, or a copy thereof;

(ix)    any Ballot received that the Voting Agent cannot match to an existing database record;

(x)    any Ballot or Master Ballot that does not contain an original signature; or

(xi)    any Ballot or Master Ballot that is submitted by facsimile, email or by other electronic means, unless otherwise authorized by the Debtors, in their discretion, upon consultation with the Committee.

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT ENCLOSED WITH THE NOTICE.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY, AND IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE VOTING AGENT LOGAN & COMPANY, INC. AT RI@LOGANANDCO.COM OR 973-509-3190.  THE VOTING AGENT IS NOT AUTHORIZED TO AND WILL NOT PROVIDE LEGAL ADVICE.

**F.**    <u>**Confirmation Hearing**</u>

The Court has scheduled a hearing to consider confirmation of the Plan for January 13, 2016 at 2:00 p.m. (Eastern time) in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom No. 4, Wilmington, Delaware 19801 (the "Confirmation Hearing").  The Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before January 6, 2016 at 4:00 p.m. (Eastern time) in the manner described in the Notice accompanying this Disclosure Statement.  The Confirmation hearing may be adjourned from time to time by way of announcement of such continuance in open Court or otherwise, without further notice to parties in interest.

**THE DEBTORS AND COMMITTEE URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

7

**THE COMMITTEE HAS ALSO PREPARED A LETTER IN SUPPORT OF CONFIRMATION OF THE PLAN, WHICH LETTER IS INCLUDED IN THE SOLICITATION PACKAGES. CREDITORS SHOULD REVIEW THE COMMITTEE'S LETTER IN CONNECTION WITH EVALUATING THE PLAN.**

## ARTICLE II

## GENERAL INFORMATION REGARDING THE DEBTORS

### A.      The Debtors' Formation

The Debtors include the following four entities: (a) Reichhold Holdings US, Inc. ("Holdings"), a Delaware corporation; (b) Reichhold Liquidation, Inc. (f/k/a Reichhold, Inc.) ("Reichhold" or "Reichhold, Inc."), a Delaware corporation, which is wholly owned by Holdings;[1] (c) Canadyne Corporation ("Canadyne"), a Delaware corporation, which is wholly owned by Reichhold Liquidation, Inc. (f/k/a Reichhold, Inc.); and (d) Canadyne-Georgia Corporation ("CGC"), a Georgia corporation, which is wholly owned by Canadyne. Reichhold, Inc. is the only entity among the four Debtors that had active operations. Holdings is strictly a holding company. Canadyne and CGC are inactive entities.

As of the Petition Date, the Debtors were part of the privately-held international "Reichhold" family of companies (the "Reichhold Companies") owned, directly or indirectly, by non-Debtor Reichhold Industries, Inc. ("Reichhold Industries"). The Reichhold Companies include operations in North America, Europe, Latin America, South America, the Middle East and Asia. The Debtors-Reichhold conducted the Reichhold Companies' United States operations.

Holdings is a wholly owned subsidiary of Reichhold Corporate Holdings II B.V., a Dutch entity, which is in turn a wholly owned subsidiary of Reichhold Industries. Reichhold Industries is wholly owned by Kestrel I Acquisition Corp. ("Kestrel"), a Delaware corporation. Kestrel is privately held. None of the foregoing entities are debtors in these cases.

### B.      The Debtors' Business and Employees

As of the Petition Date, the Reichhold Companies were leading global suppliers of intermediate products for the composites and coatings industry with operations in North America, South America, Europe, the Middle East and Asia. They served a diversified range of end users and market segments through two main business segments – composites and coatings. The Reichhold Companies had 19 manufacturing sites in 13 countries and served more than 2,000 customers in over 85 countries through their world-wide network of production facilities. The Reichhold Companies owned significant technology and know-how which was shared among the Reichhold Companies for use in their worldwide operations. As of June 30, 2014, the Reichhold Companies had consolidated assets of $538 million and consolidated liabilities of $631 million. In 2013, the Reichhold Companies generated $1,084 million in net revenues. The Reichhold Companies generated $1,081 million in net revenues for the year 2014.

---

[1] Reichhold, Inc. has changed its name to Reichhold Liquidation, Inc.

52719/0001-11921553v11

As of the Petition Date, the Debtors were the premier supplier of unsaturated polyester resins ("UPR") used to fabricate composites and advanced composite products. The composites business marketed four broad product groups: UPR, vinyl ester resin, gelcoats and bonding paste. These products are used in such applications as marine manufacturing, tub and shower components, energy windmill blades, solid surface applications, large diameter water pipe manufacturing, automotive manufacturing and advanced composites/prepregs. The Debtors (and a Canadian non-debtor affiliate) produced 219 million pounds of composites in 2013 and held a 17% market share. In 2013, the composites segment generated $772 million of revenue, 71% percent of the companies' total revenue. Consolidated UPR represented 62% of the Reichhold Companies' total revenue.

The Debtors' coatings business manufactured a comprehensive range of products. A pioneer in the coatings industry since 1927, the Debtors' expertise was in waterborne chemistries such as acrylics, alkyds, epoxies, polyesters and polyurethanes and in powder coatings and printing resins. The Debtors' more than 3,000 products were typically sold to a broad base of customers primarily for industrial purposes, used in thousands of applications such as consumer goods, architectural products, industrial maintenance, printing, marine applications, automotive coatings and construction. The Debtors (and a Canadian non-debtor affiliate) produced 203 million pounds of coatings in 2013 and held a 30% market share in alkyds. In 2013, the Debtors' coatings segment generated $312 million and was responsible for 29% of the Reichhold Companies' total revenue.

## C.    The Debtors' Corporate Headquarters

As of the Petition Date, the Debtors conducted their business from the world headquarters of the Reichhold Companies located in Durham, North Carolina, in office space leased by Debtor Reichhold, Inc. That office space also housed the Debtors' North American technology center and laboratory. In addition, the Debtors had operations in owned manufacturing facilities located in Azusa, California (composites); Houston, Texas (composites and coatings); Jacksonville, Florida (composites); Morris, Illinois (composites and coatings); Pensacola, Florida (coatings and composites); and Valley Park, Missouri (coatings).

## D.    The Debtors' Employees

As of the Petition Date, the Debtors employed approximately 379 employees in their business operations. Of those employees, approximately 47% (176) were hourly employees and approximately 53% (203) were salaried employees. Approximately 23% (89) of the Debtors' hourly employees are covered by collective bargaining agreements. The Debtors' workforce of employees was augmented by services received from approximately ten (10) independent contractors who devoted all or the substantial portion of their working time to providing services to the Debtors. As of the date of this Disclosure Statement, the Debtors do not have any employees as a result of the sale of substantially all of their assets as more fully described in Section III.2.

9

E.    **The Debtors' Corporate and Capital Structure**

The Debtors were borrowers, guarantors and/or obligors under various credit agreements, notes and financial arrangements.  As of the Petition Date, the Debtors' secured and unsecured debt obligations totaled approximately $287.3 million (exclusive of the guarantee obligations under the Senior Secured Notes described below).

1.    **Secured Debt**

As of the Petition Date, the Debtors had aggregate outstanding secured debt totaling approximately $64.3 million (exclusive of the Senior Secured Notes) in connection with various loans, notes and equipment financings, as described in more detail below.

a.    **Senior Credit Facility With Oaktree**

Debtor Reichhold, Inc. and non-debtor affiliate Reichhold Industries Limited ("RIL"), an Ontario, Canada corporation continued into British Colombia, were borrowers (the "Borrowers") under a Credit Agreement dated October 7, 2005, as subsequently amended, (the "Credit Agreement") among various lenders thereunder (the "Prior Lenders") and Bank of America, N.A. ("BofA") as administrative agent and a Prior Lender and Wells Fargo Bank, National Association ("Wells Fargo") as Documentation Agent and a Prior Lender.  Pursuant to the Credit Agreement, the Prior Lenders made available to the Borrowers a maximum amount of $85 million on a revolving basis (the "Revolving Loan").

In the early months of 2014, it became apparent that availability under the Revolving Loan was becoming insufficient to supply the Borrowers with the liquidity necessary to continue financing their operations.  As a result, the Borrowers entered into discussions with OCM Reichhold Holdings, Ltd., an affiliate of Oaktree Capital Management, L.P. ("Oaktree"), to provide a new credit facility.  On or about May 20, 2014, BofA and Wells Fargo in their respective capacities as Prior Lenders under the Credit Agreement assigned the Credit Agreement and all rights and interests thereunder to Oaktree, as the new sole lender under that agreement (the "Assignment").  BofA, however, agreed to continue as administrative agent.

In connection with the Assignment, the Borrowers and BofA entered into a Fifteenth Amendment to Credit Agreement dated May 20, 2014 (the "Amendment").  Pursuant to the Amendment, the Revolving Loan was replaced with term loans and a delayed draw term loan in the aggregate amount of $70 million as follows (collectively, the "Term Loans"): (a) a term loan in the aggregate principal amount of $8,345,353.79 to RIL, the proceeds of which were used to repay RIL's outstanding balance on the Revolving Loan; (b) a term loan in the aggregate principal amount of $29,265,221.07 to Debtor Reichhold, Inc., the proceeds of which were used to repay Reichhold, Inc.'s outstanding balance on the Revolving Loan; (c) a delayed draw term loan commitment to Debtor Reichhold, Inc. in the original principal amount of $5,000,000; and (d) additional term loans to Debtor Reichhold, Inc. in the aggregate principal amount of $27,389,425.14, of which $13,743,950.76 was used to cash collateralize outstanding letters of credit.  The Term Loans were scheduled to mature on October 31, 2014.

The Borrowers' obligations under the Credit Agreement, as amended by the Amendment, were secured by a security interest in substantially all of the Borrowers' assets other than the

10

equity interests held by Holdings.  Additionally, in consideration for the Term Loans and subject to the terms set forth in the Amendment, non-Debtor Reichhold Industries, the parent of the Borrowers, agreed not to sell any of its assets, including equity in its subsidiaries.

As of the Petition Date, the amount outstanding to Oaktree under the Credit Agreement was approximately $73 million, of which $64.3 million was owed by Debtor Reichhold, Inc. and $8.7 million was owed by non-Debtor RIL.  As set forth herein, Oaktree was repaid by the DIP Loans (defined herein).

b.    **Senior Secured Notes**

On May 8, 2012, non-debtor Reichhold Industries issued $206,578,066 of 9%/11% Senior Secured Notes (the "Senior Secured Notes") due 2017 pursuant to an indenture (the "Senior Secured Indenture") under which Wells Fargo served as trustee and collateral agent.[2] Reichhold Industries' obligations under the Senior Secured Notes and Senior Secured Indenture were guaranteed by Holdings and Reichhold, Inc. (together with Reichhold Industries, the "Issuers").  The Senior Secured Notes were secured by a pledge of, among other things, Reichhold Corporate Holdings II B.V.'s interest in Holdings and Holdings' interest in Reichhold, Inc.[3]  To secure its obligations under the Senior Secured Notes, Reichhold Industries also pledged 65% of the voting shares (and 100% of the non-voting shares) its holds in its wholly-owned direct, non-Debtor subsidiary, Reichhold Holdings Luxembourg, S.a.r.l. ("RHL").  Because RHL is the ultimate holding company of all of the non-Debtor affiliates that operate outside of North America, and given the fact that the non-voting shares that had been pledged carried with them a significant portion of the economic value of RHL, the Debtors believed the holders of the Senior Secured Notes were the primary beneficiary of the Reichhold Companies' non-U.S. operations.

The Senior Secured Notes were issued following an exchange offer whereby the Senior Secured Notes were exchanged for the Senior Unsecured Notes.[4]  The Senior Secured Notes accrued cash interest at 9% and payment-in-kind interest ("PIK Interest") at 11%, with payments due annually on November 1 and May 1.  Under the Senior Secured Indenture, the Issuers were permitted to add interest payments to the principal amount outstanding at the PIK Interest rate through May 1, 2014.

---

[2] Third Avenue Management ("Third Avenue"), JP Morgan ("JPM") and Black Diamond were the largest holders of the Senior Secured Notes.

[3] Reichhold, Inc. is a guarantor of the Senior Secured Notes.  Reichhold, Inc., however, did not pledge any assets to secure that guarantee.

[4] On August 15, 2006, Reichhold Industries issued $195 million of 9% Senior Notes (the "Senior Unsecured Notes") due in August of 2014 pursuant to a first amended indenture.  As a result of an exchange offer undertaken by Reichhold Industries in May of 2012, approximately 99% of the Senior Unsecured Notes were replaced with the Senior Secured Notes.  Holders of approximately 1% of the Senior Unsecured Notes did not agree to exchange their Senior Unsecured Notes for the Senior Secured Notes.  As of the Petition Date, however, there were no amounts due and owing to the holders of the Senior Unsecured Notes.

As of the Petition Date, principal in the amount of approximately $255 million was outstanding under the Senior Secured Notes. As of the date this Disclosure Statement, approximately $159 million remained outstanding under the Senior Secured Notes as a result of the Exchange (described below in Section 111.D.1).

        c.      **Equipment Financing**

The Debtors were also party to several equipment leases and purchase agreements for equipment that they financed. The total secured obligations related to that equipment was only $3,000 as of the Petition Date. Based upon the Debtors' books and records and the assumption and assignment of equipment leases during the cases, the Debtors do not believe there are any valid outstanding equipment financing claims.

        d.      **Other Secured Debt**

The Debtors had various mechanics' lien claims filed against them. As of the date of this disclosure statement, the Debtors estimate there is approximately $276,000 of such other secured debt outstanding.

        2.      **Unsecured Debt**

As of the date of this Disclosure Statement, the Debtors estimate there is approximately $384,972,000 to $459,972,000 of aggregate outstanding unsecured debt including, among others, environmental obligations, unfunded pension and other postretirement obligations and the outstanding obligations under the guarantee of the Senior Secured Notes.

        a.      **Intercompany Debt with Non-Debtor Affiliates**

Reichhold, Inc. had received inter-company transfers in the form of loans evidenced by notes from its foreign affiliates in order to address the Debtors' liquidity shortfall (discussed below). Those inter-company loans were recorded by intercompany notes that were issued monthly and payable the next month. As of the Petition Date, Reichhold, Inc. had borrowed approximately $103.7 million from foreign affiliates through inter-company loans. Of this amount, $93.9 million was owed to an affiliate in the Netherlands and $9.8 million was owed to RIL. As of the date of this Disclosure Statement, there is no remaining intercompany debt with the non-debtor affiliates as a result of the Intercompany Release (as defined and explained more fully in Section 111.D.2).

**F.      Summary of Events Leading to the Chapter 11 Filings**

        1.      **Declining Revenue, Operating Losses the Tightening of Trade Terms with Key Vendors and Shortage of Cash**

In recent years, prior to the Petition Date, the Debtors generated large net losses and experienced negative cash flows. In addition to the Debtors' significant debt service levels, the Debtors spent substantial amounts to fund pension and other postretirement obligations and to pay for environmental remediation matters. During 2012 and 2013, respectively, the Debtors contributed $12.7 million and $10.0 million to their pension and other postretirement benefit

12

plans. The Debtors also spent $8.6 million in 2013 for environmental matters. The Debtors incurred significant costs for legal and financial advisors to assist with their financial restructuring efforts.

Since 2010, the Debtors' significant cash needs had been satisfied primarily from intercompany loans received from their foreign affiliates. During 2011, the cash generated by the Debtors' foreign affiliates was reduced due to their investment in a plant in China and economic conditions in Europe and the Middle East. The use of PIK interest after the 2012 bond exchange (described above) reduced the cash requirements for the Reichhold Companies and improved operating results, supporting additional intercompany loans from the Debtors' foreign affiliates. That trend, however, did not continue into 2013, as a result of both a negative impact from the US coatings operations and a significant decline in the profitability of the Debtors' foreign affiliates, especially Brazil. In December of 2013, in order to provide additional funding for the Debtors and additional liquidity for the foreign affiliates, certain of the Debtors' European, Asian and South American affiliates (the "GAC Credit Parties") and GA Capital LLC ("GAC") entered into a new credit facility (the "GAC Facility"). The Reichhold Companies' affiliates in the United States (including the Debtors), Canada, India, China and Turkey ("Non-GAC Credit Parties") were not participants in the GAC Facility. The GAC Facility allowed up to $18 million, plus a portion of excess cash flow generated by the GAC Credit Parties to be calculated semi-annually, of intercompany loans or investments made by the GAC Credit Parties to any Non-GAC Credit Parties. Of the initial $18 million allowance for intercompany loans and investments, $11 million had been loaned to the Debtors and $6.1 million had been loaned to or invested in other Non-GAC Credit Parties as of the Petition Date. On September 26, 2014, the allowance for such intercompany loans and investments was increased by $5.8 million due to the semi-annual excess cash flow calculation. As of the Petition Date, the unused allowance for intercompany loans or investments by the GAC Credit Parties was $6.7 million.

On April 17, 2014, the credit rating agency Standard and Poor's ("S&P") downgraded Reichhold Industries' credit rating from B- to CCC, and thereafter issued a further downgrade on July 28, 2014 to CCC-. The credit downgrades had a significant impact on the Debtors' liquidity as they lost a total of approximately $10 million of liquidity due to reduced credit limits and the tightening of trade terms from many of their vendors.

By September 2014, the Debtors were fully drawn under the Oaktree facility and facing severe liquidity problems.

2.    **Unsustainable Legacy Liabilities**

The Debtors were heirs to an 85+ year history of involvement in the specialty chemicals industry and carry with them exceedingly burdensome liabilities related to that legacy. As of June 30, 2014, the Debtors' unfunded pension and retirement liability exceeded $71 million, and reserves on account of environmental liabilities were approximately $32 million. These obligations persisted, notwithstanding the fact that the Debtors' revenues had declined precipitously while their profits have evaporated and cash has become scarce.

13

3.    **Efforts to Address Financial Constraints**

In response to the financial challenges discussed above, the Reichhold Companies' management team initiated a number of actions to improve the performance of the company. In particular, the Debtors addressed numerous operational changes including, but not limited to, reducing facilities such as the permanent closure of the Newark, New Jersey facility as well as restructuring of contracts. Additionally, the Reichhold Companies took steps to improve the performance of the non-Debtor affiliates which, in turn, enabled them to loan more money to the Debtors. Lastly, the Debtors took steps to improve their cash position by, among other things, exchanging the Senior Unsecured Notes for the Senior Secured Notes which had a PIK interest feature. Unfortunately, those efforts proved insufficient to overcome the financial obstacles facing the Debtors.

4.    **Exploration of Strategic Alternatives**

After completing the exchange offer in May 2012, the Reichhold Companies devoted significant time and resources to exploring strategic alternatives to maximize value for the benefit of all stakeholders. Those alternatives included, but were not limited to, a potential sale of the entire company and a transaction with one of the industry players that would consolidate the composite industry. Neither of those options, however, materialized.

As of the Petition Date, the Debtors did not have sufficient liquidity to operate their businesses and could not fund the administration of these Chapter 11 Cases without the need for debtor-in-possession financing. Toward that end, before the Petition Date, the Debtors retained CDG Group to, among other things, critically examine the Debtors' business operations and funding requirements. In or about April 2014, given the Debtors' operating losses and reduced liquidity, the Debtors and their advisors contacted 4 potential lenders and received one financing proposal from a prospective lender in anticipation of a potential Chapter 11 filing. As set forth above, in May 2014, however, the Debtors secured the Oaktree Term Loans, alleviating the need for a DIP loan at that time.

Subsequently, however, due to further liquidity constraints and limited available cash, the Debtors and their advisors renewed their efforts to secure a DIP loan. They contacted and solicited DIP financing proposals from seven prospective lenders including their existing lenders and bondholders, traditional lenders and non-traditional lenders. The Debtors and their advisors explored two types of financing structures with the prospective lenders – funding for the Reichhold Companies' United States operations only and a global financing solution for the Reichhold Companies' United States and rest of world businesses. The Debtors ultimately received four proposals for DIP financing. None of the prospective lenders were willing to provide a DIP facility secured only by the Debtors' collateral. Instead, all four of the proposals required security from the Reichhold Companies rest of world businesses to fund the cash needs of the Debtors.

After careful review and extensive negotiation of the DIP financing proposals, the Debtors' Board of Directors determined in its business judgment that the proposal from Third Avenue, JP Morgan and Black Diamond represented the best option for the Debtors and their businesses (the "DIP Loan"). As described below, the DIP Loan provided for a comprehensive

14

transaction that allowed the Reichhold Companies' to emerge with continuing business operations, a delevered balance sheet and significantly enhanced financial conditions, across the Debtors' worldwide operations. Additionally, the DIP Loan provided for a stalking horse bid for the Reichhold Companies' U.S. operations (as further discussed below) thereby ensuring a clear path towards emergence while providing the liquidity needed to run a marketing process and encourage overbidding to increase value for the Debtors' estates.

### 5. **Appointment of Independent Board Members**

Before the Petition Date, three (3) independent directors were appointed to the Debtors' board. In view of management's (some of who are also directors) informal agreement with the Stalking Horse Purchaser, CDG and counsel reported directly to the independent directors regarding negotiations and approval of the Stalking Horse Agreement and in connection with the overall sale process.

### 6. **Use of Chapter 11 Process**

Given the Debtors' severe liquidity constraints, these Chapter 11 Cases were commenced to maximize value for the benefit of all stakeholders. The Debtors believed that the comprehensive transaction that underlies the commencement of these Chapter 11 Cases (including, perhaps most notably, the access to necessary debtor-in-possession financing and the willingness of the holders of the Senior Secured Notes to serve as a stalking horse bidder and establish a floor price for the U.S. operations, which led to a robust auction with participation by other bidders) was a transaction that would benefit all stakeholders. The Debtors, thus, believed these Chapter 11 filings and the pursuit of a sale process involving substantially all of the Debtors' assets under section 363 was in the best interest of the Debtors' creditors and other stakeholders. As the holders of the Senior Secured Notes were the winning bidder in the 363 sale, as described below, the Reichhold Companies will be kept together, which the Debtors believed would maximize recoveries for all creditors as well as saving the jobs of many employees.

## ARTICLE III

## THE CHAPTER 11 CASES

### A.    **Commencement of the Chapter 11 Cases**

As set forth above, on the Petition Date the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Court. By order dated October 2, 2014 [Docket No. 44], the Debtors' cases are being jointly administered for procedural purposes only. No trustee or examiner has been appointed in the Chapter 11 Cases.

After the Petition Date and through the sale of substantially all of their assets, the Debtors continued to operate their businesses and manage their properties as debtors and debtors-in-possession.

15

B.    **"First Day" Motions and Related Applications**

On the Petition Date, the Debtors filed a number of "first-day" motions and applications designed to ease the Debtors' transition into Chapter 11, maximize their assets and minimize the effects of the commencement of the Chapter 11 Cases.[5]  On October 2, 2014, the Court entered orders providing various "first-day" relief, including:

(a)    authorizing the Debtors to pay certain prepetition taxes and related obligations [Docket No. 46];

(b)    authorizing the Debtors to pay prepetition insurance obligations and maintain postpetition insurance coverage [Docket No. 47];

(c)    authorizing the Debtors to honor certain prepetition obligations to customers and continue customer programs [Docket No. 48];

(d)    authorizing the Debtors to pay certain prepetition shipping, warehousing and related claims [Docket No. 50];

(e)    authorizing the Debtors to pay prepetition employee compensation, benefits, expense reimbursements and related obligations; and continue certain employee benefit programs in the ordinary course [Docket No. 51];

(f)    authorizing the Debtors to continue use of their existing cash management system and bank accounts, checks and business forms and deposit practices; continue intercompany transactions; and accord superpriority status to postpetition intercompany claims between Debtors and administrative expense status to postpetition intercompany claims between Debtors and non-Debtor affiliates [Docket No. 53];

(g)    establishing procedures for resolving objections by utility companies and prohibiting utility companies from altering, refusing or discontinuing service (final order entered October 28, 2014) [Docket No. 189]; and

(h)    authorizing the Debtors to obtain debtor-in-possession financing, use cash collateral and grant superpriority claims (final order entered December 4, 2014) [Docket No. 310].

C.    **Retention of Professionals and Appointment of the Committee**

1.    **Retention of Debtors' Professionals**

By Orders entered October 23, 2014, the Debtors were authorized to retain (i) Cole Schotz P.C. as their bankruptcy counsel [Docket No. 169], (ii) Dickstein Shapiro LLP as their special insurance counsel [Docket No. 166], and (iii) Hunton & Williams LLP as their special

---

[5] In addition to the "first-day" motions, the Debtors filed certain other motions that are described more fully herein.

environmental counsel [Docket No. 168]. By Order entered November 19, 2014, the Debtors were authorized to retain CDG Group, LLC as their financial advisor and investment banker [Docket No. 238].

The Debtors also were authorized to retain certain professionals utilized by the Debtors in the ordinary course of business prior to the Petition Date (amended order entered December 23, 2014) [Docket No. 368].

2.    **Retention of Claims and Noticing Agent and Administrative Agent**

By order entered on October 2, 2014 [Docket No. 45], the Court authorized the Debtors to retain Logan & Company, Inc. ("Logan" or the "Voting Agent") as their claims and noticing agent in the Chapter 11 Cases. By order entered October 23, 2014 [Docket No. 167], the Court also authorized the Debtors to retain Logan as their administrative agent in the Chapter 11 Cases.

3.    **Appointment of Committee and Retention of Committee Professionals**

On October 14, 2014, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors in the Chapter 11 Cases (the "Committee") pursuant to section 1102(a) of the Bankruptcy Code [Docket No. 81]. The members of the Committee are: (i) Pension Benefit Guaranty Corporation, (ii) Stepan Company, (iii) Americas Styrenics, (iv) Evonik Corporation, (v) United Steelworkers, (vi) Alnor Oil Company, Inc. and (vii) Estate of Anna R. Hartgrave. By letter dated August 12, 2015, Americas Styrenics resigned from the Committee [Docket No. 976]. By Orders entered November 13, 2014, the Committee was authorized to retain (i) Hahn & Hessen LLP as its counsel [Docket No. 233], and (ii) Blank Rome LLP ("Blank Rome") as its co-counsel [Docket No. 234]. By Order entered on November 21, 2014, the Committee was authorized to retain Capstone Advisory Group, LLC as its financial advisor [Docket No. 261]. By Order entered on August 3, 2015, Berkeley Research Group, LLC replaced Capstone Advisory Group, LLC as the Committee's financial advisor [Docket No. 949].

4.    **Appointment of Retiree Committee**

The Debtors historically offered their employees the ability to participate in a self-funded retiree medical program (the "Retiree Medical Program") pursuant to which the Debtors would pay a portion of the cost of the employee's medical care during the entirety of the employee's retirement, and a retiree life insurance program (the "Retiree Life Insurance Program" and, together with the Retiree Medical Program, the "Retiree Welfare Programs") pursuant to which the Debtors would pay the premiums associated with the employee's life insurance following the employee's retirement from the Debtors. On January 30, 2015, the Debtors filed a motion for an order directing the U.S. Trustee to appoint a retiree committee consisting of non-union retirees who are currently receiving benefits under the Retiree Welfare Programs (the "Retiree Committee Motion") [Docket No. 537]. On February 23, 2015, the Court approved the Retiree Committee Motion [Docket No. 588]. On April 1, 2015, the Office of the United States Trustee appointed the Official Committee of Non-Union Retired Employees (the "Retiree Committee") [Docket No. 665]. The Retiree Committee's three members are as follows: (i) Ian L. Potter, (ii) John R. Young and (iii) Andrew A. Katai. By Order entered May 28, 2015, the Retiree

17

Committee was authorized to retain Stahl Cowen Crowley Addis LLC as counsel [Docket No. 755].

D.    **Significant Events During the Chapter 11 Cases**

In addition to the "first-day" relief sought and received in the Chapter 11 Cases, the Debtors have sought and received authority with respect to various matters designed to assist in the administration of the Chapter 11 Cases and to maximize the value of the Debtors' estates. Material events since the commencement of the Chapter 11 Cases are summarized below and include:

1.    **DIP Financing**

On the Petition Date, the Debtors filed a Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (II) Granting Liens and Super-Priority Claims; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Motion").

As set forth above, faced with significant liquidity constraints, the Debtors recognized that to achieve their Chapter 11 objectives – including, most notably, the effectuation of the sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code – it was necessary to obtain post-petition financing. The nature of the Debtors' prepetition capital structure (described above) made procuring such financing extremely challenging, especially since there was insufficient collateral value among the Debtor entities to enable them to attract traditional lenders willing to provide the funding the Debtors needed. As set forth above, the Debtors undertook a rigorous marketing process and exploration of strategic alternatives, in which the Debtors received formal proposals from several potential financing sources.

Ultimately, the Debtors determined that the best financing option was presented (as a component of a larger, comprehensive transaction discussed below), collectively, by funds managed by Third Avenue Management, JP Morgan and Black Diamond (collectively, but solely in their capacity as the source of postpetition financing, the "Senior DIP Lenders"), the largest holders of the Senior Secured Notes. Significantly, the Senior DIP Lenders' proposal represented the most reasonable and viable option for obtaining the additional liquidity necessary to sustain the Debtors' operations in Chapter 11 for the benefit of their estates and creditors.

Discussions with the Senior DIP Lenders accelerated and ultimately culminated with a comprehensive, multi-staged transaction (the "DIP Transaction") a key component of which was a financing structure pursuant to which the Senior DIP Lenders agreed to provide secured financing in the aggregate net principal amount of $130,000,000 (after original issue discount) both directly to the Debtors and to one of the non-Debtor affiliates that operates outside of North America ("ROW") (which affiliate would, under the terms of the DIP Transaction, in turn, loan a portion of such funds to the Debtors). The structure's ultimate funding goal was to provide the Debtors with access to new liquidity, after the repayment of (i) approximately $73 million owed to Oaktree and (ii) approximately $28.9 million owed to the ROW affiliates' secured lender GAC under the GAC Facility.

The agreed financing structure allowed funds to flow to the Debtors from two separate sources. The first funding source was a direct loan in the amount up to $53.19 million on an interim and final basis (the "Senior DIP Loan") from the Senior DIP Lenders to Debtor Reichhold, Inc., guaranteed by the other Debtors. The second funding source ultimately derived from a secured loan of $85.1 million made by the Senior DIP Lenders to Reichhold Holdings International B.V. ("Reichhold BV") a holding company for all of the ROW entities, guaranteed by many of the ROW entities (the "ROW Loan"). The proceeds from the ROW Loan were used to repay certain secured indebtedness at Reichhold BV and to fund the Junior DIP Loan (as defined below). Reichhold BV (in its capacity as a postpetition lender, the "Junior DIP Lender") then made an intercompany loan of $50.0 million (the "Junior DIP Loan" and, together with the Senior DIP Loan, the "DIP Loans") to Debtor Reichhold, Inc.

The Debtors believed that the credit support from ROW to the Debtors was necessary to maximize the overall value of the Debtors' assets. Both DIP Loans were secured by liens upon substantially all of the Debtors' assets. The liens under the Senior DIP Loan were, however, first priority liens on such assets which are senior in priority to the liens under the Junior DIP Loan. Among other conditions precedent to initial funding under the DIP Loans, reciprocal license agreements for the use of intellectual property were executed and delivered. The Debtors intended to use the proceeds of the DIP Loans to (a) pay off all outstanding obligations under the Debtors' existing Oaktree prepetition secured facility in the principal amount of approximately $73 million, (b) support the ongoing operations of the Debtors' business during these Chapter 11 cases, and (c) enable the Debtors to fund the 363 sale process.

As noted above, the furnishing of the funds underlying the DIP Loans was only the first step in the overall DIP Transaction. The second step was the commitment by Reichhold Industries to negotiate documents for (a) a consensual foreclosure by Wells Fargo, National Association as indenture of the ROW equity collateral pledged under the Senior Secured Indenture and (b) an asset purchase agreement (the "APA") under which Reichhold BV or another of the ROW entities as successor to the Junior DIP Lender would become the stalking horse to purchase substantially all of the Debtors' material assets in the 363 sale process, initially by credit- bidding the Junior DIP Loan in full.

On October 2, 2014, the Court entered an Interim Order (I) Authorizing Debtors to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (II) Granting Liens and Superpriority Claims; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the Interim DIP Order"). Pursuant to the Interim DIP Order, the Debtors were authorized to borrow, on an interim basis, $53,190,000 under the Senior DIP Loan and $40,430,000 under the Junior DIP Loan. The Court scheduled a final hearing on the DIP Motion for October 20, 2014.

The Committee, among others, filed an Objection to the final approval of the DIP Motion alleging that the DIP Loans would chill bidding and make it impossible for a third-party to effectively bid for the Debtors' assets. After extensive negotiations, the Debtors, the Committee and DIP Lenders resolved the Committee's objections as memorialized in the  Final Order (I) Authorizing Debtors to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364 and (II) Granting Liens and Superiority Claims [Docket No. 310] (the "Final DIP Order") and Order Amending Final Order (I) Authorizing Debtors to Obtain Post-Petition

19

Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364 and (II) Granting Liens and Superiority Claims [Docket No. 477]. The terms of the settlement with the Committee is discussed herein.

As a result of entry of the Final DIP Order, the Debtors were authorized to draw the full amount of the DIP Loans. The Debtors ultimately drew $53,192,000 on the Senior DIP Loan and $46,000,000 on the Junior DIP Loan. As set forth below, the Junior DIP was credit bid in connection with the Sale and the Senior DIP Loan in the amount of $53 million was assumed by the Stalking Horse Purchaser. As of the date of this Disclosure Statement, the Debtors have no amounts due and owing in connection with the DIP Loans.

Instead of a consensual foreclosure of the ROW equity pledged under the Senior Secured Indenture as originally contemplated, there was an exchange of debt for equity (the "Exchange"). On April 1, 2015, holders of the Senior Secured Notes representing 99.1% of the total outstanding notes exchanged their Senior Secured Notes with a face value of approximately $104 million, representing approximately 41% of the their Senior Secured Notes held, for 99.1% of the equity of Reichhold BV, RIL and Reichhold, LLC, (f.k.a. Reichhold Acquisitions Holdings, LLC). As Reichhold BV owns all of the Reichhold Companies' operating subsidiaries that are located outside of North America, this exchange effectively gave the Senior Secured Note holders ownership of 99.1% of the entire family of Reichhold Companies, excluding certain non-operating entities, upon the closing of the U.S. asset sale described below. Holders of the remaining 0.9% of the Senior Secured Notes have not been identified and have a participation right under the same terms for a period of one year.

2.   **Sale of Assets**

On November 12, 2014, the Debtors filed a motion [Docket No. 221] (the "Sale and Bidding Procedures Motion") seeking entry of an order (the "Bidding Procedures Order") (i) approving the proposed auction and bidding procedures (the "Bidding Procedures") for the potential sale of substantially all of the Debtors' assets (the "Purchased Assets") pursuant to the Asset Purchase Agreement (the "Stalking Horse APA") with Reichhold Acquisitions Holdings LLC (the "Stalking Horse Purchaser"); (ii) scheduling an auction and hearing to consider approval of the sale; and approving notice of respective date, time and place for auction and for hearing on approval of the sale and the assumption and assignment of certain executory contracts and unexpired leases; and for an order (the "Sale Order") authorizing (i) the sale of substantially all of the Debtors' assets free and clear of liens, claims and encumbrances; and (ii) assumption and assignment of certain executory contracts and unexpired leases.

On December 3, 2014, the Court entered the Bidding Procedures Order [Docket No. 309]. The Bidding Procedures Order fixed January 6, 2015 at 5:00 p.m. as the deadline for the submission of higher or better bids for the Purchased Assets and January 8, 2015 at 10:00 a.m. for an auction to the extent higher or better bids were submitted. The Debtors served the Bidding Procedures Order and applicable notice in accordance with the Bidding Procedures Order. Additionally, the Debtors published notice of the sale in the Wall Street Journal National Edition as well as issued an international press release announcing the approval of the Bidding Procedures Order and the proposed sale of the Purchased Assets.

Commencing immediately on the Petition Date and even before the Stalking Horse APA was executed, CDG initiated an extensive marketing of the Debtors' assets for sale as a going concern and began soliciting suitable buyers. CDG contacted 173 interested parties including 79 strategic parties and 94 financial parties. Fifty-four (54) of those parties ultimately executed non-disclosure agreements and were provided access to the Debtors' electronic data room. The Debtors' management gave presentations to nine (9) interested parties.

Ultimately, the Debtors received five (5) bids for some or all of the Purchased Assets. In consultation with the Committee, the Debtors determined that only the bid from Reichhold Resources LLC ("RR"), an entity formed by Prophet Equity Fund II, was a qualified bid (the "RR Bid"). The RR Bid was in the amount of $98,249,000 and was determined to be the highest and best bid before opening the auction.

On January 8, 2015, the Debtors conducted an auction between the Stalking Horse Purchaser and RR. The bidding at the auction was spirited. Over the ten (10) hour auction period, there were approximately 71 bids. After the final round of bids, the Debtors, in consultation with their advisors and the Committee, designated the Stalking Horse's bid in the amount of $146,749,000 as the successful bidder and RR's bid in the amount of $146,249,000 as the back-up bidder.

Pursuant to the Final DIP Order, the Junior DIP Lender was a secured creditor of the Debtors holding a valid allowed claims against the Debtors in the aggregate amount of $46,000,000 plus additional amounts to the extent allowed under the Final DIP Order and was authorized to credit bid any or all of such allowed claim. The Junior DIP Lender assigned its DIP loan claim to the Stalking Horse Purchaser. Therefore, the Stalking Horse Purchaser's bid of $146,749,000 included a credit bid of $46,000,000.

On January 9, 2015, the Debtors filed a notice of auction results the [Docket No. 459], listing the Stalking Horse Purchaser, Reichhold Acquisitions Holdings LLC, as the successful bidder and RR as the backup bidder.

On January 12, 2015, the Court held a hearing on the Sale. By orders dated January 12, 2015 and January 14, 2015 [Docket Nos. 479, 483], the Court approved the sale to the Stalking Horse Purchaser. On April 1, 2015, the sale to the Stalking Horse Purchaser closed.

In connection with the sale, the Stalking Horse Purchaser assumed approximately $80 million of liabilities. In particular, the Stalking Horse Purchaser assumed (i) $73 million of liabilities pursuant to the Stalking Horse APA (independent of the wind down budget discussed below) including, among others, liabilities under the Senior DIP Loan and 503(b)(9) claims of vendors that agree to provide the Stalking Horse Purchaser with normal trade terms subject to a $14 million cap and (ii) $7 million of estimated post-petition accounts payable. At the closing of the sale, the Debtors retained approximately $7.2 million for wind-down and closing costs and received approximately $16 million of cash from the Stalking Horse Purchaser.

Additionally, in connection with the sale and as a condition to closing, the non-Debtor affiliates executed an Intercompany Release dated as of April 1, 2015 (the "Intercompany Release"). Pursuant to the Intercompany Release, the non-Debtor affiliates released and

21

discharged, among others, the Debtors from any and all actions, causes of action, claims, demands, damages, judgments, payments, losses, debts, dues and suits of every kind. Similarly, the Debtors released the non-Debtor affiliates. As a result of the Intercompany Release, all intercompany liabilities due by the Debtors to the non-Debtor affiliates were released.

3.    **Wind Down Budget**

An integral component of the Purchase Price was ensuring that the Debtors had sufficient funds to wind down their estates. Accordingly, the Stalking Horse Purchaser agreed to fund the Sellers' Closing and Wind Down Expenses as follows: (X) an amount estimated in good faith by the Debtors and as set forth in Section 1.1(f) of the Sellers' Disclosure Schedule to the Stalking Horse APA, but in no event in excess, in the aggregate, of $6,770,000 for (i) the wind down of the Debtors' bankruptcy estates with respect to (A) the costs of preparation of financial reports and tax returns in connection with the wind down of the bankruptcy estates, and (B) all professional fees to be incurred in connection with the preparation of those reports, (ii) amounts necessary for the Debtors to pay taxes allocated to, or retained by the Debtors to the extent they are entitled to priority as administrative expenses and are not otherwise an assumed liability under the Stalking Horse APA; (iii) fees payable to the United States Trustee; (iv) accrued and unpaid professional, consulting and investment banking fees and commissions that have been allowed by the Bankruptcy Court, (v) insurance premiums, and (vi) other post-petition and unpaid operating expenses that (A) are not an assumed liability under the Stalking Horse APA or (B) not included in the DIP budget; and (Y) the amount which shall in no event exceed $1,636,000 to be spent for environmental-related liabilities. The Sellers' Closing and Wind Down Expenses totaling $8,406,000 were paid by the Purchaser.

4.    **Operation of Asuza Plant pursuant to the Tolling Agreement with the Stalking Horse Purchaser**

Since 1949, the Debtors owned and operated a facility at 237 S. Motor Avenue in Azusa, California, manufacturing resins and other products (the "Azusa Property"). The Azusa Property was integral to the Debtors' operations and the Stalking Horse Purchaser intended to purchase the Azusa Property as part of the Stalking Horse APA. However, the Azusa Property is located within the Baldwin Park Operable Unit ("BPOU"), a seven mile long area of groundwater which is part of the San Gabriel Valley Superfund Site, which in 1984, the Environmental Protection Agency ("EPA") added to the National Priorities List and designated for cleanup of groundwater contamination. At the time of the Chapter 11 filings, the Debtors were one of several potentially responsible parties ("PRPs") at the BPOU of the San Gabriel Valley Super Fund Site who are contributing to the clean-up of such BPOU. The Stalking Horse Purchaser was only willing to purchase the Azusa Property if it could obtain a prospective purchaser agreement with the United States pursuant to a settlement agreement and covenant not to sue limiting its obligations to fund the water treatment facility and responsibility for groundwater contamination ("PPA"). The Debtors, Stalking Horse Purchaser, the U.S. Department of Justice and the EPA engaged in settlement negotiations which resulted in the PPA on June 3, 2015.

Without the PPA, the Stalking Horse Purchaser was not prepared to purchase the Azusa Property. The Stalking Horse APA was amended to allow for a delay of the closing of the sale

22

of the Azusa Property pending entry of the PPA.  Because the product manufactured at the Azusa Property was integral to the Debtors' overall operations, and these products were also important to the Stalking Horse Purchaser, the Debtors and the Stalking Horse Purchaser entered into an Interim Product Tolling Manufacturing Agreement ("Tolling Agreement") as of April 1, 2015, the closing of the sale of the remaining assets.  Under the Tolling Agreement, the Debtors manufactured product at the Azusa Property for the Stalking Horse Purchaser who purchased the product and then sold it along with other products to its customers.  The Tolling Agreement provided for a pass through of all costs associated with the manufacture of the product including overhead and administration.  With the approval of the PPA, the Stalking Horse Purchaser was prepared to purchase the Azusa Property and the closing on the sale of the Azusa Property occurred on June 30, 2015.

     5.    **Settlement With Committee**

In connection with the Final DIP Order and the sale of the Purchased Assets to the Stalking Horse Purchaser, the DIP Agents and DIP Lenders agreed to resolve the Committee's objections to both the DIP Motion and approval of the sale.  In connection with that settlement, the parties agreed as follows:

     a.    The Junior DIP Lender would pay to Hahn & Hessen LLP, to be held in escrow, from their collateral, the sum of $1.50 million in cash (the "Payoff Amount"), which amount, absent the consent of the Committee, is earmarked for and will be used solely to fund a distribution to general unsecured creditors of the Debtors under a confirmed plan of liquidation or as otherwise pursuant to further order of the Bankruptcy Court.

     b.    None of the claims held by the Junior DIP Agent, the Junior DIP Lender, the Prepetition Secured Notes Agent and/or the Prepetition Secured Notes Parties (or any of the foregoing creditors' affiliates) (as defined in the Final DIP Order) or any intercompany claims held by any affiliate of a Debtor (other than another Debtor) shall be payable from the Payoff Amount.

     c.    Upon closing of the sale, the Junior DIP Lender would waive and release all obligations under the Junior DIP Loan to the extent not included in any credit bid.

     d.    The fees and expenses payable to the Committee's professionals from the Junior DIP Lenders' collateral shall be limited to the amount set forth in the line item for the Committee in the Budget.

     e.    Upon closing of the sale, the Committee's right to challenge the right of the Junior DIP Agent and Junior DIP Lender to include in the Junior DIP Obligations any and all advances made to pay off the Prepetition Obligations owed by RIL, the Debtors' Canadian affiliate, in the approximate amount of $8.7 million (the "Canadian Debt") or pursue any claims with respect to the Canadian Debt would be extinguished and any claims associated therewith would be extinguished.

f.      Upon closing of the sale, the Committee's right to seek, in connection with the sale, a modification of the license agreement between the Debtors' and their non-debtor affiliates, expired.

6.      **Executory Contracts and Leases**

Prior to the Petition Date, the Debtors entered into hundreds of contracts and leases in connection with the operation of their business, including service, purchase, distribution and other miscellaneous contracts and non-residential real property leases. The Debtors, with the assistance of their advisors, are continuing to review, evaluate and identify those contracts and leases that were excluded from the Sale, no longer benefit the Debtors' business operations and are burdensome to the Debtors' estates.

On January 1, 2015, the Debtors filed a motion [Docket No. 430] (the "Rejection Procedures Motion") seeking entry of an order authorizing and approving expedited procedures for the rejection of executory contracts and unexpired leases. On January 30, 2015, the Court entered an order [Docket No. 535] approving the rejection procedures set forth in the Rejection Procedures Motion (the "Rejection Procedures Order").

In connection with the Rejection Procedures Order, on March 31, 2015, the Debtors filed a Notice of Rejection of Executory Contract of Unexpired Lease [Docket No. 664] seeking to reject six (6) executory contracts effective as of March 31, 2015. On April 17, 2015, the Court entered an Order Authorizing and Approving Rejection of Executory Contracts and Unexpired Leases [Docket No. 690].

Additionally, on June 10, 2015, the Debtors filed a Notice of Rejection of Executory Contracts Related to Environmental Obligations [Docket No. 802]. On July 8, 2015, the Court entered an Order Authorizing and Approving Rejection of Executory Contracts Related to Environmental Obligations [Docket No. 880].

7.      **Nonresidential Real Property Leases**

On March 26, 2015, the Debtors filed a Motion for Order Under Bankruptcy Code Section 365(d)(4) to Extend Deadline, with Consent, to Assume or Reject Unexpired Leases of Nonresidential Real Property [Docket No. 655] (the "Lease Extension Motion"). Ultimately, there was only one lease that was subject to the Lease Extension Motion relating to real property in Pensacola, Florida that was intended to be assumed and assigned to the Stalking Horse Purchaser in connection with the sale. On April 15, 2015, the Debtors obtained the consent of The Alabama & Gulf Coast Railway, LLC ("AGRR") to extend the time to assume or reject the nonresidential real property lease with the Debtors through and including July 27, 2015. On April 16, 2015, the Court entered an Order approving the Lease Extension Motion [Docket No. 685].

The Debtors, Stalking Horse Purchaser and AGRR negotiated an assumption and assignment of executory contracts that were not previously assumed and assigned under the Stalking Horse APA. On July 2, 2015, the Court entered an Order Authorizing Assumption and Assignment of Executory Contracts [Docket No. 867].

24

8.    **Claims Process**

a.    **Schedules and Statements**

On November December 15, 2014, the Debtors filed their Schedules of Assets and Liabilities [Docket Nos. 333, 335,337, and 339] (the "Schedules") and Statements of Financial Affairs [Docket Nos. 334, 336, 338, and 340] (the "Statements" and, together with the Schedules, the "Schedules and Statements"). Among other things, the Schedules and Statements set forth the claims of known creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records. The Debtors retain the right to amend the Schedules and Statements during the pendency of the Chapter 11 Cases.

b.    **Bar Date Order**

On January 30, 2015, the Court entered an order [Docket No. 536] (the "Bar Date Order") establishing the following deadlines for filing claims against the Debtors (the "Bar Dates"):

General Bar Date. All persons and entities, except any governmental unit, that hold or wish to assert against the Debtors a claim arising (or deemed to arise) before the Petition Date, including any claim arising under section 503(b)(9) of the Bankruptcy Code, were required to file with the Debtors' claims and noticing agent, Logan & Company, Inc. (the "Claims Agent"), on or before March 9, 2015 at 5:00 p.m. (Eastern Time) (the "General Bar Date"), a completed and executed Proof of Claim Form. Approximately 4600 claims against the Debtors had been timely filed as of the General Bar Date.

Governmental Bar Date. All governmental units that hold or wish to assert a claim arising (or deemed to arise) before the Petition Date against the Debtors were required to file with the Claims Agent on or before March 30, 2015 at 5:00 p.m. (Eastern Time) (the "Governmental Bar Date"), a completed and executed Proof of Claim Form.

Administrative Claims Bar Date. All persons or entities that hold or wish to assert a claim arising under sections 503(b)(1) through (8) and 507(a)(2) of the Bankruptcy Code (each, an "Administrative Claim") against the Debtors that may have arisen, accrued or otherwise become due and payable at any time on and subsequent to the Petition Date but on or before December 31, 2014 (the "Initial Administrative Claims Period") were required to file with the Claims Agent on or before March 9, 2015 at 5:00 p.m. (Eastern Time) (the "Initial Administrative Claims Bar Date") a completed and executed Administrative Claim Form. Approximately [161] Administrative Claims have been timely filed.

On May 29, 2015, the Court entered an order [Docket No. 771] establishing a second bar date for the filing of Administrative Claims that were not subject to the Initial Administrative Claims Bar Date. Specifically, the Court established July 10, 2015 at 5:00 p.m. (Eastern Time) (the "Second Administrative Claims Bar Date"), as the deadline to file Administrative Claims in the Chapter 11 cases for all persons and entities that hold Administrative Claims against the Debtors that may have arisen, accrued or otherwise became due and payable at any time on and subsequent to January 1, 2015, but on or before April 1, 2015.

Approximately 160 Administrative Claims have been timely filed prior to the Initial Administrative Claims Bar Date and Second Administrative Claims Bar Date.

Rejection Bar Date.  If the Debtors reject pursuant to section 365 of the Bankruptcy Code any executory contract or unexpired lease, all persons or entities that hold or wish to assert a claim arising from such rejection (a "Rejection Damage Claim") shall file with the Claims Agent a completed and executed Proof of Claim Form on or before the later of (i) the General Bar Date or (ii) thirty (30) days after entry of any order authorizing the rejection of such executory contract or unexpired lease; provided, however, that persons or entities asserting claims with respect to contracts or leases that are not Rejection Damage Claims must file Proof of Claim Forms on account of such claims by the General Bar Date.

        c.      **Claims Objections**

The Debtors and their professionals are investigating claims filed against the Debtors to determine the validity of such claims and anticipate filing objections to claims that are filed in improper amounts or classifications, or are otherwise subject to objection under the Bankruptcy Code or other applicable law.  As of the filing of this Disclosure Statement, the Debtors have filed 14 omnibus objections to claims.

        9.      **Extension of Exclusive Periods**

Section 1121(b) of the Bankruptcy Code provides for an initial 120-day period after the Petition Date within which a debtor has the exclusive right to file a Chapter 11 plan (the "Plan Period").  Section 1121(c) of the Bankruptcy Code further provides for an initial 180-day period after the Petition Date within which a debtor has the exclusive right to solicit and obtain acceptances of a plan filed by the debtor during the Plan Period (the "Solicitation Period" and, together with the Plan Period, the "Exclusive Periods").  In accordance with section 1121, the Debtors' Plan Period was initially set to expire on January 28, 2015, and the Solicitation Period was set to expire on March 30, 2015.  On January 6, 2015, the Debtors filed a motion [Docket No. 432] (the "Exclusivity Extension Motion") seeking to extend the Exclusive Periods by approximately 90 days.  On January 26, 2015, the Court approved the Exclusivity Extension Motion [Docket No. 513].  On March 26, 2015, the Debtors filed a motion [Docket No. 654] (the "Second Exclusivity Extension Motion") seeking to further extend the Exclusive Periods by approximately 60 days.  On April 15, 2015 the Court approved the Second Exclusivity Extension Motion [Docket No. 684].  On June 22, 2015, the Court approved a further extension of the exclusivity period to file a plan through and including September 28, 2015 and to solicit acceptances thereto to November 26, 2015 [Docket No. 831].  On October 27, 2015, the Debtors filed their fourth motion [Docket No. 1169] (the "Fourth Exclusivity Extension Motion") seeking to extend their exclusive right to file a plan and solicit acceptances thereto for 60 days to January 26, 2016 and March 25, 2016, respectively.  On November 13, 2015, the Court approved the Fourth Exclusivity Extension Motion [Docket No. 1223].

        10.      **Turnover of Pension Plan**

Prior to the Petition Date, Reichhold, Inc. sponsored a tax-qualified, single employer, defined benefit pension plan which was covered by Title IV of ERISA (the "Pension Plan").

52719/0001-11921553v11

Through a notice of determination dated October 15, 2014, the PBGC notified the Pension Plan administrator of its intent to, *inter alia*, proceed under 29 U.S.C. § 1342 to have the Pension Plan terminated. On October 17, 2014, the Pension Benefit Guaranty Corporation (the "PBGC") filed a complaint seeking (i) the involuntary termination of the Pension Plan, (ii) the appointment of the PBGC as statutory trustee of the Pension Plan, and (iii) the establishment of October 17, 2014 as the termination date for the Pension Plan. The Debtors agreed with the PBGC that the Pension Plan is underfunded, and did not believe that there was a reasonable basis to challenge the PBGC's determination to terminate the Pension Plan. However, the Debtors did and do not concede the validity, amount of underfunding or amount of any claim the PBGC may assert as a creditor including any lien claims. Nevertheless, on January 30, 2015, the Debtors filed a motion to authorize the Debtors to enter into an agreement with the PBGC for appointment of the PBGC as statutory trustee and termination of the Pension Plan (the "PBGC Motion") [Docket No. 539]. On February 23, 2015, the Court approved the PBGC Motion [Docket No. 592].

The PBGC has asserted twelve (12) claims against the Debtors for unfunded benefit liabilities, minimum required contributions and unpaid premiums including termination premiums (the "PBGC Claims"). The Debtors and PBGC are negotiating a resolution of the PBGC Claims. To facilitate further approval of this Disclosure Statement and before confirmation of the Plan, the Debtors and PBGC entered into a Stipulation regarding the PBGC Claims. That Stipulation, which was approved by the Court on October 16, 2015 [Docket No. 1135], provides for, among other things, a cap of $3.25 million on the administrative or priority status of the PBGC's unfunded benefit liability claim. The Debtors, however, reserved all rights to object to the PBGC Claims on any grounds and the PBGC reserved all rights to oppose any objection. The Debtors do not believe that the PBGC has any valid administrative claims. Additionally, pursuant to the stipulation, the PBGC agreed to vote in favor of the Plan so long as it (i) provides for substantive consolidation of the Debtors' cases, (ii) treats the unsecured portion of the PBGC Claims the same as other unsecured claims, (iii) provides for payment of administrative expense claims upon confirmation of the Plan and (iv) incorporates certain language proposed by the PBGC.

11.    **De Minimis Asset Sale Procedures**

To facilitate the sale of assets and to minimize unnecessary administrative expenses, the Debtors filed a motion on January 6, 2015 [Docket No. 429] seeking to establish procedures to streamline the sale of any assets for aggregate consideration under a certain dollar threshold (the "De Minimis Assets") and to permit such sales to be consummated without the need for the filing of additional motions with the Court. The Court entered an Order on January 30, 2015 [Docket No. 534] (the "De Minimis Asset Sale Order") establishing procedures (the "De Minimis Asset Sale Procedures") permitting the sale of the De Minimis Assets in any individual transaction or series of related transactions to a single buyer or group of related buyers with an aggregate selling price of $100,000 or less. Absent written objection in accordance with the requirements of the De Minimis Asset Sale Procedures, the applicable Debtor was authorized to consummate the proposed sale in accordance with the terms of the underlying contract(s) or other document(s), after entry of an order approving such sale, which proposed order could be submitted by the Debtors to the Court under certification of counsel upon expiration of the applicable objection deadline. The De Minimis Asset Sale Order provided that any such transaction would be free and clear of all liens, claims, interests and encumbrances (collectively,

27

the "Liens"), with such liens attaching only to the sale proceeds with the same validity, extent and priority as had attached to the De Minimis Assets immediately prior to such sale.

On March 27, 2015, the Debtors filed a notice [Docket No. 659] pursuant to the De Minimis Asset Sale Procedures of their intent to sell certain equipment located in Newark, New Jersey for $25,000.  There were no objections to the proposed sale and the Court entered an order [Docket No. 675] approving the sale transaction on April 9, 2015.

12.    **Sale of Surplus Properties**

As of the closing of the sale of substantially all of the Debtors assets to the Stalking Horse Purchaser, the Debtors owned eleven (11) parcels of real estate which they no longer utilize in the operations of their business.  The following are those properties: ("Surplus Properties").

- 400 Doremus Avenue, Newark, NJ
- 46 Albert Avenue, Newark, NJ
- 45-5 Cornelia Street, Newark, NJ
- 3101 South California Avenue, Chicago, IL
- 144 Fork Branch Road, Cheswold, DE
- 300 Hadgraft Industrial Boulevard, Chickamauga, GA
- Reichhold Road, Tuscaloosa, AL
- 11015 Reichhold Drive, Gulfport, MS
- 601 Woodward Heights Boulevard and related parcels, Ferndale, MI
- River Dam Road, Oakdale, LA
- Fort Valley GA

The Surplus Properties were excluded from the assets purchased by the Stalking Horse Purchaser.  Certain of the Surplus Properties had or have environmental contamination, and in some cases, have or continue to be in the process of remediation.  The Debtors retained Hilco Real Estate, LLC ("HRE") as real estate consultants to market the Surplus Properties for sale. The Debtors have entered into firm contracts to sell five of the Surplus Properties and on July 13, 2015 an order was entered by the Bankruptcy Court approving four of these sales:

(a)    Doremus Avenue, Newark, NJ to Valley Industry, Inc. for $3,500,000;

(b)    Albert Avenue and Cornelia Street to Albert and Cornelia, LLC for $435,000 and $700,000 respectively; and

(c)    3101 South California Avenue, Chicago to Pioneer Environmental Services, LLC for $500,000.

As of August 31, 2015, the Debtors have closed those sales.

The Debtors have entered into a contract to sell 144 Fork Branch Road, Cheswold, Delaware to Michael Steiner for $1,200,000. On August 6, 2015 the Debtors file a motion

seeking approval of this sale. On August 27, 2015, the Bankruptcy Court approved that sale. This sale closed on November 2, 2015.

The Debtors have entered into a contract to sell the property located at Reichhold Road in Tuscaloosa, Alabama to Southern Ionics, Incorporated for $250,000.  On October 27, 2015, the Debtors filed  motion seeking approval of that sale.  The court approved that sale by Order dated November 13, 2015.

The Debtors are still in negotiations for the sale of the remaining Surplus Properties.  The properties not sold may be abandoned.

One of the Surplus Properties is a former resin manufacturing facility located at 11015 Reichhold Road ,Gulfport , Mississippi ( "Gulfport Property " ). The Gulfport property consists of approximately 59 acres.  Reichhold holds a Resource Conservation and Recovery Act ("RCRA") Permit ("Permit") for  a portion of the Gulfport Property ( The" RCRA Portion" ).  The Permit governs corrective actions being taken on the RECRA Portion of the Gulfport Property . A letter of credit in the amount of $3,550,000 ( The " Letter of Credit ") was issued in favor of the State of Mississippi as adequate assurance of ongoing compliance with the Permit.  The letter of Credit was issued by Bank of America and Reichhold deposited cash collateral with Bank of America to secure the Letter of Credit. Bank of America advised  Mississippi that it would not renew the Letter of Credit when it expired and Mississippi has now drawn down the Letter of Credit .  The proceeds are to be deposited in a stand by trust established for that purpose.

The balance of the Gulfport Property is not subject to any environmental restrictions.  The Gulfport Property was subdivided so that the non RCRA Portion could  be sold separately .  The Debtors are finalizing a contract for the sale of the non RCRA portion and expect to file a motion to approve a sale of this portion of the property  be heard at the December 16, 2015 Omnibus hearing.  It does not appear that there is a purchaser for the RCRA Portion of the Gulfport Property.

Reichhold has been and continues to engage in discussions with the United States Department of Justice and  Environmental Protection Agency ( EPA)  as well as the Mississippi Department of Environmental Quality  (MDEQ) regarding ultimate disposition of the Gulfport property in the event all or part of  the RCRA Portion could not been sold. Those discussions are now centered on potential conveyance of the RCRA Portion of the Gulfport Property to an environmental trust ( "Environmental Trust" ) to be funded with the proceeds of the now drawn down Letter of Credit. The EPA, MDEQ, and the Debtors are in the process of interviewing potential trustees and EPA and MDEQ are confirming the availability  of the Letter of Credit proceeds for use by the trustee of the Environmental Trust . It is not  clear if the proceeds of the Letter of Credit will be sufficient to fund the costs of the Environmental Trust and ongoing compliance with the RCRA Permit. There is no agreement on possible alternative funding sources should the proceeds of the Letter of Credit not be sufficient . The United States and MDEQ Contend the Debtors should fund any additional amounts necessary to ensure future compliance with the RCRA permit by the environmental trust as well as to fund administrative expenses associated with operating the environmental trust.  The Debtors contend that the future costs of continued compliance and administration of the trust are not entitled to priority payment

over the claims of general unsecured creditors.  The discussions between the United States and MDEQ and the Debtors are ongoing.  If Reichhold and the EPA and MDEQ cannot agree on the terms and conditions and potential funding of the Environmental Trust, Reichhold will likely seek to abandon the RCRA Portion of the Gulfport Property.  Reichhold believes it can abandon the property under applicable law.  The United States and MDEQ disagree and would oppose abandonment.

13.    **Environmental Settlements**

Since the commencement of the Chapter 11 proceedings, the Debtors have entered into the following settlement regarding their environmental liabilities:

a.    **Settlement Agreement with Glacier Northwest Inc. ("Glacier"):**  The Debtors and Glacier were parties to an agreement regarding the environmental cleanup of property owned by Glacier located in Seattle, Washington (the "Site").  Glacier and the Debtors were also parties to an agreement with others concerning the cleanup of the Lower Duwamish Waterway ("LDW Site") which abutted the Site.  Glacier filed a limited objection to the Debtors' November 12, 2014 Motion for authority to sell substantially all of its assets free and clear of liens, claims and encumbrances asserting the question of whether the Stalking Horse Purchaser could be deemed a "successor" and thereby have responsibility for Reichhold's cleanup obligations at the Site and the LDW Site, should not be addressed by the bankruptcy court.  The objection was overruled and the sale order was entered.  Glacier filed an appeal from that portion of the sale order which held that the Stalking Horse Purchaser was not a "successor".  Thereafter, Glacier and the Debtors entered into a settlement pursuant to which Glacier dismissed its appeal, and agreed not to file any claim in this case.  The Debtors assigned cost recovery rights and contribution claims that Reichhold had against third parties related to the Site or the LDW Site, and the Debtors agreed to provide Glacier with information pertaining to those claims.  The bankruptcy court entered an order approving the Glacier settlement on May 28, 2015.  The appeal was dismissed by stipulation was entered in the Federal District Court on June 12, 2015.

b.    **Authorization for the Debtors to Enter Into Environmental Covenant Regarding Gulfport Mississippi Site ("Gulfport Site"):**  The Debtors own surplus property located in Gulfport Mississippi.  The Debtors ceased manufacturing activities at the Gulfport Site.  The Debtors acquired the Gulfport Site, constructed a chemical manufacturing facility and began operations there in the 1960's.  Thereafter, the Gulfport Site was sold to Arizona Chemical Company in 1989.  Manufacturing operations at the Gulfport Site ceased in 1996 and Reichhold resumed ownership.  Contamination was discovered in the 1980's.  The Gulfport Site is subject to a Post-Closure and Corrective Action Permit (the "Permit") with the EPA and the Mississippi Environmental Quality ("MDEQ") dated August 13, 2012.  After discussions with the EPA and MDEQ the Debtors agreed to enter into and record a covenant which would restrict future development on the Gulfport Site consistent with the Permit under requirements of the Resource Conservation and Recovery Act of 1976 ("RCRA").  On February 2, 2015, the Debtors filed a motion seeking authorization to enter into the

30

covenant.  On February 23, 2015 the approval order was entered and thereafter the covenant was recorded.

        c.    **The Fairchild / Chubb Settlement**: As set forth above, the Debtors produced resins at the Azusa Property. The Azusa Property is located within the BPOU of the San Gabriel Valley Superfund Site. On June 30, 2000 the EPA issued an order ("EPA Order") directing Reichhold and eighteen other potentially responsible parties (the "PRPs") including Fairchild Holding Corporation ("FHC") to design and implement a remedy for the contamination of groundwater. On March 29, 2002, the Debtors and seven other PRPs (the "Cooperating PRPs") made the BPOU project agreement in which they agreed to fund the construction and operation of four water treatment plants. On March 18, 2009, FHC and its affiliates filed petitions for relief under Chapter 11 of the Bankruptcy Code. The Cooperating PRPs and their successors, including FHC settled claims against Chubb Insurance for $2 million to cover a portion of the costs associates with compliance with the EPA Order. The remaining Cooperating PRPs, excluding FHC, settled their claims against FHC in the FHC bankruptcy. Under that settlement, FHC will receive $299,999 of the $2 million Chubb settlement and the remaining PRPs would receive their allocable share of the $1,700,000 balance of the settlement which had been deposited into escrow. Of this $1,700,000 Reichhold would be entitled to receive 5.8714 % or $99,725.79 in exchange for the Debtors' agreement to the overall settlement agreements. On June 2, 2015, the Debtors filed a motion to approve the settlements. On June 22, 2015, an order was entered approving the settlements. Thereafter, the Debtors received its share of the settlement proceeds in the amount of $99,725.79.

        d.    **Ohio Fiber Settlement**

        On October 9, 2014 the State of Ohio ("Ohio") commenced suit against Reichhold and others in the U.S. District Court for the Southern District of Ohio alleging that Reichhold , as a former owner of property located in Bremen Ohio is responsible for contamination at and migrating from the property (the "Ohio District Court Action"). On October 15, 2014 Ohio filed a motion for preliminary injunctive relief to compel Reichhold and others to implement a plan to address the contamination that Ohio alleges is migrating toward the public water supply of Bremen, Ohio. Ohio asserted that they were acting to enforce their police powers and, thus, the automatic stay did not apply. Reichhold denied the allegations. Nevertheless, in order to avoid potentially protracted and expensive litigation and to avoid potential injunctive relief which would have compelled Reichhold to engage in costly ameliorative measures, Reichhold engaged in settlement discussions with Ohio. Those discussions resulted in a settlement whereby Reichhold will pay $75,000 in satisfaction of Ohio's claims for injunctive relief and agree to entry of a consent decree in the U.S. District Court action. The protective administrative claim filed by Ohio would be withdrawn and Reichhold reserved all rights to challenge an unsecured claim filed by Ohio. On September 1, 2015, the Debtors filed a motion seeking approval of the settlement. On September 21, 2015, the Court entered an Order approving the settlement. Thereafter, on September 30, 2015, Reichhold and the State of Ohio filed a Joint Motion for approval and entry of the Consent Decree with the U.S. District Court in the Ohio District Court Action. An objection was filed by a co-defendant in the Ohio District Court Action. Reichhold and the State of Ohio have filed a reply to the objection. Reichhold has also sought to vacate the

injunction which was entered. Reichhold has been advised by the U.S. Magistrate that the injunction would not be vacated pending application to approve the settlement. No hearing on the matter has of yet been scheduled in the Ohio District Court Action and the U.S. District Court may rule without a hearing.

### E.    Termination of Retiree Plans

As set forth above, in anticipation of the Debtors seeking to terminate the Retiree Welfare Programs under Section 1114 of the Bankruptcy Code, on April 1, 2015, the Office of the United States Trustee appointed the Retiree Committee. After its appointment, the Debtors provided information to the Retiree Committee as well as counsel for the United Steelworkers regarding the Retiree Welfare Programs and the status of the Debtors' Chapter 11 cases.

On October 20, 2015, the Debtors entered into separate settlement agreements with the Retiree Committee and Steelworkers to terminate their retiree welfare plans and resolve all claims related thereto. Pursuant to those settlement agreements and subject to Court approval, the Debtors will terminate the retiree life and medical insurance programs at 11:59 p.m. on November 30, 2015. In connection with those settlements, the Debtors agreed to make settlement payments to the retirees in satisfaction of all claims against the Debtors. Specifically, with respect to the Steelworkers, the Debtors will make a settlement payment as follows: (a) eligible recipients shall receive eight (8%) percent of the face amount of their individual life insurance coverage, and (b) eligible recipients of the Debtors' retiree medical program who do not contribute to the medical program or contribute less than $70 per month to the program shall receive a one-time payment of $1,200. The aggregate amount to be paid under the Steelworkers Settlement is approximately $54,000. With respect to the constituents represented by the Retiree Committee, the Debtors will make payments totaling $267,276.39[6] to the affected eligible participants as directed by the Retiree Committee.

The Debtors have also made proposals to terminate retiree benefits consistent with the terms of the Retiree Committee and Steelworkers' settlements to the following unions representing retirees: (a) International Brotherhood of Teamsters (the "Teamsters"); (b) International Union of Painters and Allied Trades ("IUPA"); and (c) International Chemical Workers Union ("ICWU"). Despite the Debtors' repeated attempts to negotiate with those unions, the Teamsters, IUPA and ICWU failed to respond to the Debtors' proposal.

On October 27, 2015, the Debtors filed a motion pursuant to sections 105(a), 363 and 1114(e)(1)(B) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules (i) authorizing the Debtors' entry into and approving the settlement agreements with the Steelworkers and Retiree Committee and (ii) approving termination of retiree benefits for the retired members of the Teamsters, IUPA and ICWU. A hearing on that motion is currently scheduled for November 17, 2015.

---

[6] This amount is the sum of the following: (a) eight (8%) percent of the face amount of the non-union retiree's life insurance coverage and (b) $1,200 for each non-union retiree participant in the retiree medical program that does not contribute or contributes less than $70 per month.

52719/0001-11921553v11

F.    **Asbestos Litigation and Insurance**

    1.    **Asbestos Personal Injury Claims Against Reichhold, Inc.**

The only personal injury claims pending against Reichhold, Inc. as of the Petition Date or submitted in proofs of claim filed before the General Bar Date are asbestos personal injury claims (the "Asbestos Claims"). As of the Petition Date, Reichhold, Inc. was a defendant in approximately 125 Asbestos Claims. After the Petition Date, 92 proofs of claim were submitted by certain claimants in these lawsuits. An additional 4,088 asbestos-related proofs of claim were submitted by the Bar Date by individuals who are not connected to the 125 Asbestos Claims pending as of the Petition Date. At the time of this Disclosure Statement, 1,930 of those additional proofs of claim have been withdrawn. Of the remaining 2,158 additional proofs of claim, 1,930 were filed by a single firm, Edward O. Moody, P.A., with no prior claim history against Reichhold, Inc. The Debtors objected to these 1,930 proofs of claim and the Bankruptcy Court entered an Order Sustaining the Debtors' Sixth Omnibus Objection (Substantive) to the Proofs of Claim Filed by Edward O. Moody, P.A. Of the other 228 proofs of claim not associated with a pending pre-Petition Date lawsuit, Reichhold, Inc. calculates that 121 were submitted by claimants who have previously named and dismissed Reichhold, Inc. without prejudice in a prior Asbestos Claim. Therefore, only 107 proofs of claim alleging asbestos-related bodily injuries were filed before the Bar Date by individuals who have not previously asserted an Asbestos Claim against Reichhold, Inc.

    2.    **Insurance Coverage**

Comprehensive general liability insurance policies were purchased by Reichhold, Inc. from the time it began manufacturing asbestos in 1964 until the introduction of policy exclusions barring coverage for asbestos-related injuries and damages these policies are potentially implicated and available to pay for a share of Reichhold, Inc.'s Asbestos Claims. The primary, umbrella, and excess general liability policies Reichhold, Inc. purchased from 1965 until at least until 1993, are "occurrence-based" policies, which, subject to other policy terms, generally insure against "occurrences" that result in bodily injury or property damage that trigger the applicable policy period, even if the injury or damage does not manifest itself until after the policy period. Reichhold, Inc.'s pre-1986 "occurrence" policies provide insurance coverage for asbestos and other "long-tail" claims, which are commonly asserted years or decades after the underlying injuries are alleged to have occurred. In addition, Reichhold, Inc. purchased one primary insurance policy covering four years after 1985 that has been determined to provide coverage for Reichhold, Inc.'s Asbestos Claims.

In total, these policies provide at least $17.4 million in current available limits (net of prior exhaustion by asbestos and other claims). All of the available primary policies include a duty on the part of the insurers to defend claims that are potentially covered under their policies. Such defense costs are paid by the insurers in addition to their policies' respective limits of liability.

During this period, Reichhold, Inc. also purchased multiple layers of excess coverage providing additional insurance coverage should the primary policies exhaust their coverage from the payment of coverage claims. From 1965 to 1985, Reichhold, Inc. purchased primary,

umbrella, and/or excess comprehensive general liability policies with combined policy limits of more than $843 million

3.    **Defense and Indemnity Agreement and Proposed Cooperation Agreement**

To date, defense and indemnity costs for Asbestos Claims against Reichhold, Inc. have been substantially covered by the Reichold, Inc.'s primary insurance carriers under a defense and indemnity agreement ("Defense and Indemnity Agreement"). However, pursuant to the insurance policies and the Defense and Indemnity Agreement, as well as prior insurance settlement agreements that released the premises/operations coverage available from certain of its insurance policies, certain asbestos-related defense and indemnity costs have been paid by Reichhold, Inc. The Defense and Indemnity Agreement had no expiration but could be unilaterally terminated prospectively by any party as to that party upon notice. Reichhold, Inc. and primary insurance carriers who were parties to the Defense and Indemnity Agreement therefore entered discussions concerning the replacement of the Defense and Indemnity Agreement with a cooperation agreement ("Products Insurance Cooperation Agreement") to take its place following confirmation of the Plan. Reichhold, Inc. and its primary insurance carriers have now reached agreement in principle on a Products Insurance Cooperation Agreement, in substantially the form included in the solicitation package provided to Holders of Claims in Class 3 (General Unsecured Claims). The Products Insurance Cooperation Agreement will ensure that defense costs and liability for Insured Asbestos Claims, including the asbestos-related proofs of claim filed in the bankruptcy proceeding, will be paid by insurance pursuant to its terms and without contribution by Reichhold. Upon execution of the Products Insurance Cooperation Agreement, the Defense and Indemnity Agreement will be terminated pursuant to the terms of both agreements.

4.    **Factors that May Reduce Available Insurance Coverage**

There are several factors that may reduce the amount of insurance coverage potentially available to Reichhold, Inc. on account of Asbestos Claims asserted against it.

a.    **Insurance Coverage Litigation**

Although no insurance coverage litigation is pending at this time between Reichhold, Inc. and its insurers and Reichhold, Inc. has no reason to believe that litigation will be necessary, such litigation could arise in the future, particularly, if Reichhold, Inc.'s Asbestos Claims implicate one or more of its excess insurers' policies and the excess insurers contest or otherwise fail to honor their coverage obligations. In light of its modest claim history, Reichhold, Inc. has not engaged with its excess insurers regarding their coverage obligations for Asbestos Claims. Accordingly, estimating the amount of insurance recovery from those policies is inherently uncertain at this time and depends on a number of factors, including the potential for disputes over coverage and the timing and amount of Asbestos Claims. Therefore, to the extent that any excess carriers are called on to pay a share of future Asbestos Claims against Reichhold, Inc. and thereafter assert coverage defenses, the cost of recovering under and/or the availability of the excess insurance could be affected.

b.    **Unavailable Insurance in the 1985 to 1986 Policy Year**

Certain excess insurance policies in the 1985 to 1986 policy year contain asbestos-related exclusions.  Based on current records, Reichhold, Inc. currently understands that policies providing approximately $24.5 million of the $100 million in excess policy limits purchased for that policy period include such exclusions.

Some of Reichhold, Inc.'s excess insurance coverage totaling $11 million was issued by insurers that have been declared insolvent.  As a result, Reichhold, Inc. does not expect to be able to recover under these excess liability policies.  Although Reichhold, Inc. has no reason to believe that such an event is presently foreseeable, recovery may also be limited or delayed if other Reichhold, Inc. insurers later become insolvent.

It is also possible that certain excess insurers in the 1985 to 1986 policy year who issued $51.74 million of otherwise available additional policy limits may dispute coverage because their policies provide coverage in excess of policies that are insolvent or contain asbestos-related exclusions.

c.    **Insurance Commutation Agreements**

Several years ago, Reichhold, Inc. entered into policy commutation agreements with three of its excess insurers to resolve past disputes as to insurance coverage for Reichhold, Inc.'s environmental liabilities.  Pursuant to those agreements, Reichhold, Inc. commuted $130.75 million in coverage.  As a result of these policy commutation agreements, Reichhold, Inc. will be unable to recover from these insurers.  Reichhold, Inc. also released the premises/operations coverage available from certain of its insurance policies, including certain of the primary policies pursuant to prior settlement agreements concerning Reichhold, Inc.'s historic environmental liabilities.  As a result, only products liability coverage and limits are still available under certain of Reichhold, Inc.'s primary policies and its settled but non-commuted excess policies.

It is also possible that certain excess insurers who issued $69 million in otherwise available additional policy limits may dispute coverage because their policies provide coverage in excess of the commuted policies.

## ARTICLE IV

## SUMMARY OF PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.  THE PLAN IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE

35

STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.  REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN.  UPON OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS SHALL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES AND ALL OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN, THE LIQUIDATING TRUST AGREEMENT OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN, THE LIQUIDATING TRUST AGREEMENT AND SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

## I.    Classification and Treatment of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in, the Debtors (except for certain claims classified for administrative convenience) into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that they have complied with such standard.  If the Court finds otherwise, however, it could deny confirmation of the Plan if the Claimholders and Interest Holders affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of

36

the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.  UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the value of property that ultimately will be received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.  The Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Court.

A.    **Unclassified Claims**

1.    **Administrative Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, a Holder of an Allowed Administrative Claim (other than a Professional) will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Administrative Claim or (b) such other treatment as to which such Holder and the Debtors or the Liquidating Trustee, as applicable, have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto (x) on or prior to the Effective Date, by the Debtors, and (y) after the Effective Date, by the Disbursing Agent.  Allowed Professional Fee Claims will be paid from the Professional Fee Reserve pursuant to Article V.G.1 of the Plan.  For the avoidance of doubt, any payments made by the Liquidating Trust on account of Allowed Administrative Claims will be paid solely from the Administrative Claims Reserve.

37

### 2.    Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date or (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, a Holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Tax Claim or (b) such other treatment as to which such Holder and the Debtors or the Liquidating Trustee, as applicable, have agreed upon in writing.  For the avoidance of doubt, any payments made by the Liquidating Trust on account of Allowed Priority Tax Claims will be paid solely from the Administrative Claims Reserve.

## B.    Unimpaired Claims

### 1.    Class 1:  Secured Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date or (ii) the date such Secured Claim becomes an Allowed Secured Claim, a Holder of an Allowed Secured Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Secured Claim, (a) Cash from the Debtors equal to the value of such Allowed Secured Claim, (b) a return of the Holder's Collateral securing the Secured Claim, (c) such treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be rendered Unimpaired or (d) such other treatment as to which such Holder and the Debtors or the Liquidating Trustee, as applicable, have agreed upon in writing.

Any Holder of a Secured Claim will retain its Lien in the Collateral or the proceeds of the Collateral (to the extent that such Collateral is sold by the Debtors or the Liquidating Trustee free and clear of such Lien) to the same extent and with the same priority as such Lien held as of Petition Date until such time as (A) the Holder of such Secured Claim (i) has been paid Cash equal to the value of its Allowed Secured Claim, (ii) has received a return of the Collateral securing the Secured Claim or (iii) has been afforded such other treatment as to which such Holder and the Debtors or the Liquidating Trustee, as applicable, have agreed upon in writing; or (B) such purported Lien has been determined by an order of the Court to be invalid or otherwise avoidable.

### 2.    Class 2:  Priority Non-Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date or (ii) the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, a Holder of an Allowed Priority Non-Tax Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Non-Tax Claim or (b) such other treatment as to which such Holder and the Debtors or the Liquidating Trustee, as applicable, have agreed upon in writing.  For the avoidance of doubt, any payments made by the Liquidating Trust on account of Allowed Priority Non-Tax Claims will be paid solely from the Administrative Claims Reserve.

C.    **Impaired Claims**

    1.    **Class 3:  General Unsecured Claims**

On the Effective Date, each Holder of an Allowed General Unsecured Claim that is not an Insured Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata share of the Liquidating Trust Interests.

As set forth in the Liquidating Trust Agreement, Distributions from the Liquidating Trust on account of Liquidating Trust Interests will be made from the Liquidating Trust Assets after paying, reserving against or satisfying, among other things, the operating and administrative expenses of the Liquidating Trust, including but not limited to all costs, expenses and obligations incurred by the Liquidating Trustee (or professionals who may be employed by the Liquidating Trustee in administering the Liquidating Trust) in carrying out their responsibilities under the Liquidating Trust Agreement, or in any manner connected, incidental or related thereto.

Special Provisions regarding distributions to Holders of Allowed Insured Claims and Allowed Insured Asbestos Claims are set forth in Section III.G of the Plan.

    2.    **Class 4: Convenience Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date or (ii) the date on which a Class 4 Convenience Claim becomes an Allowed Claim, each Holder of an Allowed Convenience Claim will receive Cash in the amount of 5% of the amount of its Allowed Convenience Class Claim.  For the avoidance of doubt, any payments made by the Liquidating Trust on account of Allowed Convenience Claims will be paid solely from the Convenience Claims Reserve.

    3.    **Class 5:  Intercompany Claims**

In connection with, and as a result of, the substantive consolidation of the Debtors' Estates and the Chapter 11 Cases, on the Effective Date, all Intercompany Claims will be eliminated and the Holders of Intercompany Claims will not be entitled to, and will not receive or retain, any property or interest in property on account of such Claims.

D.    **Interests**

    1.    **Class 6:  Interests**

On the Effective Date, all Interests will be cancelled and each Holder thereof will not be entitled to, and will not receive or retain, any property or interest in property under the Plan on account of such Interests.

E.    **Special Provision Regarding Unimpaired Claims**

Except as otherwise provided in the Plan, the Confirmation Order, any other order of the Court or any document or agreement enforceable pursuant to the terms of the Plan, nothing will

affect the rights and defenses, both legal and equitable, of the Debtors and/or the Liquidating Trust with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

## F.    <u>Allowed Claims</u>

Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent will only make Distributions to Holders of Allowed Claims. No Holder of a Disputed Claim will receive any Distribution on account thereof until (and then only to the extent that) its Disputed Claim becomes an Allowed Claim. The Debtors and/or the Liquidating Trustee may, in their discretion, withhold Distributions otherwise due thereunder to any Claimholder until the Claims Objection Deadline, to enable a timely objection thereto to be filed. Any Holder of a Claim that becomes an Allowed Claim after the Effective Date will receive its Distribution in accordance with the terms and provisions of the Plan and/or the Liquidating Trust Agreement, as applicable.

## G.    <u>Special Provisions Regarding Insured Claims</u>

### 1.    <u>Limitation on Amounts to Be Distributed to Holders of Allowed Insured Claims (other than Insured Asbestos Claims)</u>

Distributions under the Plan to each Holder of an Insured Claim will be limited to Distributions as the Holder of an Allowed General Unsecured Claim for the following amounts: (a) the applicable self-insured retention ("SIR") under the relevant Policy and (b) the amount by which a Claimholder's Claim exceeds the total coverage available from the relevant insurance policies of the Debtors for such Claim. Nothing in the Plan, the Plan Supplement, the Confirmation Order, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening or grants an injunction or release) alters or amends the terms and conditions of insurance policies issued to or providing coverage to any of the Debtors and/or any agreements related thereto including, but not limited to, (i) any obligation of an insurer (or third party administrator) to pay the holder of an Insured Claim amounts within a deductible (as opposed to an SIR) in whole dollars; (ii) any obligation of an insured to reimburse insurer for under-deductible amounts paid; and (iii) any right of an insurer and/or third party administrator to draw upon, hold and/or apply collateral and/or security to the insureds' obligations (including, but not limited to, deductible reimbursement obligations) thereunder regardless of whether such obligations arise before or after the Effective Date.. Nothing in Section III.G.l. of the Plan will constitute a waiver of any Cause of Action the Debtors may hold against any Person, including the Debtors' Insurers, or is intended to, will or will be deemed to preclude any Holder of an Allowed Insured Claim from recovering Insurance Proceeds from any Insurer of the Debtors subject to applicable non-bankruptcy law, in addition to any Distribution such Holder may receive under the Plan; provided, however, that nothing herein, shall create or permit a direct right of action by the Holder of an Insured Claim against an insurer; and <u>provided further</u>, <u>however</u>, that the Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

52719/0001-11921553v11

2. **Resolution of Asbestos Claims by the Liquidating Trust**

Asbestos Claims will be liquidated, determined, or otherwise resolved in the appropriate non-bankruptcy forum, except the Bankruptcy Court will retain jurisdiction to resolve bankruptcy-related issues, including concurrent jurisdiction with the appropriate non-bankruptcy forums to determine if an Asbestos Claim is barred by the Bar Date Order.

Pursuant to the Products Insurance Cooperation Agreement, Disputed Asbestos Claims will be defended against and liquidated, determined, or otherwise resolved by the Liquidating Trust in cooperation with the Products Insurance Carriers participating in that agreement, at the cost of such carriers and pursuant to and in accordance with the terms of the Products Insurance Cooperation Agreement.

Distributions under the Plan to each Holder of an Asbestos Claim settled or resolved by final judgment will be in accordance with the treatment provided under the Plan for General Unsecured Claims, but solely to the extent that such Asbestos Claim is not satisfied from proceeds payable to the holder thereof under any Products Insurance Policies and applicable law. To the extent an Asbestos Claim is an Insured Asbestos Claim, that Claim or the Insured portion of that Claim will first be satisfied by the Products Insurance Carriers participating in the Products Insurance Cooperation Agreement, pursuant to and in accordance with the terms of the Products Insurance Cooperation Agreement. To the extent that a Holder has a resolved Asbestos Claim, the amount of which exceeds the total coverage available from the Products Insurance Policies, such Holder will have an Allowed General Unsecured Claim in the amount by which such Asbestos Claim exceeds the coverage available under the Products Insurance Policies. Pursuant to the Liquidating Trust Agreement, the Liquidating Trustee will expressly allow a resolved Asbestos Claim in the amount by which such Claim exceeds the coverage available from the Products Insurance Policies, upon settlement or, if resolved by final judgment, after any period to appeal from a judgment has run without the appeal being taken.

3. **Limitations on Effect of Bankruptcy**

Except as otherwise provided in Section III.G.3 of the Plan, nothing in this Disclosure Statement, the Plan, the Confirmation Order or any other order of the Court to the contrary (including, without limitation, any other provision that purports to be preemptory or supervening or grants a release): (i) will affect, impair or prejudice the rights and defenses of the Insurers or the Debtors, or other insureds under the Insurance Policies in any manner; and such Insurers, Debtors, and other insureds will retain all rights, obligations and defenses under the Insurance Policies, and the Insurance Policies will apply to, and be enforceable by and against, the applicable Debtor(s) or insured(s) and the applicable Insurer(s) as if the Chapter 11 Cases had not occurred; (ii) will in any way operate to, or have the effect of, impairing or having any res judicata, collateral estoppel or other preclusive effect on any party's legal, equitable or contractual rights or obligations under any Insurance Policy, if any, in any respect; or (iii) shall otherwise determine the applicability or non-applicability of any provision of any Insurance Policy and any such rights and obligations will be determined under the Insurance Policies and applicable non-bankruptcy law.

## II.    Means For Implementation Of The Plan

### A.    Substantive Consolidation

#### 1.    Consolidation of the Chapter 11 Estates

The Plan contemplates and is predicated upon entry of an order substantively consolidating the Debtors' Estates and Chapter 11 Cases for all purposes, including voting, Distribution and Confirmation.  On the Effective Date, (i) all Intercompany Claims between the Debtors will be eliminated, (ii) all assets and liabilities of the Affiliate Debtor will be merged or treated as if they were merged with the assets and liabilities of Reichhold, (iii) any obligation of a Debtor and any guarantee thereof by the other Debtor will be deemed to be one obligation of Reichhold, and any such guarantee will be eliminated, (iv) the issued and outstanding shares of stock of the Affiliate Debtor will be cancelled, (v) each Claim Filed or to be Filed against any Debtor will be deemed Filed only against Reichhold and will be deemed a single Claim against and a single obligation of Reichhold, and (vi) any joint or several liability of the Debtors will be deemed one obligation of Reichhold.  On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment or performance made by one Debtor as to the obligations of another Debtor will be released and of no further force and effect.

The substantive consolidation effected pursuant to Article V.A.1 of the Plan (x) will not affect the rights of any Holder of a Secured Claim with respect to the Collateral securing such Claims and (y) will not, and will not be deemed to, prejudice the Causes of Action and the Avoidance Actions (subject to the releases set forth in Article X.D of the Plan), which will survive entry of the Substantive Consolidation Order, as if there had been no substantive consolidation.

In the event the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Debtors' Estates: (a) the Plan will be treated as a separate plan of liquidating for each Debtor not substantively consolidated and (b) the Debtors will not be required to resolicit votes with respect to the Plan.

#### 2.    The Effect of Substantive Consolidation

Pursuant to Article V of the Plan, the Debtors will be deemed consolidated solely for the purposes of voting, confirmation and making distributions to the holders of Allowed Claims under the Plan.  Substantive consolidation is an equitable remedy that a bankruptcy court may apply in the chapter 11 cases of affiliated debtors, among other instances.  Substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of multiple debtors for certain purposes under a plan.  The effect of substantive consolidation is the pooling of the assets of, and claims against, consolidated debtors, satisfying liabilities from a common fund and combining the creditors of consolidated debtors for purposes of voting on a plan.  In the absence of substantive consolidation, the creditors of an individual debtor could only look to the assets of that debtor to fully or partially satisfy such creditor's claim.

42

3.      **The Basis for Substantive Consolidation**

Substantive consolidation of the Debtors is an important element of the Debtors' successful implementation of the Plan. The Debtors submit that the proposed substantive consolidation structure is supported by the applicable legal standards, practical considerations and the Debtors' prepetition operations and financial affairs. The recoveries for unsecured creditors in these Chapter 11 Cases will ultimately derive from a single source: the Liquidating Trust Interests. Furthermore, the substantive consolidation of the Debtors will expedite the conclusion of the Chapter 11 Cases.

In the Debtors' view, it is extremely unlikely that separate plans for each of the Debtors would produce an entitlement to a recovery for any creditor that is more than what is available under the Plan. The Debtors are not seeking to substantively consolidate offensively (i.e., with a primary purpose of disadvantaging tactically a group of creditors in the plan process or altering creditors' rights).

4.      **Substantive Consolidation Order**

The Plan will serve as, and will be deemed to be, a motion for entry of an order substantively consolidating the Debtors' Chapter 11 Cases. If no objection to substantive consolidation is timely Filed and served by any Holder of an Impaired Claim affected by the Plan as provided therein on or before the deadline to object to Confirmation of the Plan, or such other date as may be fixed by the Court, the Substantive Consolidation Order (which may be the Confirmation Order) may be approved by the Court. If any such objections are timely Filed and served, a hearing with respect to the substantive consolidation of the Chapter 11 Cases and the objections thereto will be scheduled by the Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

B.      **Corporate Action**

1.      **Deemed Merger of Debtors**

On the Effective Date, (a) Canadyne-Georgia Corporation will be deemed merged with and into Canadyne Corporation, which will then be deemed merged with and into Reichhold without the necessity of action being taken by or on behalf of the Debtors; provided, however, that the Debtors shall be required to file all documents necessary to effectuate such mergers; (b) Reichhold Holdings US, Inc. will be deemed merged with and into Reichhold without the necessity of any action being taken by or on behalf of the Debtors; provided, however, that the Debtors will be required to file all documents necessary to effectuate such merger; (c) the members of the boards of directors of the Debtors will be deemed to have resigned; (d) the Chapter 11 Cases of the Affiliate Debtors will be closed upon the Effective Date without the need for further Court order, following which any and all proceedings that could have been brought or otherwise commenced in the Chapter 11 Case of an Affiliate Debtor will be brought or otherwise commenced in Reichhold's Chapter 11 Case..

Upon the resignation of the board of directors of Reichhold, the Liquidating Trust will serve as the sole shareholder of Liquidating Reichhold, and the Liquidating Trustee will serve as the sole officer and sole director of Liquidating Reichhold. The Liquidating Trust Committee, as

set forth more fully in the Plan, will be responsible for, among other things, instructing and supervising the Liquidating Trustee with respect to its responsibilities under the Plan and the Liquidating Trust Agreement.

### 2.    Continued Corporate Existence

Reichhold will continue to exist as Liquidating Reichhold after the Effective Date in accordance with the laws of the State of Delaware and pursuant to the certificate of incorporation and by-laws in effect prior to the Effective Date, as amended by the Amended and Restated Certificate of Incorporation of Reichhold Liquidating, Inc. and the Amended and Restated By-laws of Reichhold Liquidating, Inc., attached to the Plan as Exhibits B and C, respectively. The certificate of incorporation and by-laws of Reichhold will be amended as necessary, as permitted by section 303 of Title 8 of the Annotated Code of Delaware (as amended, the "Delaware General Corporation Law"), to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity Securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code. On the Effective Date, Liquidating Reichhold will issue one share of common stock (the "New Common Stock") to the Liquidating Trust. The Liquidating Trust will not sell, transfer or otherwise dispose of the New Common Stock absent the prior written consent of the Liquidating Trust Committee and approval by the Court. The Liquidating Trust will sell, transfer or otherwise dispose of the New Common Stock and will vote the New Common Stock on any matter requiring a vote of shareholders of Liquidating Reichhold under the Delaware Corporation Law, in accordance with the written directions of the Liquidating Trust Committee or order of the Court. The Liquidating Trustee, acting pursuant to the terms and conditions of the Liquidating Trust Agreement, will be authorized to execute, deliver, file or record such documents, instruments, releases and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

The Professionals employed by the Debtors and the Committee, as applicable, will be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities, including the preparation, filing and prosecution of final fee applications, upon the submission of invoices to the Liquidating Trustee for payment from the Professional Fee Reserve. Any time or expenses incurred in the preparation, filing and prosecution of final fee applications will be disclosed by each Professional in its final fee application and will be subject to approval of the Court.

### 3.    Cancellation of Existing Securities and Agreements

Except as otherwise provided in the Plan, and in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date, any promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, other than a Claim that is being Reinstated and rendered unimpaired, and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such Interests will be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations under the notes, share

44

certificates and other agreements and instruments governing such Claims and Interests will be discharged; provided, however, that certain instruments, documents and credit agreements related to Claims will continue in effect solely for the purposes of allowing the agents to make Distributions to the beneficial holders and lenders thereunder; and provided, further, however, that the cancellation of the Senior Secured Notes Indenture hereunder will not in any way affect or diminish either (x) the rights and duties of the Senior Secured Notes Trustee to make Distributions pursuant to the Plan to the Holders of the Senior Secured Noteholder Claims in accordance with the Senior Secured Notes Indenture, or (y) the right of the Senior Secured Notes Trustee to assert the Senior Secured Notes Trustee Charging Lien with respect to such Distributions. Notwithstanding the foregoing, the Senior Secured Notes and the Senior Secured Notes Indenture will remain in effect for a period of one year following the Exchange Effective Date for the purpose of permitting any Senior Secured Noteholders that have not participated in the Exchange to exercise their right to participate in the Exchange through the one year anniversary of the Exchange Effective Date, at 12:01 a.m. prevailing Eastern Time on the day following the one year anniversary of the Exchange Effective Date, the Senior Secured Notes and the Senior Secured Notes Indenture will be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule, except as set forth in the preceding sentence. The Holders of or parties to any such canceled notes, share certificates and other agreements and instruments will have no rights against the Debtors, or any of them, arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.

4.    **No Further Action**

Each of the matters provided for under the Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors will, as of the Effective Date, be deemed to have occurred and be effective as provided therein, and will be authorized and approved in all respects without any requirement of further action by any Person, including but not limited to, the Liquidating Trustee, Holders of Claims or Interests against or in the Debtors, or directors or officers of the Debtors, as permitted by section 303 of the Delaware General Corporation Law.

5.    **Effectuating Documents; Further Transactions**

Any appropriate officer of Reichhold or the Affiliate Debtor, as the case may be, will be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary of Reichhold or the Affiliate Debtor, as the case may be, will be authorized to certify or attest to any of the foregoing actions.

C.    **Retiree Committee**

The Retiree Committee will continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Court prior to the Effective

45

Date. On the Effective Date, the Retiree Committee will be dissolved and its members will be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Committee's attorneys, financial advisors and other agents shall terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order. All expenses of Retiree Committee members and the reasonable fees and expenses of their Professionals through the Effective Date willl be paid in accordance with the terms and conditions of the Professional Fee Order.

**D.    Creditors' Committee and Liquidating Trust Committee**

**1.    Dissolution of the Committee**

The Committee will continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and will perform such other duties as it may have been assigned by the Court prior to the Effective Date. On the Effective Date, the Committee will be dissolved and its members will be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Committee's attorneys, financial advisors and other agents will terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order. All expenses of Committee members and the reasonable fees and expenses of their Professionals through the Effective Date will be paid in accordance with the terms and conditions of the Professional Fee Order.

**2.    Creation of Liquidating Trust Committee and Procedures Related Thereto**

On or prior to the Plan Supplement Filing Date, the Committee, subject to the Debtors' approval, will appoint the Liquidating Trust Committee members. Each member of the Liquidating Trust Committee will be entitled to vote on all matters in accordance with the Liquidating Trust Agreement. Members of the Liquidating Trust Committee will serve without compensation, but will be entitled to reimbursement of reasonable expenses.

**3.    Standing of the Liquidating Trust Committee**

The Liquidating Trust Committee will have independent standing to appear and be heard in the Court as to any matter relating to the Plan, the Liquidating Trust Agreement, the Estates or Liquidating Reichhold, including any matter as to which the Court has retained jurisdiction pursuant to Article XI of the Plan.

**4.    Function and Duration of the Liquidating Trust Committee**

The Liquidating Trust Committee will have the rights and responsibilities set forth in the Plan and the Liquidating Trust Agreement, including (a) instructing and supervising the Liquidating Trustee with respect to its responsibilities under the Plan and the Liquidating Trust Agreement. The Liquidating Trust Committee will remain in existence until such time as the final Distributions under the Liquidating Trust Agreement have been made and Liquidating Reichhold has been dissolved in accordance with the terms of the Plan.

5.    **Indemnification of Liquidating Trustee and Liquidating Trust Committee**

The Indemnified Persons will be held harmless and will not be liable for actions taken or omitted in their capacity as, or on behalf of, the Liquidating Trust, Liquidating Trust Committee or Liquidating Trustee (as applicable), except those acts that are determined by Final Order of the Court to have arisen out of their own intentional fraud, willful misconduct or gross negligence.  Each Indemnified Person will be entitled to be indemnified, held harmless and reimbursed for fees and expenses including, without limitation, reasonable attorney's fees, which such Persons and Entities may incur or may become subject to or in connection with any action, suit, proceeding or investigation that is brought or threatened against such Persons or Entities in respect of that Person's or Entity's actions or inactions regarding the implementation or administration of the Plan, or the discharge of their duties under the Plan or Liquidating Trust Agreement, except for any actions or inactions that are determined by Final Order of the Court to have arisen from intentional fraud, willful misconduct or gross negligence.  Any Claim of the Indemnified Persons to be indemnified, held harmless or reimbursed will be satisfied solely from the Liquidating Trust Assets or any applicable insurance coverage.

6.    **Recusal of Liquidating Trust Committee Members**

A Liquidating Trust Committee member will recuse itself from any decisions or deliberations regarding actions taken or proposed to be taken by the Liquidating Trustee with respect to the Claims, Causes of Action or rights of such Liquidating Trust Committee member, the entity appointing such Liquidating Trust Committee member, or any affiliate of the foregoing.

E.    **The Liquidating Trust**

1.    **Establishment and Administration of the Liquidating Trust**

(a)    On the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement for the purpose of, among other things, (i) investigating and, if appropriate, pursuing Liquidating Trust Causes of Action, (ii) administering and pursuing the Liquidating Trust Assets, (iii) resolving Disputed Claims and any Claim objections pending as of the Effective Date and (iv) making Distributions from the Liquidating Trust to Holders of Allowed Claims as provided for in the Plan and/or the Liquidating Trust Agreement.

(b)    Upon execution of the Liquidating Trust Agreement, the Liquidating Trustee will be authorized to take all steps necessary to complete the formation of the Liquidating Trust.  The Liquidating Trust will be administered by the Liquidating Trustee in accordance with the Liquidating Trust Agreement.  From and after the Effective Date, the Liquidating Trustee will be vested with the powers of the sole shareholder, officer and director of Liquidating Reichhold.

(c)    It is intended that the Liquidating Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code.  In furtherance of this objective, the Liquidating Trustee will, in its

47

business judgment, make continuing best efforts to dispose of the trust assets, make timely distributions, and not unduly prolong the duration of the Liquidating Trust. All Liquidating Trust Assets held by the Liquidating Trust on the Effective Date will be deemed for all federal income tax purposes to have been distributed by the Debtors on a Pro Rata basis to Holders of Allowed General Unsecured Claims and then contributed by such Holders to the Liquidating Trust in exchange for the Liquidating Trust Interests, and all parties (including the Liquidating Trustee and the Holders of beneficial interests in the Liquidating Trust) will be required to treat the transfer of assets to the Liquidating Trust accordingly. All Holders of General Unsecured Claims have agreed to use consistently the valuation of the Liquidating Trust Assets transferred to the Liquidating Trust as established by the Liquidating Trustee for all federal income tax purposes and all applicable reporting requirements. The beneficiaries under the Liquidating Trust will be treated as the grantors and deemed owners of the Liquidating Trust. All earnings of the Liquidating Trust, including those retained in a Disputed Claims Reserve, will be treated as taxable income on a current basis for federal income tax purposes. The Liquidating Trustee will be responsible for filing information, including tax returns, on behalf of the Liquidating Trust as grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

2.    **Assets of the Liquidating Trust**

On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors will transfer and assign to the Liquidating Trust all of their right, title and interest in and to all of the Liquidating Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such assets will automatically vest in the Liquidating Trust free and clear of all Claims and liens, subject only to the Allowed Claims of the Holders of Liquidating Trust Interests as set forth in the Plan and the expenses of the Liquidating Trust as set forth herein and in the Liquidating Trust Agreement. Thereupon, the Debtors will not have any interest in or with respect to the Liquidating Trust Assets.

Also on the Effective Date, or as soon as reasonably practicable thereafter, Hahn and Hessen will transfer and assign to the Liquidating Trust all of the right, title and interest in and to all of the GUC Cash, which Cash, upon transfer, will be subject only to the Allowed Claims of the Holders of Liquidating Trust Interests as set forth in the Plan and the expenses of the Liquidating Trust as set forth therein and in the Liquidating Trust Agreement.

3.    **Other Funds to be Transferred to the Liquidating Trust**

(a)    On or before the Effective Date, the Debtors will transfer (i) Cash in the Amount of the Administrative and Priority Claims Estimate to the Liquidating Trust, which Cash will be used by the Liquidating Trustee to fund the Administrative Claims Reserve; (ii) Cash in the Amount of the Convenience Claims Estimate to the Liquidating Trust, which Cash will be used by the Liquidating Trustee to fund the Convenience Class Reserve; and (iii) Cash in the amount of the Professional Fee Estimate to fund the Professional Fee Reserve.

(b)    After the Effective Date, Liquidating Reichhold will be authorized to transfer Cash generated from the liquidating of its Remaining Assets to the Liquidating Trust without further Court approval.

48

4. **Rights and Powers of the Liquidating Trust and the Liquidating Trustee**

(a)    The Liquidating Trustee will be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and will have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules, including without limitation, the right to (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan, the Liquidating Trust Agreement and the Products Insurance Cooperation Agreement; (ii) prosecute, settle, abandon or compromise any Liquidating Trust Causes of Action; (iii) make Distributions contemplated by the Plan and the Liquidating Trust Agreement; (iv) establish and administer any necessary reserves that may be required, including the Disputed Claims Reserve and the Administrative Claims Reserve; (v) object to Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Court such objections; (vi) employ and compensate professionals (including professionals previously retained by the Debtors and/or the Committee), provided, however, that any such compensation will be made only out of the Liquidating Trust Assets; and (vii) file all federal, state and local tax returns if necessary; (viii) cooperate with Products Insurance Carriers participating in the Products Insurance Cooperation Agreement in defense and resolution of Asbestos Claims pursuant to and in accordance with the terms of the Products Insurance Cooperation Agreement; and (ix) seek recovery from Products Insurance Carriers for Asbestos Claims.

(b)    The Liquidating Trust will assume as of the Effective Date the Debtors' responsibility under the Plan to pay Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, Allowed Convenience Claims and Allowed Professional Fee Claims, and in accordance thereof, will be authorized to increase the amount of Cash held in the Administrative Claims Reserve, the Professional Fee Reserve, the Convenience Claims Reserve, and any other reserve set up to pay the Allowed Secured Claims, as needed.

(c)    The Liquidating Trustee will have full authority to take any steps necessary to administer the Liquidating Trust Agreement, including without limitation, the duty and obligation to liquidate Liquidating Trust Assets, to make Distributions therefrom in accordance with the provisions of the Plan and to pursue, settle or abandon any Liquidating Trust Causes of Action, all in accordance with the Liquidating Trust Agreement.

5. **Liquidating Trust Interests**

(a)    On the Effective Date, each Holder of an Allowed General Unsecured Claim will, by operation of the Plan, receive its Pro Rata share of the Liquidating Trust Interests. Liquidating Trust Interests will be reserved for Holders of Disputed General Unsecured Claims and issued by the Liquidating Trust to, and held by the Liquidating Trustee in, the Disputed Claims Reserve pending allowance or disallowance of such Claims.  No other entity will have any interest, legal, beneficial or otherwise, in the Liquidating Trust Assets upon the assignment and transfer of such assets to the Liquidating Trust. The Senior Secured Notes Trustee will be listed as the sole creditor on the records of the Liquidating Trust with respect to Liquidating

49

Trust Interests distributed on account of Senior Secured Noteholder Claims, and all Distributions to holders of such Liquidating Trust Interests shall be made to the Senior Secured Notes Trustee.

As set forth in the Liquidating Trust Agreement, Distributions from the Liquidating Trust on account of Liquidating Trust Interests will be made from the Liquidating Trust Assets after paying, reserving against or satisfying, among other things, the operating and administrative expenses of the Liquidating Trust, including but not limited to all costs, expenses and obligations incurred by the Liquidating Trustee (or professionals who may be employed by the Liquidating Trustee in administering the Liquidating Trust) in carrying out their responsibilities under the Liquidating Trust Agreement, or in any manner connected, incidental or related thereto.

(b)     The Liquidating Trust Interests will be uncertificated and will be nontransferable except upon death of the Holder or by operation of law.  Holders of Liquidating Trust Interests, in such capacity, will have no voting rights with respect to such interests.  The Liquidating Trust will have a term of five (5) years from the Effective Date, without prejudice to the rights of the Liquidating Trust Committee to extend such term conditioned upon the Liquidating Trust not becoming subject to the Securities Exchange Act of 1934 (as now in effect or hereafter amended).

6.     **Appointment of a Liquidating Trustee**

(a)     The Liquidating Trustee will be designated by the Committee, subject to the Debtors' approval.  The Debtors will file a notice on a date that is not less than ten (10) days prior to the hearing to consider confirmation of the Plan designating the Person selected as Liquidating Trustee.  The appointment of the Liquidating Trustee will be approved in the Confirmation Order, and such appointment will be as of the Effective Date.  The Liquidating Trustee will have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan and Liquidating Trust Agreement.

(b)     The Liquidating Trustee will not be obligated to obtain a bond but may do so, in the Liquidating Trust Committee's discretion, in which case the expense incurred by such bonding will be paid by the Liquidating Trust.

(c)     The Liquidating Trustee, the members of the Liquidating Trust Committee and their professionals will be exculpated and indemnified pursuant to and in accordance with the terms of the Plan and Liquidating Trust Agreement.

7.     **Distributions to Holders of General Unsecured Claims**

(a)     <u>Initial Distributions</u>.  On the Initial Distribution Date, the Liquidating Trustee, subject to Article VI.B. of the Plan, will make, or will make adequate reserves in the Disputed Claims Reserve for, the Distributions required to be made under the Plan to Holders of Allowed General Unsecured Claims.  The Trustee will not make any Distributions of Liquidating Trust Assets to the beneficiaries under the Liquidating Trust unless the Trustee retains and reserves in the Disputed Claims Reserve such amounts as are required under Article VI.I.3 of the Plan.

50

(c)    Interim Distributions. The Liquidating Trustee, subject to Article VI.B. of the Plan, will make interim Distributions of Cash in accordance with the Plan and Article IV of the Liquidating Trust Agreement (i) to Holders of Liquidating Trust Interests as soon as reasonably practicable and (ii) from the Disputed Claims Reserve as soon as reasonably practical after Disputed General Unsecured Claims become Allowed Claims.

(d)    Final Distributions. The Liquidating Trust will be dissolved and its affairs wound up and the Liquidating Trustee, subject to Article VI.B. of the Plan, will make the final Distributions, upon the earlier of (i) the date which is five (5) years after the Effective Date, and (ii) that date when, (A) in the reasonable judgment of the Liquidating Trustee, substantially all of the assets of the Liquidating Trust have been liquidated and there are no substantial potential sources of additional Cash for Distribution; and (B) there remain no substantial Disputed Claims. Notwithstanding the foregoing, on or prior to a date not less than six (6) months prior to such termination, the Court, upon motion by a party in interest, may extend the term of the Liquidating Trust for one or more finite terms based upon the particular facts and circumstances present at that time, if an extension is necessary to the liquidating purpose of the Liquidating Trust. The date on which the Liquidating Trustee determines that all obligations under the Plan and Liquidating Trust Agreement have been satisfied is referred to as the "Liquidating Trust Termination Date." On the Liquidating Trust Termination Date, the Liquidating Trustee will, to the extent not already done:

(i)    file the necessary documents to effectuate the dissolution of Liquidating Reichhold in accordance with the laws of the State of Delaware;

(ii)    resign as the sole officer and sole director of Liquidating Reichhold; and

(iii)    request that the Court enter an order closing the Bankruptcy Cases.

Upon the Liquidating Trust Termination Date, Liquidating Reichhold will be deemed dissolved for all purposes (if not previously dissolved) without the necessity for any other or further actions to be taken by or on behalf of Liquidating Reichhold or payments to be made in connection therewith.

Upon dissolution of the Liquidating Trust, if the Liquidating Trustee reasonably determines that any remaining Liquidating Trust Assets are insufficient to render a further distribution practicable, or exceed the amounts required to be paid under the Plan, the Liquidating Trustee will transfer such remaining funds to a charitable institution selected by the Liquidating Trustee, which charitable institution will be qualified as a not-for-profit corporation under applicable federal and state laws.

**8.      Distributions to Holders of Administrative and Priority Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date or (ii) the date an Administrative Claim, Priority Tax Claim or Priority Non-Tax Claim becomes an Allowed Claim, the Liquidating Trustee will make the Distributions required to be made under the Plan to Holders of Allowed Administrative Claims, Priority Tax Claims, Priority Non-

Tax Claims and Convenience Claims, subject to the limitations set forth in the Liquidating Trust Agreement.

### 9.      Reporting Requirement of Liquidating Trust

The Liquidating Trust's formation documents will require that financial statements or similar reports of the Liquidating Trust be sent to all Holders of Liquidating Trust Interests on an annual basis.

### F.      Limited Revesting of Remaining Assets

Notwithstanding anything herein to the contrary, any Remaining Assets will be vested in the Debtors on or following the Effective Date.

### G.      Limited Release of Liens

On the Effective Date, all mortgages, deeds of trust, liens or other security interests against property of the Estates, will be released; provided, however, on the Effective Date, and to the extent not released prior to the Effective Date pursuant to Court order or otherwise, all mortgages, deeds of trust, liens or other security interests against the Liquidating Trust Assets will be released.

### H.      Accounts and Reserves

### 1.      Professional Fee Reserve

On or before the Effective Date, the Debtors will transfer Cash in the Amount of the Professional Fee Estimate to the Liquidating Trust which Cash will be used by the Liquidating Trustee to fund the Professional Fee Reserve.  The Cash so transferred will not be used for any purpose other than to pay Allowed Professional Fee Claims and will be placed in a segregated escrow account.  The Liquidating Trustee, subject to the terms and conditions of the Plan and the Liquidating Trust Agreement, will pay each Professional Fee Claim of a Professional employed by the Debtors or the Committee, on or as soon as reasonably practicable after the date such Claim becomes an Allowed Claim, upon entry of a Final Order allowing such Claim.  After all Professional Fee Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid by the Liquidating Trustee, any remaining Cash in the Professional Fee Reserve will be distributed by the Liquidating Trustee to the Liquidating Trust, provided that all Allowed Administrative Claims, Convenience Claims, Priority Tax Claims and Priority Non-Tax Claims are paid.  Only Professionals employed in the Chapter 11 Cases by the Debtors or the Committee will be entitled to payment from the Professional Fee Reserve.

### 2.      Administrative Claims Reserve

On or before the Effective Date, the Debtors will transfer Cash in the Amount of the Administrative and Priority Claims Estimate to the Liquidating Trust, which Cash will be used by the Liquidating Trustee to fund the Administrative Claims Reserve.  The Cash so transferred will not be used for any purpose other than to pay Allowed Administrative Claims (except Professional Fee Claims, which will be paid from the Professional Fee Reserve), Priority Tax

52

Claims and Priority Non-Tax Claims.  The Liquidating Trustee (i) will segregate in an escrow account and will not commingle the Cash held in the Administrative Claims Reserve and (ii) subject to the terms and conditions of the Plan and the Liquidating Trust Agreement, will pay each Administrative Claim (except Professional Fee Claims, which will be paid from the Professional Fee Reserve), Priority Tax Claim and Priority Non-Tax Claim, on or as soon as reasonably practicable after the date such Claim becomes an Allowed Claim.  After all Administrative Claims (except Professional Fee Claims), Priority Tax Claims and Priority Non-Tax Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid by the Liquidating Trust, any remaining Cash in the Administrative Claims Reserve will be distributed by the Liquidating Trustee to the Liquidating Trust provided that all Allowed Professional Fee Claims have been paid.

### 3.    Other Reserves

The Liquidating Trust will establish and administer any other necessary reserves that may be required under the Plan or Liquidating Trust Agreement, including the Disputed Claims Reserve and the Convenience Class Reserve.

## I.    Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents without the payment of any such tax or governmental assessment.

## J.    Applicability of Sections 1145 and 1125(e) of the Bankruptcy Code

### 1.    Issuance of New Common Stock

Pursuant to the provisions of section 1145 of the Bankruptcy Code with respect to the New Common Stock, the distribution of New Common Stock under the terms of the Plan will constitute the offer or sale under a plan of the Debtors of a security of a successor to the Debtors under such plan in exchange for a claim against, an interest in, or a claim for an administrative expense in the Chapter 11 Cases, such that pursuant to section 1145(a)(1) of the Bankruptcy Code, the issuance of the New Common Stock, to the extent the New Common Stock constitutes "securities" under applicable law, will be exempt from requirements of section 5 of the Securities Act of 1933, as amended, and any other federal, state or local laws requiring registration for offer or sale of securities.

Solely for the limited purpose of the provisions of section 1125(e) of the Bankruptcy Code, Liquidating Reichhold will be deemed to have participated, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale or purchase of a security, offered or sold under the Plan, of a newly organized successor to the Debtors under the Plan, and therefore, pursuant to section 1125(e) of the Bankruptcy Code, will

53

not be liable for violation of any applicable law, rule or regulation governing the offer, issuance, sale or purchase of securities.

### 2.    Issuance of Liquidating Trust Interests

Under section 1145 of the Bankruptcy Code, the issuance of the Liquidating Trust Interests under the Plan will be exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities. If the Liquidating Trustee determines, with the advice of counsel, that the Liquidating Trust is required to comply with the registration and reporting requirements of the Securities and Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, then the Liquidating Trustee will take any and all actions to comply with such reporting requirements and file necessary periodic reports with the Securities and Exchange Commission.

### K.    Preservation of Causes of Action

### 1.    Liquidating Trust Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust will retain and may enforce all rights to commence and pursue, as appropriate, the Liquidating Trust Causes of Action, and the Liquidating Trust's rights to commence, prosecute or settle such Liquidating Trust Causes of Action will be preserved notwithstanding the occurrence of the Effective Date. The Liquidating Trust may pursue such Liquidating Trust Causes of Action, as appropriate, in accordance with the best interests of the Liquidating Trust beneficiaries. No Entity may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any Liquidating Trust Claims against them as any indication that Liquidating Reichhold or the Liquidating Trust, as applicable, will not pursue any and all available Liquidating Trust Causes of Action against them. The Debtors or the Liquidating Trust, as applicable, expressly reserve all rights to prosecute any and all Liquidating Trust Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Liquidating Trust Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Court order, the Liquidating Trust expressly reserves all Liquidating Trust Claims for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppels (judicial, equitable or otherwise) or laches, will apply to such Liquidating Trust Causes of Action upon, after or as a consequence of the Confirmation or Consummation.

The substantive consolidation of the Debtors and their Estates pursuant to the Confirmation Order and Article V.A of the Plan will not, and will not be deemed to, prejudice any of the Liquidating Trust Causes of Action, which will survive entry of the Confirmation Order for the benefit of the Debtors and their Estates, and, upon the Effective Date, for the benefit of the Liquidating Trust.

A nonexclusive schedule of Causes of Action is attached to the Plan as Exhibit E. In accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any Causes of Action on Exhibit E will not be deemed an admission, denial or waiver of any Cause of Action that any Debtor or any Estate may hold against any Entity.

54

2.    **Products Insurance Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, Liquidating Reichhold will retain and may enforce all rights to commence and pursue, as appropriate, the Products Insurance Causes of Action, and Liquidating Reichhold's rights to commence, prosecute or settle such Products Insurance Causes of Action will be preserved notwithstanding the occurrence of the Effective Date. Liquidating Reichhold may pursue such Products Insurance Causes of Action, as appropriate, in accordance with the best interests of Liquidating Reichhold. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Products Insurance Claims against them as any indication that Liquidating Reichhold will not pursue any and all available Products Insurance Causes of Action against them. Liquidating Reichhold expressly reserves all rights to prosecute any and all Products Insurance Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Products Insurance Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Court order, Liquidating Reichhold expressly reserves all Products Insurance Claims for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppels (judicial, equitable or otherwise) or laches, shall apply to such Products Insurance Causes of Action upon, after or as a consequence of the Confirmation or Consummation.

The substantive consolidation of the Debtors and their Estates pursuant to the Confirmation Order and Article V.A of the Plan will not, and will not be deemed to, prejudice any of the Products Insurance Causes of Action, which shall survive entry of the Confirmation Order for the benefit of the Debtors and their Estates, and, upon the Effective Date, for the benefit of Liquidating Reichhold.

L.    **Effectuating Documents; Further Transactions**

Liquidating Reichhold and the Liquidating Trustee, subject to the terms and conditions of the Plan and the Liquidating Trust Agreement, will be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

III.    **Provisions Regarding Distributions**

A.    **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan or as ordered by the Court, all Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date will be made on the Initial Distribution Date by the Disbursing Agent. Distributions on account of Claims that first become Allowed Claims after the Effective Date will be made pursuant to the terms and conditions of the Plan and the Liquidating Trust Agreement. Notwithstanding any other provision of the Plan to the contrary, no Distribution will be made on account of any Allowed Claim or portion thereof that (i) has been satisfied after the Petition Date; (ii) is listed in the schedules as contingent, unliquidated, disputed or in a zero amount, and for which a Proof of

55

Claim has not been timely filed; or (iii) is evidenced by a Proof of Claim that has been amended by a subsequently filed Proof of Claim.

**B.    Disbursing Agent**

The Disbursing Agent will make all Distributions required under the Plan, subject to the terms and provisions of the Plan and the Liquidating Trust Agreement.  If the Disbursing Agent is an independent third party designated to serve in such capacity, such Disbursing Agent will receive, without further Court approval, reasonable compensation from the Liquidating Trust for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses.  No Disbursing Agent will be required to give any bond or surety or other security for the performance of its duties.  The Disbursing Agent will be authorized and directed to rely upon the Debtors' books and records and the Liquidating Trust's, or Liquidating Reichhold's (as applicable) representatives and professionals in determining Allowed Claims not entitled to Distributions under the Plan in accordance with the terms and conditions of the Plan.

All Class 3 Distributions for the Holders of Senior Secured Noteholder Claims will be made to the Senior Secured Notes Trustee who shall act as the Disbursing Agent with respect to the Distributions to Holders of Senior Secured Noteholder Claims, and will be subject in all respects to the right of the Senior Secured Notes Trustee to assert the Senior Secured Notes Trustee Charging Lien against such Distributions.  The Senior Secured Notes Trustee may transfer such Distributions through the facilities of DTC and will be entitled to recognize and deal for all purposes under the Plan with Holders of Senior Secured Noteholder Claims to the extent consistent with customary practices of DTC.

**C.    Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**1.    Delivery of Distributions in General**

Distributions to Holders of Allowed Claims will be made by the Disbursing Agent (a) at the addresses set forth on the Proofs of Claim filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is filed or if the Debtors or the Liquidating Trustee have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim, after sufficient evidence of such addresses as may be requested by the Disbursing Agent is provided, (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address, (d) at the addresses set forth in the other records of the Debtors or the Disbursing Agent at the time of the Distribution or (e) in the case of the Holder of a Claim that is governed by an agreement and is administered by an agent or servicer, at the addresses contained in the official records of such agent or servicer.

In making Distributions under the Plan, the Disbursing Agent may rely upon the accuracy of the Claims register maintained by the Claims Agent in the Chapter 11 Cases, as modified by any Final Order of the Court disallowing Claims in whole or in part.

2.    **Undeliverable and Unclaimed Distributions**

If the Distribution to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or is otherwise unclaimed, no further Distributions will be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address and such Holder provides sufficient evidence of such address as may be requested by the Disbursing Agent, at which time all missed Distributions will be made to such Holder without interest, subject to the time limitations set forth below. Amounts in respect of undeliverable Distributions made by the Disbursing Agent will be returned to the Disbursing Agent until such Distributions are claimed. The Disbursing Agent will segregate and, with respect to Cash, deposit in a segregated account designated as an unclaimed Distribution reserve undeliverable and unclaimed Distributions for the benefit of all such similarly-situated Persons until such time as a Distribution becomes deliverable or is claimed, subject to the time limitations set forth in the Plan.

Any Holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed Distribution within three (3) months after the date such Distribution was issued will be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and will be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed Distribution against the Debtors and their Estates, Liquidating Reichhold, the Liquidating Trustee, the Liquidating Trust, the Liquidating Trust Committee and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its or their property. In the case of undeliverable or unclaimed Distributions on account of Administrative Claims, Priority Tax Claims or Priority Non-Tax Claims, any Cash otherwise reserved for undeliverable or unclaimed Distributions will revert to the Administrative Claims Reserve. In the case of undeliverable or unclaimed Distributions on account of Liquidating Trust Interests, any Cash otherwise reserved for undeliverable or unclaimed Distributions will revert to the Liquidating Trust, and all title to and all beneficial interests in the Liquidating Trust Assets represented by any such undeliverable Distributions will revert to and/or remain in the Liquidating Trust and will be distributed in accordance with Article IV of the Liquidating Trust Agreement and the Plan, including by donation of remaining funds to one or more charitable institutions qualified as a not-for-profit corporation, under applicable federal and state laws, as may be selected by the Liquidating Trustee. The reversion of such Cash to the Administrative Claims Reserve or the Liquidating Trust, as applicable, will be free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and will be treated in accordance with the terms of the Plan and the Liquidating Trust Agreement. Nothing contained in the Plan or the Liquidating Trust Agreement will require the Debtors, Liquidating Reichhold, the Liquidating Trust, the Liquidating Trustee or any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

D.    **Means of Cash Payment**

Cash payments made pursuant to the Plan will e in U.S. dollars and will be made at the option and in the sole discretion of the Disbursing Agent by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Disbursing Agent. In the case of foreign creditors, Cash payments may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular jurisdiction.

52719/0001-11921553v11

E.    **Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest will not accrue or be paid on any Claims, and no Claimholder will be entitled to interest accruing on or after the Petition Date on any Claim.  Interest will not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

F.    **Withholding and Reporting Requirements**

In accordance with section 346 of the Bankruptcy Code and in connection with the Plan and all Distributions thereunder, the Disbursing Agent will, to the extent applicable, comply with all withholding and reporting requirements imposed by any federal, state, provincial, local or foreign taxing authority.  The Disbursing Agent will be authorized to take any and all actions necessary and appropriate to comply with such requirements. All Distributions under the Plan will be subject to withholding and reporting requirements.

G.    **Setoffs**

Subject to the terms and conditions of the Liquidating Trust Agreement, the Debtors, Liquidating Reichhold and/or the Liquidating Trust may, but will not be required to, set off against any Claim and the payments or other Distributions to be made under the Plan on account of the Claim, claims of any nature whatsoever that the Debtors and/or Liquidating Reichhold may have against the Holder thereof, provided that any such right of setoff that is exercised will be allocated, first, to the principal amount of the related Claim, and thereafter to any interest portion thereof, but neither the failure to do so nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors, Liquidating Reichhold and/or the Liquidating Trust of any such claim that the Debtors and/or Liquidating Reichhold may have against such Holder.

H.    **Procedure for Treating and Resolving Disputed, Contingent and/or Unliquidated Claims**

1.    **Objection Deadline; Prosecution of Objections**

Except as set forth in the Plan with respect to Professional Fee Claims and Administrative Claims, all objections to Claims must be filed and served on the Holders of such Claims by the Claims Objection Deadline, as the same may be extended by the Court.  If an objection has not been filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that (i) was Scheduled by the Debtors but (ii) was not Scheduled as contingent, unliquidated and/or disputed, by the Claims Objection Deadline, as the same may be extended by order of the Court, the Claim to which the Proof of Claim or Scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been Allowed earlier.  Notice of any motion for an order extending the Claims Objection Deadline will be required to be given only to those persons or entities that have requested notice in the Chapter 11 Cases in accordance with Bankruptcy Rule 2002.

58

Subject to any reporting to the Liquidating Trust Committee that may be required under the Liquidating Trust Agreement, and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Liquidation Trust will have the authority to: (1) file, withdraw or litigate to judgment objections to and requests for estimation of Claims (expect for  Asbestos Claims); (2) settle or compromise any Disputed Claim (except for Asbestos Claims) without any further notice to or action, order or approval by the Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Court.  In the event that any objection filed by the Debtors or the Committee remains pending as of the Effective Date, the Liquidating Trustee will be deemed substituted for the Debtors or the Committee, as applicable, as the objecting party (except for Asbestos Claims).

The Liquidating Trust will be entitled to assert all of the Debtors' rights, claims, defenses, offsets, rights of recoupment, setoffs, rights of disallowance, subrogation, recharacterization and/or equitable subordination and counter-claims with respect to Claims (except for Asbestos Claims).

Liquidating Reichhold will have the authority to: 1) file, withdraw or litigate to judgment objections to and requests for estimation of Asbestos Claims; (2) settle or compromise any Disputed Claim that is an Asbestos Claim without any further notice to or action, order or approval by the Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Court.

## 2.   No Distributions Pending Allowance

Notwithstanding any other provision of the Plan or the Liquidating Trust Agreement, no payments or Distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.  To the extent that a Claim is not a Disputed Claim but is held by a Holder that is or may be liable to Liquidating Reichhold or the Liquidating Trust on account of a Cause of Action, no payments or Distributions will be made with respect to all or any portion of such Claim unless and until such Claim and liability have been settled or withdrawn or have been determined by Final Order of the Court or such other court having jurisdiction over the matter.

## 3.   Disputed Claims Reserves

On the Initial Distribution Date and on each subsequent Periodic Distribution Date, the Liquidating Trust will withhold on a Pro Rata basis from property that would otherwise be distributed to Holders of General Unsecured Claims entitled to Distributions under the Plan on such date, in a separate Disputed Claims Reserve, such amounts or property as may be necessary to equal one hundred percent (100%) of Distributions to which Holders of such Disputed General Unsecured Claims would be entitled under the Plan if such Disputed General Unsecured Claims were allowed in their Disputed Claims Amount.  The Liquidating Trust may request, if necessary, estimation for any Disputed General Unsecured Claim that is contingent or unliquidated, or for which the Liquidating Trust determines to reserve less than the face amount.

The Liquidating Trust will withhold the applicable Disputed Claims Reserve with respect to such Claims based upon the estimated amount of each such Claim as estimated by the Court. If the Liquidating Trust elects not to request such an estimation from the Court with respect to a Disputed General Unsecured Claim that is contingent or unliquidated, the Liquidating Trust will withhold the applicable Disputed Claims Reserve based upon the good faith estimate of the amount of such General Unsecured Claim by the Liquidating Trust. If practicable, the Liquidating Trust will invest any Cash that is withheld as the Disputed Claims Reserve in an appropriate manner to ensure the safety of the investment, in accordance with the Liquidating Trust Agreement. Nothing in the Plan, the Disclosure Statement or the Liquidating Trust Agreement will be deemed to entitle the Holder of a Disputed General Unsecured Claim to postpetition interest on such Claim, however. The Liquidating Trustee will not be required to reserve more than $100,000 in the Disputed Claims Reserve with respect to all Asbestos Claims.

4.    **Distributions After Allowance**

Payments and Distributions to Holders of Disputed Claims that ultimately become Allowed Claims will be made in accordance with provisions of the Liquidating Trust Agreement that govern Distributions to Holders of Allowed General Unsecured Claims and Holders of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims.

5.    **De Minimis Distributions**

The Liquidating Trust will not be required to make any distributions to Holders of Allowed Claims aggregating less than fifty dollars ($50.00). When the aggregate amount of distributions held by the Liquidating Trustee for the benefit of a holder of a Claim exceeds $50.00, the Liquidating Trustee will distribute such distribution to such holder. If, at the time that the final Distribution under the Plan is to be made, the distribution(s) held by the Liquidating Trustee for the benefit of a holder of a Claim total less than $50.00, such funds will not be distributed to such holder, but rather, such Claims will be deemed expunged and such Distribution will vest in the Liquidating Trust. Cash that otherwise would be payable under the Plan to Holders of Liquidating Trust Interests but for Article VI.I.5 of the Plan will remain Liquidating Trust Assets to be used in accordance with the Liquidating Trust Agreement. Cash that otherwise would be payable under the Plan to Holders of Administrative Claims, Priority Tax Claims and Priority Non-Tax Claims but for Article VI.I.5 of the Plan will remain in the Administrative Claims Reserve.

6.    **Fractional Cents**

Any other provision of the Plan notwithstanding, the Disbursing Agent will not be required to make Distributions or payments of fractional cents. Whenever any payment of a fraction of a cent under the Plan would otherwise be called for, the actual payment will reflect a rounding of such fraction to the nearest whole cent(up or down), with half cents being rounded down.

7.    **Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a Distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution will, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

8.    **Distribution Record Date**

The Disbursing Agent will have no obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on the Distribution Record Date. Instead, the Disbursing Agent will be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims register or the Debtors' Books and Records, as applicable, as of the close of business on the Distribution Record Date. This Article shall not apply to the holders of Senior Secured Notes whose Distributions will be made through the Senior Secured Notes Trustee.

IV.    **Treatment Of Executory Contracts And Unexpired Leases**

A.    **Rejected Contracts and Leases**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases to which any Debtor is a party will be deemed automatically rejected by the applicable Debtor as of the Effective Date, unless such contract or lease (i) previously has been assumed or rejected by the Debtors, (ii) expired or terminated pursuant to its own terms, (iii) is the subject of a motion to assume or reject pending before the Court as of the Confirmation Date or (iv) is identified on Exhibit E to the Plan as a Contract to be assumed or assumed/assigned to the Liquidating Trust; provided, however, that nothing contained in the Plan will constitute an admission by any Debtor that any such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor or its successors and assigns has any liability thereunder; and, provided further, that the Debtors reserve their right, at any time before the Confirmation Date, to assume any Executory Contract or Unexpired Lease that was not already rejected prior to the Confirmation Date. The Confirmation Order will constitute an order of the Court approving the rejections described in Article VII.A of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

B.    **Products Insurance Policies**

Notwithstanding anything in the Disclosure Statement, the Plan, the Confirmation Order or any other order of this Court to the contrary (including, without limitation, any other provision that purports to be preemptory or supervening or grants a release), on the Effective Date, each of the Products Insurance Policies will, as applicable, either be (i) deemed assumed to the extent such Products Insurance Policies were executory contracts of Reichhold pursuant to section 365 of the Bankruptcy Code or (ii) continued in accordance with its terms.

C.    **Director and Officer Insurance Policies and Agreements**

The Debtors do not believe that the director and officer liability policies issued to, or insurance agreements entered into by, any Debtor prior to or after the Petition Date constitute executory contracts.  To the extent that such insurance policies or agreements are considered to be Executory Contracts, they will be deemed assumed as of the Effective Date.

D.    **Assumption and Assignment of Executory Contracts**

On the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtors will assume and assign to the Liquidating Trust the Executory Contracts identified on Exhibit F to the Plan that are marked "to be assumed and assigned to the Liquidating Trust".

E.    **Rejection Damages Bar Date**

If the rejection of an Executory Contract or Unexpired Lease pursuant to Article VII.A of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim will be forever barred and will not be enforceable against the applicable Debtor or its Estate, Liquidating Reichhold, the Liquidating Trust or their respective successors or properties unless a Proof of Claim is filed with the Court and served on counsel for the Liquidating Trust within thirty (30) days after service of notice of entry of the Confirmation Order.

F.    **Indemnification Obligations**

Any obligations of the Debtors pursuant to their corporate charters and bylaws or agreements, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse or limit the liability of any Person pursuant to the Debtors' certificates of incorporation, bylaws, policy of providing employee indemnification, applicable state law or specific agreement in respect of any claims, demands, suits, causes of action or proceedings against such Persons based upon any act or omission related to such Persons' service with, for or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits and proceedings relating to the Debtors will survive confirmation of the Plan and except as set forth in the Plan, remain unaffected thereby, irrespective of whether such defense, indemnification, reimbursement or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; provided, however, that all monetary obligations under Article VII.C of the Plan will be  limited solely to available insurance coverage and neither Liquidating Reichhold, the Liquidating Trust, the Liquidating Trustee nor any of their asset will be liable for any such obligations.  Any Claim based on the Debtors' obligations set forth in Article VII.C of the Plan will not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.  The provision in the Plan for indemnification obligations will not apply to or cover any Claims, suits or actions against a Person that result in a final order determining that such Covered Person is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.

## G. Retiree Benefits

On October 20, 2015, the Debtors entered into separate settlement agreements with the Retiree Committee and United Steelworkers to terminate their retiree welfare plans and resolve all claims related thereto. Pursuant to those settlement agreements and subject to Court approval, the Debtors will terminate the retiree life and medical insurance programs at 11:59 p.m. on November 30, 2015. In connection with those settlements, the Debtors agreed to make settlement payments to the retirees in satisfaction of all claims against the Debtors. The Debtors have also made proposals to terminate retiree benefits consistent with the terms of the Retiree Committee and Steelworkers' settlements to the following unions representing retirees: (a) International Brotherhood of Teamsters (the "Teamsters"); (b) International Union of Painters and Allied Trades ("IUPA"); and (c) International Chemical Workers Union ("ICWU"). Despite the Debtors' repeated attempts to negotiate with those unions, the Teamsters, IUPA and ICWU failed to respond to the Debtors' proposal.

On October 27, 2015, the Debtors filed a motion pursuant to sections 105(a), 363 and 1114(e)(1)(B) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules (i) authorizing the Debtors' entry into and approving the settlement agreements with the Steelworkers and Retiree Committee and (ii) approving termination of retiree benefits for the retired members of the Teamsters, IUPA and ICWU. The Court approved the motion pursuant to an order dated November 13, 2015 [Docket No. 1222].

## V. Allowance And Payment Of Certain Administrative Claims

### A. Professional Fee Claims

#### 1. Final Fee Applications

All final requests for payment of Professional Fee Claims (the "Final Fee Applications") must be filed no later than forty-five (45) days after the Effective Date. Objections, if any, to Final Fee Applications of such Professionals must be filed and served on the Liquidating Trust, the Liquidating Trust Committee, the requesting Professional and the Office of the United States Trustee no later than twenty (20) days from the date on which each such Final Fee Application is served and filed. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court, the Allowed amounts of such Professional Fee Claims will be determined by the Court.

#### 2. Employment of Professionals after the Effective Date

From and after the Effective Date, any requirement that professionals comply with sections 327 through 331 of the Bankruptcy Code or any order previously entered by the Court in seeking retention or compensation for services rendered or expenses incurred after such date will terminate.

#### 3. Senior Secured Notes Trustee Fees

Nothing in the Plan will in any way affect or diminish the right of the Senior Secured Notes Trustee to assert the Senior Secured Notes Trustee Charging Lien against Distributions to

Holders of Senior Secured Noteholder Claims with respect to any unpaid Senior Secured Notes Trustee Fees.

## B.    Other Administrative Claims

All requests for payment of an Administrative Claim arising from April 2, 2015 through the Effective Date, other than Professional Fee Claims, must be filed with the Claims Agent and served on the Debtors or the Liquidating Trust, as applicable, by the date that falls on the thirtieth day (30th) day following the Effective Date. Unless Liquidating Reichhold, the Liquidating Trust or any other party in interest objects to an Administrative Claim by the Administrative Claims Objection Deadline, such Administrative Claim will be deemed Allowed in the amount requested. In the event that Liquidating Reichhold, the Liquidating Trust or any other party in interest objects to an Administrative Claim, the Court will determine the Allowed amount of such Administrative Claim.

## VI.    Effects Of Confirmation

## A.    Compromise and Settlement of Claims and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, Distributions, releases and other benefits provided pursuant to the Plan, on the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan or relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Claim or Interest, or any Distribution to be made on account of such Claim or Interest. The entry of the Confirmation Order will constitute the Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.

## B.    Binding Effect

The Plan will be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, whether or not such Holders will receive or retain any property or interest in property under the Plan, and their respective successors and assigns, including, but not limited to, Liquidating Reichhold, the Liquidating Trust and all other parties in interest in the Chapter 11 Cases.

## C.    Discharge of the Debtors

Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against the Debtors; provided, however, that no Claimholder or Interest Holder may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against, any Debtor, Liquidating Reichhold and/or their respective successors, assigns and/or property, except as expressly provided in the Plan.

## D.    **Releases**

### 1.    **Releases by the Debtors**

*As of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed in the Plan, the Debtors, and any Person seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors, any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code or the Liquidating Trust, whether pursuing an action derivatively or otherwise, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever (other than for fraud, willful misconduct or gross negligence) in connection with or related to the Debtors, the Chapter 11 Cases or the Plan (other than the rights of the Debtors and the Liquidating Trustee to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Confirmation Date, against (a) the Debtors, their Professionals and Court-retained agents (b) the Debtors' directors, officers and employees employed by or serving the Debtors on or after the Petition Date, (c) the Committee and its Professionals and, solely in their respective capacities as members or representatives of the Committee, each member of the Committee; provided, however, that nothing in Article X.D.1 of the Plan will be a waiver of any defense, offset or objection to any Claim filed against the Debtors and their Estates by any Person.*

## E.    **Exculpation and Limitation of Liability**

*None of (a) the Debtors, (b) Liquidating Reichhold, (c) the directors, officers or employees of any of the Debtors serving at any time during the pendency of the Chapter 11 Cases, (d) the professionals or Court-retained agents of the Debtors, (e) the Committee and its professionals and, solely in their respective capacities as members or representatives of the Committee, each member of the Committee, or (f) any of the successors or assigns of any of the parties identified in the foregoing clauses (a) through (e), will have or incur any liability to any Holder of a Claim or an Interest, or any other party in interest, or any of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders or affiliates, or any of their respective successors or assigns, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, the formulation, negotiation or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence or willful misconduct, and such parties in all respects will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.*

*Notwithstanding any other provision of the Plan, no Holder of a Claim or an Interest, no other party in interest, none of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders or affiliates, and none of their respective*

*successors or assigns, will have any right of action against (a) any of the Debtors, (b) Liquidating Reichhold, (c) the directors, officers or employees of any of the Debtors serving at any time during the pendency of the Chapter 11 Cases, (d) the professionals or Court-retained agents of the Debtors, (e) the members and professionals of the Committee, but only in their capacities as such, or (f) any of the successors or assigns of any of the parties identified in the foregoing clauses (a) through (e), for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, the formulation, negotiation or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence or willful misconduct.*

F.    **Injunction**

Confirmation of the Plan will have the effect of, among other things, permanently enjoining (a) all Entities or Persons that have held, hold or may hold or have asserted, assert or may assert Claims against or Interests in the Estates with respect to any such Claim or Interest, and (b) respecting (vi)(A), (vi)(B), and (vi)(C) of Article X.F of the Plan, the Estates and the Liquidating Trust, from and after the Effective Date, from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Estates, Liquidating Reichhold or the Liquidating Trust or any of its or their property; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Estates, Liquidating Reichhold or the Liquidating Trust or any of its or their property; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Estates, Liquidating Reichhold or the Liquidating Trust or any of its or their property; (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Estates, Liquidating Reichhold or the Liquidating Trust or any of its or their property, except with respect to any right of setoff asserted prior to the entry of the Confirmation Order, whether asserted in a Proof of Claim or otherwise, or as otherwise contemplated or allowed by the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) prosecuting or otherwise asserting (A) any Claim or Interest, including any right, claim or Cause of Action, released pursuant to the Plan, (B) any form of objection to any Claim that is Allowed by the Plan, or (C) asserting Avoidance Actions against any Holder of a Claim that is Allowed by the Plan. Notwithstanding any contrary suggestion in the Plan, the injunction contemplated by this Section will apply to any Asbestos Claim to the same extent such Claim is barred by the Bar Date Order. Additionally, unless otherwise explicitly stated in the Plan, the injunction contemplated by this Section will prohibit the assertion against the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Committee, of all Claims or Interests, if any, related to the Debtors, including Environmental Claims.

52719/0001-11921553v11

### G. The Automatic Stay

Solely with respect to Asbestos Claims, the automatic stay imposed by section 362 of the Bankruptcy Code will be terminated as of the date that is 60 days after the Effective Date and, pursuant to section 108(c) of the Bankruptcy Code, the applicable statute of limitations with respect to any such Claim that did not expire prior to the Petition Date will cease to be tolled as of that date.

The automatic stay of Bankruptcy Code section 362(a) and the injunction set forth in Article X.F of the Plan, if and to the extent applicable, will be deemed lifted without further order of the Court, to permit Insurers to (a) handle, administer, defend, settle and/or pay (i) workers' compensation claims, whether arising prior to or subsequent to the Effective Date, (ii) any claim where a claimant asserts a direct claim against an Insurer under applicable law, and (iii) any claim for which an order has been entered by the Bankruptcy Court granting the claimant relief from the automatic stay or the injunction set forth in Article X.F of the Plan to proceed with its claim, (b) pay any and all costs in relation to each of the foregoing and (c) to the extent the Debtors, Liquidating Reichhold or the Liquidating Trust fail to pay and/or reimburse Insurers, as required by the Plan or Bankruptcy Code, for any of the amounts in relation to the foregoing claims and costs for which the insureds are liable under the Insurance Policies (and which shall not be released or discharged under the Plan or the Confirmation Order), Insurers may draw upon, hold and/or apply any collateral and/or security, including, without limitation letter of credit proceeds and paid loss deposit funds, provided by or on behalf of the Debtors therefor pursuant to the terms of the Insurance Policies and any existing letters of credit (and the agreements and documents related thereto); provided, however, that the Insurers will provide, on a quarterly basis, Liquidating Reichhold and the Liquidating Trust with a summary of all claims settled and all draws of any collateral and/or security, including, without limitation letter of credit proceeds and paid loss deposit funds and any existing letters of credit.

### H. Compromises and Settlements

Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle Claims (a) against them and (b) that they have against other Persons. The Debtors expressly reserve the right (with Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Effective Date.

After the Effective Date, such right will pass to Liquidating Reichhold or the Liquidating Trust, as applicable, and will be governed by the terms of Article VI.I of the Plan, the Liquidating Trust Agreement and the Products Insurance Cooperation Agreement, as applicable.

### I. Satisfaction of Subordination Rights

All Claims against the Debtors and all rights and claims between or among Claimholders relating in any manner whatsoever to Distributions on account of Claims against the Debtors based upon any subordination rights, whether asserted or unasserted, legal or equitable, will be deemed satisfied by the Distributions under the Plan to Claimholders having such subordination rights, and such subordination rights will be deemed waived, released, discharged and terminated

as of the Effective Date. Distributions to the various Classes of Claims under the Plan will not be subject to levy, garnishment, attachment or like legal process by any Claimholder by reason of any subordination rights or otherwise, so that each Claimholder will have and receive the benefit of the Distributions in the manner set forth in the Plan.

## J.    ERISA Claims

Notwithstanding anything to the contrary in the Plan, any claim arising under Title I of the Employee Retirement Income Security Act of 1974, or ERISA, for breach of fiduciary duty or relating to a prohibited transaction with respect to the Reichhold, Inc. Retirement Plan shall not be discharged, released, or enjoined; provided, however, that any such claim against the Debtors for breach of fiduciary duty or relating to a prohibited transaction with respect to the Reichhold, Inc. Retirement Plan will be treated solely as an unsecured claim.

## VII.    Miscellaneous Provisions

## A.    Modifications and Amendments

The Debtors may alter, amend or modify the Plan or any Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date provided that the Debtors have received the prior written consent of the Committee, which consent will not unreasonably be withheld. After the Confirmation Date and prior to substantial consummation of the Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan; provided, however, that prior notice of such proceedings will be served in accordance with the Bankruptcy Rules or order of the Court.

## B.    Payment of Statutory Fees

All fees payable through the Effective Date pursuant to 28 U.S.C. § 1930 will be paid on or as soon as practicable after the Effective Date. The Debtors, prior to the Effective Date, and the Liquidating Trust, from and after the Effective Date, will pay statutory fees to the U.S. Trustee in accordance with 28 U.S.C. § 1930 until the Chapter 11 Cases are closed or converted and/or the entry of final decrees. In addition, the Liquidating Trust will file post-confirmation quarterly reports or any pre-confirmation monthly operating reports not filed as of the Confirmation Hearing in conformance with the U.S. Trustee Guidelines. The U.S. Trustee will not be required to file a request for payment of its quarterly fees, which will be deemed an Administrative Claim against the Debtors and their Estates.

## C.    Revocation, Withdrawal or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans. If the Debtors revoke or withdraw the Plan as to any or all of the Debtors, or if Confirmation or consummation of the

68

Plan as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) the Plan will be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, will (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by such Debtors or any other Person.

**D.**     **Plan Supplement(s)**

Exhibits to the Plan not attached thereto will be filed in one or more Plan Supplements by the Plan Supplement Filing Date. Any Plan Supplement (and amendments thereto) filed by the Debtors will be deemed an integral part of the Plan and will be incorporated by reference as if fully set forth therein. Copies of case pleadings, including the Plan Supplements, also may be examined by any party in interest: (i) between the hours of 8:00 a.m. and 4:00 p.m., Monday through Friday, excluding federal holidays, at the Office of the Clerk of the Court, 824 N. Market St., 3rd Floor, Wilmington, Delaware 19801; (ii) at the Debtors' case website (http://www.loganandco.com); or (iii) for a fee, at the Bankruptcy Court's website (http://www.deb.uscourts.gov). The documents contained in any Plan Supplements will be approved by the Court pursuant to the Confirmation Order.

## ARTICLE V

## VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN

**A.**     **General**

The Bankruptcy Code requires that, in order to confirm the Plan, the Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan has been proposed in good faith and not by any means forbidden by law; (iv) the disclosure required by section 1125 of the Bankruptcy Code has been made; (v) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vi) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan; (vii) the Plan is in the "best interests" of all Holders of Claims in an Impaired Class by providing to such Holders on account of their Claims property of a value, as of the effective date of the Plan (the "Effective Date"), that is not less than the amount that such Holders would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim in such Class has accepted the Plan; and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

**B.**     **Parties in Interest Entitled to Vote**

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights to which the Claims of that Class entitled the Holders of such Claims are modified, other than by curing defaults and reinstating the Claims. Classes that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

**C.**     **Classes Impaired and Entitled to Vote under the Plan**

The following Classes are Impaired under the Plan and entitled to vote on the Plan:

| Class | Claim | Status | Voting Right |
|:---:|---|---|---|
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Convenience Class Claims | Impaired | Entitled to Vote |

Acceptances of the Plan are being solicited only from Holders of Claims in Classes 3 and 4 that will or may receive consideration under the Plan. Holders of Claims and Interests in Classes 5 and 6 are deemed to reject the Plan. Holders of Claims in Classes 1 and 2 are deemed to accept the Plan and are not entitled to vote.

**D.**     **Voting Procedures and Requirements**

1.     **Ballots**

The Solicitation Procedures Order sets November 10, 2015, as the record date for voting on the Plan (the "Record Date"). Accordingly, only Holders of record as of the Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use only the Ballot sent to you with this Disclosure Statement. If you are a Holder of a Claim in Classes 3 and 4 and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please contact the Voting Agent at RI@loganandco.com.

2.     **Returning Ballots**

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete, sign and return your Ballot, with original signature, in the enclosed envelope.

TO BE COUNTED, YOUR BALLOT WITH YOUR ORIGINAL SIGNATURE INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN **4:00 P.M. (EASTERN TIME) ON JANUARY 4, 2016** (THE "VOTING DEADLINE").

3.    **Voting**

Pursuant to section 105(a) of the Bankruptcy Code, Bankruptcy Rules 2002(a)(7) and 3003(c)(2) and the Bar Date Order, any creditors whose claims (a) are scheduled in the Debtors' Schedules as disputed, contingent or unliquidated and which are not the subject of a timely-filed proof of claim, or a proof of claim deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Court, or otherwise deemed timely filed under applicable law; or (b) are not scheduled and are not the subject of a timely-filed proof of claim, or a proof of claim deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Court, or otherwise deemed timely filed under applicable law (the "Non-Voting Claims"), will be denied treatment as creditors with respect to such claims for purposes of (a) voting on the Plan, and (b) receiving notices, other than by publication, regarding the Plan.

For purposes of voting, the amount of a Claim used to calculate acceptance or rejection of the Plan under section 1126 of the Bankruptcy Code will be determined in accordance with the following hierarchy:

(a)    if an order has been entered by the Court determining the amount of such Claim, whether pursuant to Bankruptcy Rule 3018 or otherwise, then in the amount prescribed by the order;

(b)    if no such order has been entered, then in the liquidated amount contained in a timely-filed proof of claim that is not the subject of an objection as of the Record Date;

(c)    if no such proof of claim has been timely filed, then in the liquidated, noncontingent and undisputed amount contained in the Debtors' Schedules; and

(d)    if the claim is the subject of an objection by the Record Date, then in accordance with the relief requested in such objection.

For purposes of voting, the following conditions will apply to determine the amount and/or classification of a Claim:

(a)    if a claim is partially liquidated and partially unliquidated, such claim shall be allowed for voting purposes only in the liquidated amount; provided, however, that such liquidated amount in whole or in part is neither contingent nor estimated (if the entire liquidated amount is either contingent or estimated then the claim shall be allowed for voting purposes in the amount of $1.00, subject to the right of such holder to file a Rule 3018(a) Motion (as such term is defined in the Solicitation Procedures Order)); provided further, however, that such holder of a prepetition timely filed proof of claim that is entitled to vote in the amount of $1.00 shall not be included in the Convenience Class; and

71

(b)    the holder of a prepetition timely-filed proof of claim that is wholly unliquidated general unsecured amount, wholly contingent, disputed and/or unknown amount, and is not the subject of an objection as of the Record Date, is entitled to vote in the amount of $1.00, subject to the right of such holder to file a Rule 3018(a) Motion (as such term is defined in the Solicitation Procedures Order); provided, however, that such holder of a prepetition timely filed proof of claim that is entitled to vote in the amount of $1.00 shall not be included in the Convenience Class.

Pursuant to the Solicitation Procedures Order, the deadline for filing and serving motions pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of claims for the purpose of accepting or rejecting the Plan will be December 28, 2015 at 4:00 p.m. (Eastern Time) (the "Rule 3018(a) Motion Deadline").

## E.    <u>Acceptance of Plan</u>

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims vote to accept the Plan, except under certain circumstances. <u>See</u> "Confirmation Without Necessary Acceptances; Cramdown" below. A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half in number of claims of those that vote in such class vote to accept the plan. Only those holders of claims who actually vote on the Plan count in these tabulations. Holders of claims who fail to vote are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each holder of a claim or interest in such class. <u>See</u> "Best Interests Test" below. Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below. <u>See</u> "Confirmation Without Necessary Acceptances; Cramdown" below.

## F.    <u>Confirmation Without Necessary Acceptances; Cramdown</u>

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

Here, because Classes 5 and 6 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied as no Claim or Interest Holder junior to those in Classes 5 and 6 will receive any property under the Plan.

1.    **No Unfair Discrimination**

A plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  The Debtors believe that under the Plan all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

2.    **Fair and Equitable Test**

With respect to a dissenting class of claims or interests, the "fair and equitable" standard requires that a plan provide that either the claims or interests in each class received everything to which they are legally entitled or that classes junior in priority to the class receive nothing.  The strict requirement of the allocation of full value to dissenting classes before any junior class can receive distribution is known as the "absolute priority rule."

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims and interests, which may be summarized as follows:

a.    Secured Claims.  Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

b.    Unsecured Claims.  Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the Chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

c.    Equity Interests.  Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the Chapter 11 plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock or (b) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the Chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

As discussed above, the Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule.

73

## ARTICLE VI

## FEASIBILITY AND BEST INTERESTS OF CREDITORS

**A.    Best Interests Test**

Before the Plan may be confirmed, the Court must find the Plan provides, with respect to each Impaired Class, that each Holder of a Claim in such Class either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code.

In chapter 7 liquidation cases, unsecured creditors and equity interest holders of a debtor are paid from available assets generally in the following order, with no lower class receiving any payments until all amounts due to senior classes have been paid fully or payment has been provided for:

- Secured creditors (to the extent of the value of their collateral).

- Priority creditors.

- Unsecured creditors.

- Debts expressly subordinated by its terms or by order of the Bankruptcy Court.

- Equity interest holders.

This is a liquidating plan. In any event, whether by the Liquidating Trust, or a chapter 7 trustee, the Debtors' Estates' assets will be liquidated. Accordingly, there is no reorganization value to be calculated, or distribution scenarios related thereto. In addition, the activities of the Liquidating Trustee after the Effective Date are the very same ones that would be pursued by a chapter 7 trustee. However, in a chapter 7 liquidation case, a chapter 7 trustee may seek to charge statutory fees of up to 3% of disbursements. Additionally, it is likely that a chapter 7 trustee will retain counsel who would likely be required to spend a significant amount of time and expense becoming familiar with the case – time and expense that would not be required if the Plan is confirmed. Moreover, the value of any of sales of the Surplus Properties would likely be less in a chapter 7 proceeding because purchasers would be more inclined to request a discount.

After careful review of the estimated recoveries in a chapter 11 liquidation scenario and a chapter 7 liquidation scenario, the Debtors have concluded that recoveries to Creditors will be maximized by completing the liquidation of any remaining assets of the Debtors under chapter 11 of the Bankruptcy Code and making distributions pursuant to the Plan. A copy of an analysis of creditor recoveries in a chapter 7 proceeding is attached as Exhibit B. The Debtors believe that the Debtors' Estates have value that would not be fully realized by Creditors in a chapter 7 liquidation primarily because, among other things, (i) additional administrative expenses would

be incurred in a chapter 7 liquidation, specifically those of a chapter 7 trustee charging statutory fees of up to 3% of disbursements and any costs of counsel to the chapter 7 trustee to become familiar with the facts and circumstances of these cases, and (ii) the additional delay in distributions that would occur if the Debtors' chapter 11 cases were converted to a case under chapter 7.

**B.**      **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successors to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  The Plan provides for the distribution of all of the Debtors' assets to either the Collateral Agent or the Liquidating Trust, and for distributions of Cash from the Liquidating Trust to Creditors in accordance with the terms of the Liquidating Trust Agreement.  The Debtors will not be conducting any business operations after the Effective Date.

As such, provided that the Plan is confirmed and consummated, the Estates will no longer exist to be subject to future reorganization or liquidation.  Accordingly, the Debtors believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

## ARTICLE VII

## EFFECT OF CONFIRMATION

**A.**      **Binding Effect of Confirmation**

Confirmation will bind the Debtors and all Holders of Claims and Interests to the provisions of the Plan, whether or not the Claim or Interest of any such Holder is Impaired under the Plan and whether or not any such Holder of a Claim or Interest has accepted the Plan.

**B.**      **Good Faith**

Confirmation of the Plan will constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## ARTICLE VIII

## CERTAIN RISK FACTORS TO BE CONSIDERED

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.  No representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

A.    **Plan May Not Be Accepted**

There can be no assurance that the requisite acceptances to confirm the Plan will be obtained.  Thus, while the Debtors believe the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there is no guarantee that the Plan will be accepted by the requisite Classes entitled to vote on the Plan.

B.    **Certain Bankruptcy Law Considerations**

Even if the Holders of Claims who are entitled to vote accept the Plan, the Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, that the value of distributions to dissenting Holders of Claims or Interests may not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Although the Debtors believe the Plan meets such requirement, there can be no assurance the Court will reach the same conclusion.

C.    **Distributions to Holders of Allowed Claims Under The Plan**

Projected distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for distribution.  Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

Further, although the Avoidance Actions are being transferred to the Liquidating Trust, there is no guarantee that the Liquidating Trust will be able to obtain any recoveries on account of such actions.  Litigation is inherently speculative and uncertain in nature and no creditor should rely upon the potential for recovery by these actions as a basis for recovery on account of their Allowed General Unsecured Claim.

Moreover, a substantial amount of time may elapse between the Effective Date and the receipt of distributions because of the time required to achieve recovery of certain assets and final resolution of Disputed Claims.

**D.**     **Conditions Precedent to Consummation of the Plan**

The Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Court.  Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

**E.**     **Certain Tax Considerations**

There are a number of material income tax considerations, risks and uncertainties associated with consummation of the Plan.  Holders of Claims and other interested parties should read carefully the discussion of certain federal income tax consequences of the Plan set forth below.

## ARTICLE IX

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and to Holders of Claims and Interests.  This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, each Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain.  No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below.  Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims and Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the Holders of Claims or Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims or Interests as part of a "straddle," "hedge," "constructive sale" or "conversion transaction" with other investments).  This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue.  No aspect of foreign, state, local or estate and gift taxation is addressed.

EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH
SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL,
FOREIGN AND OTHER TAX CONSEQUENCES OF THE PLAN.

A.      **Tax Consequences to the Debtors**

        This Article will be supplemented prior to the Disclosure Statement Hearing.

        Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must
recognize income from the cancellation of indebtedness ("COD Income") to the extent that such
taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue
price determined in the manner described below.  Generally, the amount of COD Income, subject
to certain statutory and judicial exceptions, is the excess of (i) the adjusted issue price of the
discharged indebtedness less (ii) the sum of the fair market value (determined at the date of the
exchange) of the consideration, if any, given in exchange for such discharged indebtedness.

        Section 108(a)(l)(A) of the Tax Code provides an exception to the recognition of COD
Income where a taxpayer discharging indebtedness is under the jurisdiction of a court in a case
under title 11 of the Bankruptcy Code and where the discharge is granted, or is effected pursuant
to a plan approved, by a U.S. Bankruptcy Court (the "Bankruptcy Exception").  Under the
Bankruptcy Exception, instead of recognizing COD Income, the taxpayer is required, pursuant to
Section 108(b) to reduce certain of that taxpayer's tax attributes to the extent of the amount of
COD Income.  The attributes of the taxpayer generally are reduced in the following order: net
operating losses, general business and minimum tax credit carryforwards, capital loss
carryforwards, the basis of the taxpayer's assets and, finally, foreign tax credit carryforwards
(collectively, "Tax Attributes").  If the amount of COD Income exceeds the amount of Tax
Attributes available to be reduced, the excess still is excluded from income.  Pursuant to Section
108(b)(4)(A), the reduction of Tax Attributes does not occur until the end of the taxable year
after such Tax Attributes have been applied to determine the tax in the year of discharge or, in
the case of asset basis reduction, the first day of the taxable year following the taxable year in
which the COD Income is realized.  Section l08(e)(2) provides a further exception to the
recognition of COD Income upon the discharge of debt, providing that a taxpayer will not
recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have
given rise to a deduction for United States federal income tax purposes.

        Pursuant to Treas Regs section 1.1502-19(a)(2) and related authority for taxpayers who
file consolidated returns, it is possible that the deemed mergers described herein potentially
could trigger a recapture of any excess loss account held by a parent entity with respect to a
subsidiary entity.  The possibility exists given the substantial losses incurred by the Debtors.
There do not appear, however, to be excess loss accounts with respect to the Debtors after taking
into account amounts contributed to the various subsidiaries which for tax purposes appear to be
more appropriately classified as capital rather than debt.  Moreover, (1) the deemed merger steps
described herein may have the effect of eliminating excess loss accounts, if any, and (2) it
appears that the Debtors have sufficient net operating losses  for regular federal tax purposes to
absorb any gain recognition due to excess loss accounts, if any.

B.    **Tax Consequences to Creditors**

1.    **Holders of Claims**

Generally, a Holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim.  The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a Holder's Claim.  The tax basis of a Holder in a Claim will generally be equal to the Holder's cost.  To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim.  Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized generally will be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one year.

A Holder who received Cash (or potentially other consideration) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest.  A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim.  A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

2.    **Non-United States Persons**

A Holder of a Claim that is a non-United States Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

C.    **Tax Treatment of the Liquidating Trust**

Upon the Effective Date, the Liquidating Trust will be established for the benefit of Holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date.

52719/0001-11921553v11

1. **Classification of the Liquidating Trust**

The Liquidating Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Liquidating Trustee and the Holders of beneficial interests in the Liquidating Trust) are required to treat for federal income tax purposes the Liquidating Trust as a grantor trust of which the Holders of Allowed Claims are the owners and grantors. While the following discussion assumes that the Liquidating Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the Holders of Claims could vary from those discussed herein.

2. **General Tax Reporting by the Trust and Beneficiary**

For all federal income tax purposes, all parties (including the Liquidating Trustee and the Holders of beneficial interests in the Liquidating Trust) will be required to treat the transfer of assets to the Liquidating Trust, in accordance with the terms of the Plan, as a transfer of those assets directly to the Holders of Allowed General Unsecured Claims followed by the transfer of such assets by such Holders to the Liquidating Trust. Consistent therewith, all parties are required to treat the Liquidating Trust as a grantor trust of which such Holders are to be owners and grantors. Thus, such Holders (and any subsequent Holders of interests in the Liquidating Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Liquidating Trust for all federal income tax purposes. Accordingly, each Holder of a beneficial interest in the Liquidating Trust will be required to report on its federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust.

The federal income tax reporting obligation of a Holder of a beneficial interest in the Liquidating Trust is not dependent upon the Liquidating Trust distributing any cash or other proceeds. Therefore, a Holder of a beneficial interest in the Liquidating Trust may incur a federal income tax liability regardless of the fact that the Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the Holder. If a Holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Liquidating Trust it holds, the Holder may be allowed a subsequent or offsetting loss.

The Liquidating Trustee will file tax returns with the IRS for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Liquidating Trustee will also send to each Holder of a beneficial interest in the Liquidating Trust a separate statement

setting forth the Holder's share of items of income, gain, loss, deduction or credit and will instruct the Holder to report such items on its federal income tax return.

All payments to Creditors and Interest Holders are subject to any applicable withholding (including employment tax withholding). Under the Internal Revenue Code, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" then in effect. Backup withholding generally applies if the Holder (a) fails to furnish his or her social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax if an appropriate refund claim is filed with the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

3.    **Allocations of Taxable Income and Loss**

Allocations of taxable income of the Liquidating Trust among Holders of Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its respective assets to the Holders of the beneficial interests in the Liquidating Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust assets.

After the Effective Date, any amount a Holder receives as a distribution from the Liquidating Trust in respect of its beneficial interest in the Liquidating Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such Holder's beneficial interest in the Liquidating Trust.

In general, a Holder's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidating Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Holder's holding period in such assets will begin the day following the Effective Date. Distributions to any Holder of an Allowed Claim will be allocated first to the original principal portion of such Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

The tax book value of the Liquidating Trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties with regard to federal

income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

As soon as practicable after the Effective Date, the Liquidating Trustee (to the extent that it deems it necessary or appropriate in the reasonable exercise of its discretion) will, in good faith, value the Liquidating Trust Assets, and will apprise the Holders of beneficial interests in the Liquidating Trust of such valuation.  The valuation is required to be used consistently by all parties (including the Debtors, the Trustee and the Holders) for all federal income tax purposes. The Court will resolve any dispute regarding the valuation of the Assets.

The Liquidating Trust's taxable income will be allocated to the Holders of beneficial interests in the Liquidating Trust in accordance with each such Holder's Pro Rata share of the Liquidating Trust's interests.  The character of items of income, deduction and credit to any Holder and the ability of such Holder to benefit from any deductions or losses may depend on the particular situation of such Holder.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

## D.    **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE X

## RECOMMENDATION AND CONCLUSION

This Disclosure Statement was approved by the Court after notice and a hearing.  The Court has determined that this Disclosure Statement contains information adequate to permit holders of Claims to make an informed judgment about the Plan.  Such approval, however, does not mean that the Court recommends either acceptance or rejection of the Plan.

52719/0001-11921553v11

The Debtors believe that confirmation and consummation of the Plan is in the best interests of the Debtors, their estates and their creditors.  The Plan provides for an equitable distribution to creditors.  The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a reduction in the distributions to Holders of Claims in certain Classes.  Consequently, the Debtors urge all eligible Holders of Impaired Claims to vote to ACCEPT the Plan, and to complete and return their Ballots so that they will be RECEIVED by the Voting Agent on or before the Voting Deadline.

52719/0001-11921553v11

Dated: Wilmington, Delaware
November 19, 2015

REICHHOLD HOLDINGS US, INC., *et al.*,
Debtors and Debtors-in-Possession

By: *Roger L. Willis*
Name: Roger L. Willis
Title: Authorized Officer


COLE SCHOTZ P.C.

By: *Norman Quirk*
Norman L. Pernick (I.D. No. 2290)
Marion M. Quirk (I.D. No. 4136)
David W. Giattino (I.D. No. 5614)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

-and-

Gerald H. Gline
Felice R. Yudkin
25 Main Street
Hackensack, NJ 07602-0800
Telephone: (201) 489-3000
Facsimile: (201) 489-1536

*Counsel for Debtors and Debtors-in-Possession*